IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1278T
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**BRIEF FOR THE PLAINTIFF**

Bruce Graves
Brown, Winick, Graves, Gross,
Baskerville and Schoenebaum, P.L.C.
Suite 2000, Ruan Center
666 Grand Avenue
Des Moines, Iowa 50309
Telephone: 515/242-2400
Fax: 515/283-0231

ATTORNEY FOR PLAINTIFF

# TABLE OF CONTENTS

**Page**

**Table Of Authorities ........................................................................ iii**

**Issues Presented ...........................................................................................1**

**Statement Of The Case ...............................................................................1**

**Summary Of Argument ...............................................................................4**

**Argument: ....................................................................................................6**

**I. Section 453A Does Not Apply To The Deferred Installment Gain From Principal's 1991 Transaction With Prudential. ........................................................................6**

**A. In 1991, Section 453A Was Not Applicable To Principal's Deferred Installment Gain. ..................................6**

**B. Sale Of The Prudential Notes To Principal FC Cannot Be Disregarded Under The Step Transaction Doctrine. ..........................................................................17**

**(1) Economic Substance, Business Purpose, and Transactional Intent Preclude Application Of The Step Transaction Doctrine. ......................21**

**(2) The Step Transaction Doctrine Is Not Implicated Under the "End Result" Test. ...................26**

**(3) The Step Transaction Doctrine Is Not Implicated Under the "Interdependence" Test. .........................................................................28**

**II. State Guaranty Fund Assessments Are State Taxes Deductible In The Year Paid Under Section 164 ............................31**

**A. State Guaranty Fund Assessments Are A State Tax. ....31**

**B. Guaranty Fund Assessments Are Deductible As A State Tax In The Year Paid. ....34**

**(1) State Taxes Are To Be Deducted Currently Under Section 164 ....34**

**(2) Capitalization Of State Taxes Is Not Required ....34**

**(3) No Significant Future Benefit Requires Capitalization. ....37**

**(4) Capitalization Is Not Required By Section 811(a). ....38**

**C. IRS Permission To Deduct The Assessments As State Taxes Was Not Required. ....39**

**(1) Principal Has Always Treated The Assessments As A State Tax ....39**

**(2) Deducting All The Assessments In Full Was Not A Change Of Accounting Method. ....43**

**(3) Section 164 Overrides Section 446(e). ....48**

**Conclusion ....48**

**Appendix ....**

**IRC §453A**

**IRC §453B**

**IRC §164**

**IRC §811(a)**

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*American Express v. U.S.*, 262 F.3d 1376 (Fed. Cir. 2001) ........................ 12

*Associated Wholesale Grocers, Inc. v. U.S.*, 927 F.2d 1517 (10th Cir. 1991) ........................................................19, 20, 26, 28

*Benson v. American Ultrmar Ltd.*, 1996 WL 422262 (S.D. N.Y.) ................9

*Black & Decker Corp. v. U.S.*, 340 F.Supp.2d 621 (D. Md. 2004) ............. 20

*Blanco v. U.S.*, 602 F.2d 324 (Ct.Cl. 1979) .............................................. 25

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ......................................................

*Cal-Maine Foods, Inc. v. Comm.*, 93 T.C. 181 (1989)............................... 12

*Campbell v. Davenport*, 362 F.2d 624 (5th Cir. 1966) .......................... 13, 30

*Cargill, Inc. v. U.S.*, 91 F.Supp.2d 1293 (D. Minn. 2000) .......................... 47

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ....................................................................... 15

*Coltec Industries v. U.S.*, 62 Fed.Cl. 716 (Fed.Cl. 2004)........................... 20

*Comm. v. Brookshire Bros. Holding, Inc.*, 320 F.3d 507, (5th Cir. 2003)............................................................................... 47

*Comm. v. Clark*, 489 U.S. 726 (1989) ................................................. 23, 28

*Comm. v. Court Holding Co.*, 324 U.S. 331 (1945).................................. 26

*Comm. v. Laughton*, 113 F.2d 103 (9th Cir. 1940) .................................... 15

*Comm. v. Newman*, 159 F.2d 848 (2nd Cir. 1947)...................................... 14

*Comm. v. South Lake Farms, Inc.*, 324 F.2d 837 (9th Cir. 1963)................ 17

*Convergent Technologies, Inc. v. Comm.*, 70 T.C.M. (CCH) 87 (1995) ........................................................................ 47

*Cottage Savings Assoc. v. Comm.*, 409 U.S. 554 (1991).......................... 6, 9

*Coulter Electronics, Inc. v. Comm.*, 59 T.C.M. (CCH) 350 (1990) ............ 47

*Cox v. Comm*. 41 T.C. 161 (1963)........................................................... 33

*Emmons v. Comm.*, 31 T.C. 26, 31 (1958)................................................ 17

*Esmark, Inc. v. Comm.*, 90 T.C. 171 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989)............................ 22

*Estate of Gilmore*, 130 F.2d 791 (3rd Cir. 1942) .................................. 13, 30

*First National Bank in Albuquerque v. Comm.*, 56 T.C.M. (CCH) 575 (1988)......................................................................... 24

*Frank Lyon Co. v. U.S.*, 435 U.S. 561 (1977)...................................... 15, 20

*General Motors Corp. v. Comm.*, 112 T.C. 270 (1999) ............................. 16

*Gimbel Brothers, Inc. v. U.S.*, 535 F.2d 14 (Ct.Cl. 1976) .......................... 45

*Gitlitz v. Comm.*, 531 U.S. 206 (2001) ..................................................... 16

*Glacier State Electrical Supply v. Comm.*, 80 T.C. 1047 (1983) .......... 13, 30

*Granite Trust Co. v. U.S.*, 238 F.2d 670 (1st Cir. 1956) ............................. 26

*Gregory v. Helvering*, 293 U.S. 465 (1935) ........................14, 17, 19, 26, 28

*Hanover Bank v. Comm.*, 369 U.S. 672 (1962) .................................... 12, 16

*Haman v. Comm.* 31 T.C.M. 446(1972), *aff'd*. 500 F.2d 401 (9th Cir. 1974)................................................................................. 33

*INDOPCO, Inc. v. Comm.*, 503 U.S. 79 (1992)................................... 35, 36

*Jade Trading, LLC v. U.S.*, 60 Fed. Cl. 558 (2004) ................................... 18

*King Enterprises, Inc. v. U.S.*, 418 F.2d 511 (Ct.Cl. 1969)..........9, 18, 26, 27

*Long Term Capital Holdings v. U.S.*, 330 F.Supp.2d 122 (D. Conn. 2004)........................................................................... 21

*McGowan v. Comm.*, 67 T.C. 599 (1976).................................................. 32

*Moline Properties, Inc. v. Comm.*, 319 U.S. 436 (1943)............................... 8

*National Muffler Dealers Ass'n v. U.S.*, 440 U.S. 472 (1979) .................... 15

*Nichols v. U.S.*, 223 F.Supp. 709 (D. Ga. 1963) ........................................ 32

*Northern States Power Company v. United States*, 151 F.3d 876 (8th Cir. 1998) ........................................................................ 45

*O'Shaughnessy v. Comm.*, 323 F.3d 1125 (8th Cir. 2003) .......................... 47

*Samson Tire & Rubber Corp. v. Rogan*, 136 F.2d 345 (9th Cir. 1943) ........ 15

*Santa Monica Pictures, LLC v. Comm.*, T.C. Memo 2005-104, 154 (May 11, 2005) ........................................................................ 21

*Security Industrial Insurance Co. v. U.S.*, 702 F.2d 1234 (5th Cir. 1983) ........................................................................ 19, 26

*Skidmore v. Swift & Co.*, 323 U.S. 134, (1944) ........................................ 12

*Snyder v. Comm.*, 894 F.2d 1337 (6th Cir. 1990) ................................. 37, 38

*South Bay Corp. v. Comm.*, 345 F.2d 698 (10th Cir. 1965) .................. 24, 28

*Standard Oil Company (Indiana) v. Comm.*, 77 T.C. 349 (1981), *acq*., 1989-2 C.B. 1 (1989) ..........................................43, 45, 48, 49

*TIFD II-E Inc. v. U.S.*, 342 F.Supp.2d 94 (D. Conn. 2004) ................. 20, 21

*Thompson-King-Tate v. U.S.*, 296 F.2d 290 (6th Cir. 1961) ....................... 46

*True v. U.S.*, 190 F.3d 1165 (10th Cir. 1999) ............................18, 26, 27, 28

*Trujillo v. Comm.*, 68 T.C. 670 (1977) ..................................................... 32

*Underhill v. Comm.*, 45 T.C. 489 (1966) ................................................... 46

*Uniroyal, Inc. v. Comm.*, TC Memo 1993-214 .................................... 13, 30

*U.S. Freightways Corp. v. Comm.*, 270 F.3d 1137 (7th Cir. 2001) ............. 35

*U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950) .......................... 14

*U.S. v. Hughes Properties, Inc.*, 476 U.S. 593 (1986) ............................... 34

*U.S. v. Isham*, 84 U.S. 496 (1873) ............................................................ 14

*U.S. v. Mead Corp.*, 533 U.S. 218 (2001) ........................................... 12, 15

*U.S. v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982) ....................................... 15

*Weller v. Comm.*, 270 F.2d 294 (3rd Cir. 1959) ......................................... 17

*Woods Investment Co. v. Comm.*, 85 T.C. 274 (1985) ................................ 15

*Yosha v. Comm.*, 861 F.2d 494 (7th Cir. 1988).......................................... 17

**Statutes**:

Internal Revenue Code of 1986, 26 U.S.C., *et. seq*...................................... 6

§164.......................................................... 1, 3, 5, 31, 34, 38, 39, 43, 48, 49

§164(a) .........................................................................31, 32, 34, 35

§164(a)(3)........................................................................................ 32

§263.............................................................................................. 35

§263(a) .......................................................................................... 36

§263(a)(1)........................................................................................ 35

§263(c) ..................................................................................... 43, 48

§269................................................................................................9

§337(a) .......................................................................................... 18

§356(a)(2)........................................................................................ 23

§361(c)(2)........................................................................................ 11

§446(e) ............................................................................... 43, 48, 49

§453.............................................................................................. 25

§453(d) ..................................................................................... 11, 25

§453A..............................................................................1, 2, 4, 13, 17, 49

§453A(a)..................................................................................... 4, 6, 8

§453A(c)..................................................................................... 13, 15

§453A(c)(3)(A)................................................................................. 4, 9

§453B ..............................................................1, 10, 12, 13, 18, 25

§453B(a)................................................................................... 4, 9, 11

§453B(d).......................................................................................... 18

§461 .......... 34
§805 .......... 38
§805(a)(8) .......... 38, 39
§811(a) .......... 38, 39, 48
§1001(a) .......... 9
§1001(c) .......... 4, 9
§1502 .......... 13, 15, 16
§6110(k)(3) .......... 12

**<u>Treasury Regulations:</u>**

§1.164-1(a) .......... 34
§1.446-1(e)(2)(ii)(a) .......... 43
§1.453-9(c)(2) .......... 9
§1.461-1(a)(2) .......... 34. 35
§1.461-4(g)(6)(i) .......... 34
§1.1502 .......... 17
§1.1502-13 .......... 13
§1.1502-13(c) .......... 1, 4, 11, 12
§1.1502-13(c)(1) .......... 17
§1.1502-13(c)(1)(i) .......... 9
§1.1502-13(c)(1)(ii)(b) .......... 10
§1.1502-13(c)(7)(ii) .......... 15, 18
§1.1502-13(d) .......... 11
§1.1502-13(e) .......... 11, 12
§1.1502-13(f) .......... 11
§1.1502-13(h) .......... 10, 11

