IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES | ) | |
| | ) | |
| Plaintiff, | ) | No. 02-1278T |
| v. | ) | Judge Francis M. Allegra |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

EILEEN J. O'CONNOR
*Assistant Attorney General*

MILDRED L. SEIDMAN
WILLIAM K. DREW
MARY M. ABATE

*Attorneys*
*Tax Division*
*Court of Federal Claims Section*
*Post Office Box 26*
*Ben Franklin Post Office*
*Washington, D.C. 20044*

# TABLE OF CONTENTS

DEFENDANT'S POST-TRIAL BRIEF . . . . . 1
STATEMENT OF ISSUES . . . . . 1
STATUTES AND REGULATIONS INVOLVED . . . . . 2
STATEMENT . . . . . 2
Interest on Deferred Tax Issue (Internal Revenue Code § 453A) . . . . . 3
The Guaranty Fund Assessments Issue . . . . . 24
ARGUMENT . . . . . 31
I. Code § 453a Applies Here . . . . . 31
A. Introduction . . . . . 31
B. Under the step transaction doctrine, there was no "sale" or other "disposition" of the Prudential notes by Principal to Principal FC . . . . . 32
C. Alternatively, even assuming arguendo that there was a transfer (as a separate transaction) of the Prudential notes by Principal to Principal FC, it did not constitute a "disposition" within the meaning of § 453B . . . . . 33-34
II. The Guaranty Fund Assessments at Issue Are Not Currently Deductible . . . . . 37
A. The assessments at issue are not § 164 "taxes" . . . . . 37
B. Capitalization and amortization of the guaranty fund assessments is required under Code § 811(a) . . . . . 41
C. In any event, Principal's change in its tax treatment of the guaranty fund assessment payments constituted an impermissible change in accounting method under Code § 446(e) . . . . . 42
CONCLUSION . . . . . 51
APPENDIX . . . . . 52

TABLE OF AUTHORITIES

**CASES:**

*Cargill, Inc. v. United States*, 91 F. Supp. 2d 1293 (D. Minn. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 49
*Charles Baloian Co. v. Commissioner*, 68 T.C. 620 (1977), *aff'd*, 9th Cir. 1982 . . . . . . . . . . . . . . . . 42
*Chicago & North Western Transportation Co. v. Webster County Board of Supervisors*, 71 F.3d 265 (1995), *rehear. and suggestion for rehear. en banc denied* (Jan. 2, 1996) . . . . . 39
*Colonial American Life Ins. Co. v. Commissioner*, 491 U.S. 244 (1989) . . . . . . . . . . . . . . . . . . . . 41
*Commissioner v. Clark*, 489 U.S. 726 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33
*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*Commissioner v. Gordon*, 391 U.S. 83 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
*Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148 (1977) . . . . . . . . . . . . . . . . . . . . 6
*Cox v. Commissioner*, 41 T.C. 161 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*Cunningham v. Commissioner*, 44 TC 103 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
*Diebold, Inc. v. United States*, 16 Cl. Ct. 193 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48
*Diebold, Inc. v. United States*, 891 F.2d 1579 (Fed. Cir. 1989), *cert. denied* 498 U.S. 823 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 48, 49, 50
*Dubitzky v. Commissioner*, 60 T.C. 29 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
*Gimbel Brothers, Inc. v. United States*, 535 F.2d 14 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . . 45, 46, 48
*Gregory v. Helvering*, 293 U.S. 465 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*Indopco, Inc. v. Commissioner*, 503 U.S. 79 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
*J.C. Wynne v. Commissioner*, 47 B.T.A.731 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37
*King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . 32, 33
*Korn Industries, Inc. v. United States*, 532 F.2d 1352 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . 45, 47, 48
*Lincoln Savings and Loan Ass'n v. Commissioner*, 403 U.S. 345 (1971) . . . . . . . . . . . . . . . . . . . . 42
*New Jersey v. Anderson*, 203 U.S. 483 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*Pacific Nat'l Co. v. Welch*, 304 U.S. 191 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*Reimer's Estate v. Commissioner*, 12 T.C. 913, *aff'd*, 180 F.2d 913 (1949) . . . . . . . . . . . . . . . . . 39
*Security Industrial Ins. Co. v. United States*, 702 F.2d 1234 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . 33
*South Bay Corp. v. Commissioner*, 345 F.2d 698 (2d Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . 33
*Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349 (1981) . . . . . . . . . . . . . . . . . . . . . . 49, 50
*True v. United States*, 190 F.3d 1165 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
*Underhill v. Commissioner*, 45 T.C. 489 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50
*United States v. La Franca*, 282 U.S. 568 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996) . . . . . . . 38-39
*Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
*Witte v. Commissioner*, 513 F.2d 391 (D.C. Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 50

**STATUTES:**

Code of Iowa:
Chapter 508C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24
§ 508C.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 40

§ 508C.5 . . . . . . . . . . 24
§ 508C.6 . . . . . . . . . . 24
§ 508C.7 . . . . . . . . . . 25
§ 508C.9 . . . . . . . . . . 25
§ 508C.19 . . . . . . . . . . 25
§ 521A.5 . . . . . . . . . . 12
Internal Revenue Code of 1954 § 453(d) . . . . . . . . . . 2, 34, 37
Internal Revenue Code of 1986 (26 U.S.C.):
§ 103 . . . . . . . . . . 38
§ 162 . . . . . . . . . . 27
§ 164 . . . . . . . . . . 2, 28, 29, 30, 37, 38, 41, 49
§ 164(a) . . . . . . . . . . 2, 37, 38, 39
§ 164(b) . . . . . . . . . . 38
§ 263 . . . . . . . . . . 50
§ 351 . . . . . . . . . . 15, 16, 37
§ 357 . . . . . . . . . . 16, 37
§ 446 . . . . . . . . . . 2, 47, 50
§ 446(a) . . . . . . . . . . 42
§ 446(b) . . . . . . . . . . 44
§ 446(c) . . . . . . . . . . 43
§ 446(e) . . . . . . . . . . 2, 42, 49, 50
§ 452 . . . . . . . . . . 36
§ 453 . . . . . . . . . . 1, 2, 4, 5, 22
§ 453A . . . . . . . . . . 1, 2, 3, 5, 6, 22, 24, 33, 37
§ 453A(a) . . . . . . . . . . 31
§ 453A(b) . . . . . . . . . . 31
§ 453A(c) . . . . . . . . . . 31
§ 453B . . . . . . . . . . 1, 2, 31, 34
§ 453B(a) . . . . . . . . . . 32, 34
§ 461 . . . . . . . . . . 27
§ 481 . . . . . . . . . . 47
§ 811 . . . . . . . . . . 2
§ 811(a) . . . . . . . . . . 2, 41
§ 1001 . . . . . . . . . . 16
§ 1502 . . . . . . . . . . 2
Revenue Act of 1928 § 44(d) . . . . . . . . . . 2, 34, 35, 36

**REGULATIONS:**

Treasury Regulations (26 C.F.R.):
§ 1.103-1 . . . . . . . . . . 38
§ 1.164-3 . . . . . . . . . . 38

§ 1.446-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43, 44, 45, 46, 48, 50
§ 1.461-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 42
§ 1.481-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
§ 1.1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
§ 1.1502-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 31, 36

**MISCELLANEOUS:**

Bittker, Federal Taxation of Income, Estates and Gifts (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Chief Counsel Advisory 200242001, reprinted in 2002 WL 31341839 (July 10, 2002) . . . . . . . . . . . 50
H.R. Rep. 70-2, 70th Cong., 1st Sess. (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Model Life and Health Insurance Guaranty Fund Association Act (NAIC 1970) . . . . . . . . . . . . . . 24, 25
Rev. Rul. 61-152, *reprinted in* 1961-2 C.B. 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Rev. Rul. 70-539, *reprinted in* 1970-2 C.B. 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Rev. Rul. 70-622, *reprinted in* 1970-2 C.B. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Rev. Rul. 75-56, *reprinted in* 1975-1 C.B. 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Rev. Rul. 75-457, *reprinted in* 1975-2 C.B. 196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37
Rev. Rul. 77-29, *reprinted in* 1977-1 C.B. 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Rev. Rul. 77-164, *reprinted in* 1977-1 C.B. 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Rev. Rul. 77-165, *reprinted in* 1977-1 C.B. 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Rev. Rul. 82-122, *reprinted in* 1982-1 C.B. 80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Rev. Rul. 90-38, *reprinted in* 1990-1 C.B. 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 46
S. Rep. No. 70-960, 70th Cong., 1st Sess (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1278T
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE
COMPANY AND SUBSIDIARIES,

Plaintiff

v.

THE UNITED STATES,

Defendant

DEFENDANT'S POST-TRIAL BRIEF

This is an action for refund of federal income tax in the amount of $34,753,612, plus assessed and statutory interest thereon, for the taxable years 1991-1994.

STATEMENT OF ISSUES

1. Whether Code § 453A, which imposes interest on the deferred tax on Principal's $68,032,598 gain from the sale in 1991 of mortgage loans to Prudential Life Insurance Company (Prudential), reported on the installment method under § 453, is inapplicable by virtue of § 453B;

a. Whether, under the step transaction doctrine, there was no "sale" or other "disposition" by Principal to its subsidiary of the installment obligations received from Prudential;

b. Alternatively, whether there was a "disposition" by Principal to its subsidiary of the Prudential installment obligations, within the meaning of Code § 453B.

2. Whether state guaranty fund assessments in states (in which plaintiff does business) that allow all or part of such assessments to be offset or credited against future premium, franchise, or income taxes are currently deductible or must be capitalized and amortized over the time periods the assessments are to be offset or credited;

a. Whether state guaranty fund assessments are "taxes" deductible under Code § 164(a);

b. Whether capitalization and amortization of the guaranty fund assessments is required under Code § 811(a);

c. Whether plaintiff's change from capitalizing and amortizing to currently deducting the state guaranty fund assessments at issue is an impermissible change of accounting method under Code § 446(e).

STATUTES AND REGULATIONS INVOLVED

Sections 164, 446, 453, 453A, 453B, 811, 1502, Internal Revenue Code of 1986; § 453(d), Internal Revenue Code of 1954; the applicable Regulations; § 44(d), Revenue Act of 1928; Code of Iowa, Chapter 508C.

STATEMENT

During the years in issue (1991-1994), plaintiff (Principal) was an Iowa mutual life insurance company, filing consolidated returns as the parent corporation of a consolidated group of corporations. During tax years 1991-1994, and at all times relevant to this action, Principal was a calendar-year, accrual-basis taxpayer subject to tax under the provisions of Subchapter L of the Internal Revenue Code (the

"Code").[1] Principal's income tax returns for the years 1991-1994 were timely filed, and the tax shown thereon was timely paid. (DPF 1-3.) Following examination of Principal's 1991-1994 returns, the Internal Revenue Service (IRS) assessed income tax deficiencies and interest which Principal thereafter paid. Principal subsequently filed timely claims for refund of a portion of the additional tax and interest. The claims were disallowed in part, and Principal thereafter timely filed this suit for refund of a portion of the amounts disallowed. (DPF 4-6.)

**Interest on Deferred Tax Issue (Internal Revenue Code § 453A)**

In 1985, Principal (then called "Bankers Life Company") sold to Prudential Life Insurance Company 155 commercial real estate mortgage loans that Principal had originated. At the same time, Principal purchased from Prudential 105 commercial real estate mortgages that Prudential had originated. (DPF 9.) In 1990, Principal was considering various ways in which it could increase its statutory surplus (*i.e.*, its surplus reported to state insurance regulators). Principal's senior management thought it would be necessary to increase its statutory surplus by roughly $150-200 million. (DPF 18, 19.) In 1991, Prudential approached Principal with the idea of "unraveling" the 1985 transaction, before December 31, 1991. Principal anticipated that the proposed transaction could generate gain of $75 million (a significant portion of the desired increase in surplus).

As early as April 1991, Principal employees who were considering the feasibility of a mortgage loan swap recognized that there would be potential tax problems, and that they should start considering what the tax effects would be. (DPF 20-22.) Principal continued to explore the various pros and cons of the

---

[1]On July 1, 1998, "Principal Mutual Life Insurance Company" changed its name to "Principal Life Insurance Company" in the course of a reorganization. (DPF n.1.) Citations herein to Defendant's Proposed Findings of Uncontroverted Fact, filed simultaneously herewith, are abbreviated as "DPF."

proposed new transaction throughout July and August 1991. On August 26, 1991, Kurt Lettow (Principal's Investment Accounting Analyst) prepared a detailed analysis of the tax cost (which he estimated at $10,250,000) of exchanging mortgages with Prudential. In September/October, a team of Principal employees from its commercial real estate, mortgage loan, accounting, legal, and tax departments (John Schmidt, Kurt Lettow, Brad Jensen, Cynthia (Cindy) Cannon, JoEllen Watts, Lillian Chen, Jed Fisk, Pat Halter, and Margie Johnson) was assembled to plan the "unraveling" of the 1985 transaction through the new 1991 transaction. (DPF 23-25.)

In the third quarter of 1991, Principal lost its triple-A ratings from both Moody's and Standard & Poor's. Principal did not want to show a new $503 million liability to Prudential on its books or Annual Statements, because of the potential that ratings agencies, insurance regulators, customers, and marketers would consider it a sign of financial weakness. To address the problems associated with the new transaction, the idea was explored of "defeasing" the liability, or causing it to be nonreportable, by assigning high-quality assets to it in accordance with FASB 76. (*See* DPF n.6.) Among the ideas considered to accomplish defeasance were creation of a trust and assignment of Treasury obligations to the debt. (DPF 26, 27.) Also, Prudential insisted that Principal's liability to it be made "bankruptcy remote" (*i.e.,* that Prudential be insulated against possible Principal insolvency by preserving a right of offset against any unpaid balance of the purchase price). (DPF 28.)

On September 11, 1991, Principal's John Schmidt discussed with Prudential's tax attorney, Frank Gould, alternative ways (mortgage loan sale, real estate investment trust (REIT), leveraged asset trust) to structure the unraveling in order to minimize its tax effects. In a meeting of the Principal team on September 12, 1991, Mr. Lettow suggested that the anticipated $10 million gain be deferred under Code § 453, noting

that there is an interest charge on deferred tax gain. In a memorandum dated September 18, 1991, Principal's Kathy Ennis reported her conclusion that a sale of commercial mortgage loans would qualify for installment-sale treatment under Code § 453, but "we will also have to calculate interest on the deferred tax over the life of the installment note. This interest will be treated as both an additional tax and an interest expense deduction." (DPF 29-31.)

Mr. Lettow documented his assumptions regarding the present value tax liabilities of either holding the mortgages or selling them to Prudential, in a memorandum to other team members dated September 19, 1991:

> From a tax standpoint we would be worse off selling the loans to Prudential even with a 20 year installment note. This is due partly to the method we employ in amortizing discount and also to the rules under IRC § 453A requiring interest on the deferred tax liability. Extending the term of the installment note would not achieve further substantial tax savings.

(DPF 32, 33.) On September 20, 1991, Mr. Lettow sent another memorandum, with detailed analyses in four attachments, to 19 Principal employees, reporting his preliminary findings that showed "a wide spread between the present value tax liabilities under the two alternatives and favors holding our current portfolio (Attachment 2)." The memorandum also noted that application of the § 453A interest rules would mitigate favorable installment-sale tax treatment under § 453. (DPF 34-36.)

In an e-mail to other Principal team members on October 2, 1991, Principal's attorney John Schmidt reported on his preliminary analysis regarding the suggestion by Prudential's tax attorney (Frank Gould) that Principal use a trust, taxable as a corporation, to avoid the § 453A interest charge. He noted that Frank Gould--

> maintains that a sale of the installment note to a subsidiary corporation avoids application of this rule because the transfer to the sub results in a deferred intercompany transaction, and gain is not

> recognized until the earlier of (1) transfer of the property to an unrelated third party, or (2) payments are received from the buyer. Gould's interpretation is based on the theory that the transfer to the sub accelerates recognition of the entire gain, taking it out of the installment sale rules, but then deferring the gain under the consolidated return regulations.

In his October 2 e-mail, Mr. Schmidt described anticipated problems with the IRS regarding Mr. Gould's theory, noting that there was no authority supporting an argument that a trust could join in a consolidated return with Principal. He concluded that "the question is whether we want to assume the risk in order to get the statutory gain in 1991." (DPF 37-39.)

In an e-mail to Mr. Schmidt on October 3, 1991, Mr. Lettow inquired why Principal could not "use an established subsidiary like Petula to sell the installment note to. . . . Once the sub has assumed the liability and the installment note receivable, it could then transfer the note and liability to a trust if desired to get it off its books." Mr. Schmidt replied, on October 3, 1991, that it might be necessary to use a trust in order to "get the liability off the [annual] statement."[2] (DPF 40, 41.) Margie Johnson (Principal's Mortgage Underwriter--Commercial Real Estate) sent other team members an e-mail on October 3, 1991, suggesting that they meet the next morning, "especially in light of the recent suggestion by Pru for us to establish a trust to hold both the note payable and receivable."[3] (DPF 42.)

In a memorandum to the file dated October 4, 1991, Mr. Schmidt analyzed the § 453A interest

---

[2]*See Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 150 (1977):

> This national organization of state regulatory officials [the National Association of Insurance Commissioners, or NAIC], which acts on behalf of the various state insurance departments, performs audits on insurance companies like [Principal] which do business in many States. The NAIC accounting form, known in the industry as the "Annual Statement," is used by [Principal] for its financial reporting.

[3]Mr. Schmidt's notes recording that October 4 meeting reflect his statement that a trust would "need some equity - but I don't think we need a lot. $100,000 to $1 MM." (DPF 43.)

problem in detail, and concluded that in his opinion the § 453A interest charge could be avoided by a sale of the installment note to a subsidiary, and that a trust could be treated as a corporation eligible under the Consolidated Return Regulations (§§1.1502, *et seq*.) to enter into a "deferred intercompany transaction" as a member of an affiliated group. (DPF 44.) Mr. Schmidt forwarded this memorandum to other team members, noting that he expected that the IRS auditors would challenge the proposed treatment of the Prudential transaction. (DPF 45.)

In another memorandum to other team members on October 4, 1991, Mr. Schmidt stated that he and Jed Fisk (Principal's Associate Director for Corporate Tax) had narrowed the possibilities of which subsidiary should be used to hold the Prudential note and assume the liability to Prudential, "based on the following points" (DPF 46):

1. We do not wish to use an insurance company, as this creates regulatory road blocks.

2. We do not wish to use any company subject to regulation by the Securities and Exchange Commission, as it may create road blocks.

3. We do not wish to use any company that is generating losses, or that will generate losses during the next five years, as we believe that such losses will become ineligible (that is, they cannot be used to offset income from the life insurance companies).

4. We do not wish to use any company that has a substantial amount of equity, as we do not wish to place a large amount of equity at risk.

5. We do not wish to use any company that is engaged in business in a large number of states such that the transfer would generate state tax problems.

Principal's Margie Johnson informed other team members on October 4, 1991, that Principal's senior management was still concerned about the potential cost of the proposed Prudential transaction "and may need some consideration to go forward." She therefore requested that Prudential be given (DPF 47) --

> only limited feedback at this time re. our opinion of the tax avoidance. Craig [Barnes] did indicate to Pru that we were fairly confident that the proposal to avoid the tax hit would work, but he also postured the conversation by relaying that certain members of sr. mgmt. were not comfortable with even the small level of uncertainty concerning this proposal.

In an October 8, 1991, e-mail message to John Schmidt (copied and forwarded to other team members), Principal's Pat Bailey pointed out a problem with using The Principal Financial Group, Inc., as Mr. Schmidt had suggested. A suit had been filed against that company, and there was also concern about the potential for losing the company name if bankruptcy, for example, should occur. The message concluded: "Do we not have the option of opening a new company in which to house this transaction?" (DPF 48.)

Pat Halter informed other team members on October 8, 1991, that, in a phone conversation that day, Prudential was reluctant to agree to provide any additional consideration for the proposed transaction, and that Prudential–

> also noted that the installment sale idea with the sale of the receivable to an affiliate was passed on to their accounting firm DeLoitte Touche and their tax partner relayed to Pru that the structure would be effective in achieving it's [sic] purpose. . . . Frank [Gould] will be providing to Craig [Barnes] the name of the tax partner who we can call to discuss the Deloitte Touche opinion with. If this checks out Craig and myself are somewhat reluctant to pursue the consideration matter much further.

On October 9, 1991, Craig Barnes e-mailed Messrs. Schmidt and Fisk, noting that Pru's accountants (DeLoitte Touche) planned to recommend Frank Gould's "thinking on the tax deferral through consolidation" to all their tax partners. Mr. Schmidt called Gene Ferraro, at Deloitte Touche, to explore the idea further, on October 10, 1991. Mr. Ferraro told him that some people in the firm agreed with Mr. Gould's analysis, but the firm had not written an opinion, and Mr. Ferraro "thinks there is some degree of risk here." Mr. Ferraro would charge $10,000 or more to write an opinion on the issue. (DPF 49-51.)

On October 14, 1991, Principal's Vice President and Corporate Secretary, Joyce Hoffman, e-mailed Mr. Schmidt, stating (DPF 52):

> We could get an Iowa sub set up within a week, I believe. There are no capital requirements per se for a general purpose business corporation. If we undercapitalize, however, in comparison to the amount of capital the corporation needs to reasonably be able to meet its obligations, we . . . [remainder of message not provided by plaintiff].

Mr. Schmidt attended a meeting on October 15, 1991, at which--

> the consensus of the group was that we should create a new sub under Principal Holding Company to hold the asset and liability acquired from Principal Mutual that relate to the transactions.

He relayed this information to Ms. Hoffman on October 15, 1991, asking how to go about establishing the sub. (DPF 53.) Principal's Kris Anderson suggested possible names for the new subsidiary, all beginning with "Principal," in an e-mail to Mr. Schmidt on October 16, 1991. The suggested names (DPF 54) –

> are based on the idea that the name should contribute to our corporate identity by adding a name that we may find useful to have in the future, or which describes services Principal Mutual or its subsidiaries now do. In that way, we will already have a name "reserved" for possible future use.

Mr. Schmidt e-mailed other team members on October 24, 1991, with the news that Mr. Gould had informed his clients at Prudential "that Principal was going to put both the asset and liability in a sub, and that Pru would have a sub purchase the note it receives from Principal Mutual. Pru intends to retain the liability . . . ." (DPF 55.) On October 24, 1991, Margie Johnson discussed with Prudential's business people how to structure the installment notes, "and how they propose to do their intercompany sale to avoid the tax charges." They also discussed other potential problems, such as the documentation of the notes. "If the documentation shows that the notes are essentially secured by each other, do we take on any additional risk of not getting the tax treatment we desire?" Ms. Johnson e-mailed Mr. Schmidt and other team members on October 25, 1991, relaying this information, and noted that Prudential was still exploring the various options.

"They have not ruled out doing the sale as we proposed and sell both the asset and liability to a single purpose sub, with the notes being non-recourse and essentially secured by each other." (DPF 56.)

In a letter to Prudential's Mark Warner of November 7, 1991, Margie Johnson memorialized the highlights of the planned structuring of the transaction that had been determined among Prudential's and Principal's business, legal, and tax/accounting personnel in a conference call the previous week. *Inter alia*, in that conference the parties had determined:

> - Principal Mutual will issue a non-recourse note to Prudential in exchange for the purchase of the loans currently held by Prudential. This note payable will be secured by a note received by Principal Mutual from Prudential. The note receivable securing the note payable represents Prudential's consideration for its purchase of the loans held by Principal Mutual. Principal Mutual will sell the note from Prudential to a newly formed subsidiary in exchange for that subsidiary assuming Principal Mutual's obligation for the note payable to Prudential.
>
> - Prudential will issue a recourse unsecured obligation to Principal Mutual in exchange for the purchase of the loans currently held by Principal Mutual. . . . To the extent Prudential desires to assign this note to a subsidiary in the future, Prudential will remain liable.
>
> * * *
>
> - Both notes will need to mirror each other in terms of payments and maturity date with the exception of the $20 million approximate difference in principal balance which will need to be treated separately. . . .

In his notes of a meeting of team members on November 7, 1991, Mr. Schmidt noted that if the Iowa Insurance Department characterized the transaction as an investment, there would be a problem. "It needs to be treated as a sale." (DPF 58-60; *see* DPF 61.)

On November 11, 1991, Mr. Schmidt notified other team members that Frank Gould had identified potential tax problems if Principal issued a non-recourse note to Prudential and used that note as security for Principal's subsidiary's payment of the liability to Prudential. When Mr. Schmidt told Mr. Gould that Principal would want its subsidiary to assume recourse liability, Mr. Gould–

> said that was not acceptable to Pru--Pru would have no ability to recover the debt should we refuse to pay, and they must have that legal right to recovery. So they want the original note to be recourse, even if only for a moment.
>
> I am still reviewing the tax rules, but I think Gould's concern is valid. I think it's time to request help from outside counsel on the tax side . . . .

(DPF 62.) Outside counsel Cynthia Williams of Day, Berry & Howard faxed a memorandum to Margie Johnson and Principal attorneys JoEllen Watts and John Schmidt, on November 12, 1991. She proposed a revised structure addressing the non-recourse note problem, stating (DPF 63):

> The NEWCO [*i.e.*, Principal's proposed newly-formed subsidiary] charter will provide that NEWCO may enter into no business or transactions other than the holding of these assets and the assumption of the Principal Notes payable. Any transfer or encumbrance of NEWCO's assets must be consented to by a majority of the shareholders of NEWCO. The NEWCO charter will also provide that the pledgee of such shares is entitled to vote as a stockholder. This should provide comfort that NEWCO cannot become bankrupt or engage in any business or transaction which might otherwise create a concern on Pru's part that the assets of NEWCO are not available for repayment of the nonrecourse Principal Notes.

Ms. Williams' proposal was faxed to the team members after a conference call the morning of November 12, 1991, during which they discussed the non-recourse note problem. In response to Margie Johnson's question whether they could show a payment guarantee by Principal on Principal's Annual Statement, Mr. Schmidt reminded the others that they needed to have **no** such disclosure on the Annual Statement, in order "to support our tax position, ie [sic] business reason for sale to sub." (DPF 64.) After reviewing Ms. Williams' faxed proposal, the team members added the Prudential people to the conference call and relayed her proposal to them. Mr. Gould wondered if Principal could be in a better tax position "if at moment of closing, we issue a recourse note, have it assumed by someone else if certain conditions were met. Then have sub assume liability." (DPF 65.) Mr. Schmidt then prepared a memorandum, dated November 12, 1991, to Pat Halter (Principal's Assistant Director--Commercial Real Estate) and Margie

Johnson analyzing the tax considerations of the non-recourse note problem. He concluded "that there is a significant risk that the Internal Revenue Service will maintain that we cannot defer recognition of the gain on the loans we sell if we use Prudential's note as security for our debt." (DPF 66.)

On November 13, 1991, attorney Cynthia Williams faxed another memorandum, "Proposed Structure of Principal/Pru Portfolio Sales," to Principal attorneys Watts and Schmidt, and Margie Johnson. *Inter alia*, this proposal provided that Principal would pay the contemplated $520 million purchase price for its original mortgage loans by issuing two recourse unsecured purchase money notes payable to Prudential. (DPF 67.) It also provided that Principal, Prudential, and "a newly formed single purpose subsidiary of Principal ('NEWCO')" would enter into an agreement whereby Principal would sell its rights under Prudential's note to NEWCO in exchange for NEWCO's assumption of Principal's obligations under its notes to Prudential; and that NEWCO would (*ibid.*) --

> agree for the benefit of Pru . . . that NEWCO may enter into no business or transactions other than the holding of these assets and the assumption of the Principal Notes payable. NEWCO will agree that any transfer or encumbrance of NEWCO's assets must be consented to by Pru.

Principal wrote to the Iowa Division of Insurance on November 15, 1991, enclosing a "Form D - Prior Notice of a Transaction," providing notice of the contemplated transaction with Prudential. (DPF 68.) *Inter alia*, Principal stated (*ibid.*):

> We are carefully structuring the transaction so as to minimize adverse tax consequences. . . . We propose to sell the note we receive from Prudential to a subsidiary; the subsidiary would assume our liability on the note Principal Mutual issues to Prudential in consideration for the note purchased by the subsidiary. We will sell additional assets to the subsidiary to permit it to match cash flows on the asset and liability. As a result, the subsidiary will purchase assets with a fair market value of approximately $520 million and it will assume liabilities with a fair market value of approximately $520 million.
>
> We have not yet determined whether we will use an existing subsidiary or create a new subsidiary.

We expect to close the transaction in 1991.[[4]]

Margie Johnson e-mailed the other Principal team members, on November 19, 1991, with the news that Prudential did not want specific rights of set-off specified in the transaction documents. (DPF 71.) Ms. Johnson observed that (*ibid.*)–

> there is probably no risk in omitting the set off language from the documents. What it does mean, however, is that if there is a default by Pru, we will be forced to sue them on a monthly basis under their recourse obligation if we don't want to accelerate our tax hit.

Mr. Schmidt responded the same day, stating (DPF 72):

> I agree that the rights of setoff weaken our tax case, and I prefer to delete them if you are willing to accept the business risk.
>
> I do think we should retain the acceleration clause upon default--just in case we decide the business needs override the tax cost.

On December 6, 1991, Pat Halter and Margie Johnson submitted a memorandum to Principal's

---

[4]Principal's prior notice of the contemplated transaction with Prudential was sent to the Iowa Division of Insurance pursuant to § 521A.5(1)(b) of the Iowa Code, which provides:

> b. A domestic insurer and a person in its holding company system shall not enter into any of the following transactions between each other . . . unless the domestic insurer notifies the commissioner in writing of its intention to enter into the transaction at least thirty days prior to entering into the transaction or within a shorter time permitted by the commissioner and the commissioner has not disapproved of the transaction within the time period:
>
> (1) Sales.
> (2) Purchases.
> (3) Exchanges.
> (4) Loans or extensions of credit.
> (5) Guarantees.
> (6) Investments.
> (7) Loans or extensions of credit to a person who is not an affiliate . . . .

Principal's prior-notice letter was stamped "No objection" by the Division of Insurance, on November 18, 1991. (DPF 69, 70.)

Investment Committee, recommending approval of the proposed transaction with Prudential. (DPF 73.) Describing the transaction structure, the memorandum stated, *inter alia*:

- Simultaneous with closing, Principal Mutual will sell the $486 million note from Pru and $34 million in Treasury obligations to a newly-formed, single-purpose subsidiary. Subsidiary will assume recourse obligation for the notes from Principal for $520 million.
- Principal Mutual is released from any recourse obligation.
- An additional $1-2 million will be required for capitalization of the subsidiary.

The memorandum noted; "Anticipate transaction will be tax neutral (hold vs. sell), although the possibility exists for the IRS to challenge the structure. If the IRS is successful, the potential tax cost may be $9-10 million." (*Ibid.*) Principal's Investment Committee approved the proposed transaction with Prudential. (DPF 74.)

During several telephone conferences on December 9, 1991, among the various Principal and Prudential transaction planners, the potential tax problems related to the proposed structuring of the transaction, and possible solutions, were discussed. (DPF 75.) Mr. Schmidt noted that there was a risk that, if Principal guaranteed its contemplated subsidiary's net worth, the IRS could use it as a "basis for reallocation to [Principal] Mutual or a finding of a sham." Frank Gould observed that they wanted to "give appearance that assets inside sub can be [with]drawn." (DPF 76.) Cindy (Cynthia) Williams noted the "tension" between Principal's goal of getting the liability to Prudential off its balance sheet and the "tax deal." (DPF 77.)

The "tension" between the tax concerns and the recourse problem was the issue during the conference call beginning at 4:40 p.m. on December 9, 1991. In response to the question regarding how Prudential would protect itself if Principal would not issue a recourse note, Pat Halter stated that Principal "would accept a condition that we would not cause sub to violate charter," and Cindy Williams commented

that Prudential would then be able to sue Principal for a violation by the subsidiary, since Principal was the sole shareholder. The Prudential people agreed to accept a covenant that the parent (Principal) would not cause the subsidiary to violate its charter, and the subsidiary would make covenants. (DPF 78.)

In a conference call on December 11, 1991, with outside counsel Cindy Williams and Martin Allen, of Day, Berry & Howard, Principal's Assistant Counsel JoEllen Watts and John Schmidt again discussed the "tension" between the tax and economic goals. (DPF 79.) Mr. Allen raised the issue whether the IRS could question whether the transfer to the subsidiary was "a good sale or exchange. IRS could say that [it's] a § 351 transfer." (*Ibid.*) In an e-mail to Margie Johnson, Pat Halter, and JoEllen Watts after that discussion, Mr. Schmidt stated:

> I don't think there is much risk with the section 351 incorporation issue; the only way to truly minimize the risk is to use an existing corporation that has other business, and we don't want to risk the assets in another corporation. Assuming we use a new, single-purpose sub, the best thing to do is to have the documents clearly state that this is a sale, not a capital contribution or transfer in exchange for stock. I recommend we proceed to close the deal.

(DPF 80.) In another conversation with John Schmidt later that day (December 11, 1991), Mr. Allen emphasized that Principal needed a sale "to get deferral under § 1.1502-13 of the [Regulations]." They also discussed the possibility that the IRS would find that the transfer to the subsidiary was a § 351 transaction, and also whether the IRS could take the position that there was no installment sale, but rather an exchange. Mr. Schmidt notified Johnson, Halter, and Watts about this call and that he and Mr. Allen had reviewed most of the potential tax problems, yet he stated, "Please proceed." (DPF 81, 82.)

On December 11, 1991, Cindy Williams faxed a draft of the proposed purchase agreement to JoEllen Watts, who forwarded it to John Schmidt, Margie Johnson, and Pat Halter with a handwritten note that stated in part: "Cindy has not yet incorporated John's suggestion re making clear that this is a sale, not a

capital contribution or transfer in exchange for stock. She intends to add more explicit language." (DPF 83) The next day, December 12, 1991, JoEllen Watts e-mailed Schmidt, Halter, and Johnson regarding a question raised by Cindy Williams in connection with "getting the sub rolling" (DPF 84) --

> whether we intend to capitalize the sub and for how much and then [sell] the stock say for $1, or whether we want to forego any capitalization per se and put a price on the stock in the amount of money that [Principal] intends to move down. Cindy thought you may have an opinion due to tax reasons.

Mr. Schmidt replied (DPF 84):

> I prefer to issue the stock in exchange for the amount of capital we are placing in the sub, i.e., $1--2 million. This action supports our position that the transfer of the note and liability are a sale, rather than part of the incorporation of the sub in exchange for stock.

Mr. Schmidt spoke with Martin Allen again on December 12, 1991. Mr. Allen was still concerned about the possibility that the IRS would view the transfer to the subsidiary as a § 351 transaction. In that event, he concluded the subsidiary's assumption of Principal's liability would not be treated as **recognized** gain, by virtue of Code § 357, and thus Principal "can't rely on 357 to give us recognized gain. So the tension is on the sale, need § 1001 to apply, not 351." (DPF 85.) Mr. Schmidt relayed to Watts, Halter, and Johnson Mr. Allen's concerns "whether the transfer to the sub is a sale, and whether the transfer allows us to escape the charge for interest on the deferred tax liability." (DPF 86.) In an e-mail to Watts, Halter, and Johnson on December 13, Mr. Schmidt reported the gist of the next day's conference call with Frank Gould, stating (DPF 87):

> I talked to Martin Allen and Frank Gould this morning regarding some of the tax issues arising from this transaction. Allen is very concerned about the section 351 transfer issue (i.e., that the transfer of the note to the sub is a capital contribution), but we don't think Prudential has much risk on that point because they are using an existing sub that has some business, rather than a new shell corporation.

> Allen focused on the risk that the IRS would continue to charge the interest on the deferred tax liability even after the transfer of the note to the sub. . . . Pru is willing to take this risk, as am I. But you should recognize that Allen has considerable discomfort with the position Pru and I am [sic] taking – that we can avoid the interest charge on the deferred tax liability.

On December 16, 1991, Mr. Schmidt advised other team members that most of the details had been worked out, except for § 4.02 of the purchase agreement (DPF 88) --

> The name of the sub will be "Principal FC, LTD." The articles will be filed on Tuesday. Our outside counsel recommends that the $1 million in capital be transferred from Principal Holding Company and that Principal Mutual not make a transfer to the holding company until some later date.

On December 17, 1991, the Articles of Incorporation of Principal FC, LTD. ("Principal FC") were filed with the Iowa Secretary of State. (DPF 91.) *Inter alia*, ¶ 5 of the Articles provided (*ibid.*):

> (a) The corporation shall be and remain a single purpose corporation organized under the laws of a state in the United States.
>
> (b) The corporation shall not engage directly or indirectly in any business other than:
>
> (i) the ownership of the following (each an "Eligible Investment"):
>
> * * *
>
> (D) Purchase Money Notes due in 1999 and 2002 issued in an aggregate original principal amount not in excess of $525,000,000 by The Prudential Insurance Company of America pursuant to the Purchase and Sale Agreement, dated December 20, 1991, between The Prudential Insurance Company of America, as purchaser, and Principal Mutual Life Insurance Company, as seller, together with any note or notes issued in exchange therefor or replacement thereof pursuant to Article V of such Purchase and Sale Agreement; and . . .
>
> (ii) the assumption of
>
> (A) The Purchase Money Notes due in 1999 and 2002 (the "Notes") issued in an aggregate original principal amount not in excess of $525,000,000 by Principal Mutual Life Insurance Company pursuant to the Purchase and Sale Agreement, dated December 20, 1991, between Principal Mutual Life Insurance Company, as purchaser, and The Prudential Insurance Company of America, as seller, together with any note or notes issued in exchange therefor or replacement thereof pursuant to Article V of such Purchase and Sale Agreement, and . . . .

> (c) The corporation shall not incur, permit or suffer to exist any indebtedness of the corporation except for the Notes.