§1.1502-14T ........................................................................ 10, 13

§1.1502-14T(a) ........................................................................ 13

§1.1502-80(1)(1) ........................................................................ 16

T.D. 8597, Preamble ¶D, 60 FR 36671; TD 8597
(Correction), ¶4, 62 FR 12096 ........................................ 15, 16, 17

T.D. 9107, 68 FR 436-01 ........................................................ 36

**<u>Other</u>:**

*Advance Notice of Proposed Rulemaking*, January 24, 2002,
67 FR 3461 ........................................................................ 36

Antognini, *New Regs Affect Installment Accounting for Corporations Filing Consolidated Returns*, 72 J. Tax'n 356 (1990) ...................... 13

Axelrod, *Final Intercompany Transaction Regulations*, Tax Strategies for Corporate Acquisitions, Dispositions, Spin-Offs, Joint Ventures, Financings, Reorganization, and Restructurings, 10 Tax Law And Estate Planning Series, Practising Law Institute 1281 (1996) ............................ 13, 15

Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders*, 4th Ed. §12.61(3) .................................................... 13

Kwall and Maynard, *Dethroning King Enterprises*, 58 Tax Lawyer 1 (Fall, 2004), p. 11 ........................................................... 19

Mertens, *Law Of Federal Income Taxation,* §43:226 .... 13, 19, 26, 27, 28, 29

*Notice of Proposed Rulemaking and Notice of Public Hearing*, December 19, 2002, 67 FR 77701 ................................................ 36

Korb, "The Economic Substance Doctrine In The Current Tax Shelter Environment," speech delivered January 25, 2005, published at 2005 TNT 16-22 ................................................ 17, 19

P.L. 100-203, §10202 .......... 17
PLR 7106151470A .......... 11
PLR 7951011 .......... 11
PLR 8020097 .......... 33
PLR 8126040 .......... 12
PLR 8545015 .......... 11
PLR 9101004 .......... 11
PLR 9253007 .......... 11
PLR 9841037 .......... 38
Rev. Rul. 57-345, 1957-2 C.B. 132 .......... 31
Rev. Rul. 70-622, 1970-2 C.B. 41 .......... 31
Rev. Rul. 71-49, 1971-1 C.B. 103 .......... 31
Rev. Rul. 79-250, 1979-2 C.B. 156 .......... 28
Rev. Rul. 81-19, 1981-2 C.B. 49 .......... 31
Rev. Rul. 81-191, 1981-2 C.B. 49 .......... 31
Rev. Rul. 81-192, 1981-2 C.B. 50 .......... 31
Rev. Rul. 81-193, 1981-2 C.B. 52 .......... 31
Rev. Rul. 81-194, 1981-2 C.B. 54 .......... 31, 32
Rev. Rul. 89-16, 1989-1 C.B. 76 .......... 32
Rev. Rul. 96-29, 1996-1 C.B. 50 .......... 29

## ISSUES PRESENTED

**I.** Whether interest on deferred tax under Section 453A applies to Principal's installment gain the reporting of which has been deferred under the consolidated return regulations (§1.1502-13(c)), when such gain is recognized gain under Section 453B by virtue of the sale and assignment of the installment promissory notes by Principal to its subsidiary.

**II.** Whether state guaranty fund assessments paid by Principal during the taxable years 1991-1994 in the 50 states in which it does business constitute state taxes deductible in full for such taxable years under Section 164, notwithstanding that the portion of such assessments paid to states that allowed future offsets against state premium taxes had been capitalized and amortized in prior taxable years.

## STATEMENT OF THE CASE

### I. The Principal/Prudential/ Principal FC Transactions.

In order to shore up its surplus by $75 million following a decline in its financial ratings, and to "unwind" a 1985 mortgage swap that had resulted in numerous problems, Principal in 1991 sold approximately $475 million in commercial mortgage loans to Prudential and, at the same time, purchased from Prudential approximately the same amount of similar mortgage loans. (Stip. ¶¶1-10; Joint Exhibits (hereafter "JE") 30,31) The sale and purchase involved the receipt and issuance of reciprocal promissory notes. (Stip. ¶10) For the loans it sold to Prudential, Principal received two notes issued by Prudential, each in the amount of $239 million, one payable in 1999 and the other in 2002. (Stip. ¶¶23,26; JE 39,40) For the loans it purchased from Prudential, Principal issued to

Prudential three promissory notes, two of which were in the amount of $239 million, one payable in 1999 and the other in 2002. (Stip. ¶¶22,25; JE 32-34) Immediately upon its receipt of the two Principal notes, Prudential assigned them to certain of its subsidiaries. (Stip. ¶¶22,25; JE 35-38) In a document entitled "Sale, Assignment, Assumption, and Release Agreement," Principal likewise sold the two Prudential notes held by it to its newly-created subsidiary, Principal FC, in exchange for the subsidiary's assumption of Principal's indebtedness to Prudential. (Stip. ¶24; JE 53,54,55,56,59,80) The agreement was also signed by the Prudential subsidiaries that held the Principal notes, and they thereby released Principal from all liability on such notes. (JE 43,44,53) Creation of the new subsidiary and consummation of the transaction with it were accomplished by Principal primarily for the purpose of removing the liability to Prudential from Principal's financial statements and to satisfy Prudential's quest to make the claims held by its subsidiaries under the Principal notes "bankruptcy proof." (Stip. ¶¶12-14,16,17) In its 1991 consolidated federal income tax return, Principal elected to report the gain on the sale of the mortgage loans to Prudential on the installment basis. (Stip. ¶29) None of its returns for the years involved in this suit, 1991-1994, showed any interest on deferred tax calculated pursuant to Section 453A. (Stip. ¶29) The Internal Revenue Service assessed such interest on deferred tax and Principal claims refund of such amount in this action. (Stip. ¶30)

## II. Assessments Paid To State Guaranty Fund Associations.

As a result of concerns about the financial stability of insurance companies in the 1980's, each of the 50 states created, through legislation, state guaranty fund associations. The associations were given authority to levy assessments against insurance companies licensed to do business in their states in order to provide a

fund for the protection of policyholders of companies that became insolvent. Failure to pay an assessment could result in revocation of an insurance company's license to do business in that state. (Stip. ¶¶34-37; Tr. 41-47; JE 198, 199)

In order to avoid a penalty on savings through life insurance and to cause any losses to be shared by the general public, 43 of the states allowed an insurance company to offset a portion of its assessment against its state premium tax liabilities in future years. Most of the offsets allowed were at the rate of 20% per year. (Stip. ¶38) If the offsets were not used during the period allowed, they were lost, and one of Principal's subsidiaries that was sold lost certain offsets to which it would have been entitled. (Tr. 65-66,73) Seven states and Puerto Rico allowed no offsets. (Stip. ¶38)

The guaranty fund assessments paid to states that allowed no offsets were deducted in full by Principal in the year paid in a category called "Insurance Taxes." (Stip. ¶41; Tr.66-69) In years prior to 1991, the assessments paid to states that allowed offsets were capitalized by Principal and amortized over the allowable offset period, both in Principal's NAIC Annual Statements and in its tax returns. (Stip. ¶42) The amortized portion appeared as a deduction in Principal's tax returns in the category called "Insurance Taxes." (Stip. ¶42; Tr. 63-64,66-69) In 1991, Principal realized that its capitalization and amortization of such assessments for federal income tax purposes had been erroneous, and that such assessments were deductible in full in the year paid as state taxes under Section 164. (Stip. ¶42 (sic)) Accordingly, for the years 1991-1994, Principal deducted such assessments in full in the year paid. (Stip. ¶43; Tr. 70) The Internal Revenue Service disallowed such deduction on the ground that Principal was required to continue its

prior practice of capitalizing and amortizing the portion of such assessments paid to states that allowed future offsets against premium taxes.

## SUMMARY OF ARGUMENT

**I. Section 453A Does Not Apply To The Deferred Installment Gain From Principal's 1991 Transaction With Prudential,**

The Prudential promissory notes representing the installment sale proceeds from the sale of commercial mortgage loans by Principal to Prudential in 1991 were sold and assigned by Principal, under an agreement entitled "Sale, Assignment, Assumption, and Release Agreement," to a subsidiary created by Principal primarily for valid non-tax business reasons. Both the subsidiary, Principal FC, and the transaction between it, Principal, and Prudential's subsidiaries had sound economic substance. As a result of such sale and assignment, the installment sale gain inherent in the Prudential notes became recognized gain by virtue of Sections 453B(a) and 1001(c), and, accordingly, even though reporting of such gain was deferred under the consolidated return regulations, §§1.1502-13(c), there remained no unrecognized gain within the meaning of Section 453A(c)(3)(A) to which the interest charge imposed by §453A(a) could apply. Because Principal FC and the transaction between it, Principal, and Prudential's subsidiaries had both business purpose and economic substance, and because tax reasons were not the main reasons for either creation of the subsidiary or the transaction with it, the "substance-over-form" and "step transaction" doctrines are not applicable.

**<u>II. State Guaranty Fund Assessments Are State Taxes Deductible In The Year Paid Under Section 164.</u>**

State guaranty fund assessments are enforced contributions imposed by quasi-public state entities pursuant to legislative authority for the public purpose of protecting policyholders of insurance companies that become insolvent. Such assessments therefore constitute a state tax within the meaning of Section 164. Principal has always deducted such assessments as a state tax in both its NAIC Annual Statements and federal income tax returns, although with respect to states that allowed offsets of such assessments against future premium taxes, in years prior to 1991 it capitalized those assessments and amortized them over the number of years that offsets were allowed. Under Section 164, for tax return purposes such assessments are allowable as a deduction to the full extent of the amount paid or accrued within the taxable year. Principal is therefore entitled to correct its prior error involving capitalization and amortization in order to deduct in full in the year paid the assessments for which future offsets were allowable, in the same manner that it deducted in full in the year paid or accrued the assessments for which no future offsets were allowed. Deducting such assessments as state taxes in the manner prescribed by Section 164 does not constitute a prohibited change of accounting method or a prohibited inconsistency with Principal's NAIC Annual Statement.

## ARGUMENT

### I. Section 453A[1] Does Not Apply To The Deferred Installment Gain From Principal's 1991 Transaction With Prudential.

#### A. In 1991, Section 453A Was Not Applicable To Principal's Transaction.

As a large insurance company with over $31 billion in assets in 1991 (JE 188, p. 1257; Pltf's Ex 1, p.3), Principal each year engages in a number of sophisticated and complex business transactions. Each of these requires thorough investigation and careful planning. The 1991 transaction with Prudential was no exception.

When Prudential first proposed the transaction (JE 17), Principal was attracted to it for numerous non-tax business reasons, including "unwinding" a similar 1985 deal with Prudential (Pltf's Ex. 5,6; JE 157,158) and augmenting the surplus shown on its NAIC Annual Statements by $75 million. (Stip. ¶¶7,8,9; Halter Aff. ¶5; JE 20; Drury Aff. ¶¶2-4[2]) Accordingly, in December 1991, Principal and Prudential exchanged approximately $475 million in commercial mortgage loans in a transaction similar to the one reviewed by the Supreme Court in *Cottage Savings Assoc. v. Comm.*, 409 U.S. 554 (1991). (Stip. ¶22; JE 30,31,49,50,51) For the mortgage loans purchased by it from Prudential, Principal issued to Prudential three promissory notes, two in the amount of $239,238,347

---

[1] Unless otherwise indicated, all references herein to the Internal Revenue Code or provisions thereof refer to the Internal Revenue Code of 1986, 26 U.S.C. §1 *et. seq.*, as in effect during the taxable years here in suit.