Paragraphs 5(d)-(h) of Principal FC's Articles of Incorporation prohibited it from disposing of any Eligible Investments (unless they were replaced with others with the same characteristics), encumbering any of its assets, distributing any dividends to shareholders if such distributions would result in a negative net worth, making any loans or guarantees, owning or acquiring any stock (other than Eligible Investments), and merging with or transferring assets to any entity other than one having articles of incorporation identical to Principal FC's. (DPF 92.) Paragraph 5(i) stated (DPF 93):

> The provisions of this paragraph 5 may not be amended or modified without the prior written consent of the registered owners of not less than 66 2/3 % of the aggregate outstanding principal balance of the Notes.

The following day Principal capitalized the new subsidiary with capital of $1 million, which was provided through a wire transfer of funds to the new subsidiary's account. Such capital remained intact in the subsidiary's account continuously throughout the years in suit, in the form of cash and/or investments. (DPF 94.)

On December 20, 1991, a Purchase and Sale Agreement was executed between Principal (purchaser) and Prudential (seller), with respect to 131 commercial mortgage loans that had been sold to Prudential in 1985. Also on December 20, 1991, another Purchase and Sale Agreement was executed between Principal (seller) and Prudential (buyer), with respect to 71 commercial mortgage loans that had been purchased from Prudential in 1985. Section 4.02 ("Assignment of the Purchase Money Notes and Other Obligations") of each Purchase and Sale Agreement mandated in subsection (a) that the articles of incorporation of any assignee contain the identical covenants, requirements, and prohibitions that were contained in the Articles of Incorporation of Principal FC. (DPF 96-98.)

In addition, under § 4.02(b) of each Purchase and Sale Agreement, the purchaser covenanted that it would remain the sole shareholder of the assignee, that it would not cause or permit the assignee to violate any of its covenants, and that it would not cause any of the described "Insolvency Events" to occur. And, in addition, under § 4.02(c) of each Purchase and Sale Agreement, the assignee covenanted that it would not violate its articles of incorporation, and that it would not sell, transfer, assign, or delegate its obligations regarding the Purchase Money Notes. (DPF 99, 100.)

Section 4.02(d) of each Purchase and Sale Agreement provided (DPF 101):

> Purchaser's right to delegate its obligations under the Purchase Money Notes and to be released from liability thereunder as provided in this Section 4.02 is a one-time right. If Purchaser exercises its right to delegate its obligations under the Purchase Money Notes and is released from liability thereunder, and Purchaser thereafter assumes liability under one or more Purchase Money Notes, Purchaser shall have no further right to delegate its obligations under such Purchase Money Note and be released from liability thereunder.

Article V of each Purchase and Sale Agreement governed the Notes. Section 5.01 of each agreement mandated:

> Each Purchase Money Note delivered by the Issuer on the Closing Date shall be dated as of the Closing Date. All other Purchase Money Notes that are delivered after the Closing Date for any other purpose under this Agreement shall be dated the date of their execution.

Article I of each Purchase and Sale Agreement defined "Issuer" as follows:

> Issuer: The obligor under the Purchase Money Notes. The initial Issuer shall be the Purchaser. If the Purchaser is released from its obligations with respect to the Purchase Money Notes pursuant to Section 4.02, its assignee shall become the Issuer.

The Purchase Money Notes were listed and described in Schedule V to each Purchase and Sale Agreement. (DPF 102-104.)

Representing the purchase price, Principal executed in favor of Prudential three promissory notes ("Purchase Money Notes") totaling $504,637,639. Two of the notes, designated Purchase Money Notes

Nos. 2 and 3, were each in the amount of $239,238,347; one was payable in full on January 1, 1999, and the other was payable in full on January 1, 2002. Both of these Purchase Money Notes (which totaled $478,476,694) were dated December 20, 1991. Principal also executed promissory notes ("Purchase Money Notes" Nos. 4-7) to Prudential's subsidiaries PruSupply Capital Assets, Pruco Life Insurance Company, and Prudential Realty Securities II, Inc. (two notes) in the same total amount ($478,476,694) as that of Purchase Money Notes Nos. 2 and 3. All four of these Purchase Money Notes were dated December 20, 1991. (DPF 105, 106.) Purchase Money Notes 2 and 3, from Principal to Prudential were cancelled. (DPF 107.)

Representing the purchase price, Prudential executed in favor of Principal its promissory notes ("Purchase Money Notes"), designated Purchase Money Notes 1 and 2, each in the amount of $239,238,347, payable in full on January 1, 2002, and January 1, 1999, respectively. Both of these Purchase Money Notes (which totaled $478,476,694) were dated December 20, 1991. On December 20, 1991, Prudential executed promissory notes ("Purchase Money Notes" Nos. 3 and 4) to Principal FC in the same total amount ($478,476,694) as that of Purchase Money Notes Nos. 1 and 2. Both of these Purchase Money Notes were dated December 20, 1991. (DPF 108, 109, 110.) On December 20, 1991, Prudential's Purchase Money Notes Nos. 1 and 2, payable to Principal, were cancelled. Principal's Purchase Money Notes Nos. 1-3, payable to Prudential, were also cancelled. (DPF 111, 112.)

Principal's Closing Agenda for the closing on December 20, 1991, reflects that, among the documents delivered at Closing were the Purchase Money Notes payable to Principal, copy of the cancelled Purchase Money Notes payable to Principal, the Purchase Money Notes payable to Principal FC, and a related "escrow letter." (DPF 113.) The escrow letter, dated December 20, 1991, was signed by the

representatives of Principal, Principal FC, Prudential, and Prudential's subsidiaries. It requested that the law firm Cadwalader, Wickersham & Taft acknowledge that it was holding in escrow, *inter alia*, the Purchase Money Notes from Prudential to Principal (totaling $478,476,694); the Purchase Money Notes from Principal to Principal FC (totaling $478,476,694); an executed "Sale, Assignment, Assumption and Release Agreement"; Principal's letter of instructions to Prudential (executed and dated December 23, 1991) regarding the "transfer of Purchase Money Notes from [Principal] to Principal FC"; and other documents related to Principal FC. Cadwalader was instructed to cancel the Purchase Money Notes from Prudential to Principal (totaling $478,476,694), and to deliver the other documents to the parties, upon faxed instructions from Principal expected on December 23, 1991. Cadwalader countersigned the escrow letter, "Accepted and Agreed." (DPF 113-116.)

Also on December 20, 1991, Principal and Principal FC each gave a separate letter of instruction to Prudential for wire transferring Prudential's payments with respect to "the Purchase Money Notes issued by you pursuant to that certain Purchase and Sale Agreement, dated December 20, 1991 . . . and payable to the undersigned . . . ." One instruction letter directed that Prudential's payments should be "for credit to Principal Mutual Life Insurance Company Account No. 014752." The other letter directed that Prudential's payments should be "for credit to Principal FC, Ltd. Account No. 7051417." (DPF 117, 118.)

The parties to the "Sale, Assignment, Assumption and Release Agreement," which bore a date of December 23, 1991, were PruSupply Capital Assets, Inc., Pruco Life Insurance Company, and Prudential Realty Securities II, Inc. (the "Payees"); and Principal Mutual Life Insurance Company, and Principal FC. Prudential was not a party to that agreement. (DPF 119.) The "Sale, Assignment, Assumption, and Release Agreement" ("Assignment Agreement") stated, *inter alia*, that Principal desired to "sell" the

"Assets" (defined as the Purchase Money Notes Nos. 1 and 2 from Prudential payable to Principal, listed in the attached Schedule B) to Principal FC in return for Principal FC's assumption of liability on Principal's two notes to Prudential (Principal's Purchase Money Notes Nos. 2 and 3). The Assignment Agreement also stated, in § 2.02, that the "Payees" (*i.e*, Prudential's subsidiaries) agreed to the transfer, and (in § 2.01) that Principal and Principal FC intended the transaction was "a sale . . . and not a capital contribution or a transfer in exchange for stock." (DPF 120, 121.)

In § 3.01 of the Assignment Agreement, Principal FC covenanted that it would not violate its Articles of Incorporation, that it would not amend or modify ¶ 5 of its Articles of Incorporation "without the prior written consent thereto of the Payees who are the registered owners of not less than 66 2/3 % of the aggregate outstanding principal balance of the Notes." In addition, Principal FC covenanted that it would not transfer its obligations related to the Notes without the owners' prior written consent, except if the obligations were assumed by Principal. In § 3.02 of the Assignment Agreement, Principal also agreed, *inter alia*, to remain "the sole direct or indirect shareholder of [Principal FC]," to not cause or permit any "Insolvency Events" with respect to Principal FC, and to not cause or permit any violation of Principal FC's Articles of Incorporation. (DPF 122, 123.)

At 8:56 a.m. on December 23, 1991, Margie Johnson notified the participants that the transaction had been concluded. (DPF 124.) On December 26, 1991, John Schmidt e-mailed Lillian Chen, Jed Fisk, *et al.* (DPF 125):

> The commercial mortgage loan purchase and sale closed last Friday, resulting in a gain of $65 million. I will try to get my files in order for the IRS auditors.
>
> * * *
>
> I plan to do memos summarizing each transaction next month. I am pretty confident each will withstand attack by the IRS, but only time will tell.

As of December 31, 1991, the books of Principal FC showed the notes receivable from Prudential, the notes payable to Prudential's subsidiaries, the interest receivable and payable on the notes, the $1,000,000 capital contribution, and miscellaneous amounts, including federal income tax payable on the interest. (DPF 126.)

In the 1991 consolidated federal income tax return filed by Principal with its subsidiaries (including Principal FC Ltd.), Principal reported the mortgage loan sale to Prudential for the aggregate selling price of $477,057,257, and gain on the sale of $68,032,598. Principal elected to report the gain on the installment method under Code § 453, and did not include any of the gain in its income for that year. Neither its 1991 return nor its consolidated returns for subsequent years showed any interest on deferred tax under Code § 453A. (DPF 127.)

On January 29, 1993, Prudential's tax attorney, Frank Gould, called John Schmidt with a question about the 1991 mortgage loan transaction which Mr. Schmidt described in an e-mail that day to Doug Cunningham (DPF 128):

> Pru wants to know whether we eliminated our liability to Pru from Principal Mutual's annual statement, and whether our outside auditors approved of that action (Gould called it defeasance), even though it may not have met the GAAP rules for defeasance. How should I respond?
>
> I assume Pru is considering a similar action, or already took such action and is not getting a favorable response from its auditors.

Mr. Cunningham responded by e-mail on February 1, 1993 (DPF 129):

> We definitely did eliminate the liability from Principal Mutual's books when we assigned the notes and the receivable to Principal FC, Ltd. Ernst & Young were fully aware of the transaction, but apparently did not pass judgement on whether or not it met the rules for defeasance. I think they were only looking at the transaction in the sub up to the holding company level.
>
> It would seem clear to me the transaction would not meet FAS 76 requirements since that standard

> is very specific and restictive [sic] about what assets can be invested in in [sic] the trust. Such assets must be essentially risk free – like U.S. government obligations. The receivable clearly does not qualify.

The IRS audited Principal's consolidated returns for the tax years 1991-1994. (DPF 130.) In an e-mail regarding Principal FC on November 6, 1995, John Schmidt advised Mary Bricker, JoEllen Watts, and Rich Pullen:

> I reviewed my file regarding the purchase of commercial mortgage loans from Prudential in 1991. It appears that we set up a new subsidiary late that year for several reasons. First, we issued an installment note in consideration for the loans we purchased; we did not want to show that debt on Mutual's annual statement. By transferring the liability to a sub, with sufficient assets to cover the debt, we applied the concept of defeasance and eliminated the liability. Second, we set up a new sub in order to assure the seller the risk of default was very small; a new sub would not have any risk from prior business transactions or ownership of property. Thus the new sub was considered "bankruptcy remote." Finally, there were some tax considerations that related to the use of a sub. I would not mention those to the IRS, however, as there is a possibility the IRS would not understand.

(DPF 131.) In a memorandum dated November 6, 1995, Rich Pullen responded to IRS examiner Barry Leib's Information Document Request (IDR) No. FP-06 regarding Principal FC. Mr. Pullen discussed the first two reasons related by Mr. Schmidt for setting up the new subsidiary, and did not mention the "tax considerations." (DPF 130-132.) The IRS determined that Principal was liable for additional federal income tax consisting of interest on its deferred tax liability under Code § 453A.[5] (DPF 133.)

**<u>The Guaranty Fund Assessments Issue</u>**[6]

---

[5]The IRS allowed deductions for the interest on deferred tax assessed and paid for each of the years in suit. In the event that plaintiff were to prevail on this issue, these deductions must be reversed and the resulting additional tax liability offset against any tax refund or credit for the years in suit. (DPF n.3.).

[6]This issue also applies to Principal's subsidiary, Principal National Life Ins. Co. For the sake of brevity, references to Principal National are omitted here. The parties agree, however, that the ultimate disposition of this issue for the years in suit also applies to Principal National. (DPF n.11.)

In general, state guaranty fund associations are authorized to levy assessments against insurance companies licensed to do business in their states, in order to provide a fund for the protection of policyholders of companies that became insolvent, and to support the orderly rehabilitation or liquidation of insolvent insurers. State guaranty fund associations were created by state legislation, generally based on the Model Life and Health Insurance Guaranty Fund Association Act adopted in 1970 by the NAIC. The Iowa Life and Health Insurance Guaranty Association Act, Chapter 508C, Code of Iowa ("the Iowa Act"), enacted in 1987, is illustrative of the state statutes that were enacted on the subject. (DPF 135-137.)

Section 508C.5 of the Iowa Act provides that a "person" licensed to transact any kind of insurance to which Chapter 508C applies is a "member insurer" of the association, and Section 508C.6 provides that such insurers are required to remain members "as a condition of their authority to transact insurance business in this state." Section 508C.2 provides that "members of the association are subject to assessment to provide funds to carry out the purpose" of providing protection against failure in the performance of contractual obligations under insurance policies and annuities as a result of the impairment or insolvency of the member that issued the policies. Section 508C.7 provides for a board of directors composed of member insurers whose selection is subject to approval of the state insurance commissioner, who is charged with ensuring that all member insurers are fairly represented. Section 508C.9(1) provides that "the board of directors shall assess the member insurers . . . at the time and for the amounts the board finds necessary." (DPF 138.)

The NAIC Model Act contained an optional provision (Section 13) that would permit a member life insurance company to offset up to 20 percent of its assessment against its state premium tax, franchise tax, or income tax liability for each of the five succeeding calendar years until the assessment was recouped.

Most states had a state premium tax, which is in the nature of an excise tax, levied by a state on the premiums collected by an insurance company in that state, in lieu of an income tax. During the years in suit, the statutes of 35 states included the 20-percent-per-year offset provision, while another 8 states and the District of Columbia provided for offsets in different amounts. Seven states and Puerto Rico allowed no offsets. Section 508C.19(1) of the Iowa statutes provides credits against an insurer's state premium tax liability for guaranty fund assessments paid, up to 20 percent of the payment for each of the succeeding five calendar years. (DPF 139, 140, 142, 143.)

During the years in suit, Principal paid the total amounts of all assessments made by state guaranty fund associations in the states in which it did business. When Principal paid a guaranty fund assessment to a state that allowed **no** offset against future premium taxes, that payment was deducted by Principal in full in the year paid, both for Annual Statement purposes and for federal income tax purposes. The full amount of that payment was included in Line 6, entitled "All other taxes," on Exhibit 6 ("Taxes, Licenses and Fees") of the Annual Statement. (DPF 144, 145.)

A guaranty fund assessment payment recorded on Exhibit 6, Line 6, of the Annual Statement was also included on line 23, entitled "Insurance taxes, licenses, and fees," on the Annual Statement's "Summary of Operations" page. The same amount shown on line 23 on the Summary of Operations page appeared as a deduction in the "Other Deductions" schedule of Principal's federal income tax returns. (DPF 146, 147.)

When Principal paid a guaranty fund assessment to a state that **did** allow offsets against future premium taxes, that payment was capitalized as an asset and amortized by Principal over the five-year period permitted by the state, **both** for Annual Statement purposes and for federal income tax purposes. Only the amortized amount of the payment was included in Exhibit 6, Line 6, as well as on Line 23 of the

Summary of Operations, of the Annual Statement. (DPF 148.)

Some states required the payments of the guaranty fund assessments to be capitalized, in order for the insurer to qualify for the offset against premium taxes. Another reason why Principal capitalized the payments to states that allowed premium tax offsets was that if the payments were not capitalized, Principal's statutory surplus would be reduced correspondingly. It was important to Principal to recognize the asset on its books so as not to take the surplus reduction. (DPF 149, 150.)

Thus, on its federal income tax returns for tax years prior to 1991, (1) Principal deducted in full only the assessments paid to guaranty fund associations in states which allowed no offset against future state taxes; (2) with respect to states that allowed offsets, Principal capitalized the assessments paid and amortized them ratably over the periods prescribed; and (3) only the sum of those amounts (full deductions for states that allowed no offsets plus amortized amounts for states that allowed offsets) was included in "Insurance Taxes" on Exhibit 6, Line 6, of the Annual Statement, and deducted by Principal as a part of "Other Deductions" in its tax returns for those years. (DPF 151.)

In a memorandum dated September 30, 1991, to Lillian Chen (copies to Jed Fisk and John Schmidt), Kathy Ennis reported that she had learned at an industry meeting that other insurance companies were expensing rather than capitalizing and amortizing their guaranty fund assessment payments. She raised the issue, "What argument should we use to persuade the [IRS] that we should be allowed to change our accounting method?" (DPF 152.) Ms. Ennis observed:

> Connecticut Mutual applied for a Category A change of accounting method for the 1984 tax year. The IRS denied the accounting method change and currently this is being appealed. . . .
>
> * * *
>
> We will need to argue that the guaranty fees are ordinary and necessary business expenses under Code Sec. 162. In addition to the requirement that an expense must be "ordinary and necessary",

> [sic] no deduction may be claimed by a taxpayer until the "all events" test of Reg. Sec. 1.461-a(a)(2) is satisfied.
>
> * * *
>
> . . . Connecticut Mutual was able to convince the IRS that the guaranty fund assessment amounts were ordinary and necessary expenses under Code Sec. 162. However they had difficulties persuading them that the "all events" test under Code Sec. 461 had been satisfied.
>
> * * *
>
> Lillian, you indicated that you prefer to approach the auditors with this adjustment during the 1987-88 audit. Therefore, Bill Ng is summarizing the 1987 through 1990 amounts which would need to be adjusted.

(DPF 153.) Ms. Chen raised the issue during the IRS audit of Principal's 1987-1988 tax returns, and it was treated by the examiner as an informal claim. The IRS sent Principal a notice that it proposed to disallowed the claim, on February 10, 1992. (DPF 154.)

On April 7, 1992, Principal attorney Randy Bergstrom sent a memorandum to IRS agent Paul Kamp (blind copies to John Schmidt and Jed Fisk), disagreeing with the proposed disallowance, based on his contention that Principal's right to the state tax offsets was not fixed under the "all events" test. Mr. Bergstrom made **no** contention that the assessments were "taxes" deductible under Code § 164. (DPF 156.) Mr. Bergstrom's handwritten notes of April 9 reflect that he was analyzing issues related to a change of accounting method, the "all events" test, and the treatment of guaranty fund assessments for book and Annual Statement purposes. (DPF 157.) *Inter alia*, he wrote, "We show as admitted [assets for Annual Statement purposes] since 87." There was one tentative reference to § 164: Mr. Bergstrom wrote, "Tax? § 164." (*Ibid*.)

John Schmidt discussed the guaranty fund assessments issue on June 20, 1992, with Dennis Nelson of Peat Marwick. Mr. Nelson advised that many companies had adopted the capitalization accounting method for these assessments, and were requesting permission to change their method. Mr. Schmidt noted

that, under Revenue Procedure 92-20, since Principal was under audit, the deadline for filing a request was "Monday." (DPF 158.) Principal completed Form 3115 ("Application for Change in Accounting Method"), to be effective for its tax year 1992, and an accompanying "Statement of Relevant Facts," along with a cover letter from John Schmidt dated June 29, 1992, requesting application of the transition rules under Revenue Procedure 92-20. (DPF 159.)

Principal's Statement of Relevant Facts supporting the Form 3115 averred, *inter alia*, that "[t]he assessments by the state guaranty associations and the state comprehensive health insurance associations are best characterized as taxes . . . deductible in full in the year paid or accrued under section 164 of the Internal Revenue Code." Principal's Application for Change in Accounting Method with respect to the guaranty fund assessments was **not** filed, however. (DPF 160, 161.)

For the tax years 1991 through 1994, Principal claimed as deductions on its federal income tax returns the total amounts of all guaranty fund assessments paid in such years that are at issue in this suit.[7] It did not obtain the IRS's prior consent to treat the previously-capitalized and amortized payments as state "taxes" currently deductible under Code § 164. Principal's 1991 and 1992 returns were audited by the IRS in 1995. (DPF 163-165.)

In May of 1995, Principal had received a guaranty fund assessment from the State of Pennsylvania

---

[7]For the first time in 1993, the Annual Statement Instructions for Exhibit 6, Line 6 ("All Other Taxes") stated:

> Include: Guaranty fund assessments and taxes of Canada or of any other foreign country not specifically provided for elsewhere.

Prior to 1993, the Annual Statement Instructions for Exhibit 6, Line 6 did not mention guaranty fund assessments. (DPF 162.)

that included annuities. By e-mail on May 24, 1995, Rich Pullen asked John Schmidt and Randy Bergstrom whether the assessment should be expensed or capitalized. In that context, Mr. Pullen commented (emphasis added):

> First, **for tax** we currently expense all guaranty assessments in the year paid. I know this will be an audit issue in the next few years. . . .
>
> Next, **for books** it appears the capitalization policy is to capitalize all guarantee assessments for which we believe we may get a future benefit. . . . Currently, the method used for books does not affect the tax treatment. However the IRS may question why we capitalized it for books and not for tax.
>
> It appears that book and tax are at odds . . . .

(DPF 166.) In his e-mailed response on May 24, 2005, Mr. Bergstrom agreed that "[t]he tax treatment is totally separate," and he recommended expensing the Pennsylvania assessment for tax purposes, since "we are still left with our argument that expensing the payment is our method of accounting." (DPF 167.)

After the IRS proposed to disallow expensing of the amortizable portion of the guaranty fund assessment payments claimed as deductions on Principal's 1991 and 1992 returns, Randy Bergstrom sent a memorandum, dated November 28, 1995, to IRS agents Bonnie Libby and Larry Wiese stating grounds for disagreeing with the proposed disallowance. (DPF 168.) In his memorandum, Mr. Bergstrom contended that all of the guaranty fund assessments were taxes that were currently deductible under Code § 164, and that the treatment of these payments on Principal's Annual Statement did not clearly reflect its income for federal tax purposes. (DPF 169.) He then stated (*ibid.*):

> The taxpayer has deducted assessments paid to state guaranty associations in states that do not allow a tax offset in the year of payment. The taxpayer has shown the assessments paid to state guaranty associations in states that allow a tax offset on the Annual Statement and amortized those amounts over a period of five years.

As late as September of 1999, Principal was still trying to develop arguments to support its contention that the guaranty fund assessments are "taxes" deductible under Code § 164. As part of that effort, Mr. Bergstrom ordered research on the characteristics and the operation of four states' guaranty associations and the enabling legislation. In a memorandum dated September 30, 1999, Jim Madden reported to Mr. Bergstrom that all four states' associations operated virtually identically, and concluded (DPF 170):

> In all cases, the taxing authority for the state is separate from the oversight authority for the fund association. Also, the monies collected by the fund associations are maintained separate from the state's general account. I will continue to look for additional information relating to the operation of these fund associations. However, for now, this is all I have found.

Principal's treatment of the guaranty fund assessment payments at issue on its 1991-1994 returns was disallowed by the IRS.[8] (DPF 171.)

ARGUMENT

I. CODE § 453A APPLIES HERE

A. *Introduction.*

Section 453A(a)(1) states as a general rule that "interest shall be paid on the deferred tax liability with respect to [an installment obligation to which the section applies]." Section 453A(b)(1) makes the interest requirement applicable to "any obligation which arises from the disposition of any property under the installment method," where the sales price exceeds $150,000. Qualifying this general rule is the requirement that the obligation that arose during the taxable year be "outstanding as of the close of such taxable year";

---

[8]The IRS allowed deductions for the interest on deferred tax assessed and paid for each of the years in suit. In the event that plaintiff were to prevail on this issue, these deductions must be reversed and the resulting additional tax liability offset against any tax refund or credit for the years in suit. (DPF n.3.)

and that the total face amount of all of such installment obligations held by the taxpayer (including all members of a controlled group, such as Principal's consolidated group) exceed $5,000,000. Section 453A(b)(2).

The "deferred tax liability" on which the interest is imposed is defined in § 453A(c)(3) as the product of the amount of gain that has not been recognized as of the close of the year times the maximum rate of tax for that year. Plaintiff contends that all of the $68,032,598 gain on Principal's installment sale to Prudential was "recognized" when it "sold" Prudential's two notes to Principal FC, by virtue of Code § 453B (and thus that there was no "gain that has not been recognized" on which to compute a "deferred tax liability").[9]

Section 453B(a) provides:

> If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and–(1) the amount realized . . . or (2) the fair market value . . .

### B. *Under the step transaction doctrine, there was no "sale" or other "disposition" of the Prudential notes by Principal to Principal FC*

It is axiomatic that the "incidence of taxation depends upon the substance of a transaction" rather than its form. *Commissioner v. Court Holding Co.*, 324 U.S. 331,334 (1945). Under the substance-over-form doctrine, the form of a transaction will not be given effect where it operates simply as a device to conceal the true nature of a transaction. *See Gregory v. Helvering*, 293 U.S. 465, 470 (1935). As the

---

[9]Plaintiff further contends that, to whatever extent gain would have been recognized on this intercompany "sale" it is deferred under § 1.1502-13(c)(1)(i), which provides, as a general rule:

> To the extent gain or loss on a deferred intercompany transaction is recognized under the Code for a consolidated return year, such gain or loss shall be deferred by the selling member (hereinafter referred to as "deferred gain or loss").

Supreme Court noted in *Commissioner v. Clark*, 489 U.S. 726, 738 (1989):

> Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction. By thus "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," federal tax liability may be based "on a realistic view of the entire transaction." 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 4.3.5, p. 4-52 (1981).

The Court of Claims explicated the criteria for the application of the step transaction doctrine in *King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969). The Court noted that the courts employ two tests–the "interdependence test" and the "end result" test:

> The "interdependence test" requires an inquiry as to 'whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.'
> . . . The "end result" test, on the other hand, establishes a standard whereby:
>
> > * * * purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.
>
> Despite the real difference between the tests, each is faithful to the central purpose of the step transaction doctrine: that is, to assure that tax consequences turn on the substance of a transaction rather than on its form.

*Id.* at 516-17 (citations and footnote omitted).[10]

---

[10]The Court noted the existence of a third test–the "binding commitment" test, which is derived from the Supreme Court's statement in *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968), that "if one transaction is to be characterized as a 'first step' there must be a binding commitment to take the later steps." The *King* Court pointed out, however, that–

> [t]he opinion in *Gordon* contains not the slightest indication that the Supreme Court intended the binding commitment requirement as the touchstone of the step transaction doctrine in tax law. Nor is there any indication that the Court intended to overrule any prior decisions applying the step transaction doctrine to other types of transactions where there were no binding commitments. On the contrary, the opinion addressed a narrow situation (a D reorganization) . . . . Its interpretation should be so limited. Clearly, the step transaction doctrine would be a dead letter if restricted to situations where the parties were bound to take certain steps.

Thus, under either test, the ultimate question is whether the taxpayer intended a series of actions to be part of a single, integrated transaction aimed at reaching an intended result.[11] As the facts set forth above demonstrate, all of the participants to the Principal/Prudential transaction treated it as a single, integrated transaction aimed at the ultimate goal of lodging their mutual financial obligations in their respective subsidiaries, while avoiding the interest charge under § 453A; and that in fact all of the transaction documents (including all notes and all documents pertaining to the "transfer" of the Prudential notes to Principal FC) were executed on December 20, 1991.

C. *Alternatively, even assuming arguendo that there was a transfer (as a separate transaction) of the Prudential notes by Principal to Principal FC, it did not constitute a "disposition" within the meaning of § 453B*

The language of current § 453B(a) (and that of its 1954-Code predecessor, § 453(d))[12] is virtually identical to that of § 44(d) of the Revenue Act of 1928[13] which amended the Revenue Act of 1926 in which

---

> The doctrine derives vitality, rather, from its application where the form of a transaction does not require a particular further step be taken; but, once taken, the substance of the transaction reveals that the ultimate result was intended from the outset.

418 F.2d at 517, 518 (footnote omitted). *Accord*, *Security Industrial Ins. Co. v. United States*, 702 F.2d 1234, 1245 (5th Cir. 1983).

[11] The presence or absence of a business purpose underlying the transaction–or any individual step in the transaction--is irrelevant to the step transaction doctrine. *Commissioner v. Clark*, 489 U.S. at 738; *True v. United States*, 190 F.3d 1165, 1176, n.11 (10th Cir. 1999); *South Bay Corp. v. Commissioner*, 345 F.2d 698, 704 (2d Cir. 1965).

[12] Prior to 1980, § 453(d) provided:

> If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and–(A) the amount realized . . . or (B) the fair market value . . .

[13] Section 44(d) of the Revenue Act of 1928 provided:

there was no such provision. The committee reports accompanying the Revenue Bill of 1928 reflect that the sole purpose of the new provision was to prevent tax evasion on the part of the holder of an installment obligation when that obligation was transferred. The House Ways and Means Committee report stated (H.R. Rep. No. 2, 70th Cong., 1st Sess. 16 (1928)):

> Subsection (d) contains new provisions of law to prevent evasion of taxes in connection with the transmission of installment obligations upon death, their distribution by way of liquidating or other dividends, or their disposition by way of gift, or in connection with similar transactions. The situations above specified ordinarily do not give rise to gain and yet at the same time it is urged that they permit the recipient to obtain a greatly increased basis in his hands for the property received, except in the case of gifts. It therefore seems desirable to clarify the matter. The installment basis accords the taxpayer the privilege of deferring the reporting at the time of sale of the gain realized, until such time as the deferred cash payments are made. To prevent the evasion the subsection terminates the privilege of longer deferring the profit if the seller at any time transmits, distributes, or disposes of the installment obligations and compels the seller at that time to report the deferred profits. The subsection also modifies the general rule provided in subsection (a) for the ascertainment of the percentage of profit in the deferred payments, in those cases in which the obligations are satisfied at other than their face value are sold or exchanged. The modification permits a compensating reduction in the percentage of profit in case the obligations are satisfied at less than their face value, or are sold or exchanged at less than face value.
>
> Whether or not the gain or loss realized under the section is recognized for tax purposes, depends upon general principles of law embodied in the income tax provisions, the exchange of installment obligations in connection with tax-free exchanges, for instance, being cared for by section 112.

*See* S. Rep. No. 960, 70th Cong., 1st Sess. 24 (1928).

One of the seminal cases interpreting § 44(d) of the 1928 Act is *J.C. Wynne v. Commissioner*, 47

---

> If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and–(1) . . . the amount realized or (2) . . . the fair market value

B.T.A.731 (1942). There, the Board of Tax Appeals held that there was no disposition within the meaning of § 44(d) where a corporation's installment obligation due to its major shareholders was distributed in a liquidation to a partnership which assumed the corporation's obligations and of which the shareholders were member partners. While the Board recognized the "entity" theory of partnerships (*e.g.*, ownership by partnership not identical to ownership by partners), it nonetheless rejected the Commissioner's contention that there had been a § 44(d) disposition accelerating the tax due on the original installment sale. The Board stated, citing the legislative history of § 44(d) (47 B.T.A. at 735-36) (emphasis added):

> For it is only the disappearance of the installment obligation or its removal from the hands of the obligee that creates the occasion for invoking the provisions of section 44(d) . . . . If the obligation is paid in full in anticipation, which is what respondent says occurred here, or if it is otherwise discharged or transferred, as described in subsection (d), **the obligee will have no future tax liability upon the due date of subsequent installments, and hence the tax situation must be liquidated contemporaneously**. **But** if, as we think was the case here, the installment note remained to be collected by the same obligee from the partnership which replaced the old obligor . . ., **there was no prospect of a termination of the continuing tax liability of these petitioners on future installments and hence no necessity for construing the assumption by the partnership as a payment in full under subdivision (a) or (b) or as resulting in gain or loss under subdivision (d)**.
>
> . . . Since there is nothing in these individual circumstances or in the general principles to be applied which casts doubt upon the continued existence of the installment obligation, the continued liability of the partnership for its discharge, and **its continued status as a source of taxable income in the hands of these petitioners**, we think this part of the deficiency was improvidently determined.

The highlighted phrases contain the gravamen of the court's decision that is consistent with the legislative history of 1928 Act § 44(d)–*i.e.*, that there is no "disposition" accelerating the tax because the original obligee remains liable for the tax on the deferred gain as the payments on the original installment obligation are made. Assuming *arguendo* that Principal "sold" Prudential's installment obligations to Principal FC, the "sale" qualified as a "deferred intercompany transaction" under § 1.1502-13(a)(2). Under

§ 1.1502-13(e), however, Principal is not relieved of its liability for the tax due on the gain on the original installment transaction as the payments are made by the obligor Prudential (even though the payments are made to Principal FC).[14] Thus, as in *J.C. Wynne*, "there was no prospect of a termination of the continuing tax liability of [Principal] on future installments and hence no necessity for construing the [transfer to Principal FC] as a payment in full under subdivision (a) or (b) or as resulting in gain or loss under subdivision (d)."

In *Cunningham v. Commissioner*, 44 TC 103 (1965), and subsequent revenue rulings, both the Tax Court and the Service focused on whether the rights of the original obligee in the installment obligation continued in existence, in circumstances where the installment obligation was assumed by a different obligor. For example, in Rev. Rul. 75-457, 1975-2 C.B. 196, citing *Cunningham*, stated:

> Generally, a satisfaction or disposition under section 453(d) of the Code occurs when the rights accruing to the seller under an installment sale either disappear or are materially disposed of or altered so that the need for postponing recognition of gain otherwise realized ceases. The mere substitution and release of the original obligor on an installment obligation, and the assumption of the installment obligation by a new obligor without any other changes, will not in itself constitute a satisfaction or disposition under section 453(d).

Amplifying Rev. Rul. 75-457, Rev. Rul. 82-122, 1982-1 C.B. 80, stated:

> Actions of the obligor that result in a change in the installment obligation, such as a transfer to a third party or a change in the form of the note, are not ordinarily treated as a disposition because the effect is merely to continue the seller's right to receive installment payments, without

---

[14]Section 1.1502-13(a)(2)(i) provides, in pertinent part, that "[t]he term "deferred intercompany transaction" means "[t]he sale or exchange of property . . . in an intercompany transaction." Section 1.1502-13(e)(1) provides:

> If an installment obligation (within the meaning of section 452(d)) is transferred in a deferred intercompany transaction, then on each date on which the obligation is satisfied the selling member shall take into account an amount equal to the deferred gain or loss on such transfer, multiplied by a fraction, the numerator of which is the portion of such obligation satisfied on such date, and the denominator of which is the aggregate unpaid installments immediately after the deferred intercompany transaction.

substantially changing the rights arising from the original transaction.

These holdings are not inconsistent with *J.C. Wynne* or with our position in this case, since their focus on the seller's right to continue to receive the installment payments (when there is a change in the obligor or the form of the note) is clearly a predicate to determing whether the seller continues to bear the liability for payment of the tax as the installments are paid. If the tax liability remains with the seller, there is no justification for concluding that there has been a "disposition" triggering accelerated recognition of the deferred gain and imposition of the related tax.[15]

## II. THE GUARANTY FUND ASSESSMENTS AT ISSUE ARE NOT CURRENTLY DEDUCTIBLE

### A. *The Assessments at Issue Are Not § 164 "Taxes"*

Code § 164(a) lists five specific types of taxes paid or accrued during the taxable year (none of which is at issue here) that are allowable as deductions.[16] Section 164(a) further provides:

---

[15]It is significant that, throughout the planning of the transaction, the participants believed that it was very likely that the IRS would consider the transfer of the Prudential notes to Principal's newly-created, wholly-owned subsidiary and the subsidiary's assumption of Principal's liability to Prudential as subject to Code §§ 351 and § 357 (and thus that no gain would be "recognized"). Because they needed to have "recognized" gain on the Prudential/
Principal FC transaction, under their theory that was intended to avoid the reach of § 453A, the participants were careful, as they acknowledged in contemporaneous communications, to tailor the transaction and associated documents to give the appearance of a "sale" of Prudential's notes to the subsidiary.

[16]Those taxes are:

(1) State and local, and foreign, real property taxes.
(2) State and local personal property taxes.
(3) State and local, and foreign, income, war profits, and excess profits taxes.
(4) The GST tax imposed on income distributions.
(5) The environmental tax imposed by section 59A.

> In addition, there shall be allowed as a deduction State and local, and foreign, taxes not described in the preceding sentence which are paid or accrued within the taxable year in carrying on a trade or business . . . .

Section 164(b)(2) defines a "State or local tax" as including "only a tax imposed by a State, a possession of the United States, or a political subdivision of any of the foregoing, or by the District of Columbia." *See* Treas. Reg. § 1.164-3(a). Although neither § 164 nor the regulations thereunder defines a "political subdivision of a State," it is clear that the term does not encompass guaranty fund associations. Guaranty fund associations are generally nonprofit corporations whose members are insurers transacting business within the state. Subject to the supervision of the state insurance commissioner, such associations are administered by a board of directors comprised of member insurers. While the boards have authority to impose the types of assessment at issue, they do not exercise the sovereign powers of the state, such as the power of taxation, the police power, or eminent domain.[17]

Neither § 164 nor the regulations thereunder defines "taxes," for purposes of the second sentence of § 164(a). In *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996), however, the Supreme Court (determining whether a "tax" levied under the Internal Revenue Code was an excise tax entitled to seventh priority under the Bankruptcy Code, or instead a non-preferential penalty) concluded that, even where a state or federal statute labels "a particular exaction" a "tax," the determination whether it is in fact a "tax" depends "on the operation of the provision using the term in question." 518 U.S.