[2] The uncontroverted affidavits of Messrs. Halter, Drury, and Lettow, and of Ms. Custis are part of the record as Joint Exhibits 10, 12, 13, and 11, respectively. At the pretrial conference held February 18, 2005 (Transcript of Pretrial Conference Proceedings, pp. 17-21), in its Order filed March 4, 2005, ¶¶6,7, and at the trial (Tr. 23-24), the Court admitted such affidavits into evidence.

and one in the amount of $26,160,945. (Stip. ¶¶22,25; JE 32,33,34) For the mortgage loans sold by Principal to Prudential, Prudential issued to Principal two promissory notes, each in the amount of $239,238,347, one payable in 1999 and the other payable in 2002. (Stip.¶¶23,26; JE 39,40)

As Principal investigated and planned for the transaction, there were a number of important issues to be resolved, both within Principal and between Principal and Prudential. (JE 64) For example, the mortgages to be sold and purchased needed to be identified, tabulated, and valued using continuously updated bond-equivalent yields (JE 68,69), and approval needed to be sought and received from the state insurance regulatory authorities (Stip. ¶¶12,21; JE 80,98,119; Tr. 40-41,49) and from Principal's own Investment Committee, which was charged with responsibility for approving such transactions. (Stip. ¶18; JE 201,202; Halter Aff. ¶6; Custis Aff. ¶6) In addition, because it would have resulted in a 56 basis point decline in the company's capital adequacy ratio, Principal sought to keep the new liability to Prudential off its books for NAIC Annual Statement purposes. (Lettow Aff. ¶¶4,5; Halter Aff. ¶3; JE 18,19) The company had recently suffered downgrades in its financial ratings by both Moody's and Standard and Poor's (JE 60), and, as a seller of financial products, Principal was concerned that an additional $500 million of liability on its financial statements would be seen as a sign of weakness in troubled times. (Stip. ¶¶9,12; Drury Aff. ¶2; JE 16) To address this problem, the idea of "defeasance" was explored; that is, "defeasing" the liability, or causing it to be nonreportable, by the assignment of high-quality assets to it in accordance with FASB 76. (Lettow Aff. ¶6) At the same time, Prudential wanted Principal's liability to it to be made "bankruptcy remote," that is, that Prudential be insulated against any possibility of Principal's insolvency through preservation of a

right of offset against any unpaid balance of the purchase price owing on Principal's promissory notes. (Stip. ¶14) Finally, Principal's legal and tax department personnel sought to insure that the transaction would be "tax-neutral," that is, that through proper structuring the prospect of additional and unnecessary taxes would be minimized. (Stip. ¶15; JE 64, p. 518)

The idea of creating a subsidiary and assigning Prudential's promissory note to it in exchange for the subsidiary's assumption of Principal's indebtedness to Prudential was first conceived and proposed as an alternative means of "defeasance" to meet the objective of keeping the liability to Prudential off Principal's books for NAIC Annual Statement purposes. (Stip. ¶¶13,16; Lettow Aff. ¶¶6,7) Soon after it was conceived, the idea of using a subsidiary became an important means of facilitating the transaction for both Principal and Prudential, since for Prudential the new subsidiary accomplished its objective (Stip. ¶14) of assuring that Principal's liability to it would be "bankruptcy-proof." The subsidiary's charter prevented it from incurring any other liabilities or conducting any other business. (Stip. ¶17; Lettow Aff. ¶8; JE 25,143)

Principal's legal and tax departments also took the subsidiary into account in their efforts to try to keep the transaction "tax neutral," consistent with the Investment Committee's review and approval of it. (Stip. ¶17; Lettow Aff. ¶8; JE 22,23,24) In considering whether Section 453A would be applicable, *Moline Properties, Inc. v. Comm.*, 319 U.S. 436 (1943) told them that, in the first instance, a subsidiary possessing substance and created for valid business purposes deserved to have its separate corporate identity respected, and *Comm. v. Brown,* 380 U.S. 563 (1965), told them that any sale by Principal to its newly-created subsidiary deserved to be recognized as just that, a sale. But Regulation §1.453-9(c)(2)

decreed that transfer of an installment obligation to a controlled corporation in exchange for stock in a Section 351 transaction was not regarded as a taxable disposition of the obligation and did not result in recognition of gain or loss. Under Section 453B(a), however, gain would result if the Prudential notes were "distributed, transmitted, sold, or otherwise disposed of," and under Section 1001(c) such gain would be recognized gain. *Cottage Savings, supra,* confirmed this, stating, "Section 1001(c) of Title 26 provides that a gain or loss realized under §1001(a) 'shall be recognized' unless one of the Code's nonrecognition provisions applies." *Id.* at 566. *See also, King Enterprises, Inc. v. U.S.*, 418 F.2d 511, 514 (Ct.Cl. 1969). And, under Section 453A(c)(3)(A), the Code's provision imposing interest on deferred tax liability only applied to gain which has **not** been recognized.[3]

The Treasury Department's consolidated return regulations were also a critical part of this analysis. Treasury Regulation §1.1502-13(c)(1)(i) told Principal that "to the extent gain or loss on a deferred intercompany transaction is

[3] What these various authorities "told" Principal's tax department lawyers and legal assistants who were analyzing the transaction from a tax standpoint is presented here, not in an evidentiary sense, but as a part of Plaintiff's legal argument here on brief as to the law applicable to the transaction in 1991. At trial (Tr. 13-15), Plaintiff objected to the admission into evidence of the notes, memoranda, and communications reflecting the actual legal analysis of Principal's lawyers in 1991 on the grounds that such materials invade the province of the Court, are not probative on any issue in the case, and the Defendant's contentions concerning such materials represent a prohibited inconsistency with the Stipulation (Tr. 20). It is the exclusive province of this Court to determine the law applicable to the transaction in 1991, without regard to materials (other than the parties' briefs) showing someone else's analysis of that law. *Benson v. American Ultrmar Ltd.*, 1996 WL 422262 (S.D. N.Y.) And Plaintiff has acknowledged that Principal engaged in tax planning in connection with the transactions at issue (Stip. ¶15; Tr. 14), but the Defendant makes no argument concerning improper tax avoidance under Section 269 (Stip. ¶31) or even that tax reasons were the main reasons for entering into any of the transactions (Stip. ¶17). Accordingly, Plaintiff renews and preserves its objection to the admission of such materials as evidence but reserves further argument in support of its objection for its reply brief after it ascertains more particularly the exact use the Defendant seeks to make of such evidence.

**recognized** under the Code for a consolidated return year, such gain or loss shall be deferred by the selling member . . . ." (Emphasis supplied.) Section 1.1502-13(c)(1)(ii)(b) provided that "a selling member shall take into account the gain or loss on a deferred intercompany transaction in accordance with the provisions of paragraph (d), (e), or (f) of this section . . . ." Subparagraph (e) is the provision that dealt with installment obligations, and it provided in relevant part as follows:

> If an installment obligation . . . is transferred in a deferred intercompany transaction, then on each date on which the obligation is satisfied the selling member shall take into account an amount equal to the deferred gain or loss on such transfer, multiplied by a fraction, the numerator of which is the portion of such obligation satisfied on such date, and the denominator of which is the aggregate unpaid installments immediately after the deferred intercompany transaction.

Example 11 of Regulation §1.1502-13(h), illustrated the rule:

> (i) Corporations P and S file consolidated returns on a calendar year basis. On January 15, 1966, P sells an obligation payable in installments, with a basis of $48 in its hands, to S for $60. At the time of the sale the debtor owes 3 annual installments of $20 payable each year on July 1. Such installments are paid timely.
>
> (ii) The sale by P to S is a deferred intercompany transaction; P defers its $12 gain on the obligation ($60 less $48).
>
> (iii) For each of the years 1966, 1967, and 1968 P takes into account $4 of its deferred gain . . . .

In addition, Temporary Regulation §1.1502-14T, promulgated on April 18, 1988 by T.D. 8196, acknowledged that deferred gain under the consolidated return regulations could still be recognized gain under Section 453B. The Temporary

Regulation, in referring to distributions with respect to the distributing corporation's stock, provided as follows:

> (a) Deferral of gain or loss. To the extent gain or loss is recognized to the distributing corporation on a distribution described in §1.1502-14(a) or (b) (including any amount which is treated as gain under sections . . . **453B** . . .). . ., such gain or loss shall be taken into account by the distributing corporation at the time and in the manner specified in §1.1502-13(d), (e), and (f), as if such distributing corporation were a "selling member" and the distributee were a "purchasing member." (Emphasis supplied.)

Numerous Internal Revenue Service private rulings at the time also helped guide Principal's planners through their analyses. PLR 7951011 reassured them that the consolidated return regulations "do not mandate that the separate corporate integrity of group members be disregarded." More specifically, PLR 7106151470A stated, "The transfer of installment obligations arising from sales under a revolving credit plan to [a wholly-owned subsidiary] immediately at the date of sale constitutes a 'disposition' within the meaning of section 453(d) of the Internal Revenue Code." PLR 9101004 issued on July 31,1990 (modified and superseded by PLR 9253007 issued on September 28, 1992) stated that "gain will be **recognized** to [the subsidiary] on the distribution of [its] Installment Note as if it were sold to [the parent] at its fair market value. Section 361(c)(2). This gain is subject to the deferred intercompany transaction rules of section 1.1502-13(c) and to the restoration provisions of section 1.1502-13(d), (e), and (f)." (Emphasis supplied.) PLR 8545015 held that, based on Example 11 of Regulation §1.1502-13(h), "the **recognition** of income or loss on the sale by Corp P of its wholesale installment obligations to Corp S is governed by the provisions of section 453B(a) of the Code [and] the treatment of gain or loss on such sales of installment

obligations by Corp P to Corp S is governed by section 1.1502-13(c) and (e) of the regulations, for which an appropriate example of proper treatment is set forth in section 1.1503[sic]-13(h) Example 11." (Emphasis supplied.) PLR 8126040 provided that "although the sale of future accounts receivable [by a parent to its subsidiary] will be considered a disposition under section 453(B) of the Code, [the parent] will take into account its deferred gain on the sale of the accounts receivable under section 1.1502-13(e) of the regulations."

Although such private rulings could not be considered as precedent by virtue of Section 6110(k)(3), they did provide Principal with justified comfort because they "reveal[ed] the interpretation put upon the [taxing] statute by the agency charged with the responsibility of administering the revenue laws." *Hanover Bank v. Comm.*, 369 U.S. 672, 686 (1962). Accordingly, they were entitled to be considered by Principal as authoritative. *U.S. v. Mead Corp.* 533 U.S. 218, 227 (2001) ("the well-reasoned views of the agencies implementing a federal statute constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance" quoting *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944)); *American Express v. U.S.*, 262 F.3d 1376, 1383 (Fed. Cir. 2001) ("substantial deference is paid to an agency's interpretation reflected in informal rulings").