---

[17] Section 1.103-1(b) of the Regulations, for example, provides that, for purposes of § 103 (respecting tax exempt bonds), "the term 'political subdivision' . . . denotes any division of any State or local governmental unit which is a municipal corporation or which has been delegated the right to exercise part of the sovereign power of the unit." *See* Rev. Rul. 77-164, 1977-1 C.B. 20 (community development authority not political subdivision); Rev. Rul. 77-165, 1977-1 C.B. 21 (state university not political subdivision).

at 220. The Court looked to its prior decisions in the bankruptcy context that defined the characteristics of a "tax"–for example: "'A tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government.' [*New Jersey v.*] *Anderson*, 203 U.S. [483] at 492 [1906]." And, in *United States v. La Franca*, 282 U.S. 568, 572 (1931), the Court had concluded that "a tax is an enforced contribution to provide for the support of government." In a different context, the Court of Appeals for the Eighth Circuit held that "a government levy is a tax if it raises revenue to spend for the general public welfare." *Chicago & North Western Transportation Co. v. Webster County Board of Supervisors*, 71 F.3d 265, 267 (1995), *rehear. and suggestion for rehear. en banc denied* (Jan. 2, 1996).

Citing *Anderson*, the Tax Court determined that–

> A tax is a forced charge, imposition, or contribution; it operates in invitum and is in no way dependent upon the will or contractual assent, express or implied, of the person taxed. . . .
>
> The primary purpose of taxation is to obtain money which the sovereign may use in the performance of its many governmental functions.

*Reimer's Estate v. Commissioner*, 12 T.C. 913, 920, *aff'd*, 180 F.2d 913 (1949). In *Cox v. Commissioner*, 41 T.C. 161, 164 (1963) (citations omitted), the Tax Court defined a "tax," for purposes of Code § 164(a):

> A tax within the meaning of section 164(a) of the Code, is a revenue-raising levy by a governmental unit. It is a required contribution to the governmental revenue without option to pay or not to pay. It is a levy and collection of revenue without relationship to a specific governmental privilege or service.

*See also*, *Dubitzky v. Commissioner*, 60 T.C. 29, 33-34 (1973) (to be a "tax," "the extraction must be intended as a means of raising revenue for the carrying on of the Government").

The above-stated principles have been adopted by the IRS, defining "tax" as follows:

> A tax is an enforced contribution, exacted pursuant to legislative authority in the exercise of taxing power, and imposed and collected for the purpose of raising revenue to be used for public or governmental purposes, and not as payment for some special privilege granted or service rendered. Taxes are, therefore, distinguishable from various other contributions and charges imposed for particular purposes under particular powers or functions of the Government.

Rev. Rul. 61-152, 1961-2 C.B. 42. *Accord*, Rev. Rul. 77-29, 1977-1 C.B. 44; Rev. Rul. 70-622, 1970-2 C.B. 41. Thus, amounts (such as the guaranty fund assessments at issue) paid into a specific fund or earmarked for specific purposes are generally treated as imposed as a regulatory measure or as a charge for a privilege or service rendered. *See* Rev. Rul. 77-29 (annual sanitation fee imposed by county).

Although payment of the guaranty fund assessments is required as a condition of carrying on insurance business within a state, the assessments have none of the characteristics of a tax. The assessments are imposed to fund a regime created to protect the member insurers' policyholders;[18] they are not imposed to fund general public or government purposes. The assessments are earmarked to pay the claims of insolvent member insurers' policyholders; they do not become part of a state's general fund. The assessments are levied by an association's board as necessary to fund the association's functions; they are not levied by a legislative body exercising its general taxing authority. The assessments are imposed as part of a regulatory scheme; they are not imposed as a revenue raising measure. In short, guaranty fund assessments are not § 164 "taxes."

B. *Capitalization and amortization of the guaranty fund assessments is required under Code § 811(a)*

Plaintiff's practice, prior to tax year 1991, of capitalizing and amortizing the guaranty fund

---

[18]The Iowa Insurance Guaranty Association Act, for example, states that its purpose is to "protect . . . against failure in the performance of contractual obligations under life and health insurance policies and annuity contracts . . . because of the impairment or insolvency of the member insurer which issues the policies or contracts." Iowa Code, Ch. 508.C.2.

assessments at issue is also required under § 811(a) (governing the determination of life insurance company taxable income). Section 811(a) provides:

> All computations entering into the determination of the taxes imposed by this part shall be made–
>
> > (1) under the accrual method of accounting; or
> >
> > (2) to the extent permitted by regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).
>
> To the extent not inconsistent with the preceding sentence or any other provision of this part, all computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

Under § 811(a), a life insurance company is required to compute its tax using the same method of accounting used to prepare its NAIC Annual Statement, except where it is inconsistent with the accrual rules or Part I of the Code. *See, Colonial American Life Ins. Co. v. Commissioner*, 491 U.S. 244 (1989). With respect to the guaranty fund assessments, the method Principal used for its Annual Statement purposes, for all years including the 1991-1994 years at issue, was to capitalize and amortize the assessments over the periods of time they could be credited or offset against state premium taxes that became payable in later years (generally over a five-year period). Such treatment was consistent with accrual accounting principles because the guaranty fund assessments created benefits (*i.e.*, the future state tax offsets) extending beyond the close of the taxable year the assessments were paid. *Indopco, Inc. v. Commissioner*, 503 U.S. 79 (1992) (An expenditure which creates significant long-term benefits may be a capital expenditure which is not currently deductible, but must be capitalized). More specifically, an expenditure which results in the creation of a separate and distinct asset having a useful life extending substantially beyond the taxable year is a capital expenditure which is not currently deductible as an ordinary

and necessary expense. *Lincoln Savings and Loan Ass'n v. Commissioner*, 403 U.S. 345 (1971) (premiums paid by savings & loan into Federal Savings & Loan Insurance Corporations' secondary reserve fund were capital expenditures where premiums created "what is essentially a separate and distinct additional asset"). *See also*, Treas. Reg. § 1.461-1(a)(2).[19]

C. *In any event, Principal's change in its tax treatment of the guaranty fund assessment payments constituted an impermissible change in accounting method under Code § 446(e)*

Code § 446(a) mandates that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(e) provides:

> Except as otherwise expressly provided in this chapter, a taxpayer who changes his method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

Section 1.446-1(e) of the Regulations sets out the rules governing taxpayers' adoption or change of a method of accounting.[20] Section 1.446-1(e)(2)(ii)(a) provides:

---

[19]Plaintiff would be precluded from currently deducting the payments of the assessments at issue in any event, under the principle that expenditures which are to be reimbursed are not deductible under the accrual method of accounting. *Cf*, *Charles Baloian Co. v. Commissioner*, 68 T.C. 620 (1977), *aff'd*, 9th Cir. 1982).

[20]Section 1.446-1(e) states in part:

> **(e) Requirement respecting the adoption or change of accounting method.** (**1**) A taxpayer filing his first return may adopt any permissible method of accounting in computing taxable income for the taxable year covered by such return. See section 446(c) and paragraph (c) of this section for permissible methods. . . .
>
> (**2**) (i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. Consent must be secured whether or not such method

> A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. . . . A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction.

As Revenue Ruling 90-38, 1990-1 C.B. 57, recognizes--

> The treatment of a material item in the same way in determining the gross income or deductions in two or more consecutively filed tax returns represents consistent treatment of that item for purposes of section 1.446-1(e)(2)(ii)(a) of the regulations. *See Diebold, Inc. v. United States*, 891 F.2d 1579 (Fed. Cir. 1989). In addition, section 1.446-1(e)(2)(i) indicates that the consistent, but erroneous, treatment of material items constitutes a method of accounting.

(Additional citations omitted.) Thus, regardless whether the taxpayer's existing method is proper or permitted under the Code, the IRS's prior consent must be requested (by filing a Form 3115), and then actually obtained, in order for the change to be valid for tax purposes.

The Supreme Court explained the purpose underlying the consent requirement, in *Pacific Nat'l Co. v. Welch*, 304 U.S. 191, 194 (1938):

> Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns . . . to include the period allowed for recovering overpayments . . . .

This Court has noted that the rule also prevents a taxpayer's switching from one method to another because the other turned out to produce a more advantageous tax result:

> In the absence of the prior consent rule, a taxpayer could adopt a method of accounting and after several years unilaterally switch to an alternative method which hindsight suggests would have

---

is proper or is permitted under the Internal Revenue Code or the regulations thereunder.

. . .

(**3**) (i) Except as otherwise provided under the authority of paragraph (e)(3)(ii) of this section, to secure the Commissioner's consent to a taxpayer's change in method of accounting the taxpayer must file an application on Form 3115 with the Commissioner during the taxable year in which the taxpayer desires to make the change in method of accounting. . . .

> been more financially beneficial.

*Diebold, Inc. v. United States*, 16 Cl. Ct. 193, 208, *aff'd*, 891 F.2d 1579 (Fed. Cir. 1989).

The ultimate aim of the rules governing taxpayers' accounting methods is to ensure that both their overall method of accounting and their method of accounting for particular items or classes of items within that overall method clearly reflect income. As the Court of Appeals for the D.C. Circuit pointed out, "[a] prescribed method of accounting is not an end in itself but rather a means toward fulfilling the statutory goal of accounting that 'clearly reflects income.'" *Witte v. Commissioner*, 513 F.2d 391, 394-95 (D.C. Cir. 1975) (citing Code § 446(b) and the regulations). And, as the court noted (*id.* at 394, footnote omitted):

> The danger of distortion of income detrimental to governmental revenues exists regardless of whether the change in method is from one proper method to another or from an improper method to a proper one.

Thus, even "[w]here the proposed new method would be more correct than the old, the Commissioner's consent is nonetheless essential." *Diebold*, 16 Cl. Ct. at 212, n.20. And, where the taxpayer has consistently used a method–even one that distorts income-the IRS's prior consent to a change is still required. *Id.* at 211.[21]

---

[21]Regulations § 1.446-1(e)(2)(ii)(b) provides:

> A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion, or investment credit). Also, a change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction.

Thus, the IRS's consent is not required for mere "correction of mathematical or posting errors, or errors in the computation of tax liability." "A posting error is an error in 'the act of transferring an original entry to a ledger.'" *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 510-11 (1989) (citing Black's Law Dictionary). The D.C. Circuit observed in *Witte* that, although a taxpayer "is entitled to correct an error . . . [h]e is not entitled to do so in a way that may distort income." 513 F.2d

Plaintiff's contention that it was not required to obtain the Commissioner's prior consent because it was merely correcting an "error in characterization" is simply wrong. That concept was first dealt with by this Court's predecessor, in *Gimbel Brothers, Inc. v. United States*, 535 F.2d 14 (Ct. Cl. 1976), and later in *Korn Industries, Inc. v. United States*, 532 F.2d 1352 (Ct. Cl. 1976) (*see* Plt. Op. Br. 31-33).

In *Gimbel Brothers*, which did not involve Treas. Reg. § 1.446-1(2)(ii)(b), the taxpayer made an election for tax year 1952 to report its installment sales on the installment method. It omitted rotating charge account sales from the installment method computations for its returns for tax years 1952-1966, because of the IRS's policy (*i.e.*, not a requirement of the Code or the Regulations) of limiting the installment method treatment to "traditional" installment sales. When that policy was changed, the taxpayer filed timely amended returns to include the revolving credit sales in the installment method computations. The Court of Claims observed that–

> it is clear that plaintiff was not permitted [*i.e.*, under the Code and Regulations] to report on the accrual method its income from sales on rotating charge accounts, for a dealer who elected the installment method was required to report all income from its installment sales on the installment method. Accordingly, plaintiff could not have elected and did not elect to report income from its rotating charge accounts on the accrual method; but, rather, such reporting was an error. **By filing its timely claims for refund** properly reporting that income on the installment method, plaintiff corrected an error.

(535 F.2d at 22 (emphasis added).) The salient point was that, as the Court later pointed out in response to the Government's alternative argument that the taxpayer should not be permitted to change its method of accounting retroactively without the consent of the Commissioner, the taxpayer had filed a timely refund claim for the year (1952) in which the election was made, and that first year was before the Court.

The Court took note of Rev. Rul. 75-56, 1975-1 C.B. 98, which contrasted two situations in which

at 395.

taxpayers had attempted to change erroneous capitalization treatment retroactively. The Court stated (at 23) (emphasis added):

> In one situation the erroneous treatment occurred for ten years and the statute of limitations had expired for seven of those years. The taxpayer's attempt to amend its returns for only the last three years was held to be a change of accounting method from the method used in the closed years. . . .
>
> In the other situation . . . the taxpayer amended its returns to correct the erroneous accounting method in all three years in which the method was used, including the initial years of such use. The Internal Revenue Service stated in Rev. Rul. 75-56:
>
>> * * * The holding (in Rev. Rul. 70-539) was based on a decision that such taxpayer had never made a valid binding election to capitalize the expenses involved. By amending its first return, the taxpayer in Rev. Rul. 70-539 was not changing a method of accounting used in previous years, since it had no previous existence. **In effect, by timely amending of its first return, such taxpayer was adopting [*i.e.*, not changing] a method of accounting with the meaning of section 1.446-1(a) of the Regulations**.
>
> **In the instant case, plaintiff is amending its first return in which it made its election**. If under Rev. Rul. 70-539 a taxpayer could amend a return where an election was not made in order to make the election, it is our view that plaintiff here can amend a return to properly report according to the election it has already made.

In this case, Principal is unable to file a timely amended return for the first year in which it first began paying guaranty fund assessments. Thus, *Gimbel Brothers* does not apply here.[22]

*Korn Industries* involved adjustments that the Court of Claims observed "present a novel problem." 532 F.2d at 1355. There, the accrual-basis taxpayer, in calculating its taxable income from the manufacture of furniture (*id.* at 1353)--

> used inventory valuations as follows: Separate inventories of raw materials, work-in-process, supplies and finished goods were taken as of each November 30 [*i.e.*, the end of the fiscal year], based on physical count and calculation of actual cost. The actual cost of each piece of furniture in

[22]The IRS subsequently revoked Rev. Rul. 70-539, on which the *Gimbel Brothers* Court relied, in Rev. Rul. 90-38, *supra*, taking the position that, even where the period for amending the first return is still open, the Commissioner's prior consent to a method change is nonetheless required.

> the finished goods inventory was computed by using the standard cost for that piece, which standard cost was assigned at the beginning of the year, and then adding or subtracting any variances between the standard cost and the actual cost, as of the end of the year. The standard cost of each piece of furniture was the aggregate of the cost elements of materials, labor and overhead in that piece. There were 14 kinds of materials in the finished furniture . . . .
>
> In checking inventories for fiscal 1969 plaintiff's auditors discovered that three elements of the 14 materials costs had by an accountant's error not been included in the calculation of the finished goods inventory . . . . These 3 elements of cost were not omitted from the raw materials inventory, the work-in-process inventory or the supplies inventory.

The omission of the three elements resulted in a change in the taxpayer's beginning inventory for 1969. The IRS determined that there had been a change in accounting method necessitating a § 481 adjustment.

The Court concluded that, although the probity of the § 481 adjustment was at issue, "the real issue in this case is whether there has been a 'change in method of accounting.' Unless this condition has been met, Sec. 481 does not come into play." *Id.* at 1354. The Court noted that the Regulations under both §§ 481 and 446 describe an accounting method change as either a change in the overall accounting method or a change in the treatment of a material item. The Court concluded that the taxpayer computed its taxable income for the years in question under the accrual method and thus did not change its overall method. "To come within the statute then it must be shown that plaintiff's inclusion of the three items constituted a change in the treatment of a material item." *Id.* at 1355. The Court considered helpful the Regulation (§ 1.481-4(g)(3)) pointed out by the taxpayer that gave as examples of "material items" such things as research and experimental expenditures–*i.e.*, items that "constitute entire classes of expenditures rather than individual items of costs such as plaintiff omitted." *Ibid.*

The Court determined that the IRS's position "overlooks the realities of the case" (*ibid.*):

> At no time did plaintiff change its standard cost method of valuing inventories. Plaintiff did not change its basis of valuation from cost to the lower of cost or market price. It did not neglect to

> include overhead in valuing inventories. It did not deduct a percentage of the cost of inventory items in valuing inventory. It did not omit the cost of the 3 items of materials from the year end inventory, raw materials inventory or work-in-progress or supply inventory. Plaintiff's action falls more readily into the category described in Treas. Reg. 1.446-1(e)(ii)(b) that is "correction of mathematical or posting errors."

The distinction between *Korn Industries* and this case is readily apparent.

In *Diebold, Inc. v. United States*, 891 F.2d 1579 (Fed. Cir.), *cert. denied*, 498 U.S. 823 (1990), the Federal Circuit affirmed the Claims Court's reasoning in that case that was based on its conclusion that the "correction of error" exception is a "very narrow . . . exception to the consent rule." *Diebold, Inc. v. United States*, 16 Cl. Ct. 193, 203 (1989). The Federal Circuit distinguished both *Gimbel Brothers* and *Korn*, noting, *inter alia*, that (unlike the situation in *Gimbel Brothers*) Diebold had treated the assets in question as inventory for two years prior to the years for which it was attempting to "correct" its "error" and treat them as capital assets. 891 F.2d at 1582. The Court noted, too, that in *Korn* the three items in question had been included (*ibid.*)--

> in the raw materials inventory, the work-in-progress inventory and the supplies inventory. Therefore, it was obvious that the taxpayer had established the omitted items as materials costs and that it had merely made a posting error when it left them out of the calculation of the cost of finished goods in inventory.

The Court then observed *id.* at 1583, emphasis added):

> It is not clear that Diebold's original tax treatment of its replacement modules was improper. However, **even if it were correcting an erroneous characterization of the replacement modules, the correction would still be considered a change in the method of accounting**. . . .
>
> The Claims Court was correct that the change from inventory to depreciation treatment of the replacement modules was "a change in the treatment of [a] material item" because it "involves the proper time for the inclusion of the item in income or the taking of a deduction." . . . Diebold's counter that it did not and could not have taken a deduction for the cost of inventory and therefore that the change does not involve the timing of a deduction does not wash.
>
> * * *

> Diebold was required to obtain the Commissioner's consent even though it sought to amend its tax returns back to 1976, which Diebold asserts is the first year in which it maintained a pool of replacement modules for installation in customer's ATMs under its full service contract. . . . Section 446(e) prohibits taxpayers from unilaterally amending their tax returns simply because they have discovered that a different method of accounting yields a lower tax liability than the method they originally chose.

Thus, it is clear that the Federal Circuit views an attempt to "correct erroneous characterization" of an item as a "change of accounting method"; and that the Court adheres strictly to the requirement of § 446(e)--that the IRS's prior consent be obtained in every instance in which a taxpayer attempts to change its method of accounting.

Principal acknowledges that it never sought or received the IRS's prior consent to change its method of accounting for the assessment payments at issue. Principal contends (in conjunction with its attempt to re-characterize the assessments as "taxes") that prior consent to the method change was not required, because § 164 permits a current deduction for "taxes." For this proposition, Principal relies on, *inter alia*, *Underhill v. Commissioner*, 45 T.C. 489 (1966), and *Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349 (1981). Those cases, however, "ultimately rest on the erroneous premise that consent is not required if the taxpayer's previous treatment was improper." *Cargill, Inc. v. United States*, 91 F. Supp. 2d 1293, 1298 (D. Minn. 2000)

In *Standard Oil*, the Tax Court decided that certain costs were properly re-characterized as "intangible drilling costs," which the taxpayer had elected to expense rather than to capitalize, under Code § 263, and that such re-characterization by the taxpayer did not constitute a "change of accounting method" requiring the Commissioner's prior consent. *Inter alia*, that determination was based on the Tax Court's reading of Code § 446(e), which "begins with the words, 'Except as otherwise provided in this chapter [the

Commissioner's prior consent is required for an accounting-method change]'." 77 T.C. at 383. The Tax Court read that provison as meaning that, if the taxpayer's new method would be considered correct under some section of Chapter One of the Code (such as § 263), no prior consent was required. But, as the D.C. Circuit made clear in *Witte* (513 F.2d at 394 (citations omitted))–

> Regulation 1.446-1(e)(2)(i) states that "(c)onsent must be secured" to change an accounting method "whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder." . . . Two of the examples set forth in the regulations indicate that the Commissioner's consent to switch accounting methods is necessary "(a)lthough (the present) method is not a proper method." . . . Supreme Court decisions mandate that "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes."

The D.C. Circuit noted that other Tax Court decisions "have recognized that the purpose of the section 446(e) requirement demands its application 'even where the taxpayer's prior accounting method was improper,'" and concluded that § 446(e)'s "except as otherwise expressly provided in this chapter" language means that there must be a section of the Code that "'expressly' sets forth an exception to the consent requirement." *Id.* at 393, 395.[23] That interpretation is consistent with § 1.446-1(e)(2)(i), and with *Diebold*.

CONCLUSION

For the reasons stated herein, defendant is entitled to judgment, and the complaint should be dismissed with prejudice, with costs assessed against the plaintiff.

---

[23]The IRS noted, in Chief Counsel Advisory 200242001, 2002 WL 31341839 (July 10, 2002), that *Underhill* no longer has any relevance, since it was decided before the 1970 amendment to the regulations under § 446 that focused the definition of "material item" on **timing**. The Court of Appeals for the D.C. Circuit, in *Witte*, rejected the *Underhill* approach "as contrary to the applicable Treasury regulations and subversive of the underlying purpose of section 446(e)'s consent requirement." 513 F.2d at 394. The Chief Counsel Advisory concluded that, for similar reasons, *Standard Oil* is not reliable authority.

Respectfully submitted,

S/Mary M. Abate

MARY M. ABATE
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6507

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section
WILLIAM K. DREW
Reviewer

S/William K. Drew
Of Counsel

June 8, 2005

# APPENDIX

Revenue Act of 1928 § 44(d) . . . . . 52
Internal Revenue Code of 1954 § 453(d) . . . . . 54
Internal Revenue Code of 1986
§ 164(a) . . . . . 57
§ 446 . . . . . 58
§ 453 . . . . . 59
§ 453A . . . . . 66
§ 453B(a) . . . . . 68
§ 811 . . . . . 70
§ 1502 . . . . . 72
Treasury Regulation § 1.446-1 (1991) . . . . . 73
Treasury Regulation § 1.446-1T (2004) . . . . . 78
Treasury Regulation § 1.1502-13 (1991) . . . . . 82
Code of Iowa, Chapter 508C . . . . . 93
Code of Iowa § 521A.5(b) . . . . . 105

## Part IV—Accounting Periods and Methods of Accounting

INCOME TAX
Accounting periods and methods.

**SEC. 41. GENERAL RULE.**

General rule.

Net income computed on basis of annual accounting period.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. (For use of inventories, see section 22(c).)

If no accounting period, on calendar year.

Inventories.
*Ante*, p. 799.

**SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED.**

Gross income.

Items for taxable year in which received.

The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period.

**SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN.**

Deductions and credits.

For taxable year in which "paid or accrued" or "paid or incurred."

The deductions and credits provided for in this title shall be taken for the taxable year in which "paid or accrued" or "paid or incurred", dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period.

**SEC. 44. INSTALLMENT BASIS.**

Installment basis.

Dealers in personal property may make returns on, of payments actually received.

(a) **Dealers in personal property.**—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

Returns of income from casual sale of personalty or of realty.

(b) **Sales of realty and casual sales of personalty.**—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 40 per centum of the selling price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

Computation of income on change to installment basis.

(c) **Change from accrual to installment basis.**—If a taxpayer entitled to the benefits of subsection (a) elects for any taxable year to report his net income on the installment basis, then in computing his income for the year of change or any subsequent year, amounts actually received during any such year on account of sales or other dispositions of property made in any prior year shall not be excluded.

INCOME TAX
Recognition of gain or loss on disposition of installment obligations.

(d) **Gain or loss upon disposition of installment obligations.**—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition.

Basis computed.

The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

Allocation of income and deductions.

**SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.**

Provisions if same interests control two or more businesses.

In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses.

Change of accounting period.

**SEC. 46. CHANGE OF ACCOUNTING PERIOD.**

Net income computed on basis of new period.

If a taxpayer changes his accounting period from fiscal year to calendar year, from calendar year to fiscal year, or from one fiscal year to another, the net income shall, with the approval of the Commissioner, be computed on the basis of such new accounting period, subject to the provisions of section 47.

Returns for less than a year.

**SEC. 47. RETURNS FOR A PERIOD OF LESS THAN TWELVE MONTHS.**

Basis for determining, when accounting periods change.

(a) **Returns for short period resulting from change of accounting period.**—If a taxpayer, with the approval of the Commissioner, changes the basis of computing net income from fiscal year to calendar year a separate return shall be made for the period between the close of the last fiscal year for which return was made and the following December 31. If the change is from calendar year to fiscal year, a separate return shall be made for the period between the close of the last calendar year for which return was made and the date designated as the close of the fiscal year. If the change is from one fiscal year to another fiscal year a separate return shall be made for the period between the close of the former fiscal year and the date designated as the close of the new fiscal year.

Income to be based on period of separate return.

(b) **Income computed on basis of short period.**—Where a separate return is made under subsection (a) on account of a change in the accounting period, and in all other cases where a separate return is required or permitted, by regulations prescribed by the Commissioner with the approval of the Secretary, to be made for a fractional part of a year, then the income shall be computed on the basis of the period for which separate return is made.

Computation of taxable income.

(c) **Income placed on annual basis.**—If a separate return is made under subsection (a) on account of a change in the accounting period, the net income, computed on the basis of the period for which separate return is made, shall be placed on an annual basis by multiplying the amount thereof by twelve and dividing by the number of months included in the period for which the separate return is made. The tax shall be such part of the tax computed

(e) DEFINITIONS.—For purposes of this section—

(1) PREPAID INCOME.—The term "prepaid income" means any amount (includible in gross income) which is received in connection with, and is directly attributable to, a liability which extends beyond the close of the taxable year in which such amount is received. Such term does not include any income treated as gain from the sale or other disposition of a capital asset.

(2) LIABILITY TO RENDER SERVICES, ETC.—The term "liability" means a liability to render services, furnish goods or other property, or allow the use of property.

(3) RECEIPT OF PREPAID INCOME.—Prepaid income shall be treated as received during the taxable year for which it is includible in gross income under section 451 (without regard to this section).

**SEC. 453. INSTALLMENT METHOD.**

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

(B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44 (b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44 (a) of such code.

(c) CHANGE FROM ACCRUAL TO INSTALLMENT BASIS.—

(1) GENERAL RULE.—If a taxpayer entitled to the benefits of subsection (a) elects for any taxable year to report his taxable income on the installment basis, then in computing his taxable income for such year (referred to in this subsection as "year of change") or for any subsequent year—

(A) installment payments actually received during any such year on account of sales or other dispositions of property made



54

his section—
"prepaid income" means any
vhich is received in connection
to, a liability which extends
ar in which such amount is
le any income treated as gain
capital asset.
s, ETC.—The term "liability"
urnish goods or other property,

.—Prepaid income shall be
year for which it is includible
ithout regard to this section).

RTY.—Under regulations pre-
, a person who regularly sells
erty on the installment plan
taxable year that proportion
ceived in that year which the
when payment is completed,

SALES OF PERSONALTY.—
—
f real property, or
disposition of personal prop-
nd which would properly be
xpayer if on hand at the close
eeding $1,000,
y the Secretary or his dele-
the manner prescribed in sub-

all apply—
r disposition during a taxable
, 1953 (whether or not such
of enactment of this title),
le or other disposition—

f evidences of indebtedness of
percent of the selling price.
r disposition during a taxable
1954, only if the income was
ternal Revenue Code of 1939)
manner prescribed in section

LLMENT BASIS.—
r entitled to the benefits of
year to report his taxable in-
in computing his taxable in-
this subsection as "year of
—
lly received during any such
lispositions of property made



in any taxable year before the year of change shall not be excluded; but

(B) the tax imposed by this chapter for any taxable year (referred to in this subsection as "adjustment year") beginning after December 31, 1953, shall be reduced by the adjustment computed under paragraph (2).

(2) ADJUSTMENT IN TAX FOR AMOUNTS PREVIOUSLY TAXED.—In determining the adjustment referred to in paragraph (1) (B), first determine, for each taxable year before the year of change, the amount which equals the lesser of—

(A) the portion of the tax for such prior taxable year which is attributable to the gross profit which was included in gross income for such prior taxable year, and which by reason of paragraph (1) (A) is includible in gross income for the taxable year, or

(B) the portion of the tax for the adjustment year which is attributable to the gross profit described in subparagraph (A).

The adjustment referred to in paragraph (1) (B) for the adjustment year is the sum of the amounts determined under the preceding sentence.

(3) RULE FOR APPLYING PARAGRAPH (2).—For purposes of paragraph (2), the portion of the tax for a prior taxable year, or for the adjustment year, which is attributable to the gross profit described in such paragraph is that amount which bears the same ratio to the tax imposed by this chapter (or by the corresponding provisions of prior revenue laws) for such taxable year (computed without regard to paragraph (2)) as the gross profit described in such paragraph bears to the gross income for such taxable year. For purposes of the preceding sentence, the provisions of chapter 1 (other than of subchapter D, relating to excess profits tax, and of subchapter E, relating to self-employment income) of the Internal Revenue Code of 1939 shall be treated as the corresponding provisions of the Internal Revenue Code of 1939.

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

(3) SPECIAL RULE FOR TRANSMISSION AT DEATH.—Except as provided in section 691 (relating to recipients of income in respect of

decedents), this subsection shall not apply to the transmission of installment obligations at death.

(4) EFFECT OF DISTRIBUTION IN CERTAIN LIQUIDATIONS.—

(A) LIQUIDATIONS TO WHICH SECTION 332 APPLIES.—If—

(i) an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and

(ii) under section 332 (relating to complete liquidations of subsidiaries) no gain or loss with respect to the receipt of such obligation is recognized in the case of the recipient corporation,

then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation.

(B) LIQUIDATIONS TO WHICH SECTION 337 APPLIES.—If—

(i) an installment obligation is distributed by a corporation in the course of a liquidation, and

(ii) under section 337 (relating to gain or loss on sales or exchanges in connection with certain liquidations) no gain or loss would have been recognized to the corporation if the corporation had sold or exchanged such installment obligation on the day of such distribution,

then no gain or loss shall be recognized to such corporation by reason of such distribution.

**SEC. 454. OBLIGATIONS ISSUED AT DISCOUNT.**

(a) NON-INTEREST-BEARING OBLIGATIONS ISSUED AT A DISCOUNT.—If, in the case of a taxpayer owning any non-interest-bearing obligation issued at a discount and redeemable for fixed amounts increasing at stated intervals or owning an obligation described in paragraph (2) of subsection (c), the increase in the redemption price of such obligation occurring in the taxable year does not (under the method of accounting used in computing his taxable income) constitute income to him in such year, such taxpayer may, at his election made in his return for any taxable year, treat such increase as income received in such taxable year. If any such election is made with respect to any such obligation, it shall apply also to all such obligations owned by the taxpayer at the beginning of the first taxable year to which it applies and to all such obligations thereafter acquired by him and shall be binding for all subsequent taxable years, unless on application by the taxpayer the Secretary or his delegate permits him, subject to such conditions as the Secretary or his delegate deems necessary, to change to a different method. In the case of any such obligations owned by the taxpayer at the beginning of the first taxable year to which his election applies, the increase in the redemption price of such obligations occurring between the date of acquisition (or, in the case of an obligation described in paragraph (2) of subsection (c), the date of acquisition of the series E bond involved) and the first day of such taxable year shall also be treated as income received in such taxable year.

(b) SHORT-TERM OBLIGATIONS ISSUED ON DISCOUNT BASIS.—In the case of any obligation—

(1) of the United States; or

(2) of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia,

(ii) computed with such other adjustments as the Secretary may by regulations prescribe.

(B) Net interest expense.—The term "net interest expense" means the excess (if any) of—

(i) the interest paid or accrued by the taxpayer during the taxable year, over

(ii) the amount of interest includible in the gross income of such taxpayer for such taxable year.

The Secretary may by regulations provide for adjustments in determining the amount of net interest expense.

(C) Treatment of affiliated group.—All members of the same affiliated group (within the meaning of section 1504(a)) shall be treated as 1 taxpayer.

(7) **Regulations.**—The Secretary shall prescribe such regulations as may be appropriate to carry out the purposes of this subsection, including—

(A) such regulations as may be appropriate to prevent the avoidance of the purposes of this subsection.

(B) regulations providing such adjustments in the case of corporations which are members of an affiliated group as may be appropriate to carry out the purposes of this subsection, and

(C) regulations for the coordination of this subsection with section 884.

**(k) Cross references.—**

**(1) For disallowance of certain amounts paid in connection with insurance, endowment, or annuity contracts, see section 264.**

**(2) For disallowance of deduction for interest relating to tax-exempt income, see section 265(a)(2).**

**(3) For disallowance of deduction for carrying charges chargeable to capital account, see section 266.**

**(4) For disallowance of interest with respect to transactions between related taxpayers, see section 267.**

**(5) For treatment of redeemable ground rents and real property held subject to liabilities under redeemable ground rents, see section 1055.**

## IRC §164. TAXES.

**(a) General Rule.**—Except as otherwise provided in this section, the following taxes shall be allowed as a deduction for the taxable year within which paid or accrued:

(1) State and local, and foreign, real property taxes.

(2) State and local personal property taxes.

(3) State and local, and foreign, income, war profits, and excess profits taxes.

**(4)** [1]*The* GST tax imposed on income distributions.

**(5)** the environmental tax imposed by section 59A.

In addition, there shall be allowed as a deduction State and local, and foreign, taxes not described in the preceding sentence which are paid or accrued within the taxable year in carrying on a trade or business or an activity described in section 212 (relating to expenses for production of income). Notwithstanding the preceding sentence, any tax (not described in the first sentence of this subsection) which is paid or accrued by the taxpayer in connection with an acquisition or disposition of property shall be treated as part of the cost of the acquired property or, in the case of a disposition, as a reduction in the amount realized on the disposition.

**(b) Definitions and Special Rules.**—For purposes of this section—

**(1) Personal property taxes.**—The term "personal property tax" means an ad valorem tax which is imposed on an annual basis in respect of personal property.

**[Footnote IRC §164]** Matter in *italics* in IRC §164(a)(4) added by section 1018(u)(11), '88 TMRA, P.L. 100-647, 11-10-88, which struck out:

**(1)** "the"

**Effective date** (Sec. 1019(a), '88 TMRA, and section 1433(a)(1), '86 TRA, P.L. 99-514, 10-22-86 as amended by section 1014(h), '88 TMRA).—Generally applies to any generation-skipping transfer (within the meaning of section 2611 of the '86 Code) made after 10-22-86.


©1990 Macmillan, Inc.—Internal Revenue Code

## Subpart A—Methods of Accounting in General

IRC §446. General rule for methods of accounting.
IRC §447. Method of accounting for corporations engaged in farming.
IRC §448. Limitation on use of cash method of accounting.

### IRC §446. GENERAL RULE FOR METHODS OF ACCOUNTING.

**(a) General Rule.**—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

**(b) Exceptions.**—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

**(c) Permissible Methods.**—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;
(2) an accrual method;
(3) any other method permitted by this chapter; or
(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

**(d) Taxpayer Engaged in More Than One Business.**—A taxpayer engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade or business.

**(e) Requirement Respecting Change of Accounting Method.**—Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

*(f) Failure To Request Change of Method of Accounting.—If the taxpayer does not file with the Secretary a request to change the method of accounting, the absence of the consent of the Secretary to a change in the method of accounting shall not be taken into account—*

*(1) to prevent the imposition of any penalty, or the addition of any amount to tax, under this title, or*
*(2) to diminish the amount of such penalty or addition to tax.*

### IRC §447. METHOD OF ACCOUNTING FOR CORPORATIONS ENGAGED IN FARMING.

**(a) General Rule.**—Except as otherwise provided by law, the taxable income from farming of—

(1) a corporation engaged in the trade or business of farming, or
(2) a partnership engaged in the trade or business of farming, if a corporation is a partner in such partnership,

shall be computed on an accrual method of accounting. This section shall not apply to the trade or business of operating a nursery or sod farm or to the raising or harvesting of trees (other than fruit and nut trees).

**(b) Preproductive Period Expenses.—**
For rules requiring capitalization of certain preproductive period expenses, see section 263A.

**(c) Exception for Certain Corporations.**—For purposes of subsection (a), a corporation shall be treated as not being a corporation if it is—

(1) an S corporation, or
(2) a corporation the gross receipts of which meet the requirements of subsection (d).

**(d) Gross Receipts Requirements.—**

**(1) In general.**—A corporation meets the requirements of this subsection if, for each prior taxable year beginning after December 31, 1975, such corporation (and any

**[Footnote IRC §446]** IRC §446(f) added by section 161(a), '84 TRA.
**Effective date** (Sec. 161(b), '84 TRA).—Applies to taxable years beginning after 7-18-84.

 ©1990 Macmillan, Inc.—Internal Revenue Code

[2](g) **Treatment of Interest on Frozen Deposits in Certain Financial Institutions.**—

(1) **In general.**—In the case of interest credited during any calendar year on a frozen deposit in a qualified financial institution, the amount of such interest includible in the gross income of a qualified individual shall not exceed the sum of—

(A) the net amount withdrawn by such individual from such deposit during such calendar year, and

(B) the amount of such deposit which is withdrawable as of the close of the taxable year (determined without regard to any penalty for premature withdrawals of a time deposit).