Valuable guidance was also found in the esteemed *Journal of Taxation.* In a June, 1990 article, the author, Professor Walter G. Antognini, addressed the then-new final and temporary regulations issued by the Treasury Department on March 9, 1990, through T.D. 8295. Professor Antognini referred to the situation "where one member sells property outside the group on the installment method and then sells the third-party installment obligation to another member." In such situation,

he stated, "The intragroup sale of the installment obligation causes a recognition of gain pursuant to Section 453B. This recognized gain is then deferred." In his footnote, Professor Antognini stated, "Section 453B(a) requires recognition of gain . . . . The gain from the distribution is deferred pursuant to Temp. Reg. 1.1502-14T, and this deferred gain will be restored pursuant to Reg. 1.1502-13. See Temp. Reg. 1.1502-14T(a)." Antognini, *New Regs Affect Installment Accounting for Corporations Filing Consolidated Returns*, 72 J. Tax'n 356.[4]

In planning for the transaction, therefore, Principal's legal and tax departments carefully studied Sections 453A and 453B, as well as the consolidated return regulations under Section 1502. Other authorities indicated that, having two alternative forms available to it for placing the desired assets in the subsidiary, a contribution to capital or a sale, Principal was not bound to choose the most expensive method tax-wise. Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders*, 4th Ed. §12.61(3), citing *Glacier State Elec. Supply Co. v. Comm.*, 80 T.C. 1047 (1983); *See also*, Mertens, *supra*, §43.234; *Uniroyal, Inc. v. Comm.*, T.C. Memo 1993-214; *Cal-Maine Foods, Inc. v. Comm.*, 93 T.C. 181 (1989); *Estate of Gilmore*, 130 F.2d 791 (3d Cir. 1942). Accordingly, based on this analysis, Principal's legal and tax department personnel recommended that the company capitalize its new subsidiary with $1 million in cash prior to the transaction with Prudential (Stip. 20, JE 83), and then, after that transaction, that it sell the Prudential notes to the subsidiary in exchange for the

---

[4] Another commentator acknowledged, "it had been an open secret that consolidated groups could avoid a technical application of the interest charge rule of section 453A(c) by selling a third party note to another member." Axelrod, *Final Intercompany Transaction Regulations*, Tax Strategies for Corporate Acquisitions, Dispositions, Spin-Offs, Joint Ventures, Financings, Reorganization, and Restructurings, 10 Tax Law And Estate Planning Series, Practising Law Institute 1281 (1996).

subsidiary's assumption of Principal's indebtedness to Prudential. (JE 78,84,86) The plan was accomplished under an agreement entitled "Sale, Assignment, Assumption, and Release Agreement" that was executed by Principal, its subsidiary, and three Prudential subsidiaries to which Prudential had assigned the Principal notes. (Stip. ¶24; JE 53,142) Under the agreement, Principal was released from all indebtedness to Prudential arising out of the transaction. (Stip. ¶24; JE 43,44,53) Thus, although tax reasons were not the main reason for creating the subsidiary or using it in this manner (Stip. ¶17), Principal's legal and tax departments came to realize that it could constitute a valuable instrument in accomplishing the secondary objective of keeping the transaction with Prudential "tax neutral." (Lettow Aff. ¶8)

Principal was certainly entitled to carefully navigate the Code's provisions as it proceeded with its tax planning in connection with the Prudential transaction. For over 130 years, even before enactment of the income tax, it has been recognized that one who employs legal means to avoid taxes is subject to no legal censure. *U.S. v. Isham,* 84 U.S. 496, 506 (1873). After enactment of the income tax, this fundamental principle was reaffirmed in *Gregory v. Helvering*, 293 U.S. 465, 469 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted."). *See also, U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950). Judge Learned Hand's frequently-quoted dissent in *Comm. v. Newman,* 159 F.2d 848, 850-851 (2nd Cir. 1947) is among the most well-known articulations of this principle: "[T]here is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. . . . [N]obody owes any public duty to pay more than the law demands. . . ." In 1977, the Supreme Court acknowledged

that "[w]e cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 580 (1977). As long as the transaction is real and has an independent business purpose, it may not be disregarded "though designed to procure an advantageous tax consequence." *Samson Tire & Rubber Corp. v. Rogan,* 136 F.2d 345 (9th Cir. 1943), quoting *Comm. v. Laughton,* 113 F.2d 103 (9th Cir. 1940).

Then, four years after Principal consummated its transaction with Prudential and its subsidiary in 1991, the Treasury Department changed the rules for future transactions of a similar nature. T.D. 8597, which became effective on July 18, 1995, brought about numerous changes in the consolidated return regulations and, in "extraordinary reliance upon examples" considered by one commentator as "conclusory,"[5] added an Example 6 to Regulation §1.1502-13(c)(7)(ii). The new Example 6, after describing a transaction similar to that involved in this case, declared (without any supporting authority whatsoever) that "the deferred tax liability remains subject to the interest charge under section 453A(c)."

The new Example 6 and the new regulations of which it was a part were promulgated under Section 1502 of the Code, through which Congress had delegated to the Treasury Department rule-making authority in the complex area of consolidated corporate returns. The new regulations were therefore legislative in character, not merely interpretive, and as with most legislative enactments, were entitled only to prospective, not retroactive, effect. *Woods Investment Co. v. Comm.,* 85 T.C. 274 (1985). *See also, U.S. v. Mead Corp., supra,*; *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-843 (1984); *U.S. v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982); *National Muffler*

---

[5] Axelrod, *supra* at 1259.

*Dealers Ass'n v. U.S.*, 440 U.S. 472 (1979). This was expressly confirmed by T.D. 8597 itself, which provided that the new regulation "applies with respect to transactions occurring in years beginning on or after July 12, 1995," and that transactions such as the one involved in this case occurring "in a consolidated return year beginning before July 12, 1995, are taken into account under prior law." T.D. 8597, Preamble ¶D, 60 FR 36671; T.D. 8597 (Correction), ¶4, 62 FR 12096. *See also*, Regulation §1.1502-80(1)(1); *General Motors Corp. v. Comm.*, 112 T.C. 270, 301 n.29 (1999).

Therefore, Principal's transaction with its subsidiary, Principal FC, must be judged under the law as it existed in 1991, consisting of the legal authorities that Principal's tax lawyers examined and analyzed in their efforts to keep the transaction "tax neutral." If transactions such as the one involved here and those referred to in the private rulings and by the commentators are considered to have constituted a "loophole," that loophole was up to the Treasury Department to close by regulation pursuant to its rule-making authority under Section 1502, and the Treasury Department did just that four years later in 1995. Existence of a loophole does not justify a strained or unwarranted construction of a statute or regulation, or unwarranted expansion of judicial doctrines such as the step transaction doctrine, even in cases where the result enables taxpayers to escape tax. *Hanover Bank v. Comm., supra*. *See also, Gitlitz v. Comm.*, 531 U.S. 206, 220 (2001) (where the Internal Revenue Service argued that the court should not construe the statute to open a "loophole," the Supreme Court held that "the Code's plain text permits the taxpayers here to receive these benefits, [and therefore] we need not address this policy concern.") Nor should the Defendant be permitted to come in through the back door with an effort, contrary to the Treasury Department's directive in T.D.

8597, to make Example 6 of the 1995 regulation retroactive through invocation of the step transaction doctrine. A ruling against the taxpayer is not justified simply because, in the view of the government, the taxpayer's result is "undesirable." *Comm. v. South Lake Farms, Inc.*, 324 F.2d 837 (9th Cir. 1963) *See also, Yosha v. Comm.*, 861 F.2d 494 (7th Cir. 1988) ("There is no rule against taking advantage of opportunities created by Congress or the Treasury Department for beating taxes. . . .").

**B. Sale Of The Prudential Notes To Principal FC Cannot Be Disregarded Under The Step Transaction Doctrine.**

The step transaction doctrine is one of those judicially-created doctrines applied by the courts in those situations where the transaction meets the literal language of the Code or regulations but does not appear consistent with the intent of Congress when the relevant statutory provisions were enacted.[6] That is not the case here. The consolidated return regulations, §1.1502 et. seq., were on the books at the time the provision for interest on deferred tax was added to the Code in 1987[7]. Congress was therefore aware of how Regulation §1.1502-13(c)(1) operated to defer reporting of any gain recognized upon sale of an installment obligation within a consolidated group. Thus aware, it made no change to those deferral or installment sale rules when it imposed the interest charge on deferred taxes under the provision that later became known as Section 453A. Had it wanted

[6] Donald L. Korb, Chief Counsel, IRS, Remarks at 2005 Univ. of So. Cal. Tax Institute, "The Economic Substance Doctrine In The Current Tax Shelter Environment," January 25, 2005, published at 2005 TNT 16-22. *See Gregory v. Helvering, supra; Emmons v. Comm.*, 31 T.C. 26, 31 (1958); *Weller v. Comm.*, 270 F.2d 294, 296 (3rd Cir. 1959).

[7] P.L. 100-203, §10202.

to exempt sales and assignments within a consolidated group from the provision of Section 453B requiring recognition of installment gain upon such a disposition, it could easily have done so, just as it did in 1990 in Section 453B(d) with respect to distributions to which Section 337(a) applies.[8] Then the interest charge imposed by its new provision would have clearly applied to installment gain deferred within a consolidated group, regardless of intra-group sales or assignments. Because it did not do so, it cannot be said that Congress intended Section 453A to apply to recognized gain upon a sale or disposition of an installment obligation within a consolidated group, even in view of the fact that the reporting of such recognized gain was deferred under the consolidated return rules that existed at the time. As pointed out previously, it wasn't until several years later, in 1995, that the Treasury Department legislated that result itself through promulgation of Example 6 of Regulation §1.1502-13(c)(7)(ii), which applied only to taxable years beginning after July 12, 1995.

In *Jade Trading, LLC v. U.S.*, 60 Fed. Cl. 558, 561-562 (2004), cited in the Defendant's Motion *In Limine* Regarding Testimony Of Jill (Bohr) Hittner And Her "Newly-Discovered" Documents (filed February 9, 2005), the Defendant refers to "the judicial doctrines of "sham transaction," "economic substance," and "step transaction" as if they were each separate and independent from one another. It is well recognized, however, that the "step-transaction" doctrine and the "sham transaction" doctrine are but separate branches of the same venerable judicial doctrine, the "substance over form" principle. *True v. U.S.*, 190 F.3d 1165, 1174 (10th Cir. 1999) ("a particular incarnation of the basic substance over form principle [is] known as the step transaction doctrine."); *King Enterprises, Inc. v.*

[8] Section 453B(d) was added by P.L. 101-508.

*U.S., supra*, at 517 ("[T]he central purpose of the step transaction doctrine [is] to assure that tax consequences turn on the substance of a transaction rather than its form."); *Security Industrial Insurance Co. v. U.S.*, 702 F.2d 1234, 1244 (5th Cir. 1983) ("The step transaction doctrine is a corollary of the general tax principle that the incidence of taxation depends upon the substance of a transaction rather than its form."); *Associated Wholesale Grocers, Inc. v. U.S.*, 927 F.2d 1517, 1521 (10th Cir. 1991) ("The step transaction doctrine developed as part of the broader tax concept that substance should prevail over form."). Even the Defendant implicitly acknowledges this on page 11 of its Memorandum of Contentions where it states, in language not applicable to this case, "the form of a transaction will not be given effect where it operates simply as a **device to conceal the true nature of a transaction**" (emphasis supplied), citing *Gregory v. Helvering, supra*, at 470. *See also*, Mertens, *Law Of Federal Income Taxation*, §43:226; Kwall and Maynard, *Dethroning King Enterprises*, 58 Tax Lawyer 1 (Fall, 2004), p. 11 ("The step-transaction doctrine is a specific manifestation of the more general tax law principle of substance-over-form.").[9] According to the Tenth Circuit, the sub-stance over form doctrine was created in *Gregory v. Helvering* in order to deal with those transactions that were a "mere device," a "disguise," a "devious form of

[9] In recent remarks, the Internal Revenue Service's Chief Counsel confirmed this as well: "The judicially created doctrines of economic substance, business purpose, step transaction, and sham transaction . . . are all really just subcategories of the 'substance-over-form' doctrine which provides that where the form of a taxpayer's transaction may satisfy the literal requirements of the relevant statutory or regulatory language, a court can still examine whether the substance of that transaction was consistent with its form, for the simple reason that a transaction lacking such substance should not be accorded the tax treatment prescribed for the form of the transaction." Korb, *supra*.

conveyance," an "artifice" exalted above reality, "transparently artificial," or "mere formalisms." *Associated Wholesale Grocers, Inc. v. U.S., supra,* at 1522.