(2) **Interest tested each year.**—Any interest not included in gross income by reason of paragraph (1) shall be treated as credited in the next calendar year.

(3) **Deferral of interest deduction.**—No deduction shall be allowed to any qualified financial institution for interest not includible in gross income under paragraph (1) until such interest is includible in gross income.

(4) **Frozen deposit.**—For purposes of this subsection, the term "frozen deposit" means any deposit if, as of the close of the calendar year, any portion of such deposit may not be withdrawn because of—

(A) the bankruptcy or insolvency of the qualified financial institution (or threat thereof), or

(B) any requirement imposed by the State in which such institution is located by reason of the bankruptcy or insolvency (or threat thereof) of 1 or more financial institutions in the State.

(5) **Other definitions.**—For purposes of this subsection, the terms "qualified individual", "qualified financial institution", and "deposit" have the same respective meanings as when used in section 165(l).

## IRC §453. INSTALLMENT METHOD.

(a) **General Rule.**—Except as otherwise provided in this section, income from an installment sale shall be taken into account for purposes of this title under the installment method.

(b) **Installment Sale Defined.**—For purposes of this section—

(1) **In general.**—The term "installment sale" means a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs.

(2) **Exceptions.**—The term "installment sale" does not include—

(A) Dealer [1]*dispositions.—Any dealer disposition (as defined in subsection (l)).*

(B) Inventories of personal property.—A disposition of personal property of a kind which is required to be included in the inventory of the taxpayer if on hand at the close of the taxable year.

(c) **Installment Method Defined.**—For purposes of this section, the term "installment method" means a method under which the income recognized for any taxable year from a disposition is that proportion of the payments received in that year which the gross

**[Footnote IRC §451 continued]**

Matter in *italics* in IRC §451(g) added by section 1009(d)(3), '88 TMRA, P.L. 100-647, 11-10-88, which struck out;

(2) "(f)"

**Effective date** (Sec. 1019(a) and section 905(c), '86 TRA P.L. 99-514, 10-22-86, as amended by 1009(d)(2), '88 TMRA).—(1) Generally applies 12-31-82.

(2) Special rules * * *

(A) Applies to taxable years beginning after 12-31-82, and before 1-1-87, only if the qualified individual elects to have such amendment apply for all such taxable years.

(B) In the case of interest attributable to the period beginning 1-1-83, and ending 12-31-87, the interest deduction of financial institutions shall be determined without regard to paragraph (3) of section 451(f) of the '86 Code (as added by section 905(b), '86 TRA).

**[Footnote IRC §453]** Matter in *italics* in IRC §453(b)(2)(A), and a new (*l*) added by section 10202(b)(1), and (2), '87 OBRA, P.L. 100-203, 12-22-87, which struck out:

(1) "disposition of personal property.—A disposition of personal property on the installment plan by a person who regularly sells or otherwise disposes of personal property on the installment plan."

**Effective date** (Sec. 10202(e)(1), '87 OBRA).—Generally applies to dispositions in taxable years beginning after 12-31-87. For special and transitional rules, as amended by '88 TMRA, see below, or Amending Acts, Code Volume II.

ɪeposits in Certain Financial Institutions.—
:st credited during any calendar year on a fro
ıtion, the amount of such interest includible in
l shall not exceed the sum of—
such individual from such deposit during such

ıich is withdrawable as of the close of the tax
to any penalty for premature withdrawals of a

nterest not included in gross income by reason
ted in the next calendar year.

No deduction shall be allowed to any qualified
ıdible in gross income under paragraph (1) un
ome.

of this subsection, the term "frozen deposit"
the calendar year, any portion of such deposit

of the qualified financial institution (or threat

he State in which such institution is located by
y (or threat thereof) of 1 or more financial in

ɜ of this subsection, the terms "qualified indi-
and "deposit" have the same respective mean-

e provided in this section, income from an in-
for purposes of this title under the installment

·poses of this section—

:nt sale" means a disposition of property where
r the close of the taxable year in which the dis-

ent sale" does not include—
*ler disposition (as defined in subsection (l)).*
:rty.—A disposition of personal property of a
in the inventory of the taxpayer if on hand at

purposes of this section, the term "installment
ıe income recognized for any taxable year from
ayments received in that year which the gross

1009(d)(3), '88 TMRA, P.L. 100-647, 11-10-88, which struck

TRA P.L. 99-514, 10-22-86, as amended by 1009(d)(2), '88

-82, and before 1-1-87, only if the qualified individual elects
ars.
od beginning 1-1-83, and ending 12-31-87, the interest deduc
ɔut regard to paragraph (3) of section 451(f) of the '86 Code

53(b)(2)(A), and a new (*l*) added by section 10202(b)(1), and
ɔut:
:on of personal property on the installment plan by a person
property on the installment plan."
erally applies to dispositions in taxable years beginning after
led by '88 TMRA, see below, or Amending Acts, Code Vol



profit (realized or to be realized when payment is completed) bears to the total contra
price.

(d) **Election Out.—**

(1) **In general.—**Subsection (a) shall not apply to any disposition if the taxpay elects to have subsection (a) not apply to such disposition.

(2) **Time and manner for making election.—**Except as otherwise provided by regu lations, an election under paragraph (1) with respect to a disposition may be mac only on or before the due date prescribed by law (including extensions) for filing tl taxpayer's return of the tax imposed by this chapter for the taxable year in which tl disposition occurs. Such an election shall be made in the manner prescribed by regul tions.

(3) **Election revocable only with consent.—**An election under paragraph (1) wit respect to any disposition may be revoked only with the consent of the Secretary.

(e) **Second Dispositions by Related Persons.—**

(1) **In general.—**If —

(A) any person disposes of property to a related person (hereinafter in this sul section referred to as the "first disposition"), and

(B) before the person making the first disposition receives all payments with r spect to such disposition, the related person disposes of the property (hereinafter i this subsection referred to as the "second disposition"),

then, for purposes of this section, the amount realized with respect to such second di position shall be treated as received at the time of the second disposition by the perso making the first disposition.

(2) **2-year cutoff for property other than marketable securities.—**

(A) In general.—Except in the case of marketable securities, paragraph (1) sha apply only if the date of the second disposition is not more than 2 years after tl date of the first disposition.

(B) Substantial diminishing of risk of ownership.—The running of the 2-year pe iod set forth in subparagraph (A) shall be suspended with respect to any propert for any period during which the related person's risk of loss with respect to tl property is substantially diminished by—

(i) the holding of a put with respect to such property (or similar property),

(ii) the holding by another person of a right to acquire the property, or

(iii) a short sale or any other transaction.

(3) **Limitation on amount treated as received.—**The amount treated for any taxab year as received by the person making the first disposition by reason of paragraph ( shall not exceed the excess of—

(A) the lesser of—

(i) the total amount realized with respect to any second disposition of tl property occurring before the close of the taxable year, or

(ii) the total contract price for the first disposition, over

(B) the sum of—

(i) the aggregate amount of payments received with respect to the first dispo sition before the close of such year, plus

(ii) the aggregate amount treated as received with respect to the first dispo sition for prior taxable years by reason of this subsection.

(4) **Fair market value where disposition is not sale or exchange.—**For purposes c this subsection, if the second disposition is not a sale or exchange, an amount equal t the fair market value of the property disposed of shall be substituted for the amour realized.

(5) **Later payments treated as receipt of tax paid amounts.—**If paragraph (1) ap plies for any taxable year, payments received in subsequent taxable years by the perso making the first disposition shall not be treated as the receipt of payments with respec to the first disposition to the extent that the aggregate of such payments does not ex ceed the amount treated as received by reason of paragraph (1).

(6) **Exception for certain dispositions.—**For purposes of this subsection—

(A) Reacquisitions of stock by issuing corporation not treated as first dispos tions.—Any sale or exchange of stock to the issuing corporation shall not be treate as a first disposition.



60

(B) Involuntary conversions not treated as second dispositions.—A compulsory or involuntary conversion (within the meaning of section 1033) and any transfer thereafter shall not be treated as a second disposition if the first disposition occurred before the threat or imminence of the conversion.

(C) Dispositions after death.—Any transfer after the earlier of—

(i) the death of the person making the first disposition, or

(ii) the death of the person acquiring the property in the first disposition,

and any transfer thereafter shall not be treated as a second disposition.

**(7) Exception where tax avoidance not a principal purpose.**—This subsection shall not apply to a second disposition (and any transfer thereafter) if it is established to the satisfaction of the Secretary that neither the first disposition nor the second disposition had as one of its principal purposes the avoidance of Federal income tax.

**(8) Extension of statute of limitations.**—The period for assessing a deficiency with respect to a first disposition (to the extent such deficiency is attributable to the application of this subsection) shall not expire before the day which is 2 years after the date on which the person making the first disposition furnishes (in such manner as the Secretary may by regulations prescribe) a notice that there was a second disposition of the property to which this subsection may have applied. Such deficiency may be assessed notwithstanding the provisions of any law or rule of law which would otherwise prevent such assessment.

**(f) Definitions and Special Rules.**—For purposes of this section—

**(1) Related person.**—Except for purposes of [2]*subsections* (g) and (h), the term "related person" means—

(A) a person whose stock would be attributed under section 318(a) (other than paragraph (4) thereof) to the person first disposing of the property, or

(B) a person who bears a relationship described in section 267(b) to the person first disposing of the property.

**(2) Marketable securities.**—The term "marketable securities" means any security for which, as of the date of the disposition, there was a market on an established securities market or otherwise.

**(3) Payment.**—Except as provided in paragraph (4), the term "payment" does not include the receipt of evidences of indebtedness of the person acquiring the property (whether or not payment of such indebtedness is guaranteed by another person).

**(4) Purchaser evidences of indebtedness payable on demand or readily tradable.**—Receipt of a bond or other evidence of indebtedness which—

(A) is payable on demand, or

(B) is issued by a corporation or a government or political subdivision thereof and is readily tradable.

shall be treated as receipt of payment.

**(5) Readily tradable defined.**—For purposes of paragraph (4), the term "readily tradable" means a bond or other evidence of indebtedness which is issued—

(A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or

(B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market.

**(6) Like-kind exchanges.**—In the case of any exchange described in section 1031(b)—

(A) the total contract price shall be reduced to take into account the amount of any property permitted to be received in such exchange without recognition of gain,

(B) the gross profit from such exchange shall be reduced to take into account any amount not recognized by reason of section 1031(b), and

(C) the term "payment", when used in any provision of this section other than subsection (b)(1), shall not include any property permitted to be received in such exchange without recognition of gain.

Similar rules shall apply in the case of an exchange which is described in section 356(a) and is not treated as a dividend.

**[Footnote IRC §453 continued]**

Matter in *italics* in IRC §453(f)(1) and (f)(8) added by section 1018(u)(25) and (26), '88 TMRA, P.L. 100-647, 11-10-88, which struck out:

(2) "subsection"

eated as second dispositions.—A compulsory
meaning of section 1033) and any transfer
ond disposition if the first disposition occurred
conversion.
transfer after the earlier of—
g the first disposition, or
ring the property in the first disposition,
treated as a second disposition.

ot a principal purpose.—This subsection shall
ny transfer thereafter) if it is established to the
the first disposition nor the second disposition
voidance of Federal income tax.

s.—The period for assessing a deficiency with
t such deficiency is attributable to the applica-
before the day which is 2 years after the date
position furnishes (in such manner as the Sec-
otice that there was a second disposition of the
have applied. Such deficiency may be assessed
aw or rule of law which would otherwise pre-

purposes of this section—
oses of [2]*subsections* (g) and (h), the term "re-

be attributed under section 318(a) (other than
rst disposing of the property, or
ship described in section 267(b) to the person

n "marketable securities" means any security
on, there was a market on an established secu-

paragraph (4), the term "payment" does not
btedness of the person acquiring the property
dness is guaranteed by another person).

**ess payable on demand or readily tradable.**—
ndebtedness which—

a government or political subdivision thereof

purposes of paragraph (4), the term "readily
e of indebtedness which is issued—
or in registered form (other than one in regis-
ishes will not be readily tradable in an estab-

render such bond or other evidence of indebt-
ed securities market.

case of any exchange described in section

be reduced to take into account the amount of
in such exchange without recognition of gain,
change shall be reduced to take into account
of section 1031(b), and
sed in any provision of this section other than
any property permitted to be received in such

n exchange which is described in section 356(a)

by section 1018(u)(25) and (26), '88 TMRA, P.L. 100-647

©PH, Inc.—Internal Revenue Code

(7) **Depreciable property.**—The term "depreciable property" means property of character which (in the hands of the transferee) is subject to the allowance for deprec iation provided in section 167.

(8) **Payments to be received defined.**—The term [3]"*payments* to be received includes—

(A) the aggregate amount of all payments which are not contingent as t amount, and

(B) the fair market value of all payments which are contingent as to amount.

(g) **Sale of Depreciable Property to Controlled Owned Entity.—**

(1) **In general.**—In the case of an installment sale of depreciable property betwee related persons[4]—

[5]*(A) subsection (a) shall not apply,*

*(B) for purposes of this title—*

*(i) except as provided in clause (ii), all payments to be received shall be treate as received in the year of the disposition, and*

*(ii) in the case of any payments which are contingent as to the amount but wit respect to which the fair market value may not be reasonably ascertained, the bas shall be recovered ratably, and*

*(C) the purchaser may not increase the basis of any property acquired in such sa by any amount before the time such amount is includible in the gross income of th seller.*

(2) **Exception where tax avoidance not a principal purpose.**—Paragraph (1) sha not apply if it is established to the satisfaction of the Secretary that the disposition di not have as one of its principal purposes the avoidance of Federal income tax.

*(3) Related persons.—For purposes of this subsection, the term "related persons" ha the meaning given to such term by section 1239(b), except that such term shall include or more partnerships having a relationship to each other described in section 707(b)(1)(B*

(h) **Use of Installment Method by Shareholders in Certain Liquidations.—**

(1) **Receipt of obligations not treated as receipt of payment.—**

(A) In general.—If, in a liquidation to which section 331 applies, the shareholde receives (in exchange for the shareholder's stock) an installment obligation acquire in respect of a sale or exchange by the corporation during the 12-month period be ginning on the date a plan of complete liquidation is adopted and the liquidation i completed during such 12-month period, then, for purposes of this section, the re ceipt of payments under such obligation (but not the receipt of such obligation) b the shareholder shall be treated as the receipt of payment for the stock.

(B) Obligations attributable to sale of inventory must result from bulk sale.– Subparagraph (A) shall not apply to an installment obligation acquired in respect c a sale or exchange of—

(i) stock in trade of the corporation,

**[Footnote IRC §453 continued]**

(3) "payment"

**Effective date** (Sec. 1019(a), '88 TMRA, and section 642(c), '86 TRA, P.L. 99-514, 10-22-86, as amended b section 1006(i)(3), '88 TMRA).—(1) Generally applies to sales after 10-22-86, in taxable years ending after suc date.

(2) Transitional rule for binding contracts.—The amendments made by this section shall not apply to sal made after 8-14-86, which are made pursuant to a binding contract in effect on 8-14-86, and at all times thereafte

Matter in *italics* in IRC §453(g)(1), (3) added by section 1006(i)(1), and (2), '88 TMRA, P.L. 100-647, 11-10-8 which struck out:

(4) "(within the meaning of section 1239(b)"

(5) "(A) subsection (a) shall not apply, and

(B) for purposes of this title—

(i) except as provided in clause (ii) all payments to be received shall be treated as received in the year of th disposition, and

(ii) in the case of any payments which are contingent as to amount but with respect to which the fair mark value may not be reasonably ascertained—

(I) the basis shall be recovered ratably, and

(II) the purchaser may not increase the basis of any property acquired in such sale by any amount before suc time as the seller includes such amount in income."

**Effective date** (Sec. 1019(a), '88 TMRA, and section 642(c), '86 TRA, as amended by section 1006(i)(3), '8 TMRA).—See above.

(ii) other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and

(iii) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,

unless such sale or exchange is [6]*to 1 person in 1 transaction* and involves substantially all of such property attributable to a trade or business of the corporation.

(C) Special rule where obligor and shareholder are related persons.—If the obligor of any installment obligation and the shareholder are married to each other or are related persons (within the meaning of section 1239(b)), to the extent such installment obligation is attributable to the disposition by the corporation of depreciable property—

(i) subparagraph (A) shall not apply to such obligation, and

(ii) for purposes of this title, all payments to be received by the shareholder shall be deemed received in the year the shareholder receives the obligation.

(D) Coordination with subsection (e)(1)(A).—For purposes of subsection (e)(1)(A), disposition of property by the corporation shall be treated also as disposition of such property by the shareholder.

(E) Sales by liquidating subsidiaries.—For purposes of subparagraph (A), in the case of a controlling corporate shareholder (within the meaning of section [7]*368(c)*) of a selling corporation, an obligation acquired in respect of a sale or exchange by the selling corporation shall be treated as so acquired by such controlling corporate shareholder. The preceding sentence shall be applied successively to each controlling corporate shareholder above such controlling corporate shareholder.

**(2) Distributions received in more than 1 taxable year of shareholder.**—If—

(A) paragraph (1) applies with respect to any installment obligation received by a shareholder from a corporation, and

(B) by reason of the liquidation such shareholder receives property in more than 1 taxable year,

then, on completion of the liquidation, basis previously allocated to property so received shall be reallocated for all such taxable years so that the shareholder's basis in the stock of the corporation is properly allocated among all property received by such shareholder in such liquidation.

**(i) Recognition of Recapture Income in Year of Disposition.—**

**(1) In general.**—In the case of any installment sale of property to which subsection (a) applies—

(A) notwithstanding subsection (a), any recapture income shall be recognized in the year of the disposition and

(B) any gain in excess of the recapture income shall be taken into account under the installment method.

**(2) Recapture income.**—For purposes of paragraph 1, the term "recapture income" means, with respect to any installment sale, the aggregate amount which would be treated as ordinary income under section 1245 or 1250 (or so much of section 751 as relates to section 1245 or 1250) for the taxable year of the disposition if all payments to be received were received in the taxable year of disposition.

**(j) Regulations.—**

**(1) In general.**—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the provisions of this section.

**[Footnote IRC §453 continued]**

Matter in *italics* in IRC §453(h)(1)(B) and (E) added by section 1006(e)(7)(A) and (B), '88 TMRA, P.L. 100-647, 11-10-88, which struck out:

(6) "to one person"

(7) "368(c)(1)"

**Effective date** (Sec.1019(a), '88 TMRA and section 633(a), '86 TRA).—Generally applies to—

(1) any distribution in complete liquidation, and any sale or exchange, made by a corporation after 7-31-86, unless such corporation is completely liquidated before 1-1-87,

(2) any transaction described in section 338 of the '86 Code for which the acquisition date occurs after 12-31-86, and

(3) any distribution (not in complete liquidation) made after 12-31-86.

For special and transitional rules, as amended by section 1006(g)(1)—(12), '88 TMRA, see footnote IRC §1374 on Amending Acts, Code Volume II.

 ©PH, Inc.—Internal Revenue Code

uld properly be included in the inven-
)se of the taxable year, and
primarily for sale to customers in the

*in 1 transaction* and involves substan-
de or business of the corporation.

older are related persons.—If the obli-
areholder are married to each other or
ection 1239(b)), to the extent such in-
)osition by the corporation of deprecia-

such obligation, and
ents to be received by the shareholder
areholder receives the obligation.

A).—For purposes of subsection (e)(1)
ion shall be treated also as disposition

r purposes of subparagraph (A), in the
ithin the meaning of section [7]*368(c))* of
in respect of a sale or exchange by the
cquired by such controlling corporate
applied successively to each controlling
corporate shareholder.

**xable year of shareholder.—If—**
any installment obligation received by

reholder receives property in more than

previously allocated to property so re-
years so that the shareholder's basis in
ed among all property received by such

**)f Disposition.—**

ent sale of property to which subsection

recapture income shall be recognized in

come shall be taken into account under

ragraph 1, the term "recapture income"
the aggregate amount which would be
or 1250 (or so much of section 751 as
year of the disposition if all payments
of disposition.

be such regulations as may be necessary
is section.

section 1006(e)(7)(A) and (B), '88 TMRA, P.L.

6 TRA).—Generally applies to—
or exchange, made by a corporation after 7-31-86,

Code for which the acquisition date occurs after

12-31-86.
g)(1)—(12), '88 TMRA, see footnote IRC §1374 or

——



(2) **Selling price not readily ascertainable.**—The regulations prescribed under paragraph (1) shall include regulations providing for ratable basis recovery in transactions where the gross profit or the total contract price (or both) cannot be readily ascertained.

[8]*(k)* **Current Inclusion in Case of Revolving Credit Plans, Etc.**—In the case of—

**[Footnote IRC §453 continued]**

"(k)" in *italics* in IRC §453(k) added by section 1008(g)(1), '88 TMRA, P.L. 100-647, 11-10-88, which struck out"

(8) "(j)"

**Effective date** (Sec. 1019(a), '88 TMRA, and section 812(c), '86 TRA.—(1) Generally applies to taxable years beginning after 12-31-86.

(2) Sales of stock, etc.—Section 453(k)(2) of the '86 Code, as added by subsection (a) [812 of '86 TRA] shall apply to sales after 12-31-86, in taxable years ending after "such date."

(3) Change of method of accounting.—In the case of any taxpayer who made sales under a revolving credit plan and was on the installment method under section 453 or 453A of the '86 Code for such taxpayer's last taxable year beginning before 1-1-87, the amendments made by this section shall be treated as a change in method of accounting for its 1st taxable year beginning after 12-31-86, and—

(A) such change shall be treated as initiated by the taxpayer,

(B) such change shall be treated as having been made with the consent of the Secretary,

(C) the period for taking into account adjustments under section 481 of such Code by reason of such change shall be equal to 4 years, and

(D) except as provided in paragraph (4), the amount taken into account in each of such 4 years shall be the applicable percentage (determined in accordance with the following table) of the net adjustment:

| In the case of the: | The applicable percentage is: |
|---|---|
| 1st taxable year | 15 |
| 2nd taxable year | 25 |
| 3rd taxable year | 30 |
| 4th taxable year | 30. |

If the taxpayer's last taxable year beginning before 1-1-87, was the taxpayer's 1st taxable year in which sales were made under a revolving credit plan, all adjustments under section 481 of such Code shall be taken into account in the taxpayer's 1st taxable year beginning after 12-31-86.

(A) In general.—If the percentage determined under subparagraph (B) for any taxable year in the adjustment period exceeds the percentage which would otherwise apply under paragraph (3)(D) for such taxable year (determined after the application of this paragraph for prior taxable years in the adjustment period)—

(i) the percentage determined under subparagraph (B) shall be substituted for the applicable percentage which would otherwise apply under paragraph (3)(D), and

(ii) any increase in the applicable percentage by reason of clause (i) shall be applied to reduce the applicable percentage determined under paragraph (3)(D) for subsequent taxable years in the adjustment period (beginning with the 1st of such subsequent taxable years).

(B) Determination of percentage.—For purposes of subparagraph (A), the percentage determined under this subparagraph for any taxable year in the adjustment period is the excess (if any) of—

(i) the percentage determined by dividing the aggregate contraction in revolving installment obligations by the aggregate face amount of such obligations outstanding as of the close of the taxpayer's last taxable year beginning before 1-1-87, over

(ii) the sum of the applicable percentages under paragraph (3)(D) (as modified by this paragraph) for prior taxable years in the adjustment period.

(C) Aggregate contraction in revolving installment obligations.—For purposes of subparagraph (B), the aggregate contraction in revolving installment obligations is the amount by which—

(i) the aggregate face amount of the revolving installment obligations outstanding as of the close of the taxpayer's last taxable year beginning before 1-1-87, exceeds

(ii) the aggregate face amount of the revolving installment obligations outstanding as of the close of the taxable year involved.

(D) Revolving installment obligations.—For purposes of this paragraph, the term "revolving installment obligations" means installment obligations arising under a revolving credit plan.

(E) Treatment of certain obligations disposed of on or before 10-26-87.—For purposes of subparagraph (B)(i) and (C)(i), in determining the aggregate face amount of revolving installment obligations outstanding as of the close of the taxpayer's last taxable year beginning before 1-1-87, there shall not be taken into account any obligation—

(i) which was disposed of to an unrelated person on or before 10-26-87,

(ii) was disposed of to an unrelated person on or after such date pursuant to a binding written contract in effect on 10-26-87, and at all times thereafter before such disposition.

For purposes of the preceding sentence, the term "unrelated person" means any person who is not a related person (as defined in section 453(g) of the '86 Code).

(5) Limitation on losses from sales of obligations under revolving credit plans.—If 1 or more obligations arising under a revolving credit plan and taken into account under paragraph (3) are disposed of during the adjustment period, then, notwithstanding any other provision of law—

(A) no losses from such dispositions shall be recognized, and

(B) the aggregate amount of the adjustment for taxable years in the adjustment period (in reverse order of



64

(1) any disposition of personal property under a revolving credit plan, or
(2) any installment obligation arising out of a sale of—
(A) stock or securities which are traded on an established securities market, or
(B) to the extent provided in regulations, property (other than stock or securities) of a kind regularly traded on an established market,

subsection (a) [9] shall not apply, and, for purposes of this title, all payments to be received shall be treated as received in the year of disposition. The Secretary may provide for the application of this subsection in whole or in part for transactions in which the rules of this subsection otherwise would be avoided through the use of related parties, pass-thru entities, or intermediaries.

(*l*) **Dealer Dispositions.**—For purposes of subsection (b)(2)(A)—

(1) **In general.**—The term "dealer disposition" means any of the following dispositions:
(A) Personal property.—Any disposition of personal property by a person who regularly sells or otherwise disposes of personal property *of the same type* on the installment plan.
(B) Real property.—Any disposition of real property which is held by the taxpayer for sale to customers in the ordinary course of the taxpayer's trade or business.

(2) **Exceptions.**—The term "dealer disposition" does not include—
(A) Farm property.—The disposition on the installment plan of any property used or produced in the trade or business of farming (within the meaning of section 2032A(e)(4) or (5)).
(B) Timeshares and residential lots.—
(i) In general.—Any dispositions described in clause (ii) on the installment plan if the taxpayer elects to have paragraph (3) apply to any installment obligations which arise from such dispositions. An election under this paragraph shall not apply with respect to an installment obligation which is guaranteed by any person other than an individual.
(ii) Dispositions to which subparagraph applies.—A disposition is described in this clause if it is a disposition in the ordinary course of the taxpayer's trade or business to an individual of—

---

**[Footnote IRC §453 (8) continued]**
time) shall be reduced by the amount of such losses.
(6) Adjustment period.—For purposes of paragraphs (4) and (5), the adjustment period is the 4-year period under paragraph (3).

---

Matter in *italics* in IRC §453(k) and (*l*)(1)(A), added by 2004(d)(1) and (5), '88 TMRA, P.L. 100-647, 11-10-88, which struck out:
(9) "and section 453A"
**Effective date** (Sec. 2004(u), '88 TMRA, and section 10202(e)(1)(2), and '87 OBRA as amended by section 2004(d)(4), (6).).—Generally applies to dispositions in taxable years beginning after 12-31-87.
(2) Special rules for dealers.—
(A) In general.—In the case of dealer dispositions (within the meaning of section 453(*l*)(1) as added by this section), the amendments made by subsections (a) and (b) shall apply to installment obligations arising from dispositions after 12-31-87.
(B) Special rules for obligations arising from dealer dispositions after 2-28-86 and before 1-1-88.
(i) In general.—In the case of an applicable installment obligation arising from a disposition described in subclause (I) or (II) of section 453C(e)(1)(A)(i) of the '86 Code (as in effect before the amendments made by this section) before 1-1-88, the amendments made by subsections (a) and (b) shall apply to taxable years beginning after 12-31-87.
(ii) Change in method of accounting.—In the case of any taxpayer who is required by clause (i) to change its method of accounting for any taxable year with respect to obligations described in clause (i)—
(I) such change shall be treated as initiated by the taxpayer,
(II) such change shall be treated as made with the consent of the Secretary of the Treasury or his delegate, and
(III) the net amount of adjustments required by section 481 of the '86 Code shall be taken into account over a period not longer than 4 taxable years.
(C) Certain rules made applicable.—For purposes of this paragraph, rules similar to the rules of paragraphs and (5) of section 812(c) of '86 TRA (as added by '88 TMRA) shall apply.

* * * * * * * * * * * * * *

(5) Coordination with '86 TRA.—The amendments made by this section shall not apply to any installment obligation or to any taxpayer during any period to the extent the amendments made by section 811 of the '86 TRA do not apply to such obligation or during such period.

a revolving credit plan, or
sale of—
an established securities market, or
property (other than stock or securi-
d market,
ɛs of this title, all payments to be re-
lisposition. The Secretary may provide
in part for transactions in which the
led through the use of related parties,

ction (b)(2)(A)—
ı" means any of the following dispo-

f personal property by a person who
ıal property *of the same type* on the

ıl property which is held by the tax-
ɔurse of the taxpayer's trade or busi-

" does not include—
the installment plan of any property
arming (within the meaning of section

bed in clause (ii) on the installment
h (3) apply to any installment obliga-
ın election under this paragraph shall
bligation which is guaranteed by any

applies.—A disposition is described in
ıary course of the taxpayer's trade or

---

ı (5), the adjustment period is the 4-year period

ı)(1) and (5), '88 TMRA, P.L. 100-647, 11-10-88,

e)(1)(2), and '87 OBRA as amended by section
rs beginning after 12-31-87.

ıe meaning of section 453(*l*)(1) as added by this
pply to installment obligations arising from dispo-

ıs after 2-28-86 and before 1-1-88.
ation arising from a disposition described in sub-
n effect before the amendments made by this sec-
d (b) shall apply to taxable years beginning after

ɛpayer who is required by clause (i) to change its
ions described in clause (i)—

the Secretary of the Treasury or his delegate, and
ɔf the '86 Code shall be taken into account over a

ıragraph, rules similar to the rules of paragraphs
ıall apply.

* * * *

y this section shall not apply to any installment
the amendments made by section 811 of the '86



(I) a timeshare right to use or a timeshare ownership interest in residential real property for not more than 6 weeks per year, or a right to use specified campgrounds for recreational purposes, or

(II) any residential lot, but only if the taxpayer (or any related person) is not to make any improvements with respect to such lot.

For purposes of subclause (I), a timeshare right to use (or timeshare ownership interest in) property held by the spouse, children, grandchildren, or parents of an individual shall be treated as held by such individual.

(C) Carrying charges or interest.—Any carrying charges or interest with respect to a disposition described in subparagraph (A) or (B) which are added on the books of account of the seller to the established cash selling price of the property shall be included in the total contract price of the property and, if such charges or interest are not so included, any payments received shall be treated as applying first against such carrying charges or interest.

**(3) Payment of interest on timeshares and residential lots.—**

(A) In general.—In the case of any installment obligation to which paragraph (2)(B) applies, the tax imposed by this chapter for any taxable year for which payment is received on such obligation shall be increased by the amount of interest determined in the manner provided under subparagraph (B).

(B) Computation of interest.—

(i) In general.—The amount of interest referred to in subparagraph (A) for any taxable year shall be determined—

(I) on the amount of the tax for such taxable year which is attributable to the payments received during such taxable year on installment obligations to which this subsection applies,

(II) for the period beginning on the date of sale, and ending on the date such payment is received, and

(III) by using the applicable Federal rate under section 1274 (without regard to subsection (d)(2) thereof) in effect at the time of the sale compounded semi-annually.

(ii) Interest not taken into account.—For purposes of clause (i), the portion of any tax attributable to the receipt of any payment shall be determined without regard to any interest imposed under subparagraph (A).

(iii) Taxable year of sale.—No interest shall be determined for any payment received in the taxable year of the disposition from which the installment obligation arises.

(C) Treatment as interest.—Any amount payable under this paragraph shall be taken into account in computing the amount of any deduction allowable to the taxpayer for interest paid or accrued during such taxable year.

## IRC §453A. SPECIAL RULES FOR NONDEALERS.

**(a) General Rule.—**In the case of an installment obligation to which this section applies—

(1) interest shall be paid on the deferred tax liability with respect to such obligation in the manner provided under subsection (c), and

(2) the pledging rules under subsection (d) shall apply.

**(b) Installment Obligations to Which Section Applies.—**

**(1) In general.—**This section shall apply to any obligation which arises from the disposition any property under the installment method, but only if the sales price of such property exceeds $150,000.

**(2) Special rule for interest payments.—**For purposes of subsection (a)(1), this section shall apply to an obligation described in paragraph (1) arising during a taxable year only if—

(A) such obligation is outstanding as of the close of such taxable year, and

(B) the face amount of all [1]*such obligations held by the taxpayer* which arose

---

**[Footnote IRC §453A]** Matter in *italics* in IRC §453A(b)(2)(B) added by section 7821(a)(1), '89 OBRA, P.L. 101-239, 12-19-89, which struck out:

(1) "obligations of the taxpayer described in paragraph (1)"

**Effective date** (Sec. 7823, '89 OBRA and section 10202(e)(1), and (5), '87 OBRA, P.L. 100-203, 12-22-87).—

(1) Generally applies to dispositions in tax years beginning after 12-31-87.



66

during, and are outstanding as of the close of, such taxable year exceeds $5,000,000. Except as provided in regulations, all persons treated as a single employer under subsection (a) or (b) of section 52 shall be treated as one person for purposes of this paragraph and subsection (c)(4).

[2]*(3) Exception for personal use and farm property.—An installment obligation shall not be treated as described in paragraph (1) if it arises from the disposition—*

*(A) by an individual of personal use property (within the meaning of section 1275(b)(3)), or*

*(B) of any property used or produced in the trade or business of farming (within the meaning of section 2032A(e)(4) or (5)).**

**(4) Special rule for timeshares and residential lots.**—An installment obligation shall not be treated as described in paragraph (1) if it arises from a disposition described in section 453(l)(2)(B), but the provisions of section 452(l)(3) (relating to interest payments on timeshares and residential lots) shall apply to such obligation.

**(5) Sales price.**—For purposes of paragraph (1), all sales or exchanges which are part of the same transaction (or a series of related transactions) shall be treated as 1 sale or exchange.

**(c) Interest on Deferred Tax Liability.—**

**(1) In general.**—If an obligation to which this section applies is outstanding as of the close of any taxable year, the tax imposed by this chapter for such taxable year shall be increased by the amount of interest determined in the manner provided under paragraph (2).

**(2) Computation of interest.**—For purposes of paragraph (1), the interest for any taxable year shall be an amount equal to the product of—

(A) the applicable percentage of the deferred tax liability with respect to such obligation, multiplied by

(B) the underpayment rate in effect under section 6621(a)(2) for the month with or within which the taxable year ends.

**(3) Deferred tax liability.**—For purposes of this section, the term "deferred tax liability" means, with respect to any taxable year, the product of—

(A) the amount of gain with respect to an obligation which has not been recognized as of the close of such taxable year, multiplied by

(B) the maximum rate of tax in effect under section 1 or 11, whichever is appropriate, for such taxable year.

**(4) Applicable percentage.**—For purposes of this subsection, the term "applicable percentage" means, with respect to obligations arising in any taxable year, the percentage determined by dividing—

(A) the portion of the aggregate face amount of such obligations outstanding as of the close of such taxable year in excess of $5,000,000, by

**[Footnote IRC §453A (1) continued]**

* * * * * * * * * * * * * * *

(5) Coordination with Tax Reform Act of 1986.—The amendments made by this section shall not apply to any installment obligation or to any taxpayer during any period to the extent the amendments made by section 811 of '86 TRA do not apply to such obligation or during such period.

IRC 453A(b)(3) in *italics* added by section 7815(g), '89 OBRA, which struck out:

(2) "(3) **Exception for farm property.**—An installment obligation shall not be treated as described in paragraph (1) if it arises from the disposition of any property used or produced in the trade or business of farming (within the meaning of section 2032A(e)(4) or (5)."

**Effective date** (Sec. 7817, '89 OBRA and sec. 5076(c), '88 TMRA).—(1) Generally applies to sales after 12-31-88.

(2) Binding contract, etc.—The amendments made by this section shall not apply to any sale on or before 12-31-90, if—

(A) such sale is pursuant to a written binding contract in effect on 10-21-88, and at all times thereafter before such sale.

(B) such sale is pursuant to a letter of intent in effect on 10-21-88.

(C) there is a board of directors or shareholder approval for such sale on or before 10-21-88.

*Previously amended by section 7812(c)(2) which added: ")"

such taxable year exceeds $5,000,000.
ed as a single employer under subsec-
person for purposes of this paragraph

*perty.—An installment obligation shall*
*rises from the disposition—*
*perty (within the meaning of section*

*e trade or business of farming (within*

itial lots.—An installment obligation
(1) if it arises from a disposition de-
of section 452(1)(3) (relating to inter-
shall apply to such obligation.

(1), all sales or exchanges which are
ted transactions) shall be treated as 1

is section applies is outstanding as of
by this chapter for such taxable year
ermined in the manner provided under

of paragraph (1), the interest for any
duct of—
rred tax liability with respect to such

section 6621(a)(2) for the month with

f this section, the term "deferred tax
, the product of—
obligation which has not been recog-
tiplied by
ler section 1 or 11, whichever is appro-

f this subsection, the term "applicable
arising in any taxable year, the percent-

unt of such obligations outstanding as
$5,000,000, by

* * * *

lments made by this section shall not apply to any
he extent the amendments made by section 811 of

, which struck out:
ligation shall not be treated as described in para-
1 or produced in the trade or business of farming

8 TMRA).—(1) Generally applies to sales after

section shall not apply to any sale on or before

ffect on 10-21-88, and at all times thereafter before

21-88.
such sale on or before 10-21-88.

©PH, Inc.—Internal Revenue Code



(B) the aggregate face amount of such obligations outstanding as of the close of such taxable year.