Three recent cases involving the substance-over-form doctrine demonstrate why the Defendant's attempt to apply a branch of that doctrine in this case is misplaced: *Black & Decker Corp. v. U.S.*, 340 F.Supp.2d 621 (D.Md. 2004); *Coltec Industries v. U.S.*, 62 Fed.Cl. 716 (Fed.Cl. 2004); and *TIFD II-E Inc. v. U.S.*, 342 F.Supp.2d 94 (D.Conn. 2004). Even though each of such cases, unlike this case, involved intricate tax shelters, each was decided in favor of the taxpayer.[10]

In *Black & Decker*, *supra,* the district court held that the newly-created subsidiary and the parent's transaction with it had real economic substance and therefore the transaction could not be disregarded as a sham **even though** tax avoidance was the **sole** motivation for the transaction.

In *Coltec Industries, supra*, Judge Braden of this Court held that the taxpayer did not step over the line in its desire to escape taxes and that Coltec's transfer of its subsidiary's stock to banks constituted a "sale" in which it legitimately recognized a loss of $370 million. Judge Braden's quotation from the Supreme Court's decision in *Frank Lyon Co. v. U.S.*, *supra*, at 583-584 (1977), is equally applicable here:

> [W]here, as here, there is a genuine multi-party transaction with economic substance which is compelled . . . by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government

[10] All are now on appeal in their respective circuits.

> should honor the allocation of rights and duties effectuated by the parties.

In *TIFD II-E Inc. v. U.S., supra*, the evidence showed that the primary purpose of the transaction between the partnership and Dutch banks was to raise capital and to show ratings agencies it could do so. Accordingly, the court held that **even though** the transaction sought to save the partnership taxes, it had real economic substance, was based on real non-tax business motives, was not a sham, and deserved to be respected for tax purposes.

In clear contrast stands *Long Term Capital Holdings v. U.S.*, 330 F.Supp.2d 122 (D. Conn. 2004). In a 78-page opinion, the district court applied the "end result" test of the step-transaction doctrine to collapse the steps and hold that what really occurred was the sale of preferred stock for $1 million, rather than for $400 million. However, the court did so only after describing the transaction as a "naked tax deal" conceived only for tax purposes "to buy tax losses," with no substantive business purpose other than tax avoidance because there was no expectation of profit. Moreover, the court found that the taxpayer had acted in bad faith and concealed the transaction. *See also*, *Santa Monica Pictures, LLC v. Comm.*, T.C. Memo 2005-104, 154 (May 11, 2005) ("The exclusive purpose of this apparent transaction, we conclude, was to transfer . . . enormous tax attributes. . . .") On these facts, Principal's case is clearly different.

**(1) Economic Substance, Business Purpose, and Transactional Intent Preclude Application Of The Step Transaction Doctrine.**

By stipulation, the Defendant makes no contention in this case that a valid non-tax business purpose was lacking either for the creation of Principal FC or for the transaction between it and Principal. Likewise, the Defendant has stipulated that it makes no contention that economic substance was lacking in such instances.

(Stip. ¶32) Moreover, not only does the Defendant make no contention that tax reasons were the principal motivation for the creation of the subsidiary or the transaction with it, but the Defendant has also stipulated that, while tax reasons were admittedly involved, they were **not** the main reasons. (Stip. ¶¶12-17) In these circumstances, the Defendant's position boils down to a "naked" application of the step transaction doctrine in a manner that would follow automatically from characterization of Principal's sale of the promissory notes to its subsidiary as a "second step." In other words, under the Defendant's argument, any transaction can be disregarded for tax purposes where, despite valid business purpose and economic substance, it represents a "second step." Or, stated another way, any business arrangement can be collapsed, without more, if it involves more than one step. Quite simply, that is not now and never has been the law. *Esmark, Inc. v. Comm.*, 90 T.C. 171, 195 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989) ("[t]he existence of an overall plan does not alone, however, justify application of the step transaction doctrine. . . . [It requires] meaningless or unnecessary steps that should be ignored.").

In its motion previously referred to regarding the testimony of Jill Hittner, the Defendant argued:

> Whether Principal FC's operations had "economic substance" is completely irrelevant. It would be relevant only if there were an issue in the case (there is not) whether the mortgage loan transaction between plaintiff and Prudential were a sham. Plaintiff apparently believes that it is necessary to show "economic substance" in light of our "step transaction" argument (Def. Pretrial Mem. 11-13). But . . . in order for that doctrine to apply it is not necessary that there have been no business purpose to the transaction. (Motion, 3)

Similarly, in its Memorandum Of Contentions Of Law And Fact filed December 10, 2004, where the step transaction doctrine was first raised in the nine-year history of this dispute, the Defendant contended, "[t]he presence or absence of a business purpose underlying the transaction - or any individual step in the transaction - is simply irrelevant to the step transaction doctrine." (Memorandum, 13 n. 6)

These contentions incorrectly treat the concepts of "business purpose" and "economic substance" interchangeably. Nevertheless, they underscore the fact that the Defendant does not argue that either is missing in this case. The Stipulation contains abundant evidence that both economic substance and business purpose were present in multiple forms (Stip. ¶¶5-9,12-14,16-28), there is no evidence to the contrary, and the Defendant in effect concedes the point. (Stip. ¶32) That concession, together with its concession that tax reasons were **not** the main reasons for the transaction between Principal and its subsidiary, dooms the Defendant's argument.

More importantly, however, the Defendant's position concerning economic substance and business purpose is simply wrong. At best it represents an attempt to misapply the Supreme Court's decision in *Comm. v. Clark*, 489 U.S. 726, 738 (1989). In *Clark*, the Court applied the step transaction doctrine to view the various components of the transaction as an integrated whole and to rule **in favor of the taxpayer** that the distribution of boot in connection with a merger could not be brought within the ambit of Section 356(a)(2) and taxed as a dividend. Contrary to the Defendant's assertion in this case that economic substance is irrelevant, however, the Supreme Court characterized its own decision in *Clark* as one based on a "commonsense understanding of the **economic substance** of the transaction at

issue," and emphasized that the step transaction doctrine was being applied in favor of the taxpayer so that its "federal tax liability may be based 'on a realistic view of the entire transaction.'" *Id.* at 738 (citing 1 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 4.3.5, p 4-52 (1981)). (Emphasis supplied.) It was also very significant to the Supreme Court in *Clark* that, as here, there was no ruse or concealment involved and the transaction appeared to be comparable to an arms-length one. *Id.* at 744.

The Defendant also relies upon the Tenth Circuit's decision in *South Bay Corp. v. Comm.*, 345 F.2d 698 (10th Cir. 1965), where the issue was whether a series of corporate stock and asset acquisitions were reorganizations resulting in carryover basis or purchases where basis was to be determined by the purchase price. Although the evidence showed that the merger of the acquired corporations and assets was planned from the outset, the Court of Appeals held (reversing the Tax Court) that the transactions deserved to be considered as purchases and not as a reorganization. After explaining the need to determine the "identity of the full transaction in reality involved and to identify the total of the steps that make up the **substance** of that transaction," and "analyzing the overall **substance** of the transactions," the Court of Appeals applied these elements of the step transaction doctrine to hold **in favor of the taxpayer**. *Id*. at 703 (Emphasis supplied.)

*First National Bank in Albuquerque v. Comm.*, 56 T.C.M. (CCH) 575 (1988), is the only known case involving an attempt to invoke the step transaction doctrine to nullify disposition of an installment obligation. In that case, in anticipation of municipal bond sale proceeds for acquisition and renovation of a building, the taxpayer sold the building to the developers' partnership. The sale price was received in the form of an installment note, for which the taxpayer

elected installment reporting under Section 453. When the municipal bonds were offered for sale by the City of Albuquerque almost a year later, the taxpayer, a bank, bought a substantial amount of the bonds. The City, which had acquired title to the building from the developer partnership in a leaseback arrangement, then used the bond proceeds to pay off the installment note. The Internal Revenue Service asserted that the bond proceeds satisfied the promissory note and therefore all of the gain on sale of the building that was deferred via the installment election was recognized under Section 453(d), the predecessor to Section 453B. The taxpayer, on the other hand, argued that under the step transaction doctrine, since the sale of the building was only an interim measure pending eventual sale of the bonds, the bonds were in reality substituted in its hands for the installment note and that these two steps should be "collapsed" so as to avoid "disposition of an installment obligation" under Section 453(d). The Tax Court refused to collapse the steps because, as here, they were "straightforward," were taken for valid business reasons, and, although related, each had economic substance on its own.

Thus, it is Principal's position in this case that the step transaction doctrine does not apply automatically to a planned transaction involving more than one step, but, contrary to the Defendant's assertion, applies only after a finding of lack of economic substance and business purpose. *See*, *Blanco v. U.S.*, 602 F.2d 324, 327 (Ct.Cl. 1979) ("The courts have recognized that where a single business transaction is fragmented into two ostensibly separate steps **which had no valid business purposes** and which were taken to avoid taxes, the Commissioner may 'collapse' two transactions into a single one and treat that entity as the taxable event") (Emphasis supplied). Resort to the step transaction doctrine is therefore inappropriate here because the facts establish the highly relevant economic

substance and business purposes that render the doctrine inapplicable. Stated another way, the critical inquiry here, under the step transaction doctrine or any component test of that doctrine, is whether the substance of the transaction coincides with its form, that is, whether the realities of the situation are the same as what they appeared. *Gregory v. Helvering, supra; Comm. v. Court Holding Co.*, 324 U.S. 331, 334 (1945). Although the cases have articulated two tests to assist in the resolution of that inquiry, those tests are not ends unto themselves but merely tools to assist in deciding whether a transaction's substance or reality differs from its form or appearance. If the sale of the Prudential notes by Principal to Principal FC was **in fact** a sale, then the Defendant cannot ignore its tax effect. *Associated Wholesale Grocers, Inc. v. U.S., supra* at 1524, describing *Granite Trust Co. v. U.S.*, 238 F.2d 670 (1st Cir. 1956).

**(2) The Step Transaction Doctrine Is Not Implicated Under The "End Result" Test.**

The two tests most frequently employed in the step-transaction doctrine are the "end-result" test and the "interdependence" test. *King Enterprises, Inc. v. U.S., supra*; *True v. U.S., supra* at 1174; *Security Industrial Insurance Co. v. U.S., supra* at 1244; *Associated Wholesale Grocers, Inc. v. U.S., supra* at 1522; 11 Mertens, *Law of Federal Income Taxation*, §43:226. The Defendant acknowledges these two tests on page 11 of its Memorandum of Contentions.

But, again, contrary to the assertion of the Defendant, economic substance, business purpose, and transactional intent are highly relevant under both tests. Indeed, the end result test is based upon the **actual intent of the parties**. Mertens, *supra*, §§ 43:226; 43:227; 43:235. In *True v. U.S., supra* at 1175, the Tenth Circuit

stated, "The taxpayer's subjective intent is especially relevant under this [end result] test . . . ." It went on to point out that such intent is a question of fact:

> Like the overall question of substance over form embodied by the step transaction doctrine, the issues involved in our application of the end result and interdependence tests, especially with regard to the taxpayer's intent, are undeniably questions of fact.