*(5) Treatment as interest.—Any amount payable under this subsection shall be taken into account in computing the amount of any deduction allowable to the taxpayer for interest paid or accrued during the taxable year.*

[3]*(6)* **Regulations.**—The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of this subsection including regulations providing for the application of this subsection in the case of contingent payments, short taxable years, and pass-thru entities.

**(d) Pledges, Etc., of Installment Obligations.—**

**(1) In general.**—For purposes of section 453, if any indebtedness (hereinafter in this subsection referred to as "secured indebtedness") is secured by an installment obligation to which this section applies, the net proceeds of the secured indebtedness shall be treated as a payment received on such installment obligation as of the later of—

(A) the time the indebtedness becomes secured indebtedness, or

(B) *the time* the proceeds of such indebtedness are received by the taxpayer.

**(2) Limitation based on total contract price.**—The amount treated as received under paragraph (1) by reason of any secured indebtedness shall not exceed the excess (if any) of—

(A) the total contract price, over

(B) any portion of the total contract price received under the contract before [4]*the later of the times referred to in subparagraph (A) or (B) of paragraph (1)* (including amounts previously treated as received under paragraph (1) but not including amounts not taken into account by reason of paragraph (3)).

**(3) Later payments treated as receipt of tax paid amounts.**—If any amount is treated as received under paragraph (1) with respect to any installment obligation, subsequent payments received on such obligation shall not be taken into account for purposes of section 453 to the extent that the aggregate of such subsequent payments does not exceed the aggregate amount treated as received under paragraph (1).

**(4) Secured indebtedness.**—For purposes of this subsection indebtedness is secured by an installment obligation to the extent that payment of principal or interest on such indebtedness is directly secured (under the terms of the indebtedness or any underlying arrangements) by any interest in such installment obligation.

**(e) Regulations.**—The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this section, including regulations—

(1) disallowing the use of the installment method in whole or in part for transactions in which the rules of this section otherwise would be avoided through the use of related persons, pass-thru entities, or intermediaries, and

(2) providing that the sale of an interest in a partnership or other pass-thru entity will be treated as a sale of the proportionate share of the assets of the partnership or other entity.

## IRC §453B. GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.

**(a) General Rule.**—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(1) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

**[Footnote IRC §453A continued]**

Matter in *italics* in IRC §453A(c)(5), (6), (d)(1)(B) and (2)(B) added by section 7821(a)(2), (3), and (4)(B), '89 OBRA, P.L. 101-239, 12-19-89, which struck out:

(3) "(5)"

(4) "such secured indebtedness was incurred"

**Effective date** (Sec. 7823, '89 OBRA and section 10202(e)(1) and (5), '87 OBRA, P.L. 100-203, 12-22-87, as amended by section 2004(d)(3), (4) and (6), '88 TMRA, P.L. 100-647, 11-10-88).—Generally applies to dispositions in taxable years beginning after 12-31-87.

* * * * * * * * * * * * * * *

(5) Coordination with Tax Reform Act of 1986.—The amendments made by this section shall not apply to any installment obligation or to any taxpayer during any period to the extent the amendments made by section 811 of '86 TRA do not apply to such obligation or during such period.

(2) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

**(b) Basis of Obligation.**—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

**(c) Special Rule for Transmission at Death.**—Except as provided in section 691 (relating to recipients of income in respect of decedents), this section shall not apply to the transmission of installment obligations at death.

**(d)** [1]*Exception for Distributions to Which Section 337(a) Applies.—Subsection (a) shall not apply to any distribution to which section 337(a) applies.*

**(e) Life Insurance Companies.—**

**(1) In general.**—In the case of a disposition of an installment obligation by any person other than a life insurance company (as defined in section 816(a)) to such an insurance company or to a partnership of which such an insurance company is a partner, no provision of this subtitle providing for the nonrecognition of gain shall apply with respect to any gain resulting under subsection (a). If a corporation which is a life insurance company for the taxable year was (for the preceding taxable year) a corporation which was not a life insurance company, such corporation shall, for purposes of this subsection and subsection (a), be treated as having transferred to a life insurance company, on the last day of the preceding taxable year, all installment obligations which it held on such last day. A partnership of which a life insurance company becomes a partner shall, for purposes of this subsection and subsection (a), be treated as having transferred to a life insurance company, on the last day of the preceding taxable year of such partnership, all installment obligations which it holds at the time such insurance company becomes a partner.

**(2) Special rule where life insurance company elects to treat income as not related to insurance business.**—Paragraph (1) shall not apply to any transfer or deemed transfer of an installment obligation if the life insurance company elects (at such time and in such manner as the Secretary may by regulations prescribe) to determine its life insurance company taxable income—

(A) by returning the income on such installment obligation under the installment method prescribed in section 453, and

(B) as if such income were an item attributable to a noninsurance business (as defined in section 806(b)(3)).

**(f) Obligation Becomes Unenforceable.**—For purposes of this section, if any installment obligation is cancelled or otherwise becomes unenforceable—

(1) the obligation shall be treated as if it were disposed of in a transaction other than a sale or exchange, and

(2) if the obligor and obligee are related persons (within the meaning of section 453(f)(1)), the fair market value of the obligation shall be treated as not less than its face amount.

**(g) Transfers Between Spouses or Incident to Divorce.**—In the case of any transfer described in subsection (a) of section 1041 (other than a transfer in trust)—

(1) subsection (a) of this section shall not apply, and

**[Footnote IRC §453B]** Matter in *italics* in IRC §453B(d) added by section 11702(a)(2), OBRA '90, P.L. 101-508, 11-5-90, which struck out:

**(1) "Effect of Distribution in Liquidations to Which Section 332 Applies.**—If—

(1) an installment obligation is distributed in a liquidation to which section 332 (relating to complete liquidations of subsidiaries) applies, and

(2) the basis of such obligation in the hands of the distributee is determined under section 334(b)(1),

then no gain or loss with respect to the distribution of such obligation shall be recognized by the distributing corporation."

**Effective date** (Sec. 11702(j), OBRA '90, P.L. 101-508, 11-5-90, section 1019(a), '88 TMRA and section 633(a), '86 TRA)—(a) Generally applies to—

(1) any distribution in complete liquidation, and any sale or exchange, made by a corporation after 7-31-86, unless such corporation is completely liquidated before 1-1-87,

(2) any transaction described in section 338 '86 Code for which the acquisition date occurs after 12-31-86,

(3) any distribution (not in complete liquidation) made after 12-31-86.

 ©1990 Macmillan, Inc.—Internal Revenue Code

Case 1:02-cv-01278-FMA Document 76-3 Filed 06/08/2005 Page 1 of 9

the 3 taxable years preceding the

the 15 taxable years following the

ompany for the loss year, an opera-
rs following the 15 taxable years de-

he entire amount of the loss from
the earliest of the taxable years to
be carried. The portion of such loss
years shall be the excess (if any) of
:ts (as defined in subsection (d)) for
nay be carried.

n the case of a loss from operations
:linquish the entire carryback period
e due date (including extensions of
ie loss from operations for which the
taxable year, such election shall be

purposes of this section—

s" means the excess of the life insur-
insurance gross income for such tax-

(1)—
e allowed, and
3 (relating to dividends received by
d on certain preferred stock of public
:d from certain foreign corporations)
(b) as modified by section 805(a)(4).

b)(2), the term "offset" means, with
that increase in the operations loss
e life insurance company taxable in-
and (3) of section 804) for such year

of paragraph (1), the operations loss
without regard to the loss from oper-
:reafter.

is part, a life insurance company is a
ble year begins not more than 5 years
if section 381(c)(22) applies) was au-

of Operation Losses.—Except as pro-
ipply in respect of operation loss car-
ns loss deduction under this part, in
ibtitles apply in respect of net operat-
id the net operating loss deduction.

:tion and section 812 (as in effect be-
1984), this section shall be treated as

**, and Foreign Provisions**

1 policyholders' share.
] Repealed.
lomestic life insurance companies.
rom pre-1984 policyholders surplus





## IRC §811. ACCOUNTING PROVISIONS.

**(a) Method of Accounting.**—All computations entering into the determination of the taxes imposed by this part shall be made—

(1) under an accrual method of accounting, or

(2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

To the extent not inconsistent with the preceding sentence or any other provision of this part, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

**(b) Amortization of Premium and Accrual of Discount.—**

**(1) In general.**—The appropriate items of income, deductions, and adjustments under this part shall be adjusted to reflect the appropriate amortization of premium and the appropriate accrual of discount attributable to the taxable year on bonds, notes, debentures, or other evidences of indebtedness held by a life insurance company. Such amortization and accrual shall be determined—

(A) in accordance with the method regularly employed by such company, if such method is reasonable, and

(B) in all other cases, in accordance with regulations prescribed by the Secretary.

**(2) Special rules.—**

(A) Amortization of bond premium.—In the case of any bond (as defined in section 171(d)), the amount of bond premium, and the amortizable bond premium for the taxable year, shall be determined under section 171(b) as if the election set forth in section 171(c) had been made.

(B) Convertible evidence of indebtedness.—In no case shall the amount of premium on a convertible evidence of indebtedness include any amount attributable to the conversion features of the evidence of indebtedness.

**(3) Exception.**—No accrual of discount shall be required under paragraph (1) on any bond (as defined in section 171(d)), except in the case of discount which is—

(A) interest to which section 103 applies, or

(B) original issue discount (as defined in section 1273).

**(c) No Double Counting.**—Nothing in this part shall permit—

(1) a reserve to be established for any item unless the gross amount of premiums and other consideration attributable to such item are required to be included in life insurance gross income,

(2) the same item to be counted more than once for reserve purposes, or

(3) any item to be deducted (either directly or as an increase in reserves) more than once.

**(d) Method of Computing Reserves on Contract Where Interest Is Guaranteed Beyond End of Taxable Year.**—For purposes of this part (other than section 816), amounts in the nature of interest to be paid or credited under any contract for any period which is computed at a rate which—

(1) exceeds [1]*the greater of the prevailing State assumed interest rate or applicable Federal interest rate in effect under section 807 for the contract* for such period, and

(2) is guaranteed beyond the end of the taxable year on which the reserves are being computed,

shall be taken into account in computing the reserves with respect to such contract as if such interest were guaranteed only up to the end of the taxable year.

**(e) Short Taxable Years.**—If any return of a corporation made under this part is for a period of less than the entire calendar year (referred to in this subsection as "short period"), then section 443 shall not apply in respect to such period, but life insurance com-

---

**[Footnote IRC §811]** Matter in *italics* in IRC §811(d)(1) added by section 2004(p)(1), '88 TMRA, P.L. 100-647, 11-10-88, which struck out:

(1) "the prevailing State assumed interest rate for the contract"

**Effective date** (Sec. 2004(u), '88 TMRA, and section 10241(c), '87 OBRA, P.L. 100-203, 12-22-87).—Applies to contracts issued in taxable years beginning after 12-31-87.

pany taxable income shall be determined, under regulations prescribed by the Secretary, on an annual basis by a ratable daily projection of the appropriate figures for the short period.

## IRC §812. DEFINITION OF COMPANY'S SHARE AND POLICYHOLDERS' SHARE.

**(a) General Rule.—**

**(1) Company's share.**—For purposes of section 805(a)(4), the term "company's share" means, with respect to any taxable year, the percentage obtained by dividing—

(A) the company's share of the net investment income for the taxable year, by

(B) the net investment income for the taxable year.

**(2) Policyholders' share.**—For purposes of section 807, the term "policyholders' share" means, with respect to any taxable year, the excess of 100 percent over the percentage determined under paragraph (1).

**(b) Company's Share of Net Investment Income.—**

**(1) In general.**—For purposes of this section, the company's share of net investment income is the excess (if any) of—

(A) the net investment income for the taxable year, over

(B) the sum of—

(i) the policy interest, for the taxable year, plus

(ii) the gross investment income's proportionate share of policyholder dividends for the taxable year.

**(2) Policy interest.**—For purposes of this subsection, the term "policy interest" means—

(A) required interest (at the greater of the prevailing State assumed rate or the applicable Federal interest rate) on reserves under section 807(c) (other than paragraph (2) thereof),

(B) the deductible portion of excess interest,

(C) the deductible portion of any amount (whether or not a policyholder dividend), and not taken into account under subparagraph (A) or (B), credited to —

(i) a policyholder's fund under a pension plan contract for employees (other than retired employees), or

(ii) a deferred annuity contract before the annuity starting date, and

(D) interest on amounts left on deposit with the company.

In any case where [1]*neither the prevailing State assumed interest rate nor the applicable Federal interest rate is used, another appropriate rate shall be used for purposes of subparagraph (A).*

**(3) Gross investment income's proportionate share of policyholder dividends.**—For purposes of paragraph (1), the gross investment income's proportionate share of policyholder dividends is—

(A) the deduction for policyholders' dividends determined under sections 808 and 809 for the taxable year, but not including—

(i) the deductible portion of excess interest,

(ii) the deductible portion of policyholder dividends on contracts referred to in clauses (i) and (ii) of paragraph (2)(C), and

(iii) the deductible portion of the premium and mortality charge adjustments with respect to contracts paying excess interest for such year,

multiplied by

(B) the fraction—

(i) the numerator of which is gross investment income for the taxable year (reduced by the policy interest for such year), and

**[Footnote IRC §812]** Matter in *italics* in IRC §812(b)(2) added by section 2004(p)(2), '88 TMRA, P.L. 100-647, 11-10-88, which struck out:

(1) "the prevailing State assumed rate is not used, another appropriate rate shall be treated as the prevailing State assumed rate for purposes of subparagraph (A)."

**Effective date** (Sec. 2004(u), '88 TMRA, and section 10241(c), '87 OBRA, P.L. 100-203, 12-22-87).—Applies to contracts issued in taxable years beginning after 12-31-87.



©PH, Inc.—Internal Revenue Code

# CHAPTER 6—CONSOLIDATED RETURNS

Subchapter A. Returns and payment of tax.
Subchapter B. Related rules.

## SUBCHAPTER A—RETURNS AND PAYMENT OF TAX

IRC §1501. Privilege to file consolidated returns.
IRC §1502. Regulations.
IRC §1503. Computation and payment of tax.
IRC §1504. Definitions.
IRC §1505. Cross references.

### IRC §1501. PRIVILEGE TO FILE CONSOLIDATED RETURNS.

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

### IRC §1502. *REGULATIONS.

The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

### IRC §1503. COMPUTATION AND PAYMENT OF TAX.

In any case in which a consolidated return is made or is required to be made, the tax shall be determined, computed, assessed, collected, and adjusted in accordance with the regulations under section 1502 prescribed before the last day prescribed by law for the filing of such return.

**(c) [Should be Redesignated] Special Rule for Application of Certain Losses Against Income of Insurance Companies Taxed Under Section 801.—**

**(1) In general.**—If an election under section 1504(c)(2) is in effect for the taxable year and the consolidated taxable income of the members of the group not taxed under section 801 results in a consolidated net operating loss for such taxable year, then under regulations prescribed by the Secretary, the amount of such loss which cannot be absorbed in the applicable carryback periods against the taxable income of such members not taxed under section 801 shall be taken into account in determining the consolidated taxable income of the affiliated group for such taxable year to the extent of 35 percent of such loss or 35 percent of the taxable income of the members taxed under section 801, whichever is less. The unused portions of such loss shall be available as a carryover, subject to the same limitations (applicable to the sum of the loss for the

**[Footnote IRC §1502]** * [Note: For purposes of applying Reg. §1.1502-19, section 6126, '88 TMRA, P.L. 100-647, 11-10-88, provides rules for certain reorganizations involving dual resident companies. For text of section 6126, '88 TMRA, see Amending Acts, Code Volume II.]

 ©1990 Macmillan, Inc.—Internal Revenue Code

**Example (2).** The facts are the same as in example (1), except that G desires to extend the due date of its income tax return for the year ending January 31, 1988, to a date beyond August 15, 1988. Pursuant to paragraph (c)(1)(ii) of this section, G may extend such return to November 15, 1988 (i.e., the date that is up to 6 months after May 15, 1988, the normal due date of the return). However, in order to obtain this additional extension, G must file Form 2758 pursuant to paragraph (c)(1)(i) of this section on or before August 15, 1988.

**Example (3).** H, a partnership that historically used a May 31 taxable year, makes a section 444 election to use a year ending September 30 for its taxable year beginning on June 1, 1987. Absent paragraph (c)(1)(i) of this section, H's Form 1065 for the taxable year beginning June 1, 1987, and ending September 30, 1987, is due on or before January 15, 1988. However, if H types or legibly prints "SECTION 444 RETURN" at the top of Form 1065 for such year, paragraph (c)(1)(i) of this section automatically extends to due date of such return to August 15, 1988.

**Example (4).** The facts are the same as in example (3), except H desires to further extend (i.e., extend beyond August 15, 1988) the due date of its income tax return for its taxable year beginning June 1, 1987, and ending September 30, 1987. Since August 15, 1988, is 6 months or more after the due date (without extensions) of such return, paragraph (c)(1)(ii) of this section prevents H from further extending the time for filing such return.

**Example (5).** I, a partnership that historically used a June 30 taxable year, considered making a section 44 election to retain such taxable year, but eventually decided to change to a December 31, taxable year (I's required taxable year). Absent paragraph (c)(1)(i) of this section, I's Form 1065 for the taxable year beginning July 1, 1987, and ending December 31, 1987, is due on or before April 15, 1988. Pursuant to paragraph (c)(1)(i) of this section, if I types or legibly prints "SECTION 444 RETURN" at the top of Form 1065 for such year, paragraph (c)(1)(i) of this section automatically extends the due date of such return to August 15, 1988. In addition, I may further extend such return pursuant to paragraph (c)(1)(ii) of this section.

**(2) No penalty for certain late payments—(i) In general.** In the case of a personal service corporation or S corporation described in paragraph (c)(1)(i) of this section, no penalty under section 6651 (a)(2) will be imposed for failure to pay income tax (if any) for the first taxable year beginning after December 31, 1986, but only for the period beginning with the last date for payment and ending with the later of the date specified in paragraph (c)(1)(i) or paragraph (c)(1)(ii) of this section.

**(ii) Example.** The provisions of paragraph (c)(2)(i) of this section may be illustrated by the following example.

**Example.** J, a personal service corporation that historically used a January 31 taxable year, makes a section 444 election to retain such year for its taxable year beginning February 1, 1987. The last date (without extension) for payment of J's income tax (if any) for its taxable year beginning February 1, 1987, is April 15, 1988. However, under paragraph (c)(2)(i) of this section, no penalty under section 6651(a)(2) will be imposed on any underpayment of income tax for the period beginning April 15, 1988 and ending August 15, 1988.

**(d) Effective date.** This section is effective for taxable years beginning after December 31, 1986. [T.D. 8205, 53 FR 19703, May 27, 1988]

## Methods Of Accounting

### Methods of Accounting in General

### § 1.446–1 General rule for methods of accounting.

**(a) General rule. (1)** Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which a taxpayer regularly computes his income in keeping his books. The term "method of accounting" includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item. Examples of such over all methods are the cash receipts and disbursements method, an accrual method, combinations of such methods, and combinations of the foregoing with various methods provided for the accounting treatment of special items. These methods of accounting for special items include the accounting treatment prescribed for research and experimental expenditures, soil and water conservation expenditures, depreciation, net operating losses, etc. Except for deviations permitted or required by such special accounting treatment, taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. For requirement respecting the adoption or change of accounting method, see section 446(e) and paragraph (e) of this section.

**(2)** It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

matically extends the du
988. In addition, I may
to paragraph (c)(1)(ii) of

**ate payments—(i) In**
onal service corpora
ribed in paragraph
enalty under section
for failure to pay
first taxable year
1986, but only for
e last date for pay
er of the date speci
aragraph (c)(1)(ii) of

sions of paragraph
be illustrated by the

rporation that historically
s a section 444 election to
r beginning February
ision) for payment of
ar beginning February
nder paragraph (c)(2)(i) of
n 6651(a)(2) will be im
come tax for the period
g August 15, 1988.

ction is effective for
December 31, 1986
27, 1988]

le income shall be
of accounting on the
egularly computes his
s. For requirement
hange of accounting
nd paragraph (e) of

uniform method of
d for all taxpayers
ch forms and systems
suited to his needs
ounting is acceptable
he Commissioner
nethod of accounting
application of gener
iciples in a particular
dance with accepted
hat trade or business
as clearly reflecting
of gross income
tly from year to year

(3) Items of gross income and expenditures which are elements in the computation of taxable income need not be in the form of cash. It is sufficient that such items can be valued in terms of money. For general rules relating to the taxable year for inclusion of income and for taking deductions, see sections 451 and 461, and the regulations thereunder.

(4) Each taxpayer is required to make a return of his taxable income for each taxable year and must maintain such accounting records as will enable him to file a correct return. See section 6001 and the regulations thereunder. Accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on his books of account and on his return, as for example, a reconciliation of any differences between such books and his return. The following are among the essential features that must be considered in maintaining such records:

(i) In all cases in which the production, purchase, or sale of merchandise of any kind is an income-producing factor, merchandise on hand (including finished goods, work in process, raw materials, and supplies) at the beginning and end of the year shall be taken into account in computing the taxable income of the year. (For rules relating to computation of inventories, see sections 263A, 471, and 472, and the regulations thereunder.)

(ii) Expenditures made during the year shall be properly classified as between capital and expense. For example, expenditures for such items as plant and equipment, which have a useful life extending substantially beyond the taxable year, shall be charged to a capital account and not to an expense account.

(iii) In any case in which there is allowable with respect to an asset a deduction for depreciation, amortization, or depletion, any expenditures (other than ordinary repairs) made to restore the asset or prolong its useful life shall be added to the asset account or charged against the appropriate reserve.

**(b) Exceptions.** (1) If the taxpayer does not regularly employ a method of accounting which clearly reflects his income, the computation of taxable income shall be made in a manner which, in the opinion of the Commissioner, does clearly reflect income.

(2) A taxpayer whose sole source of income is wages need not keep formal books in order to have an accounting method. Tax returns, copies thereof, or other records may be sufficient to establish the use of the method of accounting used in the preparation of the taxpayer's income tax returns.

**(c) Permissible methods—(1) In general.** Subject to the provisions of paragraphs (a) and (b) of this section, a taxpayer may compute his taxable income under any of the following methods of accounting:

**(i) Cash receipts and disbursements method.** Generally, under the cash receipts and disbursements method in the computation of taxable income, all items which constitute gross income (whether in the form of cash, property, or services) are to be included for the taxable year in which actually or constructively received. Expenditures are to be deducted for the taxable year in which actually made. For rules relating to constructive receipt, see § 1.451-2. For treatment of an expenditure attributable to more than one taxable year, see section 461(a) and paragraph (a)(1) of § 1.461-1.

**(ii) Accrual method.** Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. The method used by the taxpayer in determining when income is to be accounted for will be acceptable if it accords with generally accepted accounting principles, is consistently used by the taxpayer from year to year, and is consistent with the Income Tax Regulations. For example, under an accrual method, a taxpayer engaged in manufacturing may account for the sale of an item when the item is shipped, when the item is delivered, when the item is accepted, or when title to the item passes to the purchaser, whether or not billed, depending upon the method regularly employed in keeping the taxpayer's books; however, see § 1.451-5 relating to advance payments. The determination of when an item is shipped, delivered or accepted, or when title passes, does not depend upon when any other item in the contract is shipped, delivered or accepted, or when title passes.

**(iii) Other permissible methods.** Special methods of accounting are described elsewhere in chapter 1 of the Code and the regulations thereunder. For example, see the following sections and the regulations thereunder: Sections 61 and 162, relat-

ing to the crop method of accounting; section 453, relating to the installment method; section 451, relating to the long-term contract methods. In addition, special methods of accounting for particular items of income and expense are provided under other sections of chapter 1. For example, see section 174, relating to research and experimental expenditures, and section 175, relating to soil and water conservation expenditures.

(iv) **Combinations of the foregoing methods.** (a) In accordance with the following rules, any combination of the foregoing methods of accounting will be permitted in connection with a trade or business if such combination clearly reflects income and is consistently used. Where a combination of methods of accounting includes any special methods, such as those referred to in subdivision (iii) of this subparagraph, the taxpayer must comply with the requirements relating to such special methods. A taxpayer using an accrual method of accounting with respect to purchases and sales may use the cash method in computing all other items of income and expense. However, a taxpayer who uses the cash method of accounting in computing gross income from his trade or business shall use the cash method in computing expenses of such trade or business. Similarly, a taxpayer who uses an accrual method of accounting in computing business expenses shall use an accrual method in computing items affecting gross income from his trade or business.

(b) A taxpayer using one method of accounting in computing items of income and deductions of his trade or business may compute other items of income and deductions not connected with his trade or business under a different method of accounting.

**(2) Special rules.** (i) In any case in which it is necessary to use an inventory the accrual method of accounting must be used with regard to purchases and sales unless otherwise authorized under subdivision (ii) of this subparagraph.

(ii) No method of accounting will be regarded as clearly reflecting income unless all items of gross profit and deductions are treated with consistency from year to year. The Commissioner may authorize a taxpayer to adopt or change to a method of accounting permitted by this chapter although the method is not specifically described in the regulations in this part if, in the opinion of the Commissioner, income is clearly reflected by the use of such method. Further, the Commissioner may authorize a taxpayer to continue the use of a method of accounting consistently used by the taxpayer, even though not specifically authorized by the regulations in this part, if, in the opinion of the Commissioner, income is clearly reflected by the use of such method. See section 446(a) and paragraph (a) of this section, which require that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books, and section 446(e) and paragraph (e) of this section, which require the prior approval of the Commissioner in the case of changes in accounting method.

**(d) Taxpayer engaged in more than one business.** **(1)** Where a taxpayer has two or more separate and distinct trades or businesses, a different method of accounting may be used for each trade or business, provided the method used for each trade or business clearly reflects the income of that particular trade or business. For example, a taxpayer may account for the operations of a personal service business on the cash receipts and disbursements method and of a manufacturing business on an accrual method, provided such businesses are separate and distinct and the methods used for each clearly reflect income. The method first used in accounting for business income and deductions in connection with each trade or business, as evidenced in the taxpayer's income tax return in which such income or deductions are first reported, must be consistently followed thereafter.

(2) No trade or business will be considered separate and distinct for purposes of this paragraph unless a complete and separable set of books and records is kept for such trade or business.

(3) If, by reason of maintaining different methods of accounting, there is a creation or shifting of profits or losses between the trades or businesses of the taxpayer (for example, through inventory adjustments, sales, purchases, or expenses) so that income of the taxpayer is not clearly reflected, the trades or businesses of the taxpayer will not be considered to be separate and distinct.

**(e) Requirement respecting the adoption or change of accounting method.** **(1)** A taxpayer filing his first return may adopt any permissible method of accounting in computing taxable income for the taxable year covered by such return. See section 446(c) and paragraph (c) of this section for permissible methods. Moreover, a taxpayer may adopt any permissible method of accounting in connection with each separate and distinct trade or business, the income from which is reported for the first time. See section 446(d) and paragraph (d) of this section. See also section 446(a) and paragraph (a) of this section.

is part, if, in the
income is clearly
thod. See section
his section, which
hall be computed
ng on the basis of
mputes his income
n 446(e) and para-
1 require the prior
r in the case of

ore than one busi-
has two or more
businesses, a differ-
be used for each
e method used for
reflects the income
ness. For example,
he operations of a
e cash receipts and
f a manufacturing
od, provided such
tinct and the meth-
flect income. The
ng for business in
nnection with each
d in the taxpayer's
h income or deduc-
be consistently fol-

will be considered
poses of this para-
parable set of books
trade or business
ning different meth-
reation or shifting of
ades or businesses of
rough inventory ad-
r expenses) so that
clearly reflected, the
axpayer will not be
d distinct.

g the adoption of
d. (1) A taxpayer
lopt any permissible
mputing taxable in-
vered by such return
aph (c) of this section
Moreover, a taxpaye
method of accounting
ate and distinct trade
which is reported to
46(d) and paragraph
o section 446(a) and
n.

(2)(i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder.

(ii)(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment. A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. Changes in method of accounting include a change from the cash receipts and disbursement method to an accrual method, or vice versa, a change involving the method or basis used in the valuation of inventories (see sections 471 and 472 and the regulations thereunder), a change from the cash or accrual method to a long-term contract method, or vice versa (see § 1.451–3), a change involving the adoption, use or discontinuance of any other specialized method of computing taxable income, such as the crop method, and a change where the Internal Revenue Code and regulations thereunder specifically require that the consent of the Commissioner must be obtained before adopting such a change.

(b) A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion or investment credit). Also, a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction. For example, corrections of items that are deducted as interest or salary, but which are in fact payments of dividends, and of items that are deducted as business expenses, but which are in fact personal expenses, are not changes in method of accounting. In addition, a change in the method of accounting does not include an adjustment with respect to the addition to a reserve for bad debts or an adjustment in the useful life of a depreciable asset. Although such adjustments may involve the question of the proper time for the taking of a deduction, such items are traditionally corrected by adjustments in the current and future years. For the treatment of the adjustment of the addition to a bad debt reserve, see the regulations under section 166 of the Code; for the treatment of a change in the useful life of a depreciable asset, see the regulations under section 167(b) of the Code. A change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts. On the other hand, for example, a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which has been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting.

(c) A change in an overall plan or system of identifying or valuing items in inventory is a change in method of accounting. Also a change in the treatment of any material item used in the overall plan for identifying or valuing items in inventory is a change in method of accounting.

(iii) A change in the method of accounting may be illustrated by the following examples:

**Example (1).** Although the sale of merchandise is an income producing factor, and therefore inventories are required, a taxpayer in the retail jewelry business reports his income on the cash receipts and disbursements method of accounting. A change from the cash receipts and disbursements method of accounting to the accrual method of accounting is a change in the overall plan of accounting and thus is a change in method of accounting.

**Example (2).** A taxpayer in the wholesale dry goods business computes its income and expenses on the accrual method of accounting and files its Federal income tax returns on such basis except for real estate taxes which have been reported on the cash receipts and disbursements method of accounting. A change in the treatment of real estate taxes from the cash receipts and disbursements method to the accrual method is a change in method of accounting because such change is a change in the treatment of a material item within his overall accounting practice.

**Example (3).** A taxpayer in the wholesale dry goods business computes its income and expenses on the accrual method of accounting and files its Federal income tax returns on such basis. Vacation pay has been deducted in the year in which paid because the taxpayer did not have a completely vested vacation pay plan, and, therefore, the liability for payment did not accrue until that year. Subsequently, the taxpayer adopts a completely vested vacation pay plan that changes its year for accruing the deduction from the year in which payment is made to the year in which the liability to make the payment now arises. The change for the year of deduction of the vacation pay plan is not a change in method of accounting but results, instead, because the underlying facts (that is, the type of vacation pay plan) have changed.

**Example (4).** From 1968 through 1970, a taxpayer has fairly allocated indirect overhead costs to the value of inventories on

a fixed percentage of direct costs. If the ratio of indirect overhead costs to direct costs increases in 1971, a change in the underlying facts has occurred. Accordingly, an increase in the percentage in 1971 to fairly reflect the increase in the relative level of indirect overhead costs is not a change in method of accounting but is a change in treatment resulting from a change in the underlying facts.

**Example (5).** A taxpayer values inventories at cost. A change in the basis for valuation of inventories from cost to the lower of cost or market is a change in an overall practice of valuing items in inventory. The change, therefore, is a change of method of accounting for inventories.

**Example (6).** A taxpayer in the manufacturing business has for many taxable years valued its inventories at cost. However, cost has been improperly computed since no overhead costs have been included in valuing the inventories at cost. The failure to allocate an appropriate portion of overhead to the value of inventories is contrary to the requirement of the Internal Revenue Code and the regulations thereunder. A change requiring appropriate allocation of overhead is a change in method of accounting because it involves a change in the treatment of a material item used in the overall practice of identifying or valuing items in inventory.

**Example (7).** A taxpayer has for many taxable years valued certain inventories by a method which provides for deducting 20 percent of the cost of the inventory items in determining the final inventory valuation. The 20 percent adjustment is taken as a "reserve for price changes." Although this method is not a proper method of valuing inventories under the Internal Revenue Code or the regulations thereunder, it involves the treatment of a material item used in the overall practice of valuing inventory. A change in such practice or procedure is a change of method of accounting for inventories.

**Example (8).** A taxpayer has always used a base stock system of accounting for inventories. Under this system a constant price is applied to an assumed constant normal quantity of goods in stock. The base stock system is an overall plan of accounting for inventories which is not recognized as a proper method of accounting for inventories under the regulations. A change in this practice is, nevertheless, a change of method of accounting for inventories.

**(3)(i)** Except as otherwise provided under the authority of subdivision (ii) of this subparagraph, in order to secure the Commissioner's consent to a change of a taxpayer's method of accounting, the taxpayer must file an application on Form 3115 with the Commissioner of Internal Revenue, Washington, D.C. 20224, within 180 days after the beginning of the taxable year in which it is desired to make the change. The taxpayer shall, to the extent applicable, furnish (a) all information requested on such form, disclosing in detail all classes of items which would be treated differently under the new method of accounting and showing all amounts which would be duplicated or omitted as a result of the proposed change and (b) the taxpayer's computation of the adjustments to take into account such duplications or omissions. The Commissioner may require such other information as may be necessary in order to determine whether the proposed change will be permitted. Permission to change a taxpayer's method of accounting will not be granted unless the taxpayer and the Commissioner agree to the terms, conditions, and adjustments under which the change will be effected. See section 481 and the regulations thereunder, relating to certain adjustments required by such changes, section 472 and the regulations thereunder, relating to changes to and from the last-in, first-out method of inventorying goods, and section 453 and the regulations thereunder, relating to certain adjustments required by a change from an accrual method to the installment method.

**(ii)** Notwithstanding the provisions of subdivision (i) of this subparagraph, the Commissioner may prescribe administrative procedures, subject to such limitations, terms, and conditions as he deems necessary to obtain his consent, to permit taxpayers to change their accounting practices or methods to an acceptable treatment consistent with applicable regulations. Limitations, terms, and conditions, as may be prescribed in such administrative procedures by the Commissioner, shall include those necessary to prevent the omission or duplication of items includible in gross income or deductions.

[T.D. 6500, 25 FR 11708, Nov. 26, 1960, as amended by T.D. 7073, 35 FR 17710, Nov. 18, 1970; T.D. 7285, 38 FR 26184, Sept. 19, 1973; T.D. 8067, 51 FR 378, Jan. 6, 1986; T.D. 8131, 52 FR 10084, March 30, 1987]

## § 1.448–1T Limitation on the use of the cash receipts and disbursements method of accounting (temporary).

**(a) Limitation on accounting method—(1) In general.** This section prescribes regulations under section 448 relating to the limitation on the use of the cash receipts and disbursements method of accounting (the cash method) by certain taxpayers.

**(2) Limitation rule.** Except as otherwise provided in this section, the computation of taxable income using the cash method is prohibited in the case of a—

(i) C corporation,

(ii) Partnership with a C corporation as a partner, or

(iii) Tax shelter.

A partnership is described in paragraph (a)(2)(ii) of this section, if the partnership has a C corporation as a partner at any time during the partnership's taxable year beginning after December 31, 1986.

**(3) Meaning of C corporation.** For purposes of this section, the term "C corporation" includes any corporation that is not an S corporation. For

ction 481(a) to be taken into account the taxable year or years prescribed the Commissioner.

(iii) This paragraph (e)(3) applies to rms 3115 filed on or after December 1997. For other Forms 3115, see 446-1(e)(3) in effect prior to December 31, 1997 (§1.446-1(e)(3) as contained the 26 CFR part 1 edition revised as April 1, 1997).

(f) *Effective date.* [Reserved]. For further guidance, see §1.446(e)-1T(e)(4)(i) d (ii).

D. 6500, 25 FR 11708, Nov. 26, 1960, as nded by T.D. 7073, 35 FR 17710, Nov. 18, T.D. 7285, 38 FR 26184, Sept. 19, 1973; 8067, 51 FR 378, Jan. 6, 1986; T.D. 8131, 52 0084, Mar. 30, 1987; T.D. 8408, 57 FR 12419, 10, 1992; T.D. 8482, 58 FR 42233, Aug. 9, T.D. 8608, 60 FR 40078, Aug. 7, 1995; T.D. 62 FR 26741, May 15, 1997; T.D. 8742, 62 8169, Dec. 31, 1997; T.D. 8929, 66 FR 2223, 11, 2001; T.D. 9025, 67 FR 76985, Dec. 16, T.D. 9105, 69 FR 8, Jan. 2, 2004]

## .446-1T General rule for methods of accounting (temporary).

(a) through (e)(2)(i) [Reserved]. For other guidance, see §1.446-1(a) rough (e)(2)(i).

(e)(2)(ii)(*a*) A change in the method of ounting includes a change in the rall plan of accounting for gross ine or deductions or a change in the tment of any material item used in overall plan. Although a method accounting may exist under this defition without the necessity of a pat of consistent treatment of an m, in most instances a method of acunting is not established for an item hout such consistent treatment. A terial item is any item that involves proper time for the inclusion of the m in income or the taking of a detion. Changes in method of accountinclude a change from the cash rets and disbursement method to an rual method, or vice versa, a change olving the method or basis used in e valuation of inventories (see secs 471 and 472 and the regulations er sections 471 and 472), a change m the cash or accrual method to a g-term contract method, or vice rsa (see §1.460-4), certain changes in mputing depreciation or amortizan (see paragraph (e)(2)(ii)(*d*) of this ction), a change involving the adopn, use or discontinuance of any other specialized method of computing taxable income, such as the crop method, and a change where the Internal Revenue Code and regulations under the Code specifically require that the consent of the Commissioner must be obtained before adopting such a change.