*Id.* at 1176, n. 10 (citations omitted). Furthermore, the end result test is not applicable where, as here, each of the steps has separate economic substance. Mertens, *supra,* §43:230.

The focus of the end result test is whether "purportedly separate transactions will be amalgamated into a single transaction when it appears that they are really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *King Enterprises*, *supra*, at 516. Stated another way, a taxpayer cannot request independent tax recognition of the individual steps unless he can show that at the time he engaged in the individual step under scrutiny, its result was the intended result in and of itself. *True v. U.S.*, *supra* 1175, n. 9. This means that steps having economic substance separate and apart from the overall transaction are not combined. Mertens, *supra* at 43:227. And even though a party to a transaction may intend that a particular result be obtained, if the party, from the outset, does not have control over all separate transactional steps leading to the particular end result, the end result test is not to be applied. *Id.*

Under the facts of this case, Principal's transaction passes the end result test for several reasons. First, the transaction with Principal FC was an end result intended in and of itself for valid non-tax business reasons, namely, removing the liability to Prudential from Principal's books and assuring Prudential that the debt

owed it would be "bankruptcy proof." (Stip. ¶17) It was not simply a manipulation undertaken primarily to achieve an end result from a tax viewpoint. Second, the transaction between Principal and Principal FC had economic substance because it involved real assets and liabilities totaling over $478 million, release of Principal from liability to Prudential, a definitive written agreement, unrelated adverse parties (the Prudential subsidiaries), and myriad other documents showing that the parties respected its form and substance. (JE 25-29, 43-45, 53, 119) Third, unlike the reorganization cases such as *Gregory v. Helvering, supra, Comm. v. Clark, supra,* and *South Bay Corp. v. Comm., supra*, where the taxpayer controls both of the steps, Principal did not itself control the transaction with Principal FC because, to accomplish the end result sought, the approval of the Iowa Insurance Department needed to be obtained and the three Prudential subsidiaries needed to release Principal from its liability under its promissory notes.

**(3) The Step Transaction Doctrine Is Not Implicated Under The "Interdependence" Test.**

Under the "interdependence test,' the inquiry is whether "the steps were so interdependent that the legal relations created by one of the transactions seem fruitless without completion of the series." *True v. U.S., supra* at 1175. *Associated Wholesale Grocers, Inc. v. U.S., supra,* at 1527 ("the merger agreement would bear no fruit unless the two-step series could be completed."). *See also,* Mertens, *supra* at §43:228. But, "if the steps have 'reasoned **economic justification** standing alone,' then . . . the interdependence test is inappropriate." *True v. U.S., supra* at 1178 (Emphasis added). *See also,* Rev. Rul. 79-250, 1979-2 C.B. 156 ("The substance of each of a series of steps will be recognized and the step transaction doctrine will not apply, if each such step demonstrates independent

economic significance . . . and was undertaken for valid business purposes . . . .") (By a post-1991 revenue ruling, Rev. Rul. 96-29, 1996-1 C.B. 50, Rev. Rul 79-250 was limited to reorganizations.). The interdependence test only applies "where an entity acts as a conduit, having no business purpose of its own . . . ." Mertens, *supra*, §43:228; *West Coast Marketing Corp. v. Comm.*, 46 T.C. 32 (1966); *D'Angelo Associates, Inc. v. Comm.*, 70 T.C. 121 (1978) ("Where there is no evidence of a business reason for having a separate sale of property by the controlling shareholder to his newly formed corporation, the sale will be disregarded . . . .").

Here there were strong business reasons for the sale and assignment of the Prudential promissory notes by Principal to its subsidiary, Principal FC, and the sale and assignment had ample economic substance when it took place. Principal wanted to get the liability represented by the notes it issued to Prudential off its balance sheet (Stip. ¶12; Lettow Aff. ¶¶4,5; Halter Aff. ¶3), and the sale and assignment of the Prudential notes to Principal FC represented valuable consideration for assumption of that liability by the subsidiary. (JE 53) Prudential wanted to see both the asset and the liability placed in a separate entity against which Prudential's claim would be preserved in the event of Principal's bankruptcy. (Stip. ¶¶14,17; Lettow Aff. ¶8) Economic substance is further indicated by the fact that after the transaction the subsidiary had capital of $1 million (JE 27) and $481 million of assets (Stip. ¶28; JE 88, p. 629) and, more importantly, Principal had secured Prudential's release from $478 million in liability in exchange for Principal FC's assumption of that liability. (JE 46, 47, 53, §2.02)

Furthermore, although it was desirable from the standpoint of both parties that the transaction with Principal FC proceed in this manner, there is no evidence

in the record that the "unwinding" of the 1985 exchange of mortgage loans between Principal and Prudential (Pltff's Ex. 5,6) would not have occurred without such a transaction. In fact, what evidence there is shows that the "unwinding" of the 1985 transaction was important to Principal for numerous non-tax business reasons, such as enhancing its surplus by $75 million after its financial ratings had been downgraded (Stip. ¶8; JE 20,61,65; Drury Aff. ¶¶2-4; Halter Aff. ¶5) and eliminating the unduly burdensome PSPPA calculation, (Stip. ¶¶7,8; Lettow Aff. ¶5; Halter Aff. ¶3; Custis Aff.¶2; Pltff's Ex. 5, pp I-11 and II-8), and that alternative methods of accomplishing the parties' objectives were available (such as removing the liability to Prudential from Principal's books by "defeasing" it with U.S. Treasury securities under FASB 76 (Stip. ¶13; Lettow Aff. ¶6; JE 19,82,158), or with a guaranteed interest contract, or "GIC," issued by another insurer (JE 64, p. 531; 122, p. 715), assigning the Prudential notes to a trust (Lettow Aff. ¶6; JE 69,111), and by preserving for Prudential recourse against Principal (Stip. ¶16; Lettow Aff. ¶7; JE 64, p. 532, 74)). As the Court weighs this evidence, there is no contrary evidence for it to be weighed against. Therefore, the inference is inescapable that the transaction with Prudential would have been carried out one way or another in any event because it was so important to both parties. Principal was simply not required to implement this important transaction in the most expensive manner tax-wise. *Estate of Gilmore, supra*; *Glacier State Electrical Supply v. Comm., supra*; *Uniroyal, Inc. v. Comm., supra*; *Cal-Maine Foods, Inc. v. Comm., supra*. The Defendant simply cannot today accomplish indirectly through unwarranted extension of the step transaction doctrine what the law at the time of the transaction would not have permitted it to accomplish directly.

## II. State Guaranty Fund Assessments Are A State Tax Deductible In The Year Paid Under Section 164.

### A. State Guaranty Fund Assessments Are A State Tax.

Section 164(a) allows a deduction for all state taxes "paid or accrued within the taxable year in carrying on a trade or business . . . ." According to the Internal Revenue Service, a tax is -

- an enforced contribution,
- pursuant to legislative authority in the exercise of taxing power,
- imposed and collected for the purpose of raising revenue,
- to be used for public or governmental purposes.

Rev. Rul. 57-345, 1957-2 C.B. 132; Rev. Rul. 70-622, 1970-2 C.B. 41; Rev. Rul. 81-19, 1981-2 C.B. 49; Rev. Rul. 81-192, 1981-2 C.B. 50; Rev. Rul. 81-193, 1981-2 C.B. 52; and Rev. Rul. 81-194, 1981-2 C.B. 54, quoting I.T. 3511, 1941-2 C.B. 2, 90.

Rev. Rul. 70-622 held to be a tax a 1¢ per gallon state inspection fee imposed on volatile oil that was to be deposited to the state's highway fund. Rev. Rul. 71-49, 1971-1 C.B. 103 held to be a tax assessments made against real estate which were paid to a specific fund, or public benefit corporation, the New York City Educational Construction Fund. Rev. Rul. 81-191, 1981-2 C.B. 49, stated that a tax may be paid to certain public benefit corporations created by the government for a public purpose, and held to be a tax amounts paid by Rhode Island employers to the state's temporary disability benefit fund. Similarly, Rev. Rul. 81-192 (New York nonoccupational disability benefit fund), Rev. Rul. 81-193 (New Jersey unemployment compensation fund and nonoccupational disability benefit fund), Rev. Rul. 81-194 (California unemployment compensation fund and nonoccupa-

tional disability benefit fund); and Rev. Rul. 89-16, 1989-1 C.B. 76 (West Virginia unemployment compensation fund)

Several of these Revenue Rulings were undoubtedly the result of earlier judicial decisions. In *McGowan v. Comm.*, 67 T.C. 599 (1976), the Tax Court held that an employee's state-mandated contribution to a temporary disability insurance fund qualified as a deductible state "income" tax within the meaning of Section 164(a)(3) and that, in addition, even if it was not a state "income" tax, it was deductible as a tax under the flush language of Section 164(a). The court noted that relief of unemployment is a recognized public purpose and a state-required "contribution" to a fund to achieve that purpose is a "tax." *Id.* at 609-10. *See also, Trujillo v. Comm.*, 68 T.C. 670 (1977) (compulsory "contribution" made by an employee to the state's disability insurance fund); *Campbell v. Davenport*, 362 F.2d 624 (5th Cir. 1966) (assessment required to be paid to the county executive committee by a candidate before his name could be placed on the ballot); *Nichols v. U.S.*, 223 F.Supp. 709 (D. Ga. 1963) (filing fee to run in statewide primary election).

There would seem to be little question that the state guaranty fund assessments paid by Principal constitute state taxes within the meaning of these authorities. It is stipulated that the state guaranty fund associations that imposed the assessments functioned as statutorily-created **quasi-public** nonprofit legal entities. (Stip. ¶36) The assessments are an "enforced contribution," since non-payment can result in revocation of an insurance company's license to do business. (Stip. ¶37; JE 198, 168 §11A(3); Tr. 46) They are not a fee imposed for some special privilege granted, as are driver license fees, dog license fees, automobile inspection fees, parking permit fees, bridge and highway tolls, and hunting and

fishing license fees. *Haman v. Comm.* 31 T.C.M. 446(1972), *aff'd*. 500 F.2d 401 (9th Cir. 1974); *Cox v. Comm*. 41 T.C. 161 (1963); PLR 8020097. They are a levy in the nature of an excise tax (Tr. 72) and are imposed "pursuant to legislative authority," namely, enactments by the state legislatures in each of the fifty states in which Principal does business. (Stip. ¶35; JE 168;197; Tr. 41,53) They are assessed in order to raise revenue (Stip. ¶35; JE 168, §§9-A, B(2), C(3)) to be used for a public purpose (protection of policyholders of insurance companies that had become impaired or insolvent) (Stip. ¶¶35, 37; JE 168, §2-A; Tr. 42). Just as state premium taxes are based on the premiums derived by the insurance company within the state, the state guaranty fund assessments are likewise apportioned and based on premiums derived within the state. (Tr. 45,72,76; JE 168, p. 1063; Stip. ¶35) The former Deputy Director of the Iowa Department of Insurance testified that it was his view and the view of his Department that the Iowa Guaranty Fund Association and similar state associations were, in essence, adjuncts to the Insurance Commissioner's office, represented a "safety net" for policyholders, and served a public, rather than a private, purpose. (Tr. 41-43). There is no evidence to the contrary with respect to any of these criteria. Indeed, there is evidence that, at least in Iowa, excess monies received from guaranty fund assessments were deposited into the state's general fund (Tr. 47). (Pltff's Ex. 7, p. 10, §508C.19(2))

## B. Guaranty Fund Assessments Are Deductible As A State Tax In The Year Paid.

### (1) State Taxes Are To Be Deducted Currently Under Section 164.

Section 164(a) expressly provides that "**there shall be allowed as a deduction"** state taxes paid or accrued within the taxable year in carrying on a trade or business. (Emphasis supplied.) Regulation §1.164-1(a) similarly provides that "**there shall be allowed as a deduction** under this section" state taxes paid or accrued within the taxable year in carrying on a trade or business." (Emphasis supplied.) Under Section 461 and the tests set out in Regulation 1.461-1(a)(2), it is the full amount of the state taxes, in this case called guaranty fund assessments, paid or accrued in the taxable year that is allowable as a deduction for that taxable year under Section 164.