(*b*) A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion, or investment credit). Also, a change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction. For example, corrections of items that are deducted as interest or salary, but that are in fact payments of dividends, and of items that are deducted as business expenses, but which are in fact personal expenses, are not changes in method of accounting. In addition, a change in the method of accounting does not include an adjustment with respect to the addition to a reserve for bad debts. Although such adjustment may involve the question of the proper time for the taking of a deduction, such items are traditionally corrected by adjustment in the current and future years. For the treatment of the adjustment of the addition to a bad debt reserve (for example, for banks under section 585 of the Internal Revenue Code), *see* the regulations under section 166 of the Internal Revenue Code. A change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts. For further guidance on changes involving depreciable or amortizable assets, see paragraph (e)(2)(ii)(*d*) of this section and §1.1016-3T(h).

(*c*) [Reserved]. For further guidance, *see* §1.446-1(e)(2)(ii)(*c*).

(*d*) *Changes involving depreciable or amortizable assets*—(*1*) *Scope.* This paragraph (e)(2)(ii)(*d*) applies to property subject to section 167, 168, 197, 1400I, 1400L(b), or 1400L(c), or to section 168 prior to its amendment by the Tax Reform Act of 1986 (100 Stat. 2121) (former section 168).





(*2*) *Changes in depreciation or amortization that are a change in method of accounting.* Except as provided in paragraph (e)(2)(ii)(*d*)(*3*) of this section, a change in the treatment of an asset from nondepreciable or nonamortizable to depreciable or amortizable, or vice versa, is a change in method of accounting. Additionally, a correction to require depreciation or amortization in lieu of a deduction for the cost of depreciable or amortizable assets that had been consistently treated as an expense in the year of purchase, or vice versa, is a change in method of accounting. Further, except as provided in paragraph (e)(2)(ii)(*d*)(*3*) of this section, the following changes in computing depreciation or amortization are a change in method of accounting:

(*i*) A change in the depreciation or amortization method, period of recovery, or convention of a depreciable or amortizable asset.

(*ii*) A change from not claiming to claiming the additional first year depreciation deduction provided by section 168(k) or 1400L(b) for, and the resulting change to the amount otherwise allowable as a depreciation deduction for the remaining adjusted depreciable basis (or similar basis) of, qualified property, 50-percent bonus depreciation property, or qualified New York Liberty Zone property, provided the taxpayer did not make the election out of the additional first year depreciation deduction (or did not make a deemed election out of the additional first year depreciation deduction; for further guidance, *see* Rev. Proc. 2002-33 (2002-1 C.B. 963), Rev. Proc. 2003-50 (2003-29 I.R.B. 119), and §601.601(d)(2)(ii)(*b*) of this chapter) for the class of property in which the qualified property, the 50-percent bonus depreciation property, or the qualified New York Liberty Zone property is included.

(*iii*) A change from claiming the 30-percent additional first year depreciation deduction to claiming the 50-percent additional first year depreciation deduction for 50-percent bonus depreciation property (provided the property is not included in any class of property for which the taxpayer elected the 30-percent, instead of the 50-percent, additional first year depreciation deduction) or a change from claiming the 50-percent additional first year depreciation deduction to claiming the 30-percent additional first year depreciation deduction for qualified property (including property that is included in a class of property for which the taxpayer elected the 30-percent, instead of the 50-percent, additional first year depreciation deduction) or qualified New York Liberty Zone property, and the resulting change to the amount otherwise allowable as a depreciation deduction for the property's remaining adjusted depreciable basis (or similar basis). This paragraph (e)(2)(ii)(*d*)(*2*)(*iii*) does not apply if a taxpayer is making a late election or revoking a timely valid election under section 168(k) or 1400L(b) (see paragraph (e)(2)(ii)(*d*)(*3*)(*iii*) of this section).

(*iv*) A change from claiming to not claiming the additional first year depreciation deduction for an asset that is not qualified property, 50-percent bonus depreciation property, or qualified New York Liberty Zone property, and the resulting change to the amount otherwise allowable as a depreciation deduction for the property's depreciable basis.

(*v*) A change in salvage value to zero for a depreciable or amortizable asset for which the salvage value is expressly treated as zero by the Internal Revenue Code (for example, section 168(b)(4)), the regulations under the Code (for example, §1.197-2(f)(1)(ii)), or other guidance published in the Internal Revenue Bulletin.

(*vi*) A change in the accounting for depreciable or amortizable assets from a single asset account to a multiple asset account (pooling), or vice versa, or from one type of multiple asset account (pooling) to a different type of multiple asset account (pooling).

(*vii*) For depreciable or amortizable assets that are mass assets accounted for in multiple asset accounts or pools, a change in the method of identifying which assets have been disposed. For purposes of this paragraph (e)(2)(ii)(*d*)(*2*)(*vii*), the term *mass assets* means a mass or group of individual items of depreciable or amortizable assets that are not necessarily homogeneous, each of which is minor in value relative to the total value of the



Case 1:02-cv-01278-EMA Document 76-3 Filed 06/08/2005 Page 9 of 9

Case 1:02-cv-01278-FMA Document 76-4 Filed 06/08/2005 Page 1 of 11



ass or group, numerous in quantity, ually accounted for only on a total llar or quantity basis, with respect which separate identification is im-acticable, and placed in service in same taxable year.

(viii) Any other change in deprecia-n or amortization as the Secretary ay designate by publication in the EDERAL REGISTER or in the Internal venue Bulletin (see §601.601(d)(2) of is chapter).

(3) *Changes in depreciation or amortiza-on that are not a change in method of counting*—(i) *Useful life.* An adjust-nt in the useful life of a depreciable amortizable asset for which depre-ation is determined under section 167 her than under section 168, section 00I, section 1400L, or former section 8) is not a change in method of ac-unting. This adjustment in useful e is corrected by adjustments in the xable year in which the conditions own to exist at the end of that tax-ble year changed thereby resulting in redetermination of the useful life der §1.167(a)–1(b) (or if the period of mitation for assessment under sec-on 6501(a) has expired for that taxable ar, in the first succeeding taxable ar open under the period of limita-on for assessment), and in subsequent xable years. In other situations, the justment in useful life may be cor-cted by adjustments in the earliest axable year open under the period of mitation for assessment under sec-on 6501(a) or the earliest taxable year der examination by the Internal venue Service (IRS) but in no event rlier than the placed-in-service year the asset, and in subsequent taxable ears. However, if a taxpayer initiates e correction in useful life, in lieu of ing amended Federal tax returns (for xample, because the conditions known exist at the end of a prior taxable ear changed thereby resulting in a re-etermination of the useful life under 167(a)–1(b)), the taxpayer may cor-ct the adjustment in useful life by djustments in the current and subse-uent taxable years. This paragraph e)(2)(ii)(*d*)(*3*)(*i*) does not apply if a tax-ayer is changing to or from a useful ife (or recovery period or amortization eriod) that is specifically assigned by he Internal Revenue Code (for example, section 167(f)(1), section 168(c), section 197), the regulations under the Code, or other guidance published in the Internal Revenue Bulletin and, therefore, such change is a change in method of accounting (unless paragraph (e)(2)(ii)(*d*)(*3*)(*v*) of this section applies).

(ii) *Change in use.* A change in computing depreciation or amortization allowances in the taxable year in which the use of an asset changes in the hands of the same taxpayer is not a change in method of accounting.

(iii) *Elections.* Generally, the making of a late depreciation or amortization election or the revocation of a timely valid depreciation or amortization election is not a change in method of accounting, except as otherwise expressly provided by the Internal Revenue Code, the regulations under the Code, or other guidance published in the Internal Revenue Bulletin. This paragraph (e)(2)(ii)(*d*)(*3*)(*iii*) also applies to making a late election or revoking a timely valid election made under section 13261(g)(2) or (3) of the Revenue Reconciliation Act of 1993 (107 Stat. 312, 540) (relating to amortizable section 197 intangibles). A taxpayer may request consent to make a late election or revoke a timely valid election by submitting a request for a private letter ruling.

(iv) *Salvage value.* Except as provided under paragraph (e)(2)(ii)(*d*)(*2*)(*v*) of this section, a change in salvage value of a depreciable or amortizable asset is not treated as a change in method of accounting.

(v) *Placed-in-service date.* Any change in the placed-in-service date of a depreciable or amortizable asset is not treated as a change in method of accounting. The change in placed-in-service date may be corrected by adjustments in the earliest taxable year open under the period of limitation for assessment under section 6501(a) or the earliest taxable year under examination by the IRS but in no event earlier than the placed-in-service year of the asset, and in subsequent taxable years. However, if a taxpayer initiates the change in placed-in-service date, in lieu of filing amended federal tax returns, the taxpayer may correct the placed-in-service date by adjustments in the current and subsequent taxable years.

(vi) Any other change in depreciation or amortization as the Secretary may designate by publication in the FEDERAL REGISTER or in the Internal Revenue Bulletin (*see* §601.601(d)(2) of this chapter).

(*4*) *Item being changed.* For purposes of a change in depreciation or amortization to which this paragraph (e)(2)(ii)(*d*) applies, the item being changed generally is the depreciation treatment of each individual depreciable or amortizable asset. However, the item is the depreciation treatment of each vintage account with respect to a depreciable asset for which depreciation is determined under §1.167(a)–11 (CLADR property). Further, a change in computing depreciation or amortization under section 167 (other than under section 168, section 1400I, section 1400L, or former section 168) is permitted only with respect to all assets in a particular account (as defined in §1.167(a)–7) or vintage account.

(*5*) *Special rules.* For purposes of a change in depreciation or amortization to which this paragraph (e)(2)(ii)(*d*) applies—

(*i*) *Declining balance method to the straight line method for MACRS property.* For tangible, depreciable property subject to section 168 (MACRS property) that is depreciated using the 200-percent or 150-percent declining balance method of depreciation under section 168(b)(1) or (2), a taxpayer may change without the consent of the Commissioner from the declining balance method of depreciation to the straight line method of depreciation in the first taxable year in which the use of the straight line method with respect to the adjusted depreciable basis of the MACRS property as of the beginning of that year will yield a depreciation allowance that is greater than the depreciation allowance yielded by the use of the declining balance method. When the change is made, the adjusted depreciable basis of the MACRS property as of the beginning of the taxable year is recovered through annual depreciation allowances over the remaining recovery period (for further guidance, *see* section 6.06 of Rev. Proc. 87–57 (1987–2 C.B. 687) and §601.601(d)(2)(ii)(*b*) of this chapter).

(*ii*) *Depreciation method changes for section 167 property.* For a depreciable or amortizable asset for which depreciation is determined under section 167 (other than under section 168, section 1400I, section 1400L, or former section 168), see §1.167(e)–1T(b), (c), and (d) for the changes in depreciation method that are permitted to be made without the consent of the Commissioner. For CLADR property, see §1.167(a)–11(c)(1)(iii) for the changes in depreciation method for CLADR property that are permitted to be made without the consent of the Commissioner. Further, *see* §1.167(a)–11(b)(4)(iii)(c) for how to correct an incorrect classification or characterization of CLADR property.

(*iii*) *Section 481 adjustment.* Except as otherwise expressly provided by the Internal Revenue Code, the regulations under the Code, or other guidance published in the Internal Revenue Bulletin, no section 481 adjustment is required or permitted for a change from one permissible method of computing depreciation or amortization to another permissible method of computing depreciation or amortization for an asset because this change is implemented by either a cut-off method (for further guidance, see section 2.06 of Rev. Proc. 97–27 (1997–1 C.B. 680), section 2.06 of Rev. Proc. 2002–9 (2002–1 C.B. 327), and §601.601(d)(2)(ii)(*b*) of this chapter) or a modified cut-off method (under which the adjusted depreciable basis of the asset as of the beginning of the year of change is recovered using the new permissible method of accounting), as appropriate. However, a change from an impermissible method of computing depreciation or amortization to a permissible method of computing depreciation or amortization for an asset results in a section 481 adjustment. Similarly, a change in the treatment of an asset from nondepreciable or nonamortizable to depreciable or amortizable (or vice versa) or a change in the treatment of an asset from expensing to depreciating (or vice versa) results in a section 481 adjustment.

(iii) *Examples.* The rules of this paragraph (e) are illustrated by the following examples:

Case 1:02-cv-01278-FMA Document 76-4 Filed 06/08/2005 Page 2 of 11



*Example 1.* Although the sale of merchanse is an income producing factor, and erefore inventories are required, a taxyer in the retail jewelry business reports s income on the cash receipts and disbursements method of accounting. A change from e cash receipts and disbursements method accounting to the accrual method of acunting is a change in the overall plan of counting and thus is a change in method of counting.

*ample 2.* A taxpayer in the wholesale dry ds business computes its income and exses on the accrual method of accounting d files its Federal income tax returns on ch basis except for real estate taxes which ve been reported on the cash receipts and sbursements method of accounting. A ange in the treatment of real estate taxes m the cash receipts and disbursements thod to the accrual method is a change in thod of accounting because such change is ange in the treatment of a material item thin his overall accounting practice.

*ample 3.* A taxpayer in the wholesale dry ds business computes its income and exses on the accrual method of accounting d files its Federal income tax returns on ch basis. Vacation pay has been deducted the year in which paid because the taxer did not have a completely vested vacan pay plan, and, therefore, the liability payment did not accrue until that year. bsequently, the taxpayer adopts a comtely vested vacation pay plan that nges its year for accruing the deduction m the year in which payment is made to year in which the liability to make the ment now arises. The change for the year deduction of the vacation pay plan is not change in method of accounting but relts, instead, because the underlying facts hat is, the type of vacation pay plan) have nged.

*ample 4.* From 1968 through 1970, a taxer has fairly allocated indirect overhead sts to the value of inventories on a fixed rcentage of direct costs. If the ratio of inct overhead costs to direct costs inases in 1971, a change in the underlying s has occurred. Accordingly, an increase the percentage in 1971 to fairly reflect the rease in the relative level of indirect rhead costs is not a change in method of ounting but is a change in treatment reting from a change in the underlying ts.

*ample 5.* A taxpayer values inventories at t. A change in the basis for valuation of entories from cost to the lower of cost or arket is a change in an overall practice of luing items in inventory. The change, erefore, is a change in method of accountg for inventories.

*Example 6.* A taxpayer in the manufacring business has for many taxable years lued its inventories at cost. However, cost has been improperly computed since no overhead costs have been included in valuing the inventories at cost. The failure to allocate an appropriate portion of overhead to the value of inventories is contrary to the requirement of the Internal Revenue Code and the regulations under the Code. A change requiring appropriate allocation of overhead is a change in method of accounting because it involves a change in the treatment of a material item used in the overall practice of identifying or valuing items in inventory.

*Example 7.* A taxpayer has for many taxable years valued certain inventories by a method which provides for deducting 20 percent of the cost of the inventory items in determining the final inventory valuation. The 20 percent adjustment is taken as a "reserve for price changes." Although this method is not a proper method of valuing inventories under the Internal Revenue Code or the regulations under the Code, it involves the treatment of a material item used in the overall practice of valuing inventory. A change in such practice or procedure is a change of method of accounting for inventories.

*Example 8.* A taxpayer has always used a base stock system of accounting for inventories. Under this system a constant price is applied to an assumed constant normal quantity of goods in stock. The base stock system is an overall plan of accounting for inventories which is not recognized as a proper method of accounting for inventories under the regulations. A change in this practice is, nevertheless, a change of method of accounting for inventories.

*Example 9.* In 2000, A1, a calendar year taxpayer engaged in the trade or business of manufacturing knitted goods, purchased and placed in service a building and its components at a total cost of $10,000,000 for use in its manufacturing operations. A1 classified the $10,000,000 as nonresidential real property under section 168(e). A1 did not make any elections under section 168 on its 2000 Federal tax return. As a result, on its 2000, 2001, and 2002 federal tax returns, A1 depreciated the $10,000,000 under the general depreciation system of section 168(a), using the straight line method of depreciation, a 39-year recovery period, and the mid-month convention. In 2003, A1 completes a cost segregation study on the building and its components and identifies items that cost a total of $1,500,000 as section 1245 property. As a result, the $1,500,000 should have been classified in 2000 as 5-year property under section 168(e) and depreciated on A1's 2000, 2001, and 2002 Federal tax returns under the general depreciation system, using the 200-percent declining balance method of depreciation, a 5-year recovery period, and the half-year convention. Pursuant to paragraph (e)(2)(ii)(*d*)(2)(*i*) of this section, A1's change to this depreciation method, recovery period, and convention is a change in method of accounting. This method change results in a section 481 adjustment. The useful life exception under paragraph (e)(2)(ii)(*d*)(3)(*i*) of this section does not apply because the assets are depreciated under section 168.

*Example 10.* In 1996, B, a calendar year taxpayer, purchased and placed in service new equipment at a total cost of $1,000,000 for use in its plant located outside the United States. The equipment is 15-year property under section 168(e) with a class life of 20 years. The equipment is required to be depreciated under the alternative depreciation system of section 168(g). However, B incorrectly depreciated the equipment under the general depreciation system of section 168(a), using the 150-percent declining balance method, a 15-year recovery period, and the half-year convention. In 2003, the IRS examines B's 2000 Federal income tax return and changes the depreciation of the equipment to the alternative depreciation system, using the straight line method of depreciation, a 20-year recovery period, and the half-year convention. Pursuant to paragraph (e)(2)(ii)(*d*)(2)(*i*) of this section, this change in depreciation method and recovery period made by the IRS is a change in method of accounting. This method change results in a section 481 adjustment. The useful life exception under paragraph (e)(2)(ii)(*d*)(3)(*i*) of this section does not apply because the assets are depreciated under section 168.

*Example 11.* In May 2001, C, a calendar year taxpayer, purchased and placed in service equipment for use in its trade or business. C never held this equipment for sale. However, C incorrectly treated the equipment as inventory on its 2001 and 2002 Federal tax returns. In 2003, C realizes that the equipment should have been treated as a depreciable asset. Pursuant to paragraph (e)(2)(ii)(*d*)(2) of this section, C's change in the treatment of the equipment from inventory to a depreciable asset is a change in method of accounting. This method change results in a section 481 adjustment.

*Example 12.* Since 2001, D, a calendar year taxpayer, has used the distribution fee period method to amortize distributor commissions and, under that method, established pools to account for the distributor commissions (for further guidance, see Rev. Proc. 2000–38 (2000–2 C.B. 310) and § 601.601(d)(2)(ii)(*b*) of this chapter). A change in the accounting of distributor commissions under the distribution fee period method from pooling to single asset accounting is a change in method of accounting pursuant to paragraph (e)(2)(ii)(*d*)(2)(*vi*) of this section. This method change results in no section 481 adjustment because the change is from one permissible method to another permissible method.

*Example 13.* Since 2000, E, a calendar year taxpayer, has accounted for items of MACRS property that are mass assets in pools. Each pool includes only the mass assets that are placed in service by E in the same taxable year. E is able to identify the cost basis of each asset in each pool. None of the pools are general asset accounts under section 168(i)(4) and the regulations under section 168(i)(4). E identified any dispositions of these mass assets by specific identification. Because of changes in E's recordkeeping in 2003, it is impracticable for E to continue to identify disposed mass assets using specific identification. As a result, E wants to change to a first-in, first-out method under which the mass assets disposed of in a taxable year are deemed to be from the pool with the earliest placed-in-service year in existence as of the beginning of the taxable year of each disposition. Pursuant to paragraph (e)(2)(ii)(*d*)(2)(*vii*) of this section, this change is a change in method of accounting. This method change results in no section 481 adjustment because the change is from one permissible method to another permissible method.

*Example 14.* In August 2001, F, a calendar taxpayer, purchased and placed in service a copier for use in its trade or business. F incorrectly classified the copier as 7-year property under section 168(e). F made no elections under section 168 on its 2001 Federal tax return. As a result, on its 2001 and 2002 Federal tax returns, F depreciated the copier under the general depreciation system of section 168(a), using the 200-percent declining balance method of depreciation, a 7-year recovery period, and the half-year convention. In 2003, F realizes that the copier is 5-year property and should have been depreciated on its 2001 and 2002 Federal tax returns under the general depreciation system using a 5-year recovery period rather than a 7-year recovery period. Pursuant to paragraph (e)(2)(ii)(*d*)(2)(*i*) of this section, F's change in recovery period from 7 to 5 years is a change in method of accounting. This method change results in a section 481 adjustment. The useful life exception under paragraph (e)(2)(ii)(*d*)(3)(*i*) of this section does not apply because the copier is depreciated under section 168.

*Example 15.* In 1998, G, a calendar year taxpayer, purchased and placed in service an intangible asset that is not an amortizable section 197 intangible and that is not described in section 167(f). G amortized the cost of the intangible asset under section 167(a) using the straight line method of depreciation and a useful life of 13 years. In 2003, because of changing conditions, G changes the remaining useful life of the intangible asset to 2 years. Pursuant to paragraph (e)(2)(ii)(*d*)(3)(*i*) of this section, G's change in useful life is not a change in method of accounting because the intangible asset is depreciated under section 167 and G is not changing to or

Case 1:02-cv-01278-EMA Document 76-4 Filed 06/08/2005 Page 3 of 11



om a useful life that is specifically as-gned by the Internal Revenue Code, the gulations under the Code, or other guid-ice published in the Internal Revenue Bul-tin.

*Example 16.* In July 2001, H, a calendar year xpayer, purchased and placed in service f-the-shelf" computer software and a new mputer. The cost of the new computer and mputer software are separately stated. H correctly included the cost of this software part of the cost of the computer, which is ar property under section 168(e). On its Federal tax return, H elected to depre-te its 5-year property placed in service in 01 under the alternative depreciation sys-m of section 168(g). The class life for a mputer is 5 years. As a result, because H cluded the cost of the computer software part of the cost of the computer hardware, epreciated the cost of the software under alternative depreciation system, using straight line method of depreciation, a 5-ar recovery period, and the half-year con-ntion. In 2003, H realizes that the cost of software should have been amortized der section 167(f)(1), using the straight line ethod of depreciation, a 36-month useful e, and a monthly convention. H's change om 5-years to 36-months is a change in ethod of accounting because H is changing a useful life that is specifically assigned section 167(f)(1). The change in convention om the half-year to the monthly conven-n also is a change in method of account-g. Both changes result in a section 481 ad-tment.

*Example 17.* On September 15, 2001, I2, a cal-dar year taxpayer, purchased and placed in vice new equipment at a total cost of 0,000 for use in its business. The equip-ent is 5-year property under section 168(e) th a class life of 9 years and is qualified operty under section 168(k). I2 did not e in service any other depreciable prop-ty in 2001. Section 168(g)(1)(A) through (D) not apply to the equipment. I2 intended to ct the alternative depreciation system der section 168(g) for 5-year property aced in service in 2001. However, I2 did not ke the election. Instead, I2 deducted on 2001 Federal tax return the 30-percent ad-tional first year depreciation attributable the equipment and, on its 2001 and 2002 deral tax returns, depreciated the remain-g adjusted depreciable basis of the equip-ent under the general depreciation system der 168(a), using the 200-percent declining lance method, a 5-year recovery period, d the half-year convention. In 2003, I2 real-es its failure to make the alternative de-eciation system election in 2001 and files a rm 3115 to change its method of depre-ating the remaining adjusted depreciable sis of the 2001 equipment to the alter-tive depreciation system. Because this uipment is not required to be depreciated under the alternative depreciation system, I2 is attempting to make an election under section 168(g)(7). However, this election must be made in the taxable year in which the equipment is placed in service (2001) and, consequently, I2 is attempting to make a late election under section 168(g)(7). Accordingly, I2's change to the alternative depreciation system is not a change in accounting method pursuant to paragraph (e)(2)(ii)(*d*)(*3*)(*iii*) of this section. Instead, I2 must submit a request for a private letter ruling under §301.9100-3 of this chapter, requesting an extension of time to make the alternative depreciation system election on its 2001 Federal tax return.

(3) [Reserved]. For further guidance, see §1.446-1(e)(3).

(4) *Effective date*—(i) *In general.* Except as provided in paragraphs (e)(3)(iii) and (e)(4)(ii) of this section, paragraph (e) of this section applies on or after December 30, 2003. For the applicability of regulations before December 30, 2003, *see* §1.446-1(e) in effect prior to December 30, 2003 (§1.446-1(e) as contained in 26 CFR part 1 edition revised as of April 1, 2003).

(ii) *Changes involving depreciable or amortizable assets.* With respect to paragraph (e)(2)(ii)(*d*) of this section, paragraph (e)(2)(iii) *Examples 9* through *17* of this section, the addition of the language "certain changes in computing depreciation or amortization (see paragraph (e)(2)(ii)(*d*) of this section)" to the last sentence of paragraph (e)(2)(ii)(*a*) of this section, and the removal of all language regarding useful life and the sentence "On the other hand, a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which had been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting" from paragraph (e)(2)(ii)(*b*) of this section—

(A) For any change in depreciation or amortization that is a change in method of accounting, this section applies to such a change in method of accounting made for taxable years ending on or after December 30, 2003; and

(B) For any change in depreciation or amortization that is not a change in method of accounting, this section applies to such a change made for taxable years ending on or after December 30, 2003.





(iii) The applicability of paragraph (e) of this section expires on or before December 29, 2006.

[T.D. 9105, 69 FR 8, Jan. 2, 2004; 69 FR 5273, Feb. 4, 2004]

### §1.446-2 Method of accounting for interest.

(a) *Applicability*—(1) *In general.* This section provides rules for determining the amount of interest that accrues during an accrual period (other than interest described in paragraph (a)(2) of this section) and for determining the portion of a payment that consists of accrued interest. For purposes of this section, interest includes original issue discount and amounts treated as interest (whether stated or unstated) in any lending or deferred payment transaction. Accrued interest determined under this section is taken into account by a taxpayer under the taxpayer's regular method of accounting (e.g., an accrual method or the cash receipts and disbursements method). Application of an exception described in paragraph (a)(2) of this section to one party to a transaction does not affect the application of this section to any other party to the transaction.

(2) *Exceptions*—(i) *Interest included or deducted under certain other provisions.* This section does not apply to interest that is taken into account under—

(A) Sections 1272(a), 1275, and 163(e) (income and deductions relating to original issue discount);

(B) Section 467(a)(2) (certain payments for the use of property or services);

(C) Sections 1276 through 1278 (market discount);

(D) Sections 1281 through 1283 (discount on certain short-term obligations);

(E) Section 7872(a) (certain loans with below-market interest rates); or

(F) Section 1.1272-3 (an election by a holder to treat all interest on a debt instrument as original issue discount).

(ii) *De minimis original issue discount.* This section does not apply to de minimis original issue discount (other than de minimis original issue discount treated as qualified stated interest) as determined under §1.1273-1(d). See §1.163-7 for the treatment of de minimis original issue discount by the issuer and §§1.1273-1(d) and 1.1272-3 for the treatment of de minimis original issue discount by the holder.

(b) *Accrual of qualified stated interest.* Qualified stated interest (as defined in §1.1273-1(c)) accrues ratably over the accrual period (or periods) to which it is attributable and accrues at the stated rate for the period (or periods).

(c) *Accrual of interest other than qualified stated interest.* Subject to the modifications in paragraph (d) of this section, the amount of interest (other than qualified stated interest) that accrues for any accrual period is determined under rules similar to those in the regulations under sections 1272 and 1275 for the accrual of original issue discount. The preceding sentence applies regardless of any contrary formula agreed to by the parties.

(d) *Modifications*—(1) *Issue price.* The issue price of the loan or contract is equal to—

(i) In the case of a contract for the sale or exchange of property to which section 483 applies, the amount described in §1.483-2(a)(1)(i) or (ii), whichever is applicable;

(ii) In the case of a contract for the sale or exchange of property to which section 483 does not apply, the stated principal amount; or

(iii) In any other case, the amount loaned.

(2) *Principal payments that are not deferred payments.* In the case of a contract to which section 483 applies, principal payments that are not deferred payments are ignored for purposes of determining yield and adjusted issue price.

(e) *Allocation of interest to payments*—(1) *In general.* Except as provided in paragraphs (e)(2), (e)(3), and (e)(4) of this section, each payment under a loan (other than payments of additional interest or similar charges provided with respect to amounts that are not paid when due) is treated as a payment of interest to the extent of the accrued and unpaid interest determined under paragraphs (b) and (c) of this section as of the date the payment becomes due.

(2) *Special rule for points deductible under section 461(g)(2).* If a payment of points is deductible by the borrower under section 461(g)(2), the payment is

axable
..... $100

..... (80)
..... 20

to loss on the dispo-
d S has a capital loss
he capital loss, S has
January 1, 1969, the
$400. On December
f the stock of S for

idated taxable income
tal gain *(capital gain*
*years beginning after*
$40, and (2) a net op-
l of which is attribut-

2(b) and (e) and sub-
s paragraph, there is
ment to the basis of
negative adjustment
and a positive adjust-
ortion of the consoli-
ss attributable to S,
ried back to a prior
adjusted basis of the
realizes a loss of $160

able income for 1969

...... ($120)

...... (200)
...... (200)

are apportioned to S
d (b) and may be car-
eparate return year of

-66; amended by TD
0-80; TD 7876, filed
has been 1 Proposed
Amendments to Reg-

the following modifi-

etween members and
ect to stock, bonds, or

©1991 Macmillan, Inc.



other obligations of members shall be reflected according to the provisions of §§1.1502-13 and 1.1502-14;

(b) Any deduction which is disallowed under §1.1502-15 shall be taken into account as provided in that section;

(c) The limitation on deductions provided in section 615(c) or section 617(h) shall be taken into account as provided in §1.1502-16;

(d) The method of accounting under which such computation is made and the adjustments to be made because of any change in method of accounting shall be determined under §1.1502-17;

(e) Inventory adjustments shall be made as provided in §1.1502-18;

(f) Any amount included in income under §1.1502-19 shall be taken into account;

(g) In the computation of the deduction under section 167, property shall not lose its character as new property as a result of a transfer from one member to another member during a consolidated return year if—

(1) The transfer occurs on or before January 4, 1973, or

(2) The transfer occurs after January 4, 1973, and the transfer is a deferred intercompany transaction as defined in §1.1502-13(a)(2) or the basis of the property in the hands of the transferee is determined (in whole or in part) by reference to its basis in the hands of the transferor;

(h) No net operating loss deduction shall be taken into account;

(i) [Reserved]

(j) No capital gains or losses shall be taken into account;

(k) No gains and losses subject to section 1231 shall be taken into account;

(l) No deduction under section 170 with respect to charitable contributions shall be taken into account;

(m) No deduction under section 922 (relating to the deduction for Western Hemisphere trade corporations) shall be taken into account; and

(n) No deductions under section 243(a)(1), 244(a), 245, or 247 (relating to deductions with respect to dividends received and dividends paid) shall be taken into account;

(o) Basis shall be determined under §§1.1502-31 and 1.1502-32, and earnings and profits shall be determined under §1.1502-33; and

(p) The limitation on deductions provided in section 613A shall be taken into account for each member's oil and gas properties as provided in §1.1502-44.

(q) A thrift institution's deduction under section 593(b)(2) (relating to the addition to the reserve for bad debts of a thrift institution under the percentage of taxable income method) shall be determined under §1.1502-42.

The term "separate taxable income" shall include a case in which the determination under this section results in an excess of deductions over gross income.

(r) [1] For rules relating to loss disallowance or basis reduction on the disposition or deconsolidation of stock of a subsidiary, see [2]*§§1.337(d)-1 and 1.337(d)-2T.*

**Reg. §1.1502-13 Intercompany transactions.** (TD 6894, filed 9-7-66; amended by TD 7246, filed 12-29-72; TD 8131, filed 3-24-87; TD 8196; filed 4-14-88; TD 8295, filed 3-9-90.)

**(a) Definitions.** For purposes of §§1.1502-1 through 1.1502-80—

**(1) "Intercompany transaction".** (i) Except as provided in subdivision (ii) of this subparagraph, the term "intercompany transaction" means a transaction during a consolidated return year between corporations which are members of the same group immediately after such transaction. Thus, for example, an intercompany transaction would include a sale of property by one member of a group (hereinafter referred to as the "selling member") to another member of the same group ("purchasing member"), the performance of services by one member of a group ("selling member") for another member of the same group ("purchasing member"), or the payment of interest by one member of a group ("purchasing member") to another member of the same group ("selling member"), during a consolidated return year.

(ii) The term "intercompany transaction" does not include a distribution by one member of a group to another member of the same group with respect to the distributing member's stock, or a contribution to capital on which no gain is realized. Thus, for example, dividend distributions, redemptions, and liquidations are not intercompany transactions. The term also does not include sales and other dispositions of, and bad debts with respect to, obligations of other members of the group. See §1.1502-14, relating to amounts received with respect to stock, bonds, or other obligations of a member of the group.

**(2) "Deferred Intercompany transaction".** The term "deferred intercompany transaction" means—

(i) The sale or exchange of property,

(ii) The performance of services in a case where the amount of the expenditure for such services is capitalized (for example, a

**[Footnote Reg. §1.1502-12]** Matter in *italics* added by TD 8319, which struck out:
**(1)** **"Cross reference to temporary regulations."**
**(2)** "§§1.337(d)-1T and 1.1502-20T"

©1991 Macmillan, Inc.

builder's fee, architect's fee, or other similar cost which is included in the basis of property), or

(iii) Any other expenditure in a case where the amount of the expenditure is capitalized (for example, prepaid rent, or interest which is included in the basis of property);

in an intercompany transaction.

**(b) Treatment of intercompany transactions other than deferred intercompany transactions—(1) General rule.** Gain or loss on intercompany transactions (other than deferred intercompany transactions) shall not be deferred or eliminated. Thus, for example, if, during a consolidated return year, a purchasing member makes an interest payment on an indebtedness to a selling member in an intercompany transaction, the purchasing member shall take the deduction for interest into account and the selling member shall take the interest income into account.

**(2) Special rule.** If, in an intercompany transaction (other than a deferred intercompany transaction), one member would otherwise properly take an item of income or a deduction into account for a consolidated return year earlier than the year (whether consolidated or separate) for which another member of the group can properly take into account the corresponding item of income or deduction, then both the item of income and the deduction shall be taken into account for the later year (whether consolidated or separate). On the other hand, if one member properly takes an item of income or a deduction into account for a separate return year earlier than the consolidated return year for which the other member can properly take into account the corresponding item of income or deduction, then such other member shall take the corresponding deduction or item of income into account for such later consolidated return year.

**(c) Deferral of gain or loss on deferred intercompany transactions—(1) General rule.** (i) To the extent gain or loss on a deferred intercompany transaction is recognized under the Code for a consolidated return year, such gain or loss shall be deferred by the selling member (hereinafter referred to as "deferred gain or loss").

(ii) The following rules apply with respect to the deferral of gain or loss on deferred intercompany transactions:

(a) The selling member may not report gain on the installment method under section 453;

(b) A selling member shall take into account the gain or loss on a deferred intercompany transaction in accordance with the provisions of paragraphs (d), (e), and (f) of this section, notwithstanding that such selling member, under its method of accounting, would not otherwise recognize such gain or loss until a later taxable year. Thus, for example, a selling member must take into account its gain on a deferred intercompany transaction for the first taxable year for which the purchasing member is allowed a deduction for depreciation with respect of the property involved, even though the selling member, under its method of accounting, would not otherwise recognize such gain until a later taxable year.

(iii) See paragraphs (d), (e), and (f) of this section, relating to the time and manner of restoring deferred gain or loss. See paragraph (a) of §1.1502-31, relating to basis of property acquired in a deferred intercompany transaction. *See §1.1502-13T, relating to the time and manner of restoring deferred gain or loss in taxable years for which the due date (without extensions) of the income tax return is after March 14, 1990.*

**(2) Determination of amount of deferred gain or loss.** In determining the amount of deferred gain or loss, the cost of property, services or any other expenditure shall include both direct costs and indirect costs which are properly includible in the cost of goods sold or cost of the services or other expenditure. See section 1.263A-1T for costs properly includible in cost of goods sold.

**(3) Election not to defer.** A group may elect with the consent of the Commissioner not to defer gain or loss on any deferred intercompany transactions with respect to all property or any class or classes of property. Applications for such consent must be filed with the Commissioner of Internal Revenue, Washington, D.C. 20224, on or before the due date of the consolidated return (not including extensions of time) for the taxable year to which the election is to apply. An election under this subparagraph shall, unless revoked with the consent of the Commissioner, apply to all members of the group for the consolidated return year for which made and all subsequent consolidated return years ending prior to the first year for which such group does not file a consolidated return.

**(4) Character and source of deferred gain or loss.** (i) Except as provided in subdivision (ii) of this subparagraph, the character and source of deferred gain or loss on a deferred intercompany transaction shall be determined at the time of the deferred intercompany transaction as if such transaction had not occurred during a consolidated return year.

(ii) Deferred gain or loss taken into account by the selling member under paragraph (d)(1) of this section, or (as a result of abandonment) under paragraph (f) of this section, shall be treated as ordinary income or loss.

**(5) Accounting for deferred gain or loss.** The amount of deferred gain or loss shall be reflected on permanent records (including work papers). From such permanent

[Footnote Reg. §1.1502-13] Matter in *italics* added by TD 8295.



©1991 Macmillan, Inc.

must take into l intercompany xable year for er is allowed a vith respect of hough the sell- od of account- gnize such gain

, and (f) of this and manner of oss. See para- ing to basis of rred intercom- 2-13T, *relating toring deferred for which the of the income 990.*

aount of de- termining the ss, the cost of er expenditure s and indirect ludible in the he services or 1.263A-1T for cost of goods

**er.** A group f the Commis- ss on any de- ions with re- lass or classes such consent issioner of In- D.C. 20224, on e consolidated ns of time) for election is to subparagraph consent of the embers of the turn year for t consolidated the first year file a consoli-

**of deferred** provided in ragraph, the d gain or loss transaction ne of the de- on as if such during a con-

aken into ac- under para- as a result of h (f) of this inary income

**red gain** or gain or loss t records (in- h permanent





records the group must be able to identify the character and source of the deferred gain or loss to the selling member, and must be able to apply the restoration rules of paragraphs (d), (e), and (f) of this section.