### (2) Capitalization Of State Taxes Is Not Required.

Section 461 of the Code provides that "the **amount** of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." (Emphasis supplied.) Regulation §1.461-1(a)(2) explains that "under an accrual method of accounting, a liability . . . is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." *U.S. v. Hughes Properties, Inc.*, 476 U.S. 593 (1986). Under Regulation §1.461-4(g)(6)(i), "if the liability of a taxpayer is to pay a tax, economic performance occurs as the tax is paid to the governmental

authority that imposed the tax." Conversely, it is only "a liability that relates to the creation of an asset having a useful life extending substantially beyond the close of the taxable year [that] is taken into account in the taxable year through capitalization" under Section 263. *Ibid.*

Neither Section 263 nor any other provision of the Internal Revenue Code requires that taxes of the type here involved be capitalized and amortized.[11] In 1991, Section 263(a)(1) treated as a capital expenditure "[a]ny amount paid out . . . for permanent improvements or betterments made to increase the value of any property or estate." It is Principal's position that taxes levied by state taxing authorities, including guaranty fund assessments, are not capital expenditures within the ambit of that definition.

Without referring to Regulation §1.461-1(a)(2), the Defendant has contended in this case that capitalization of the guaranty fund assessments is required because they provide a "significant future benefit." That standard for capitalizetion arose under the Supreme Court's 1992 decision in *INDOPCO, Inc. v. Comm.*, 503 U.S. 79 (1992). There the Court held that professional fees incurred by a target corporation in a stock acquisition constituted expenditures providing a significant future benefit and therefore were required to be capitalized under Section 263. *See also, U.S. Freightways Corp v. Comm.*, 270 F.3d 1137 (7th Cir. 2001).

Ten years later, however, the Treasury Department itself repudiated the INDOPCO decision as it acknowledged that INDOPCO's "'significant future benefit' standard . . . does not provide the certainty and clarity necessary for

[11] Section 164(a) does require that a tax paid or accrued in connection with the acquisition of property be added to the cost of the acquired property.

compliance with, and sound administration of, the law." *Notice of Proposed Rulemaking and Notice of Public Hearing*, December 19, 2002, 67 FR 77701. That acknowledgement was in addition to its earlier admissions with reference to the "significant future benefit" standard that -

- "the results reached by the courts are often difficult to reconcile and, particularly in recent years, have contributed to substantial uncertainty and controversy;"

- "the current level of uncertainty and controversy is neither fair to taxpayers nor consistent with sound and efficient tax administration;" and

- "many expenditures that create or enhance intangible assets or benefits do not create the type of future benefits for which capitalization under section 263(a) is appropriate . . . ."

*Advance Notice Of Proposed Rulemaking,* January 24, 2002, 67 FR 3461.

Therefore, on January 5, 2004, the Treasury Department issued final regulations nullifying the "significant future benefit" standard of INDOPCO. T.D. 9107, 68 FR 436-01. These final regulations issued under Section 263(a) "identify categories of intangibles for which capitalization is required," and provide, conversely, that "an amount paid to acquire or create an intangible not otherwise required to be capitalized by the regulations is not required to be capitalized on the ground that it produces significant future benefits for the taxpayer . . . ." *Id.*, Preamble, Sec. II-A. Because neither state taxes nor guaranty fund assessments is described in any of the categories in the final regulations, the conclusion follows that the Treasury Department has now admitted that they produce no significant future benefit that requires capitalization.

**(3) No Significant Future Benefit Requires Capitalization.**

Such a conclusion is warranted on the facts as well. Even though many states provided a right of offset against premium taxes in future years, that right of offset was only a possible and uncertain benefit insufficient to require capitalization. Realization of any such benefit depended on a continuing premium tax liability in such state sufficient to offset the assessment against, and any year's offset was lost to the extent there was insufficient premium tax liability in that year to absorb it. (Tr. 65,73-74) Any number of events could result in zero premium tax liability in future years, such as insolvency, withdrawal from that state, surrender of the license, or a change in state law. In fact, Principal itself lost the right to offset some previously capitalized assessments paid by a subsidiary because the subsidiary was sold before the offsets were exhausted. (Tr. 66) Similarly, the right of offset in the State of Florida was lost for all practical purposes when that state changed its period of amortization from 5 to 1000 years. (Tr. 65)

The Sixth Circuit has properly distinguished between a significant future benefit and the possibility of reduction of a future expense. In *Snyder v. Comm.*, 894 F.2d 1337 (6th Cir. 1990) (unpublished opinion), a racetrack operator made capital improvements that were certified by the state racing commission. Under that state's law, the operator was entitled to a reduction of ½ percent of the state wagering tax for up to six years or for a total of 70 percent of the amount paid for the improvements. The Tax Court had upheld the IRS' determination that the future reduction in the wagering tax was income in the year the taxpayer's expenditures were certified. But upon the taxpayer's appeal, the IRS conceded that its position was wrong, and, accordingly, the Sixth Circuit reversed, holding that

the reduction of a future expense was just that, and not income. Under the *Snyder* analysis, therefore, and particularly because of the possibility that there may not be future premium taxes to offset the assessments against, the right to offset guaranty fund assessments against future premium taxes represents not a "significant future benefit" but merely the possibility for reduction of a future expense. *See also*, PLR 9841037 (where settlement agreement provided taxpayer with rights of future offsets against sales and use taxes, "the future tax reductions should be accounted for through smaller state tax deductions in the year in which the tax reductions are used. . . .", citing *Snyder v. Comm., supra*).

**(4) Capitalization Is Not Required By Section 811(a).**

The Defendant argues that because Principal capitalized and amortized a portion of its guaranty fund assessment payments in its NAIC Annual Statements, it is required to similarly capitalize and amortize them for federal income tax purposes by virtue of Section 811(a). However, Section 811(a) provides that its requirement of consistency with NAIC Annual Statements for "computations" entering into the determination of a life insurance company's federal income tax applies only "to the extent not inconsistent with . . . any other provision of this part." The "part" referred to is Part I of Subchapter L. Included within Part I of Subchapter L is Section 805, entitled "General Deductions." Section 805(a)(8) provides for the allowance of "all other deductions allowed under this subtitle for purposes of computing taxable income." The "subtitle" referred to is "Subtitle A - Income Taxes," and Section 164 and the deduction it allows for taxes paid or accrued in carrying on a trade or business are included within that subtitle. And, as pointed out previously, Section 164 expressly states that taxes **shall be allowed as a deduction**.

The guaranty fund assessments paid by Principal, therefore, are not required under Section 811(a) to be capitalized for federal income tax purposes simply because they were capitalized for NAIC Annual Statement purposes, and the current deduction allowable under Section 164 is allowable to Principal by virtue of Section 805(a)(8).

**C. IRS Permission To Deduct The Assessments As State Taxes Was Not Required.**

**(1) Principal Has Always Treated The Assessments As A State Tax**

As shown by the exhibits and the testimony of Principal's former Assistant Director of Corporate Taxes, Mr. Fisk (Tr. 51), Principal has always deducted state guaranty fund assessments as a part of "Insurance Taxes," both on its NAIC Annual Statements and in its federal income tax return. (Tr. 56-58, 68-69) Therefore, the issue in this case is not whether Principal is entitled to now deduct such assessments currently as taxes after having deducted them in prior years as something else, but only whether some of such payments, having always been treated as state taxes, are required to be capitalized and amortized for federal income tax purposes.

When a guaranty fund assessment was paid to a state that allowed no offset against future premium taxes, that payment was deducted in full in the year paid, both for NAIC Annual Statement purposes and for federal income tax purposes. (Stip. ¶41) The full amount of such payment was included in line 6, entitled "All Other Taxes," on Exhibit 6 of the NAIC Annual Statement, in accordance with NAIC Annual Statement instructions in that regard. (JE 159, p.832; Tr. 57-58, 60-61) By virtue of their inclusion in Exhibit 6 of the Annual Statement, such

guaranty fund assessment payments were also included on line 23, entitled "Insurance taxes, licenses, and fees," on the Summary Of Operations page of the Annual Statement. (Tr. 61-62) The same amount shown on line 23, "Insurance taxes, licenses, and fees," on the Summary of Operations page of the NAIC Annual Statement appeared as a deduction in the "Other Deductions" schedule of Principal's federal income tax returns. (Stip. ¶41; Tr. 68-69) That deduction was there denominated "Insurance Taxes." (Tr. 69; JE 171 - 191).

When a guaranty fund assessment was paid to a state that allowed offsets against premium taxes in succeeding years, such as, for example, when an assessment of $100,000 was paid to the state of Kansas which allowed offsets at the rate of 20% per year (JE 169, p. 1105; Tr. 62-63), the amount of such payment was added to an asset account that appeared on the Assets page of Principal's NAIC Annual Statement. (Tr. 63) Then, when it was determined that premium taxes were owing to such state, such as, to continue the example, $500,000 to the state of Kansas, the premium tax return filed with the state of Kansas would show a payment of $480,000 and a credit of $20,000 arising from offset of 20% of the guaranty fund assessment paid. (Tr.72-73) In such case, the guaranty fund asset that appeared on the Assets page of the Annual Statement would be reduced (amortized) by $20,000, and "Other State Taxes" appearing on Line 6 of Exhibit 6 of the Annual Statement would be increased by $20,000. Therefore, the amount that was carried over from Exhibit 6 of the Annual Statement to line 23, "Insurance taxes, licenses, and fees," of the Summary of Operations page included the $20,000 of amortization of the guaranty fund assessment previously paid to Kansas. (Tr. 64, 66) Since the same amount that appeared as "Insurance taxes, licenses, and fees" on line 23 of the Summary of Operations page was carried over

to Principal's federal income tax returns and deducted as "Insurance Taxes" on the "Other Deductions" schedule (Stip. ¶41; Tr. 68-69), the amortized portions of the guaranty fund assessments have likewise always been deducted as "taxes," more specifically, as "Insurance Taxes," on Principal's federal income tax returns. (Tr. 66, 69-70;:JE 171-191)

As established through the testimony of Mr. Fisk (Tr. 66,68-69) and Principal's NAIC Annual Statements and tax returns (JE 171-191), the following table shows in summary fashion that for many years exactly the same amounts were included in "Insurance Taxes" on the "Other Deductions" schedule of Principal's federal income tax return as were included in "Insurance Taxes, Licenses, And Fees" on Line 23 of the "Summary of Operations" schedule of the NAIC Annual Statement, and the "Other State Taxes" on Line 6, Exhibit 6 of the NAIC Annual Statement that included the guaranty fund assessments and which were, in turn, included in "Insurance Taxes" deducted in both the NAIC Annual Statements and federal income tax returns:

| Year | "Insurance Taxes, Licenses And Fees," per Line 23, Summary of Operations, NAIC Ann. Stmt. (JE 183 - 191) | "Insurance Taxes" deducted under "Other Deductions" in tax returns (JE 171-180) | "Other State Taxes" per Ann. Stmt. Line 6, Ex. 6 included in "Ins. Taxes, Licenses, And Fees" per Line 23, Sum. of Ops. (JE 183-191) | State Premium Taxes included in "Ins. Taxes, Licenses And Fees" per Line 23, Sum. Of Ops. and Line 3, Ex. 6, NAIC Ann. Stmt. (JE 183 - 191) |
|---|---|---|---|---|
| 1986 | 52,908,745 | 52,908,745 | 5,631,509 | 33,137,310 |
| 1987 | 55,345,587 | 55,345,587 | 6,956,740 | 33,152,932 |
| 1988 | 66,517,412 | 66,517,412 | 2,387,463 | 46,969,499 |
| 1989 | 84,237,423 | 84,237,423 | 4,105,218 | 59,423,019 |
| 1990 | 89,165,356 | 89,165,356 | 12,493,000 | 54,074,557 |
| 1991 | 97,031,786 | 97,031,786 | 9,405,598 | 63,543,592 |
| 1992 | 109,164,795 | 109,164,795 | 15,649,525 | 67,340,089 |
| 1993 | 122,663,518 | 122,663,518 | 10,173,007 | 83,062,665 |
| 1994 | 122,854,775 | 122,854,775 | 6,864,860 | 76,301,934 |

The above table also shows that another type of state taxes, namely, state premium taxes in substantial amounts, had long been deducted currently in the year paid in Principal's federal income tax returns. By virtue of their inclusion in Exhibit 6 of Principal's NAIC Annual Statements (Tr. 56), such state premium taxes were also deducted as a part of "Insurance Taxes" in the "Other Deductions" schedule of Principal's tax returns. (Tr. 57, 69)

**(2) Deducting All The Assessments In Full Was Not A Change Of Accounting Method.**

Nor can it be contended that Principal's right under Section 164 to deduct the state guaranty fund assessments currently as state taxes is precluded by the fact that it did not receive the IRS' consent to change its accounting method.