(6) **Inheritance of deferred gain or loss.** If the assets of a selling member are acquired by one or more other members in an acquisition to which section 381(a) applies, the member acquiring the greatest portion of the assets (measured by fair market value) of the selling member shall be subject to the provisions of paragraphs (d), (e), and (f) of this section with respect to the entire remaining balance of the deferred gain or loss. If two or more members acquire the same portion (which is greater than that acquired by any other members), the common parent shall select which such member shall be subject to the provisions of paragraphs (d), (e), and (f) of this section. For purposes of this section, a member which inherits the balance of the deferred gain or loss under this subparagraph shall be treated as the selling member.

(7) **Cross reference to temporary regulations.** For rules relating to inheritance of deferred gain or loss in the case of acquisitions in taxable years for which the due date (without extensions) of the income tax return is after April 14, 1988, see §1.1502-13T(c).

(d) **Restoration of deferred gain or loss for property subject to depreciation, amortization, or depletion—(1) General rule.** (i) If property (including a capitalized expenditure for services, or any other capitalized expenditure) acquired in a deferred intercompany transaction is, in the hands of any member of the group, subject to depreciation, amortization, or depletion, then, for each taxable year (whether consolidated or separate) for which a depreciation, amortization, or depletion deduction is allowed to any member of the group with respect to such property, a portion (as determined under subdivision (ii) of this subparagraph) of the deferred gain or loss attributable to such property shall be taken into account by the selling member.

(ii) The portion of the deferred gain or loss attributable to any property which shall be taken into account by the selling member shall be an amount equal to—

(a) The amount of gain or loss deferred by the selling member at the time of the deferred intercompany transaction (and if a member has transferred the property to another member of the group, the remaining balance at the time of such transfer), multiplied by

(b) A fraction, the numerator of which is the amount of the depreciation, amortization, or depletion deduction with respect to such property allowed to any member of the group for the year (whether consolidated or separate), and the denominator of which is the depreciable basis (i.e., basis reduced by salvage value required to be taken into account, if any) of such property in the hands of such member immediately after such property was transferred to such member.

(2) **Multiple asset accounts.** In the case of property contained in a multiple asset account (or in single asset accounts for which an average rate is used), for purposes of subparagraph (1)(ii)(b) of this paragraph, the depreciation deduction allowed for a particular taxable year shall be determined by reference to the rate and method of depreciation applied to such multiple asset account (or average rate and method of depreciation applied to such single asset accounts). Thus, if property with an estimated useful life of 3 years is placed in a multiple asset account which is depreciated on the straight-line method at a rate of 20 percent, the depreciation deduction allowed for each taxable year shall be assumed to be 20 percent of the basis of such property (reduced by the salvage value taken into account).

(3) **Reduction of deferred gain or loss.** The deferred gain or loss shall be reduced by the amount taken into account by the selling member under subparagraph (1) of this paragraph. If the deferred gain includes any ordinary income, the reduction shall first be applied against the ordinary income. Thus, for example, if the selling member has deferred gain of $100, of which $70 is capital gain and $30 is ordinary income, the first $30 taken into account by the selling member under subparagraph (1) of this paragraph shall be applied against the ordinary income, and any additional amounts so taken into account shall be applied against the capital gain.

(e) **Restoration of deferred gain or loss installment obligations and sales—(1) Installment obligations.** If an installment obligation (within the meaning of section 453(d)) is transferred in a deferred intercompany transaction, then on each date on which the obligation is satisfied the selling member shall take into account an amount equal to the deferred gain or loss on such transfer, multiplied by a fraction, the numerator of which is the portion of such obligation satisfied on such date, and the denominator of which is the aggregate unpaid installments immediately after the deferred intercompany transaction.

(2) **Installment sales.** If—

(i) Property acquired in a deferred intercompany transaction is disposed of outside the group, and

(ii) The purchasing member-vendor reports its income on the installment method under section 453,

then on each date on which the purchasing member-vendor receives an installment payment the selling member shall take into account an amount equal to the deferred gain or loss attributable to such property (after taking into account any prior reductions under paragraph (d)(3) of this section) multiplied by a fraction, the numerator of

©1991 Macmillan, Inc.

which is the installment payment received and the denominator of which is the total contract price. If the deferred gain includes any ordinary income, the ordinary income shall be taken into account first.

**(3) Reduction of deferred gain or loss.** The deferred gain or loss shall be reduced by the amount taken into account by the selling member under subparagraph (1) or (2) of this paragraph. If the deferred gain includes any ordinary income, the reduction shall first be applied against the ordinary income.

**(f) Restoration of deferred gain or loss on dispositions, etc. (1) General rule.** The remaining balance (after taking into account any prior reductions under paragraphs (d)(3) and (e)(3) of this section) of the deferred gain or loss attributable to property, services, or other expenditure shall be taken into account by the selling member as of the earliest of the following dates:

(i) The date on which such property is dipsosed of outside the group (including abandoned) other than in a transaction described in paragraph (e)(2) of this section (but not including a normal retirement, as defined in paragraph (b) of §1.167(a)-8, from an average-life multiple asset account or from a single asset account for which an average rate is used). If such property is of a kind which would properly be included in the inventory of a member if on hand at the close of its taxable year, such member shall determine whether or not such item of property has been disposed of outside the group by reference to its method of inventory identification (e.g., first-in, first-out, last-in, first-out, or specific identification);

(ii) In the case of a transaction described in paragraph (e)(2) of this section, the date on which the installment debt is written off, satisfied, discharged, or disposed of outside the group or the property sold is repossessed (except as provided in section 1038), whichever occurs earliest;

(iii) Immediately preceding the time when either the selling member or the member which owns the property ceases to be a member of the group;

(iv) In the case of property which is stock in trade or other property of a kind which would be properly included in inventory of the member which owns the property if on hand at the close of such member's taxable year, or held primarily for sale to customers in the ordinary course of such member's trade or business, the first day of the first separate return year of the selling member or the member which owns the property;

(v) In the case of an obligation (other than an obligation of a member of the group), the date on which such obligation is satisfied or becomes worthless;

(vi) In the case of stock, the date on which such stock is redeemed (whether or not it is canceled, retired, or held as treasury stock) or becomes worthless;

(vii) If consolidated returns are filed by the group for fewer than three consecutive taxable years immediately preceding a separate return year of the common parent, the first day of such separate return year; or

(viii) In the case of inventory, the date on which its value is written down to market (if the lower-of-cost-or-market method is used by the purchaser), but only to the extent of such writedown.

**(2) Exceptions.** (i) Subparagraph (1) of this paragraph shall not apply solely because of a termination of the group (hereinafter referred to as the "terminating group") resulting from—

(a) The acquisition by a nonmember corporation of (1) the assets of the common parent in a reorganization described in subparagraph (A), (C), or (D) (but only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met of section 368(a)(1), or (2) stock of the common parent, or

(b) The acquisition (in a transaction to which §1.1502-75(d)(3) applies) by a member of (1) the assets of a nonmember corporation in a reorganization referred to in subdivision (a), or (2) stock of a nonmember corporation,

if all the members of the terminating group (other than such common parent if its assets are acquired) immediately before the acquisition are members immediately after the acquisition of another group (hereinafter referred to as the "succeeding group") which files a consolidated return for the first taxable year ending after the date of acquisition. The members of the succeeding group shall succeed to any deferred gain or loss of members of the terminating group and to the status of such members as selling or purchasing members. This subdivision shall not apply with respect to acquisitions occurring before August 25, 1971, except that in the case of an acquisition occurring after April 16, 1968, and before August 25, 1971, this subdivision shall apply if the terminating group and the succeeding group elect to apply §1.1502-18(c)(4) (notwithstanding the last sentence thereof) with respect to such acquisition. The election shall be made in a joint statement filed by the terminating and succeeding groups on or before March 5, 1973, with the Internal Revenue Service Center or Centers with which the terminating and succeeding groups filed their consolidated returns for the taxable year which includes the date of the acquisition. Such election shall be irrevocable.

(ii) Subparagraph (1)(iii) of this paragraph shall not apply in a case where—

(a) The selling member, or the member which owns the property, as the case may be, ceases to be a member of the group by reason of an acquisition to which section 381(a) applies, and the acquiring corporation is a member, or

(b) The group is terminated, and immediately after such termination the corporation which was the common parent (or cor-



©1991 Macmillan, Inc.



poration which was
affiliated group and ha
become the owner of su
assets of such former pa
erty involved and is th
is treated as the selling
agraph (c)(6) of this sec
and (e) of this section
shall apply to such sel
for example, subparag
paragraph does not ap
corporation P, the co
group consisting of P
and T, sells an asset to
tercompany transaction
all of the assets of S ar
complete liquidation of
the liquidation of S, P
(1)(iii) of this paragrap
even though P ceases to
group.

(iii) See §1.1502-13T(
of an exception to parag
section.

**(3) Certain divesti**
to a final judgment or
court or an agency of th
government, any memb
required to divest them
any other member an
member ceases to be a
missioner may enter in
ment under section 71
Such closing agreemen
any deferred gain or lo
erwise be taken into acc
graph (1)(iii) of this par
be taken into account
period of time related t
within which the defe
have been taken into ac
titure not taken place,
10 years. Ordinarily,
closing agreement will
such divestiture is occas
tion after August 31, 1
corporation or of asset
any such application be
group establishes to th
Commissioner that the
liability attributable to
will not be jeopardized

**(g) Holding perio**
the period for which a
has held property acq
intercompany transacti
property was held by
shall not be included.

**(h) Examples.** This
illustrated by the follow

**Example (1).** (i) Co
file consolidated returns
basis. On January 10,
which it has used in its

$2

©1991 Macmillan, Inc.

ed returns are filed by
than three consecutive
iately preceding a sepa-
he common parent, the
rate return year; or
of inventory, the date
s written down to mar-
st-or-market method is
er), but only to the ex-
m.
(i) Subparagraph (1)
all not apply solely be-
n of the group (herein-
e "terminating group")

1 by a nonmember cor-
assets of the common
ation described in sub-
r (D) (but only if the
aragraphs (A) and (B)
are met of section
of the common parent,

n (in a transaction to
) applies) by a member
nonmember corporation
referred to in subdivi-
f a nonmember corpo-

the terminating group
non parent if its assets
ately before the acqui-
immediately after the
er group (hereinafter
ceeding group") which
turn for the first tax-
r the date of acquisi-
the succeeding group
deferred gain or loss of
inating group and to
members as selling or
This subdivision shall
to acquisitions occur-
, 1971, except that in
sition occurring after
efore August 25, 1971,
apply if the terminat-
ceeding group elect to
(notwithstanding the
with respect to such
n shall be made in a
y the terminating and
or before March 5,
nal Revenue Service
1 which the terminat-
ups filed their consol-
taxable year which
the acquisition. Such
cable.
(1)(iii) of this para-
n a case where—
mber, or the member
rty, as the case may
nber of the group by
ion to which section
acquiring corporation

rminated, and imme-
nination the corpora-
nmon parent (or cor-

©1991 Macmillan, Inc.



poration which was a member of the affiliated group and has succeeded to and become the owner of substantially all of the assets of such former parent) owns the property involved and is the selling member or is treated as the selling member under paragraph (c)(6) of this section. Paragraphs (d) and (e) of this section and this paragraph shall apply to such selling member. Thus, for example, subparagraph (1)(iii) of this paragraph does not apply in a case where corporation P, the common parent of a group consisting of P and corporations S and T, sells an asset to S in a deferred intercompany transaction, and subsequently all of the assets of S are distributed to P in complete liquidation of S. Moreover, if, after the liquidation of S, P sold T, subparagraph (1)(iii) of this paragraph would not apply even though P ceases to be a member of the group.

(iii) See §1.1502-13T(f) for a modification of an exception to paragraph (f)(1)(iii) of this section.

**(3) Certain divestitures.** If, pursuant to a final judgment or a final order of a court or an agency of the Federal or a state government, any member or members are required to divest themselves of control of any other member and, as a result, any member ceases to be a member, the Commissioner may enter into a closing agreement under section 7121 with the group. Such closing agreement may provide that any deferred gain or loss which would otherwise be taken into account under subparagraph (1)(iii) of this paragraph shall instead be taken into account over an appropriate period of time related to the period of time within which the deferred income would have been taken into account had the divestiture not taken place, but not in excess of 10 years. Ordinarily, application for such closing agreement will not be granted where such divestiture is occasioned by the acquisition after August 31, 1966, of control of a corporation or of assets. In no event will any such application be granted unless the group establishes to the satisfaction of the Commissioner that the collection of the tax liability attributable to any deferred gain will not be jeopardized by the delay.

**(g) Holding period.** In determining the period for which a purchasing member has held property acquired in a deferred intercompany transaction, the period such property was held by the selling member shall not be included.

**(h) Examples.** This section may be illustrated by the following examples:

**Example (1).** (i) Corporations P and S file consolidated returns on a calendar year basis. On January 10, 1966, S sells land, which it has used in its trade or business, to P for $100,000. Immediately before the sale the basis of the land in S's hands is $60,000. P holds the land primarily for sale to customers in the ordinary course of its trade or business. On July 12, 1967, P sells the land to A, an individual.

(ii) The sale by S to P is a deferred intercompany transaction; S defers its $40,000 gain on the land ($100,000 less $60,000), which is gain from the sale of property described in section 1231. As of July 12, 1967, S takes the $40,000 deferred gain into account since on such date the property is disposed of outside the group. Such $40,000 gain is taken into account in determining the consolidated section 1231 net gain or loss for 1967 under §1.1502-23.

**Example (2).** Corporations P and S file consolidated returns on a calendar year basis. On August 1, 1966, P transfers property with a fair market value of $100,000 and an adjusted basis in its hands of $85,000 to S in exchange for stock and $10,000 cash. Under section 351(b), only $10,000 of the $15,000 gain is recognized by P. The transfer is a deferred intercompany transaction; P defers the $10,000 gain recognized under section 351(b).

**Example (3).** Corporations P ans S file consolidated returns on a calendar year basis and report income on the cash basis. On July 1, 1966, S pays P $1,000 interest on a loan made in 1961. The payment of interest is an intercompany transaction other than a deferred intercompany transaction; S does not defer or eliminate the $1,000 deduction for interest, and P does not defer or eliminate the $1,000 item of interest income. Thus, consolidated taxable income for 1966 reflects interest income of $1,000 and a corresponding deduction for interest of $1,000.

**Example (4).** (i) Corporation P, S, and T file consolidated returns on a calendar year basis. On January 1, 1966, S, which is in the business of manufacturing machinery, sells a machine to P for $1,000. The cost of the machine is $800. P uses the machine in its trade or business and depreciates it on the straight-line method over an estimated useful life of 10 years. Salvage value of $200 is taken into account. Thus, its annual depreciation deduction with respect to the machine is $80 ($800 ($1,000 less $200 salvage) divided by 10). On January 1, 1969, P sells the machine to A, an individual.

(ii) The sale by S to P is a deferred intercompany transaction; S defers its $200 gain on the machine ($1,000 less $800), which is characterized as ordinary income. For each of the 3 taxable years (1966, 1967, and 1968), prior to the sale to A, S takes into account $20 of its deferred gain, computed as follows:

$$\$200 \text{ deferred gain} \times \frac{\$80 \text{ depreciation deduction}}{\$800 \text{ basis to P subject to depreciation}}$$

*(Example (4) cont.)*

Such $20 gain retains its character as ordinary income.

(iii) As of January 1, 1969, S takes the $140 remaining balance of the deferred gain ($200 less $60) into account since on such date the machine is disposed of outside the group. Such $140 gain retains its character as ordinary income.

**Example (5).** (i) The facts are the same as in example (4) except that beginning with 1968 P and S file separate returns.

(ii) Assuming that P, S, and T filed a consolidated return for 1965, the result is the same as in example (4). Thus, for each of the years 1966, 1967, and 1968 S takes into account $20 of its deferred gain and as of January 1, 1969, S takes the remaining $140 ($200 less $60) into account.

(iii) Assuming that P, S, and T filed separate returns for 1965, as of January 1, 1968, S takes the $160 remaining balance of the deferred gain ($200 less $40) into account since P filed a separate return for 1968 and the group had filed consolidated returns for only 2 consecutive years preceding 1968.

**Example (6).** (i) The facts are the same as in example (4) except that on January 1, 1969, P sells the machine to T for $660 in a transaction in which gain is recognized. T uses the machine in its trade or business and depreciates it on the straight-line method over an estimated useful life of 10 years. No salvage value is taken into account. Thus, T's annual depreciation deduction with respect to the machine is $66 ($660 divided by 10).

(ii) The sale by S to P is a deferred intercompany transaction; S defers its $200 gain on the machine ($1,000 less $800), which is characterized as ordinary income. For each of the 3 years (1966, 1967, and 1968) prior to the sale to T, S takes into account $20 of its deferred gain.

(iii) The sale by P to T is also a deferred intercompany transaction; P defers its $100 loss on the machine (adjusted basis of $760 ($1,000 less $240 total depreciation) less $660).

(iv) For 1969 S takes into account $14 of its deferred gain, computed as follows:

$$\text{\$140 remaining balance of deferred gain} \times \frac{\text{\$66 depreciation deduction}}{\text{\$660 basis to T subject to depreciation}}$$

(v) For 1969 P takes into account $10 of its deferred loss, computed as follows:

$$\text{\$100 deferred loss} \times \frac{\text{\$66 depreciation deduction}}{\text{\$660 basis to T subject to depreciation}}$$

**Example (7).** (i) Corporations P and S file consolidated returns on a calendar year basis. On May 2, 1966, S sells a machine with an adjusted basis of $50 to P for $100 in a transaction in which gain is recognized. S used the machine in its trade or business. For purposes of depreciation, P places the machine, which has an estimated useful life of 3 years, in an average life multiple asset account which is depreciated on the straight-line method at a rate of 20 percent. Under P's consistent depreciation practice it takes a full year's depreciation on all purchases made in the first half of its taxable year.

(ii) The sale by S to P is a deferred intercompany transaction; S defers its $50 gain on the machine ($100 less $50). For each of the taxable years 1966, 1967, 1968, 1969, and 1970 S takes into account $10 of its deferred gain, computed as follows:

$$\text{\$50 deferred gain} \times \frac{\text{\$20 depreciation deduction}}{\text{\$100 basis to P subject to depreciation}}$$

Such $10 is characterized as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231, notwithstanding the character of the $50 gain determined at the time of the sale.

**Example (8).** The facts are the same as in example (7) and in addition during 1969 the machine is disposed of outside the group. Such disposal is treated as a normal retirement (as defined in paragraph (b) of §1.167(a)-8). The result is the same as in example (7). Thus, S takes into account $10 for each of the years 1966, 1967, 1968, 1969, and 1970 even though the property was disposed of in 1969.

**Example (9).** (i) The facts are the same as in example (7) except that the multiple asset account is depreciated over a 5-year



©1991 Macmillan, Inc.

INTER-CO. TRANSACTI

*(Example (9) cont.)*
average useful life on the d
balance method.

$50 deferr

For 1967 S takes into accoun

$50 deferred

**Example (10).** (i) P Cor
Corporation, its wholly-own
file consolidated returns on a
basis. On January 10, 1966,
with a basis of $60,000, to I
As of the close of business on
P sells 25 percent of the out
of S to A, an individual.
(ii) The sale by S to P is a
company transaction; S defe
gain on the land ($100,000 le
of June 10, 1969, S takes th
into account for 1969 since it
member of the group as of th
ness on such date.

$12 deferr

**Example (12).** (i) Corpora
file consolidated returns on a
basis. On January 2, 1966, S
turer, sells a machine to P, a
$2,000. The machine cost S $1
ruary 1, 1966 P sells the mac
individual, for $2,200 and,
453, reports its income there

$800 deferred

**Example (13).** Corporation
consolidated returns on a cale
sis for 1966 and 1967. S repo
the accrual method while P r
on the cash method. On Decen
S would properly accrue inte
which is payable to P. On Febr
S pays P the $1,000. Both the
the item of income are taken
for 1967, the later year. Thus
$1,000 interest deduction into
1967, which is the year P al
$1,000 item of interest income
Consolidated taxable income
flects both interest income of

©1991 Macmillan, Inc.

(i) The facts are the same
) except that on January 1,
machine to T for $660 in a
'hich gain is recognized. T
e in its trade or business
it on the straight-line
estimated useful life of 10
e value is taken into ac-
annual depreciation deduc-
t to the machine is $66
10).
S to P is a deferred inter-
ion; S defers its $200 gain
$1,000 less $800), which is
ordinary income. For each
66, 1967, and 1968) prior to
kes into account $20 of its

y P to T is also a deferred
saction; P defers its $100
ne (adjusted basis of $760
total depreciation) less

takes into account $14 of
omputed as follows:

n deduction

subject to depreciation
mputed as follows:
ction

t to depreciation

t depreciation practice it
depreciation on all pur-
first half of its taxable

to P is a deferred inter-
n; S defers its $50 gain
0 less $50). For each of
1966, 1967, 1968, 1969,
to account $10 of its de-
d as follows:

tion

to depreciation

ed in paragraph (b) of
ult is the same as in
takes into account $10
1966, 1967, 1968, 1969,
h the property was dis-

The facts are the same
cept that the multiple
eciated over a 5-year

©1991 Macmillan, Inc.



*(Example (9) cont.)*
average useful life on the double declining balance method.

(ii) For 1966 S takes into account $20 of its deferred gain, computed as follows:

$$\$50 \text{ deferred gain} \times \frac{\$40\ (\$100 \times 40\%) \text{ depreciation deduction}}{\$100 \text{ basis to P subject to depreciation}}$$

For 1967 S takes into account $12 of its deferred gain, computed as follows:

$$\$50 \text{ deferred gain} \times \frac{\$24\ (\$60\ (\$100 \text{ less } \$40) \times 40\%) \text{ depreciation deduction}}{\$100 \text{ basis to P subject to depreciation}}$$

**Example (10).** (i) P Corporation and S Corporation, its wholly-owned subsidiary, file consolidated returns on a calendar year basis. On January 10, 1966, S sells land, with a basis of $60,000, to P for $100,000. As of the close of business on June 10, 1969, P sells 25 percent of the outstanding stock of S to A, an individual.

(ii) The sale by S to P is a deferred intercompany transaction; S defers its $40,000 gain on the land ($100,000 less $60,000). As of June 10, 1969, S takes the $40,000 gain into account for 1969 since it ceases to be a member of the group as of the close of business on such date.

**Example (11).** (i) Corporations P and S file consolidated returns on a calendar year basis. On January 15, 1966, P sells an obligation payable in installments, with a basis of $48 in its hands, to S for $60. At the time of the sale the debtor owes 3 annual installments of $20 payable each year on July 1. Such installments are paid timely.

(ii) The sale by P to S is a deferred intercompany transaction; P defers its $12 gain on the obligation ($60 less $48).

(iii) For each of the years 1966, 1967, and 1968 P takes into account $4 of its deferred gain, computed as follows:

$$\$12 \text{ deferred gain} \times \frac{\$20 \text{ portion satisfied}}{\$60 \text{ aggregate unpaid portions}}$$

**Example (12).** (i) Corporations P and S file consolidated returns on a calendar year basis. On January 2, 1966, S, a manufacturer, sells a machine to P, a distributor, for $2,000. The machine cost S $1,200. On February 1, 1966 P sells the machine to A, an individual, for $2,200 and, under section 453, reports its income thereon on the installment plan. A makes monthly payments of $110 starting with March 1966.

(ii) The sale by S to P is a deferred intercompany transaction; S defers its $800 gain ($2,000 less $1,200).

(iii) For 1966 S takes into account $400 of its deferred gain, computed as follows:

$$\$800 \text{ deferred gain} \times \frac{\$1{,}100 \text{ installment payments received}}{\$2{,}200 \text{ total contract price}}$$

**Example (13).** Corporations P and S file consolidated returns on a calendar year basis for 1966 and 1967. S reports income on the accrual method while P reports income on the cash method. On December 31, 1966, S would properly accrue interest of $1,000 which is payable to P. On February 1, 1967, S pays P the $1,000. Both the deduction and the item of income are taken into account for 1967, the later year. Thus, S takes the $1,000 interest deduction into account for 1967, which is the year P also takes the $1,000 item of interest income into account. Consolidated taxable income for 1967 reflects both interest income of $1,000 and a corresponding deduction for interest of $1,000.

**Example (14).** The facts are the same as in example (13) except that for 1967 S and P file separate returns. The result is the same as in example (13).

**Example (15).** (i) The facts are the same as in example (13) except that for 1966 P and S file separate returns.

(ii) For 1966 S takes into account the $1,000 deduction for interest; for 1967 P takes into account the $1,000 item of interest income.

©1991 Macmillan, Inc.

**Example (16).** Corporations P and S file consolidated returns on a calendar year basis. On January 10, 1968, P sells an issue of its $100 par value bonds. S purchases a bond from P for $110. S does not elect under section 171 to amortize the $10 premium. P may not take the $10 premium into account as income until it redeems the bond since S cannot properly take a deduction for the $10 premium until the bond is redeemed.

**Example (17).** (i) Corporations P, S, and M file consolidated returns on a calendar year basis. On November 20, 1962, S sold land, with a basis of $60,000, to P for $100,000. Under paragraph (b)(1) of §1.1502-31A the $40,000 gain was eliminated. Thus, S did not take into account such $40,000 gain for 1962 and P's basis in the land is only $60,000. On February 10, 1966, P sells the land to A, an individual, for $104,000.

(ii) P takes the entire $44,000 gain ($104,000 less $60,000) on the land into account for 1966 since the deferral rules provided in paragraph (c) of this section, as well as the corresponding basis rules provided in paragraph (a) of §1.1502-31, were not effective with respect to the sale of such land.

(iii) If, on February 10, 1966, P had sold the land to M for $104,000, P would defer its $44,000 gain on the land since the sale by P to M would be a deferred intercompany transaction.

**Example (18).** (i) Corporations P and S file separate returns on a calendar year basis for 1966 and file consolidated returns on a calendar year basis beginning with 1967. On January 2, 1966, S, a dealer in machinery, sells a machine to P for $2,000 and, under section 453, reports the income thereon on the installment plan. The machine cost S $1,200. P makes monthly payments of $100 starting with January 1966.

(ii) The sale by S to P is not an intercompany transaction since the sale did not occur during a consolidated return year. Therefore, S takes into account the gross profit on each of the 20 monthly payments under section 453.

(i) [Reserved]

(j) **Regulated public utilities.** Subject to the provisions of section 7121, the Commissioner may enter into a closing agreement which, notwithstanding the provisions of §§1.1502-13, 1.1502-31, and 1.1502-33, determines the consequences of deferred intercompany transactions or of any matters relating to or affected by such transactions, provided that—

(1) The purchasing members are domestic regulated public utilities as defined in section 7701(a)(4) and (33),

(2) In the taxable year immediately preceding the first taxable year for which this section is effective there was in effect among the members an arrangement relating to intercompany transactions which had a significant effect upon regulated rates of the public utility members of the group, and the accounting of the public utility members under the arrangement was accepted or approved by a regulatory agency having jurisdiction over the accounts of such members, and

(3) The Commissioner is satisfied that the terms of such closing agreement will not for any taxable year result in a reduction of the tax liability of the group (including former members) or of the shareholders of any members (or former members).

A request for such an agreement must be made on or before November 15, 1966.

**Temp. Reg. §1.1502-13T Temporary regulations for certain intercompany transactions.** (TD 7991, filed 11-29-84; amended by TD 8196, filed 4-14-88; TD 8295, filed 3-9-90.)

► This rule is also proposed to be prescribed as final regulations.

**(a)** [Reserved]

**(b)** [Reserved]

**(c) Deferral of gain or loss on intercompany transactions—(1) Inheritance of deferred gain or loss.** If the assets of the selling member are acquired by one or more members in an acquistion to which section 381(a) applies, or pursuant to a distribution in a complete liquidation not described in section 332(b), the member acquiring the greatest portion of the assets (measured by fair market value) of the selling member shall be subject to the provisions of §1.1502-13(d), (e), and (f) with respect to the entire remaining balance of the deferred gain or loss. If two or more members acquire the same portion (which is greater than that acquired by any other members), the common parent shall select which such member shall be subject to the provisions of §1.1502-13(d), (e), and (f). For purposes of this section and §1.1502-13, a member which inherits the balance of the deferred gain or loss under this subparagraph (1) shall be treated as the selling member.

**(2) Effective date.** Paragraph (c)(1) of this section applies, and §1.502-13(c)(6) does not apply, to acquisitions of assets by one or more members from another member in taxable years for which the due date (without extensions) of the income tax return is after April 14, 1988. In the case of a transaction to which this paragraph (c) applies, a reference in this part to §1.1502-13(c) is treated as including a reference to this paragraph (c).

**(d)** [Reserved]

**(e)** [Reserved]



©1991 Macmillan, Inc.

th January 1966.
P is not an inter-
e the sale did not
lated return year.
account the gross
monthly payments

utilities. Subject
on 7121, the Com-
o a closing agree-
ding the provisions
1, and 1.1502-33,
ences of deferred
s or of any matters
such transactions,

embers are domes-
ities as defined in
),
r immediately pre-
year for which this
re was in effect
arrangement relat-
sactions which had
regulated rates of
rs of the group, and
lic utility members
vas accepted or ap-
gency having juris-
s of such members,

r is satisfied that
agreement will not
lt in a reduction of
roup (including for-
shareholders of any
bers).
agreement must be
ber 15, 1966.

rcompany transac-
38; TD 8295, filed

d), (e), and (f). For
and §1.1502-13, a
the balance of the
nder this subpara-
ted as the selling

Paragraph (c)(1) of
§1.502-13(c)(6) does
of assets by one or
nother member in
the due date (with-
come tax return is
the case of a trans-
graph (c) applies, a
to §1.1502-13(c) is
ference to this par-

©1991 Macmillan, Inc.



**(f) Restoration of deferred gain or loss on dispositions, etc. (1) Exception to general rule of §1.1502-13(f)(1)(iii).** Section 1.1502-13(f)(1)(iii) shall not apply in a case where the selling member or the member which owns the property, as the case may be, ceases to be a member of the group by reason of an acquisition to which section 381(a) applies, or pursuant to a distribution in a complete liquidation not described in section 332(b), and the acquiring corporation is a member.

**(2) Effective date.** Paragraph (f)(1) of this section applies, and §1.1502-13(f)(2)(ii)(a) does not apply, when the selling member or the member which owns the property ceases to be a member of the group in a taxable year for which the due date (without extensions) of the income tax return is after April 14, 1988. In the case of a transaction to which this paragraph (f) applies, a reference in this part to §1.1502-13(f) is treated as including a reference to this paragraph (f).

**(g)** [Reserved]

**(h)** [Reserved]

**(i)** [Reserved]

**(j)** [Reserved]

**(k) Priority of sections 267(f).** For application of section 267(f) when a consolidated return is filed, see §1.267(f)-2T.

***(l) Restoration of deferred gain before disposition outside group—(1) In general.*** *For purposes of §1.1502-13, gain (or loss) deferred with respect to property sold or exchanged in an intercompany transaction shall be taken into account for any taxable year (whether consolidated or separate) in an amount equal to any increase (or decrease) in a deduction or basis recovery for the taxable year that is attributable to an increase (or decrease) in the basis of the property (or to the basis of any other property the basis of which is determined, directly or indirectly, in whole or in part, by reference to the basis of such property) resulting from the sale or exchange. For purposes of the preceding sentence, basis shall not be treated as recovered by reason of a subsequent deferred intercompany transaction or distribution described in §1.1502-14(a) or (b).*

***(2) Examples.*** *The application of this paragraph (l) is illustrated by the following examples.*

***Example (1).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. P owns a 40% interest in the capital and profits of XYZ, a partnership. P has a basis of $20 in its partnership interest. XYZ owns a single depreciable asset. P's share of the basis of the asset is $20 and its share of the value of the asset is $60. In 1989, P sells its partnership interest to S for $60 and recognizes a gain of $40, all of which is deferred under §1.1502-13(c). S's basis in the XYZ interest is increased to $60 under §1.1502-31(a). Because XYZ has made an election under section 754, the basis of the asset with respect to S is increased, under section 743, to $60 by reference to S's basis in the XYZ interest.*

*(ii) If P had not transferred its partnership interest to S, its allocable share of depreciation with respect to the asset would have been $5 for 1990. As a result of the basis adjustment under section 743 resulting from the sale of the XYZ interest to S, S's depreciation with respect to the asset for 1990 is $15 ($10 of which is attributable to the basis adjustment). P is therefore required to take into account $10 of deferred gain under this paragraph (l).*

*(iii) In 1991, XYZ sells the asset and S's share of the amount realized with respect to the sale is $65. Without regard to depreciation for 1991, if P had not transferred its XYZ interest to S, its basis recovery on the sale of the asset would have been $15. As a result of the basis adjustment under section 743 resulting from the sale of the XYZ interest to S, S's share of the basis of the asset at the time it is sold is $45 ($60 minus $15). Accordingly, there has been a $30 increase in basis recovery in 1991 as a result of the sale of the XYZ interest to S and, under this paragraph (l), P must therefore take into account the remaining $30 of deferred gain at the time of the sale.*

***Example (2).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. S purchases and places in service on August 1, 1989, construction equipment costing $1,000,000. S elects to use the straight-line method over the equipment's recovery period (5 years) and appropriately applies the half-year convention to compute its depreciation deduction for the equipment. Thus, S's depreciation deduction for the equipment for 1989 is $100,000 (½ of 20% of $1,000,000). In 1990, S sells the equipment to P and recognizes a gain of $500,000, all of which is deferred under §1.1502-13(c). P does not dispose of the equipment before 1996.*

*(ii) Under section 168(i)(7), P must use the same depreciation method that S used over S's remaining recovery period for so much of the adjusted basis of the equipment in P's hands as does not exceed the adjusted basis of the equipment in S's hands immediately before the sale (the "carryover portion"). Therefore, P's depreciation deduction that is attributable to the carryover portion is the same in each year as S's deduction would have been if S had not sold the equipment to P. The amount of the deferred gain attributable to the equipment that S must take into account in any year (that is, the amount of the increased depreciation deduction to the group) is the amount of the depreciation deduction attributable to the portion of P's basis which exceeds the carryover portion (the "excess portion"). P appropriately depreciates the excess portion ($500,000) under the 200-percent declining balance method over a 5-year recovery period, applying a half-year convention. Thus, the amount of deferred gain that S is required to take into*

**[Footnote Temp. Reg. §1.1502-13T]** Matter in *italic* added by TD 8295.

©1991 Macmillan, Inc.

*(Example (2) cont.)*
*account, which equals the amount of depreciation claimed by P on the excess portion, is $100,000 for 1990, $160,000 for 1991, $96,000 for 1992, $57,600 for 1993, $57,600 for 1994, and $28,800 for 1995.*

*(3)* ***Effective date.*** *This paragraph (l) applies to intercompany transactions in taxable years for which the due date (without extensions) of the income tax return is after March 14, 1990.*

***(m) Restoration of deferred gain on disposition outside group—(1) In general.*** *Except as provided in paragraph (m)(2) of this section, for purposes of §1.1502-13, if property sold or exchanged in an intercompany transaction (or property the basis of which is determined, directly or indirectly, in whole or in part, by reference to the basis of such property) is disposed of outside the group, any remaining deferred gain (and any associated tax consequences) shall be taken into account as if the selling member had disposed of the property at the same time and in the same manner as the property is disposed of outside the group. Notwithstanding the previous sentence, the source and character of the gain to the selling member and the status of the selling member for tax purposes (e.g., as a dealer or non-dealer in the property sold) shall be determined as of the time of the intercompany transaction. Any event requiring the restoration of gain pursuant to §1.1502-13(e) or §1.1502-13(f), as modified by paragraph (f) of this section, is treated as a disposition outside the group.*

*(2)* ***Exception.*** *Paragraph (m)(1) of this section does not apply, and §1.1502-13(e) and §1.1502-13(f), as modified by paragraph (f) of this section, apply, to the extent that gain or loss is not recognized in a transaction in which property, which was sold or exchanged in an intercompany transaction, (or property the basis of which is determined, directly or indirectly, in whole or in part, by reference to such property) is disposed of outside the group. However, to the extent gain or loss is recognized in such transaction, paragraph (m)(1) of this section applies.*

*(3)* ***Examples.*** *The application of this paragraph (m) is illustrated by the following examples.*

***Example (1).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. P regularly sells real property in the ordinary course of business. In 1990, P sells nondepreciable real property with a basis of $7,000 to S for $10,000 and P recognizes $3,000 of gain, all of which is deferred under §1.1502-13(c).*

*(ii) In 1991, S, which does not regularly sell real property in the ordinary course of business, sells the real property to X, an unrelated third party, for a $12,000 obligation, bearing interest at the applicable federal rate and payable in two equal annual installments of $6,000 in 1992 and 1993. If, instead of selling the property to S in 1990, P had sold it to X, P would not have been eligible, under section 453(b), to use the installment method of reporting with respect to its $3,000 gain because it was a dealer in real property in 1990. When S sells the real property to X in 1991, P must therefore take into account its entire $3,000 of deferred gain.*

***Example (2).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. S owns depreciable property described in section 1245 that it purchased for $10 million. At the end of 1989, when S's basis in the property has been reduced to $7 million as a result of depreciation deductions, S sells the property to P for $20 million and recognizes $13 million of gain, $3 million of which is subject to recapture under section 1245. All of the gain is deferred under §1.1502-13(c).*

*(ii) At the end of 1990, P sells the property to X, an unrelated third party, for a $25 million obligation, bearing interest at the applicable federal rate and payable in two equal annual installments of $12.5 million in 1991 and 1992. Without regard to depreciation in 1990, P realizes $5 million of gain, which it reports on the installment method under section 453. If, instead of selling the property to P, S had sold it to X in an installment sale, S would have been required to report under section 453(i) the $3 million of recapture income. When P sells the property to X, S must therefore take into account $3 million of deferred gain that is subject to recapture under section 1245.*

*(iii) Under §1.1502-13(e)(2), S takes into account the $10 million of deferred gain not subject to recapture as P receives the installment payments. Thus, P recognizes $2.5 million of gain under section 453, and S takes into account $5 million of its deferred gain, in each of 1991 and 1992. Section 453A requires interest to be paid on a group's tax liability deferred by reason of section 453 if the installment obligations of the group (and related persons) outstanding at the close of the group's taxable year exceed an aggregate face amount of $5 million. Because the aggregate face amount of the group's installment obligations, $25 million, exceeds $5 million, the deferred tax liabilities of both P and S must be taken into account in determining the interest charge under section 453A beginning with the taxable year in which P's sale occurs.*

***Example (3).*** *(i) Corporation's P, S and T file consolidated returns on a calendar year basis. S holds nondepreciable property A and T holds nondepreciable property B. Properties A and B each have a basis of $1,000 and a fair market value of $10,000. In 1989, T sells the property B to P for $10,000. T recognizes $9,000 of gain in 1989 on its sale of property B to P, all of which is deferred under §1.1502-13(c). Under §1.1502-31(a), P's basis in property B is $10,000.*

*(ii) In 1991, P and S exchange property A and property B in an exchange that qualifies*



©1991 Macmillan, Inc

, *P would not have been ion 453(b), to use the in- f reporting with respect to :ause it was a dealer in 90. When S sells the real 91, P must therefore take ntire $3,000 of deferred*

*) Corporations P and S turns on a calendar year eciable property described at it purchased for $10 l of 1989, when S's basis : been reduced to $7 mil- depreciation deductions, S o P for $20 million and ion of gain, $3 million of ) recapture under section gain is deferred under*

*of 1990, P sells the prop- ited third party, for a $25 bearing interest at the rate and payable in two illments of $12.5 million Without regard to depreci- alizes $5 million of gain, ı the installment method If, instead of selling the ıd sold it to X in an in- vould have been required tion 453(i) the $3 million e. When P sells the prop- herefore take into account red gain that is subject to tion 1245. 502-13(e)(2), S takes into llion of deferred gain not ; as P receives the install- us, P recognizes $2.5 mil- section 453, and S takes llion of its deferred gain, ıd 1992. Section 453A re- be paid on a group's tax y reason of section 453 if igations of the group (and tstanding at the close of year exceed an aggregate million. Because the ag- nt of the group's install- $25 million, exceeds $5 d tax liabilities of both P ken into account in deter- est charge under section ith the taxable year in rs.*

*) Corporation's P, S and d returns on a calendar 's nondepreciable property ondepreciable property B. B each have a basis of market value of $10,000. the property B to P for zes $9,000 of gain in 1989 rty B to P, all of which is 1502-13(c). Under §1.1502- property B is $10,000. ınd S exchange property A an exchange that qualifies*

©1991 Macmillan, Inc.