Under Section 446(e) of the Code, a taxpayer who changes his method of accounting must first obtain the consent of the Internal Revenue Service. Regulation §1.446-1(e)(2)(ii)(a) provides that a "change in method of accounting" includes a change in the **treatment** of any material item. The regulation further provides that consistent treatment of an item results in the establishment of a method of accounting for that item.

In this case, there has been no change in treatment of the guaranty fund assessments because Principal has always treated such assessments as state taxes for federal income tax purposes. Its consistent deduction of the assessments, including amortized portions of some, as "Insurance Taxes" on the Other Deductions schedule of its tax returns established a method of accounting for the **treatment** of such assessments as taxes, The only question here, then, is whether, without the advance consent of the Service, Section 446(e) prevents Principal from deducting all such assessments currently as state taxes, as it had done in many prior years with respect to certain of such assessments, and requires that it continue to capitalize and amortize a portion of them as it had erroneously done in prior years.

The Tax Court has squarely held that merely changing from amortization to current deduction of the same item within a universe of similar items long deducted currently is not a change in accounting method. In *Standard Oil Company (Indiana) v. Comm.*, 77 T.C. 349 (1981), *acq.*, 1989-2 C.B. 1 (1989), the taxpayer, in accordance with Section 263(c), had elected to expense intangible

drilling and development costs ("IDC") in constructing platforms for drilling oil wells. In the first phase of the project, the costs included "other costs" such as labor, fuel, repairs, hauling, and supplies. Standard Oil capitalized these "other costs" in 1970 and 1971. But in its Tax Court petition, Standard Oil sought to currently deduct such "other costs" rather than capitalize them. The Service argued that because Standard Oil had consistently capitalized such costs, currently deducting them constituted a change in method of accounting. The Tax Court disagreed and held there was no change in accounting method, stating -

> If the election (to expense IDC) is made, all IDC **must** be deducted. [Taxpayer's] tardy assertion that the 'other costs' in issue should have been deducted does not, assuming such costs are IDC, constitute a discretionary **choice** that such costs should be deducted. It is a **discovery** that [taxpayer] failed to deduct costs which, under the accounting method it has chosen, had to be deducted.
>
> * * *
>
> [Taxpayer's] position constitutes an attempt to remedy its failure to report similar items consistently under a fixed method of accounting. Such correction of internal inconsistencies does not constitute a change in accounting method.
>
> * * *
>
> Moreover, where a mistake of law affected the computation of a deduction under an established method of accounting, the subsequent correction of that error was deemed 'tantamount to a mathematical error.' . . . The correction of such items does not constitute a change in method of accounting. . . . . The situation before us admits of a similar analysis. . . .
>
> In reality, [taxpayer] has no choice (after electing to deduct IDC) in determining whether to deduct the costs before us. In such cases, the strictures of Section 446(e) do not apply. (Emphasis by the court; citations omitted.)

Under *Standard Oil*, therefore, treating similar items similarly is not a change in accounting method. In *Northern States Power Company v. United States*, 151 F.3d 876 (8th Cir. 1998), the Eighth Circuit agreed. There, Northern States had entered into a contract to secure its projected uranium enrichment needs at a fixed price well into the future, and under the contract was required to pay for the uranium whether it was needed or not. After abandoning plans to build another nuclear power plant, its supply exceeded its needs. At the same time, the world-wide price fell below its contracted price. Consequently, it began to sell or assign various amounts to third parties to mitigate its losses.

Northern States' tax department, apparently unaware of the sales and assignments, depreciated the contract losses over the life of the fuel assemblies instead of deducting them as an ordinary business expense, an ordinary loss, or a capital loss. When the tax department later learned that the sales and assignments had occurred, the company filed a claim for refund for the difference between the tax paid while depreciating the contract losses and the lower taxes it would have paid had a current deduction been taken. The Service denied the claim for refund on the ground that it was a veiled attempt to change the method of accounting for the contract losses. The Eighth Circuit disagreed and held that the taxpayer sought to **correct an error** that was akin to a posting error. Northern States sought to treat the contract losses in the same manner that it treated similar types of losses. Because Northern States was not attempting to change its accounting method for a class of assets or expenses, i.e., not attempting to change the **treatment** of the item, the Secretary's consent was not necessary.

Likewise, in *Gimbel Brothers, Inc. v. U.S.*, 535 F.2d 14 (Ct.Cl. 1976), the taxpayer had filed an election under the installment method which required it to

apply that method to all its "revolving credit plan" sales, but erroneously continued to report some of such sales under the ordinary accrual method. When the taxpayer sought to report all revolving credit sales under the installment method, the Internal Revenue Service argued that the taxpayer's action amounted to an impermissible change in its method of accounting. The Court of Claims rejected that argument, stating that "an election of a permissible elective method is valid despite the taxpayer's incorrect application of that method," and held that the taxpayer was entitled to **correct its error** by reporting all of the "revolving credit plan" sales under the installment method. *Id*. at 22-23.

Similarly, in *Thompson-King-Tate v. U.S.*, 296 F.2d 290 (6th Cir. 1961), the Sixth Circuit applied the "error-within-a-method" exception to allow the taxpayer to conform the erroneous treatment of one of its excavation contracts to the completed contract method it used for its other long-term contracts.

Finally, in *Underhill v. Comm.*, 45 T.C. 489 (1966), the taxpayer purchased interest-bearing obligations at a discount and reported the discount on a pro rata basis as payments were received, but later changed reporting of the discount to the cost recovery basis without the consent of the Service. The first issue before the court was to determine if the pro rata basis or the cost recovery method of reporting the discount was correct. Once the Tax Court concluded that the obligations were speculative and the discount was properly reportable on a cost recovery basis, it then turned to the second issue regarding whether the taxpayer had changed his method of accounting. The Tax Court held that the taxpayer "should no more be precluded from reporting his payments on the correct basis than a taxpayer who has previously been reporting nontaxable income as taxable

income would be required to continue to do so because of his prior error. . . ." *Id.* at 496.

*See also, Comm. v. Brookshire Bros. Holding, Inc.*, 320 F.3d 507, 511 (5th Cir. 2003) ("Brookshire's change in the classification of its gas station properties from straight-line depreciation of non-residential real estate to declining balance depreciation of 15-year property does not equate with a change in the taxpayer's method of accounting for purposes of IRC §446."); *O'Shaughnessy v. Comm.*, 323 F.3d 1125, 1132 (8th Cir. 2003)(although reallocation of an asset from one depreciation category to another may change the timing of its depreciation, "[r]eallocating an asset into an existing asset category for purposes of MACRS depreciation more closely resembles a correction of a reporting error or inconsistency than a wholesale change in accounting method."); *Convergent Technologies, Inc. v. Comm.*, 70 T.C.M. (CCH) 87 (1995) (change from amortizing warrants based on their value at the time of issuance to expensing them in year of exercise based on their value at that time treated as a permissible change in characterization); *Coulter Electronics, Inc. v. Comm.*, 59 T.C.M. (CCH) 350 (1990) (the timing consequence "is automatically determined by the characterization [of an item] and no change of accounting within the meaning of section 446 is involved.").[12]

---

[12] *Contra, Cargill, Inc. v. U.S.*, 91 F.Supp.2d 1293 (D. Minn. 2000). However, it was nevertheless important to the district court in *Cargill* whether the taxpayer's original treatment of the property as leased rather than as owned, from which it sought to change to be consistent with its treatment of other properties, was due to inadvertent mistake or a deliberate choice, and the court held that an issue of fact existed on that question that precluded summary judgment. *Id.* at 1300. That dichotomy is not presented in this case. No reason for such suspicion is present in this case.

In this case, Principal's tax department that was responsible for the preparation and filing of its federal income tax returns, the same department that was responsible for payment and recording of the guaranty fund assessments (Tr. 54-55, 67), came to realize that its prior capitalization and amortization of a portion of the guaranty fund assessments for federal income tax purposes had been erroneous, and that such assessments constituted a state tax deductible in full under Section 164. (Stip. ¶42 (sic, ¶45); Tr. 70) Its deduction in full of all of the assessments paid within the taxable years 1991-1994, in the same manner that it had deducted in full for many years certain of such assessments paid to states that allowed no future offset against premium taxes, was proper under Section 164, was not precluded by Section 811(a), and did not require the advance consent of the Internal Revenue Service under Section 446(e).

**(3) Section 164 Overrides Section 446(e).**

Even though Principal consistently treated the guaranty fund assessments as state taxes, always deducted a portion of them in full in the year paid, and deducted the remainder in full after discovery of its error, there is one final reason why the advance consent of the Internal Revenue Service was not required in order for Principal to correct its error and deduct the remainder of such state taxes in the year paid. The requirement of Section 446(e) that consent be first obtained for a change of accounting method is preceded by the clause, "Except as otherwise expressly provided in this chapter, . . ." The chapter referred to is Chapter 1 of the income tax subtitle, and Section 164, which is a part of that chapter, states that all state taxes paid or accrued within the taxable year in carrying on a trade or business "**shall be allowed as a deduction.**" (Emphasis added.) Just as in *Standard Oil, supra,* where the election under Section 263(c) to expense intangible

drilling costs overrode Section 446(e), so likewise in this case the express language of Section 164 similarly overrides Section 446(e). *Standard Oil, supra*, at 383.

**CONCLUSION**

The Defendant was wrong in failing to allow Principal's claims for refund on the issues here involved. Principal was not liable for interest on deferred tax under Section 453A of the Code, and Principal was entitled to deduct its guaranty fund assessments as state taxes in the year paid under Section 164.

Dated June 8, 2005.

Respectfully submitted,

/s/ Bruce Graves
Bruce Graves
Brown, Winick, Graves, Gross,
Baskerville and Schoenebaum, P.L.C.
Suite 2000, Ruan Center
666 Grand Avenue
Des Moines, Iowa 50309
Telephone: 515/242-2400
Fax: 515/283-0231

ATTORNEY FOR PLAINTIFF

Filed electronically.