*(Example (3) cont.)*

*for nonrecognition of gain or loss under section 1031 with respect to both P and S. P does not recognize gain or loss on the exchange, and P's basis in property A is $10,000.*

*(iii) In 1993, in a transaction to which section 1031(f) and (g) do not apply, P sells property A to X, an unrelated third party, for $10,000. P realizes no gain on the sale of property A to X. T is required to take into account the $9,000 of deferred gain with respect to property B in 1993, because property A (the basis of which is determined by reference to the basis of property B) was disposed of outside the group.*

*(4) **Effective date**—(i) In general. Except as provided in paragraph (m)(4)(ii) of this section, this paragraph (m) applies to dispositions (as described in this paragraph) of property in taxable years for which the due date (without extensions) of the income tax return is after March 14, 1990.*

*(ii) Exception. Notwithstanding paragraph (m)(4)(i) of this section, this paragraph (m) does not apply to deferred gain taken into account on a disposition of property before March 9, 1990, if the gain was deferred in an intercompany transaction—*

*(A) after December 31, 1988, provided that, at the time of the intercompany transaction, there was no plan or intention to dispose of the property outside the group and the taxpayer files a separate statement with the taxpayer's return for the taxable year in which such property is disposed of disclosing—*

*(1) a description of the transferred property and the dates of the intercompany transaction and the disposition,*

*(2) the name and employer identification number (E.I.N.) of the member disposing of the property and the amount realized and gain realized by such member on the disposition, and*

*(3) the amount realized and gain realized by the selling member on the intercompany transaction with respect to the property and the name and E.I.N. of the selling member; or*

*(B) before January 1, 1989.*

*(n) **Exception to deferral rules**—(1) **In general.** Section 1.1502-13(c) shall not apply to defer gain or loss with respect to a sale or exchange in an intercompany transaction of property to the extent the gain (or loss) is attributable to any income and expense (i) accounted for (or required to be accounted for) by the selling member in accordance with the percentage of completion method and (ii) arising from any activity performed by the selling member for the benefit of, or by reason of, a long term contract between a member and a person not a member that is accounted for by such member, in whole or part, under the percentage of completion method.*

*(2) **Example.** This paragraph (n) is illustrated by the following example.*

***Example.** (i) Corporations P and S file consolidated returns on a calendar year basis. In 1990, P enters into a contract with X, a person not a member of the group, for the manufacture and sale of 5 airplanes for a total contract price of $500 million. The contract is a long term contract within the meaning of section 460(f) and P is required to account for income and expense attributable to the contract under the percentage of completion method. By reason of the contract, S manufactures and sells engines for the airplanes to P for a total price of $50 million. S begins to manufacture the engines in 1991 and delivers them in 1992. In 1991, S incurs $20 million out of total estimated costs of $40 million, and, in 1992, S incurs an additional $20 million of costs to complete manufacture of the engines. S accounts for income and expense attributable to the production of the engines pursuant to the percentage of completion method.*

*(ii) S's sale of the engines to P is a deferred intercompany transaction. However, §1.1502-13(c) does not apply to defer gain attributable to the income and expense accounted for by S under the percentage of completion method. Under the percentage of completion method, S takes into account $20 million in costs and $25 million in income in each of 1991 and 1992.*

*(3) **Effective date.** This paragraph (n) applies to intercompany transactions in taxable years for which the due date (without extensions) of the income tax return is after March 14, 1990 that are attributable to long term contracts entered into by a member after June 20, 1988.*

*(o) **References.** A reference in this part to §1.1502-13 is treated as including a reference to this section.*

**Reg. §1.1502-14 Stock, bonds, and other obligations of members.** (TD 6909, filed 12-29-66; amended by TD 7246, filed 12-29-72; TD 8196, filed 4-14-88; TD 8245, filed 3-14-89; TD 8295, filed 3-9-90.)

**(a) Intercompany distributions with respect to stock**—(1) **Dividends.** A dividend distributed by one member to another member during a consolidated return year shall be eliminated. For purposes of this paragraph, the term "dividend" means a distribution which is described in section 301(c)(1) other than a distribution described in section 243(c)(1).

(2) **Nondividend distributions.** No gain shall be recognized to the distributee on a distribution with respect to stock, from one member to another member during a consolidated return year, which is described in section 301(c)(2) or (3). Such distribution shall be applied against and reduce the adjusted basis (determined after taking into account any adjustment under §1.1502-32) of

©1991 Macmillan, Inc

Code of Iowa (1991)

TITLE XX. INSURANCE

CHAPTER 508C. IOWA LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION

508C.1. Title

This chapter shall be cited as the "Iowa Life and Health Insurance Guaranty Association Act".

508C.2. Purpose

1. The purpose of this chapter is to protect, subject to certain limitations, the persons specified in section 508C.3, subsection 1, against failure in the performance of contractual obligations under life and health insurance policies and annuity contracts specified in section 508C.3, subsection 2, because of the impairment or insolvency of the member insurer which issued the policies or contracts.
2. To provide this protection, an association of insurers is created to enable the guaranty of payments of benefits and of continuation of coverages as limited in this chapter. Members of the association are subject to assessment to provide funds to carry out the purpose of this chapter.

508C.3. Scope

1. This chapter shall provide coverage under the policies and contracts specified in subsection 2 to all of the following:
   a. Except for nonresident certificate holders under group policies or contracts, persons who are the beneficiaries, assignees, or payees of the persons covered under paragraph "b".
   b. Persons who are owners of the policies or contracts specified in subsection 2, or are insureds or annuitants under the policies or contracts, and who are either of the following:
      (1) Residents of this state.
      (2) Nonresidents of this state if all of the following conditions are met:
         (a) The state in which the person resides has an association similar to the association created in this chapter.
         (b) The person is not eligible for coverage by an association described in subparagraph part (a).
         (c) The insurer which issued the policy or contract never held a license or certificate of authority in the state in which the person resides.
         (d) The insurer is domiciled in this state.
2. This chapter shall provide coverage to the persons specified in subsection 1 under direct life insurance policies, health insurance policies, annuity contracts, supplemental contracts, certificates under group policies or contracts, and unallocated annuity contracts issued by member insurers.
3. This chapter does not apply to:

a. Any portion of a life, health, or annuity benefit payment liability arising on or after the date of insolvency to the extent that it is based upon a rate of interest which exceeds the lesser of the following:

(1) The minimum rate of interest guaranteed under the policy or contract.

(2) The rate of interest calculated as prescribed in the standard valuation law of this state for determining the minimum standard for the valuation of life insurance policies issued during the year of insolvency which have an interest-guaranteed duration of ten or fewer years.

b. That portion or part of a policy or contract under which the risk is borne by the policyholder.

c. A policy or contract or part of a policy or contract assumed by the impaired or insolvent insurer under a contract of reinsurance, other than reinsurance for which assumption certificates have been issued.

d. An unallocated annuity contract issued to an employee benefit plan protected under the federal pension benefit guaranty corporation, which is not issued to or in connection with a specific employee, union, or association of natural persons, or any portion of a financial guarantee.

e. A policy or contract issued by a company which is licensed under chapter 509A, 512A, 512B, 514, 514B, 518, 518A, or 520.

f. Except for a policy issued pursuant to section 515.48, subsection 5, paragraph "a", a policy or contract issued by a company which is licensed under chapter 515.

g. An insurer which was placed under an order of liquidation, rehabilitation, or conservation by a court prior to July 1, 1987, is not an impaired insurer or an insolvent insurer for the purposes of this chapter.

h. An annuity contract issued to a government lottery or to a liability insurer in connection with a structured settlement.

508C.4. Construction

This chapter shall be liberally construed to effect its purpose as provided under section 508C.2.

508C.5. Definitions

As used in this chapter, unless the context otherwise requires:

1. "Account" means any of the four accounts created under section 508C.6.
2. "Association" means the Iowa life and health insurance guaranty association created in section 508C.6.
3. "Commissioner" means the commissioner of insurance.
4. "Contractual obligation" means an obligation under a covered policy.
5. "Covered policy" means a policy or contract within the scope of this chapter as provided under section 508C.3.
6. "Impaired insurer" means a member insurer which, after July 1, 1987, is either of the following:

   a. Deemed by the commissioner to be potentially unable to fulfill its contractual obligations but is not an insolvent insurer.

   b. Placed under an order of rehabilitation or conservation by a court of competent jurisdiction.
7. "Insolvent insurer" means a member insurer which, after July 1, 1987, becomes insolvent and is placed under a final order of liquidation by a court of competent jurisdiction.
8. "Member insurer" means a person licensed or who holds a certificate of authority to transact

in this state any kind of insurance to which this chapter applies under section 508C.3, including a person whose license or certificate of authority has been suspended, revoked, not renewed, or voluntarily withdrawn.

9. "Person" means an individual, corporation, partnership, association, or voluntary organization.

10. "Premiums" means direct gross insurance premiums and annuity considerations received on covered policies, less return insurance premiums and annuity considerations and dividends paid or credited to policyholders on the direct business. "Premiums" do not include premiums and considerations on contracts between insurers and reinsurers.

11. "Resident" means a person who resides in this state, or if a corporation has its principal place of business in this state, at the time a member insurer is determined to be an impaired or insolvent insurer, and to whom contractual obligations are owed.

12. "Supplemental contract" means an agreement entered into for the distribution of policy or contract proceeds.

13. "Unallocated annuity contract" means a guaranteed investment contract, deposit administration contract, unallocated funding agreement, or any other annuity contract which is not issued to and owned by an individual, except to the extent of any annuity benefits guaranteed to an individual by an insurer under such a contract or certificate.

508C.6. Creation of the association

1. A nonprofit legal entity is created to be known as the Iowa life and health insurance guaranty association. All member insurers shall be and shall remain members of the association as a condition of their authority to transact insurance business in this state. The association shall perform its functions under the plan of operation established and approved under section 508C.10 and shall exercise its powers through the board of directors established in section 508C.7. For purposes of administration and assessment, the association shall maintain all of the following accounts:
   a. A health insurance account.
   b. A life insurance account.
   c. An annuity account. A plan established under section 403(b) of the United States Internal Revenue Code shall be covered by the annuity account.
   d. An unallocated annuity contract account.

2. The association is subject to the immediate supervision of the commissioner and the applicable provisions of the insurance laws of this state.

508C.7. Board of directors

1. The board of directors of the association shall consist of not less than five nor more than nine member insurers serving terms as established in the plan of operation. The members of the board shall be selected by member insurers, subject to the approval of the commissioner. Vacancies on the board shall be filled for the remaining period of the term by a majority vote of the remaining board members, subject to the approval of the commissioner. To select the initial board of directors, and initially organize the association, the commissioner shall give notice to all member insurers of the time and place of the organizational meeting. In determining voting rights at the organizational meeting each member insurer is entitled to one vote in person or by proxy. If the board of directors is not selected within sixty days after notice of the organizational meeting, the commissioner may appoint the initial members.

2. In approving selections or in appointing members to the board, the commissioner shall consider, among other factors, whether all member insurers are fairly represented.

3. At the option of the association, members of the board may be reimbursed from the assets of the association for expenses incurred by them as members of the board of directors. However, members of the board shall not otherwise be compensated by the association for their services.

508C.8. Powers and duties of the association

1. If a domestic, foreign, or alien insurer is an impaired insurer, the association, subject to conditions imposed by the association and approved by the impaired insurer and the commissioner, may:
   a. Guarantee, assume, reinsure, or cause to be guaranteed, assumed, or reinsured, any or all of the covered policies of the impaired insurer.
   b. Provide moneys, pledges, notes, guarantees, or other means as proper to effectuate paragraph "a" and assure payment of the contractual obligations of the impaired insurer pending action under paragraph "a".
   c. Loan money to the impaired insurer and guarantee borrowings by the impaired insurer, provided the association has concluded, based on reasonable assumptions, that there is a likelihood of repayment of the loan and a probability that unless a loan is made the association would incur substantial liabilities under subsection 2.
2. a. If a domestic, foreign, or alien insurer is an impaired insurer and the insurer is not paying claims timely, then, subject to the approval of the commissioner and to the preconditions specified in this subsection, the association may do either or both of the following:
      (1) Take any of the actions specified in subsection 1, subject to the conditions in that subsection.
      (2) Provide substitute benefits in lieu of the contractual obligations of the impaired insurer solely for health claims, periodic annuity benefits, death benefits, supplemental benefits, and cash withdrawals for policy or contract owners who petition for the benefits under claims of emergency or hardship in accordance with standards proposed by the association and approved by the commissioner.
   b. The association is subject to this subsection only if all of the following conditions are met:
      (1) The laws of the state of domicile provide that until all payments of or on account of the impaired insurer's contractual obligations by all guaranty associations, along with all interest on the payments and expenses have been repaid to the guaranty associations or a plan of repayment by the impaired insurer has been approved by the guaranty associations all of the following apply:
         (a) The delinquency proceeding shall not be dismissed.
         (b) Neither the impaired insurer nor its assets shall be returned to the control of its shareholders or private management.
         (c) The impaired insurer shall not be permitted to solicit or accept new business or have any suspended or revoked license restored.
      (2) If the impaired insurer is a domestic insurer it has been placed under an order of rehabilitation by a court of competent jurisdiction in this state; or, if the impaired insurer is a foreign or alien insurer it has been prohibited from soliciting or accepting new business in this state, its certificate of authority has been suspended or revoked in this state, and a petition for rehabilitation or liquidation has been filed in a court of competent

jurisdiction in its state or nation of domicile by the commissioner of that state or similar authority in an alien nation.

3. a. In carrying out its duties under subsection 2, permanent policy liens or contract liens may be imposed in connection with a guarantee, assumption, or reinsurance agreement, if the court does both of the following:

(1) Finds either that the amounts which can be assessed under this chapter are less than the amounts needed to assure full and prompt performance of the insolvent insurer's contractual obligations, or that the economic or financial conditions as they affect member insurers are sufficiently adverse to the public interest to justify the imposition of policy or contract liens.

(2) Approves the specific policy liens or contract liens to be used.

b. Before being obligated under subsection 2, the association may request the imposition of a temporary moratorium, not exceeding three years, or liens on payments of cash values, termination values, and policy loans in addition to any contractual provisions for deferral of cash values, termination values, or policy loans. The temporary moratoriums and liens may be imposed by the court as a condition of the association's liability with respect to the insolvent insurer.

c. The obligations of the association under subsection 2 regarding a covered policy shall be reduced to the extent that the person entitled to the obligations has received payment of all or any part of the contractual benefits payable under the covered policy from any other source.

d. The association may offer modifications to the owners of policies or contracts or classes of policies or contracts issued by the insolvent insurer, if the association finds that under the policies or contracts the benefits provided, provisions pertaining to renewal, or the premiums charged or which may be charged are not reasonable. If the owner of a policy or contract to be modified fails or refuses to a accept the modification as approved by the court, the association may terminate the policy or contract as of a date not less than one hundred eighty days after the modification is sent to the owner. The association shall have no liability under the policy or contract for any claim incurred or continuing beyond the termination date.

4. If the association fails to act within a reasonable period of time as provided in subsection 2, the commissioner shall have the powers and duties of the association under this chapter with respect to insolvent insurers.

5. Upon request the association may give assistance and advice to the commissioner concerning the rehabilitation, payment of claims, continuance of coverage, or the performance of other contractual obligations of an impaired or insolvent insurer.

6. The association has standing to appear before any court in this state with jurisdiction over an impaired or insolvent insurer concerning which the association is or may become obligated under this chapter. Standing shall extend to all matters germane to the powers and duties of the association including, but not limited to, proposals for reinsuring or guaranteeing the covered policies of the impaired or insolvent insurer and the determination of the covered policies and contractual obligations.

7. a. A person receiving benefits under this chapter is deemed to have assigned the rights under the covered policy to the association to the extent of the benefits received under this chapter, whether the benefits are payments of contractual obligations or a continuation of coverage. The association may require an assignment to the association of the rights by a payee, policyholder or contract owner, beneficiary, insured, or annuitant as a condition precedent to the receipt of any rights or benefits conferred by this chapter upon the person. The association shall be subrogated to these rights against the assets of the insolvent insurer.

b. The subrogation rights of the association under this subsection have the same

priority against the assets of the insolvent insurer as that possessed by the person entitled to receive benefits under this chapter.

c. In addition to the rights pursuant to subsection 3, paragraphs "a" and "b", the association shall have all common law rights of subrogation and any other equitable or legal remedy which would have been available to the insolvent insurer or holder of a policy or contract.

8. The contractual obligations of the insolvent insurer, for which the association becomes or may become liable, are as great as but not greater than the contractual obligations of the insolvent insurer would have been in the absence of an insolvency, unless the obligations are reduced as permitted in this chapter. However, with respect to any one life, the aggregate liability of the association shall not exceed one hundred thousand dollars in cash and termination values, or three hundred thousand dollars for all benefits, including cash and termination values, death benefits, annuity payments, accident and health benefits, and all other amounts payable under all policies or contracts of the insolvent insurer. With respect to any one holder of an unallocated annuity contract, the aggregate liability of the association shall not exceed one million dollars of contract benefits, irrespective of the number of contracts held by the contract holder.

9. The association has no obligation for either of the following:

a. To continue coverage, or to pay a claim for benefits to any person under an individual accident, health, or disability policy accruing more than three years following the date the member insurer is adjudicated to be insolvent.

b. To issue a group conversion policy of any nature to a person or to continue a group coverage in force for more than sixty days following the date the member insurer was adjudicated to be insolvent.

10. The association may do any of the following:

a. Enter into contracts as necessary or proper to carry out this chapter.

b. Sue or be sued, including taking any legal actions necessary or proper for recovery of any unpaid assessments under section 508C.9.

c. Borrow money to effect the purposes of this chapter. Any notes or other evidence of indebtedness of the association held by domestic insurers and not in default qualify as investments eligible for deposit under section 511.8, subsection 16.

d. Employ or retain persons as necessary to handle the financial transactions of the association, and to perform other functions as necessary or proper under this chapter.

e. Negotiate and contract with a liquidator, rehabilitator, conservator, or ancillary receiver to carry out the powers and duties of the association.

f. Take legal action as necessary to avoid payment of improper claims.

g. For the purposes of this chapter and to the extent approved by the commissioner, exercise the powers of a domestic life or health insurer. However, the association shall not issue insurance policies or annuity contracts other than those issued to perform the contractual obligations of the impaired or insolvent insurer.

h. Join an organization of one or more other state associations of similar purposes to further the purposes and administer the powers and duties of the association.

508C.9. Assessments

1. For the purpose of providing the funds necessary to carry out the powers and duties of the association, the board of directors shall assess the member insurers, separately for each account established pursuant to section 508C.6, at the time and for the amounts the board finds necessary. An assessment is due not less than thirty days after prior written notice has been sent to the member insurers and accrues interest at ten percent per annum

commencing on the due date.

2. There are two classes of assessments as follows:

a. Class A assessments shall be made for the purpose of meeting administrative costs and other general expenses and examinations conducted under section 508C.12, subsection 5, not related to a particular impaired or insolvent insurer.

b. Class B assessments shall be made to the extent necessary to carry out the powers and duties of the association under section 508C.8 with regard to an impaired domestic insurer or an insolvent domestic, foreign, or alien insurer.

3. a. The amount of a class A assessment shall be determined by the board and to the extent that class A assessments do not exceed one hundred dollars per company in any one calendar year may be made on a per capita basis. The amount of a class B assessment shall be allocated for assessment purposes among the accounts as the liabilities and expenses of the association, either experienced or reasonably expected, are attributable to those accounts, all as determined by the association and on as equitable a basis as is reasonably practical.

b. Class A assessments in excess of one hundred dollars per company per calendar year and class B assessments against member insurers for each account shall be in the proportion that the aggregate premiums received on business in this state by each assessed member insurer on policies or contracts related to that account for the three most recent calendar years for which information is available, preceding the year in which the insurer became impaired or insolvent, is to the aggregate premiums received on business in this state by all assessed member insurers on policies related to that account for the three most recent calendar years for which information is available preceding the assessment.

c. Assessments for funds to meet the requirements of the association with respect to an impaired or insolvent insurer shall not be made until necessary to implement the purposes of this chapter. Classification of assessments under this subsection shall be made with a reasonable degree of accuracy, recognizing that exact determinations may not always be possible.

4. The association may abate or defer, in whole or in part, the assessment of a member insurer if, in the opinion of the board, payment of the assessment would endanger the ability of the member insurer to fulfill its contractual obligations. If an assessment against a member insurer is abated or deferred, in whole or in part, the amount by which the assessment is abated or deferred may be assessed against the other member insurers in a manner consistent with the basis for assessments set forth in this section.

5. a. The total of all assessments upon a member insurer for each account shall not in any one calendar year exceed two percent of the insurer's premiums received in this state during the three most recent calendar years for which information is available, preceding the year in which the insurer becomes impaired or insolvent, on the policies related to that account. If the maximum assessment for an account, together with the other assets of the association in the account, does not provide in any one year in the account an amount sufficient to carry out the responsibilities of the association, the necessary additional funds shall be assessed for the account in succeeding years as soon as permitted by this chapter.

b. If the maximum assessment under paragraph "a" for any account, other than the health insurance account, does not provide an amount sufficient to carry out the responsibilities of the association in any succeeding year, the board, pursuant to subsection 3, paragraph "a", shall assess the necessary additional amount and allocate the amount for assessment among the accounts, other than the health insurance account, in the following sequence: from the life insurance account, to the annuity account, to the unallocated annuity contract account; from the annuity account, to the

unallocated annuity contract account, to the life insurance account; from the unallocated annuity contract account, to the annuity account, to the life insurance account; provided that no amount shall be allocated to an account for assessment until the maximum amount has been allocated to the preceding account.

6. By an equitable method as established in the plan of operation, the board may refund to member insurers, in proportion to the contribution of each insurer to that account, the amount by which the assets of the account, including assets accruing from net realized gains and income from investments, exceed the amount the board finds is necessary to carry out during the coming year the obligations of the association with regard to that account. A reasonable amount may be retained in any account to provide funds for the continuing expenses of the association and for future losses if refunds are impractical.

7. In determining its premium rates and policyowner dividends as to any kind of insurance within the scope of this chapter, it is proper for a member insurer to consider the amount reasonably necessary to meet its assessment obligations under this chapter.

8. The association shall issue to each insurer paying a class B assessment under this chapter, a certificate of contribution in a form prescribed by the commissioner for the amount of the assessment so paid. All outstanding certificates shall be of equal dignity and priority without reference to amounts or dates of issue. A certificate of contribution may be shown by the insurer in its financial statement as an asset in the form, for the amount and for a period of time as the commissioner may approve.

508C.10. Plan of operation

1. a. The association shall submit to the commissioner a plan of operation and any amendments to the plan of operation necessary or suitable to assure the fair, reasonable, and equitable administration of the association. The plan of operation and any amendments to the plan are effective upon the commissioner's written approval.
   b. If the association fails to submit a suitable plan of operation within one hundred eighty days following July 1, 1987, or if at any time the association fails to submit suitable amendments to the plan, the commissioner shall, after notice and hearing, adopt rules pursuant to chapter 17A as necessary or advisable to effectuate this chapter. The rules shall continue in force until modified by the commissioner or superseded by a plan submitted by the association and approved by the commissioner.
2. All member insurers shall comply with the plan of operation.
3. In addition to other requirements established in this chapter the plan of operation shall establish all of the following:
   a. Procedures for handling the assets of the association.
   b. The amount and method of reimbursing members of the board of directors under section 508C.7.
   c. Regular places and times for meetings of the board of directors.
   d. Procedures for records to be kept of all financial transactions of the association, its agents, and the board of directors.
   e. Procedures for selecting the board of directors and submitting the selections to the commissioner.
   f. Any additional procedures for assessments under section 508C.9.
   g. Additional provisions necessary or proper for the execution of the powers and duties of the association.
4. The plan of operation may provide that any powers and duties of the association, except

those under section 508C.8, subsection 10, paragraph "c" and section 508C.9 are delegated to a corporation, association, or other organization which performs or will perform functions similar to those of this association, or its equivalent, in two or more states. Such a corporation, association, or organization shall be reimbursed for any payments made on behalf of the association and shall be paid for its performance of any function of the association. A delegation under this subsection shall take effect only with the approval of both the board of directors and the commissioner. The delegation shall be made only to a corporation, association, or organization which extends protection at least as favorable and effective as that provided by this chapter.

508C.11. Duties and powers of the commissioner

1. The commissioner shall:
   a. Upon request of the board of directors, provide the association with a statement of the premiums for each member insurer.
   b. When an impairment is declared and the amount of the impairment is determined, serve a demand upon the impaired insurer to make good the impairment within a reasonable time. Notice to the impaired insurer constitutes notice to its shareholders, if any. The failure of the insurer to promptly comply with the demand shall not excuse the association from the performance of its powers and duties under this chapter.
   c. In a liquidation or rehabilitation proceeding involving a domestic insurer, be appointed as the liquidator or rehabilitator.
2. After notice and hearing, the commissioner may suspend or revoke the certificate of authority to transact insurance in this state of a member insurer which fails to pay an assessment when due or fails to comply with the plan of operation. As an alternative, the commissioner may levy an administrative penalty on any member insurer which fails to pay an assessment when due. The administrative penalty shall not exceed five percent of the unpaid assessment per month. However, an administrative penalty shall not be less than one hundred dollars per month.
3. An action of the board of directors or the association may be appealed to the commissioner by a member insurer if the appeal is taken within thirty days of the action being appealed. A final action or order of the commissioner is subject to judicial review pursuant to chapter 17A in a court of competent jurisdiction.
4. The liquidator, rehabilitator, or conservator of an impaired insurer may notify all interested persons of the effect of this chapter.

508C.12. Prevention of insolvencies

1. To aid in the detection and prevention of insurer insolvencies or impairments the commissioner shall:
   a. Notify the commissioners or insurance departments of other states or territories of the United States and the District of Columbia when any of the following actions against a member insurer is taken:
      (1) A license is revoked.
      (2) A license is suspended.
      (3) A formal order is made that a company restrict its premium writing, obtain additional contributions to surplus, withdraw from the state, reinsure all or any part of its business, or increase capital, surplus, or any other account for the security of policyholders or creditors.

   Notice shall be mailed to the commissioners or departments within thirty days following

the earlier of when the action was taken or the date on which the action occurs. This subparagraph does not supersede section 507C.9, subsection 5.

b. Report to the board of directors when the commissioner has taken any of the actions set forth in paragraph "a" or has received a report from any other commissioner indicating that a member insurer is impaired or insolvent. Reports to the board of directors shall contain all significant details of the action taken or the report received from another commissioner.

c. Report to the board of directors when there is reasonable cause to believe from an examination, whether completed or in process, of a member company that the company may be an impaired or insolvent insurer.

d. Furnish to the board of directors the national association of insurance commissioners' early warning tests. The board may use the information in carrying out its duties and responsibilities under this section. The report and the information contained in the report shall be kept confidential by the board of directors until such time as it is made public by the commissioner or other lawful authority.

2. The commissioner may seek the advice and recommendations of the board of directors concerning any matter affecting the commissioner's duties and responsibilities regarding the financial condition of member companies and companies seeking admission to transact insurance business in this state.

3. The board of directors may upon majority vote make reports and recommendations to the commissioner upon any matter germane to the solvency, liquidation, rehabilitation or conservation of a member insurer or germane to the solvency of a company seeking to transact insurance business in this state. These reports and recommendations are not public records pursuant to chapter 22.

4. Upon majority vote, the board of directors shall notify the commissioner of any information indicating that a member insurer may be an impaired or insolvent insurer.

5. Upon majority vote, the board of directors may request that the commissioner order an examination of a member insurer which the board in good faith believes may be an impaired or insolvent insurer. The examination may be conducted as a national association of insurance commissioners examination or may be conducted by persons designated by the commissioner. The cost of the examination shall be paid by the association and the examination report shall be treated as are other examination reports. The examination report shall not be released to the board of directors prior to its release to the public, but this shall not preclude the commissioner from complying with subsection 1. The commissioner shall notify the board of directors when the examination is completed. The request for an examination shall be kept on file by the commissioner but it is not a public record pursuant to chapter 22 until the release of the examination report to the public.

6. Upon majority vote, the board of directors may make recommendations to the commissioner for the detection and prevention of insurer insolvencies.

7. At the conclusion of an insurer insolvency in which the association was obligated to pay covered claims, the board of directors shall prepare a report to the commissioner containing information as the board may have in its possession bearing on the history and causes of the insolvency. The board shall cooperate with the boards of directors of guaranty associations in other states in preparing a report on the history and causes of insolvency of a particular insurer, and may adopt by reference any report prepared by other associations.

508C.13. Miscellaneous provisions

1. This chapter does not reduce the liability for unpaid assessments of the insureds on an impaired or insolvent insurer operating under a plan with assessment liability other than

the plan of this chapter.

2. Records shall be kept of all negotiations and meetings in which the association or its representatives are involved to discuss the activities of the association in carrying out its powers and duties under section 508C.8. Records of the negotiations or meetings shall be made public pursuant to chapter 22 only upon the termination of a liquidation, rehabilitation, or conservation proceeding involving the impaired or insolvent insurer, upon the termination of the impairment of insolvency of the insurer, or upon the order of a court of competent jurisdiction. This subsection does not limit the duty of the association to render a report of its activities under section 508C.14.

3. For the purpose of carrying out its obligations under this chapter, the association shall be deemed to be a creditor of the impaired or insolvent insurer to the extent of assets attributable to covered policies reduced by any amounts to which the association is entitled pursuant to its subrogation rights under section 508C.8, subsection 7. Assets of the impaired or insolvent insurer attributable to covered policies shall be used to continue all covered policies and pay all contractual obligations of the impaired or insolvent insurer as required by this chapter. As used in this subsection, "assets attributable to covered policies" means that proportion of the assets which the reserves that should have been established for the policies bear to the reserves that should have been established for all policies of insurance written by the impaired or insolvent insurer.

4. a. Prior to the termination of a liquidation, rehabilitation, or conservation proceeding, the court may take into consideration the contributions of the respective parties, including the association, similar associations of other states, the shareholders and policyowners of the insolvent insurer, and any other party with a bona fide interest, in making an equitable distribution of the ownership rights of the insolvent insurer. When considering the contributions, consideration shall be given to the welfare of the policyholders of the continuing or successor insurer.

b. A distribution to stockholders, if any, of an impaired or insolvent insurer shall not be made until the total amount of valid claims of the association and of similar associations of other states for funds expended in carrying out its powers and duties under section 508C.8 with respect to the insurer have been fully recovered by the association and the similar associations.

5. a. Subject to the limitations of paragraphs "b", "c", and "d", if an order for liquidation or rehabilitation of an insurer domiciled in this state has been entered, the receiver appointed under the order may recover, on behalf of the insurer, from any affiliate that controlled it, the amount of distributions other than stock dividends paid by the insurer on its capital stock made at any time during the five years preceding the petition for liquidation or rehabilitation.

b. Distributions are not recoverable if the insurer shows that when paid the distributions were lawful and reasonable and that the insurer did not know and could not reasonably have known that the distributions might adversely affect the ability of the insurer to fulfill its contractual obligations.

c. A person who was an affiliate that controlled the insurer at the time the distributions were paid is liable up to the amount of distributions received. A person who was an affiliate that controlled the insurer at the time the distributions were declared is liable up to the amount of distributions that would have been received if they had been paid immediately. If two persons are liable with respect to the same distributions, they are jointly and severally liable.

d. The maximum amount recoverable under this subsection is the amount needed in excess of all other available assets of the insolvent insurer to pay the contractual obligations of the insolvent insurer.

e. If a person liable under paragraph "c" is insolvent, all its affiliates that controlled it at the time the dividend was paid are jointly and severally liable for a resulting

deficiency in the amount recovered from the insolvent affiliate.

508C.14. Examination of the association--annual report

The association is subject to examination and regulation by the commissioner. The board of directors shall submit to the commissioner by May 1 of each year, a financial report for the preceding calendar year and a report of its activities during the preceding calendar year. The financial report shall be in a form approved by the commissioner.

508C.15. Tax exemptions

The association is exempt from payment of all fees and all taxes levied by this state or any of its subdivisions except taxes levied on the association's real property.

508C.16. Immunity--indemnification

A member insurer and its agents and employees, the association and its agents and employees, members of the board of directors, and the commissioner and the commissioner's representatives are not liable for any action taken by them or omission by them while acting within the scope of their employment and in the performance of their powers and duties under this chapter.
The provisions of section 496A.4A [FN1PP] shall apply to the association.

508C.17. Stay of proceedings--reopening default judgments

Proceedings in which the insolvent insurer is a party in a court in this state shall be stayed sixty days from the date an order of liquidation, rehabilitation, or conservation is final to permit proper legal action by the association on matters germane to its powers or duties. The association may apply to have a judgment under a decision, order, verdict, or finding based on default, set aside by the same court that entered the judgment, and shall be permitted to defend against the suit on the merits.

508C.18. Prohibited advertisements

A person, including an insurer, agent or affiliate of an insurer shall not make, publish, disseminate, circulate, or place before the public, or cause directly or indirectly, to be made, published, disseminated, circulated, or placed before the public in a newspaper, magazine, or other publication, or in the form of a notice, circular, pamphlet, letter, or poster, or over a radio station or television station, or in any other way, an advertisement, announcement, or statement which uses the existence of the insurance guaranty association of this state for the purpose of sales, solicitation, or inducement to purchase any form of insurance covered by this chapter. However, this section does not apply to the association or any other entity which does not sell or solicit insurance.

508C.19. Credits for assessments paid

1. An insurer may offset an assessment made pursuant to section 508C.9 against its premium tax liability pursuant to chapter 432 to the extent of twenty percent of the amount of the assessment for each of the five calendar years following the year in which the assessment was

paid. If an insurer ceases doing business, all uncredited assessments may be credited against its premium tax liability for the year it ceases doing business.

2. Sums acquired by refund from the association which have been written off by contributing insurers and offset against premium taxes as provided in subsection 1 and are not then needed for purposes of this chapter shall be paid by the association to the commissioner. The commissioner shall remit the moneys to the treasurer of state to deposit in the state general fund.

CHAPTER 521A. INSURANCE HOLDING COMPANY SYSTEMS

521A.5. Standards

1. Transactions within a holding company system affecting domestic insurers.

*****

b. A domestic insurer and a person in its holding company system shall not enter into any of the following transactions between each other involving amounts equal to or exceeding the greater of five percent of the insurer's admitted assets or twenty-five percent of the surplus as regards policyholders as of the next preceding December 31, unless the domestic insurer notifies the commissioner in writing of its intention to enter into the transaction at least thirty days prior to entering into the transaction or within a shorter time permitted by the commissioner and the commissioner has not disapproved of the transaction within the time period:

(1) Sales.
(2) Purchases.
(3) Exchanges.
(4) Loans or extensions of credit.
(5) Guarantees.
(6) Investments.
(7) Loans or extensions of credit to a person who is not an affiliate, if the domestic insurer makes the loans or extensions of credit with the agreement or understanding that the proceeds of the transactions, in whole or in substantial part, are to be used to make loans or extensions of credit to, to purchase assets of, or to make investments in, an affiliate of the domestic insurer making the loans or extensions of credit.