th January 1966.
P is not an inter-
;e the sale did not
lated return year.
account the gross
monthly payments

utilities. Subject
on 7121, the Com-
o a closing agree-
ding the provisions
1, and 1.1502-33,
ences of deferred
s or of any matters
such transactions,

embers are domes-
ities as defined in
),
r immediately pre-
year for which this
re was in effect
arrangement relat-
sactions which had
regulated rates of
rs of the group, and
lic utility members
was accepted or ap-
gency having juris-
of such members,

r is satisfied that
agreement will not
lt in a reduction of
roup (including for-
shareholders of any
bers).
agreement must be
ber 15, 1966.

rcompany transac-
38; TD 8295, filed

d), (e), and (f). For
and §1.1502-13, a
the balance of the
nder this subpara-
ted as the selling

Paragraph (c)(1) of
§1.502-13(c)(6) does
of assets by one or
nother member in
the due date (with-
come tax return is
the case of a trans-
graph (c) applies, a
to §1.1502-13(c) is
ference to this par-

©1991 Macmillan, Inc.



**(f) Restoration of deferred gain or loss on dispositions, etc. (1) Exception to general rule of §1.1502-13(f)(1)(iii).** Section 1.1502-13(f)(1)(iii) shall not apply in a case where the selling member or the member which owns the property, as the case may be, ceases to be a member of the group by reason of an acquisition to which section 381(a) applies, or pursuant to a distribution in a complete liquidation not described in section 332(b), and the acquiring corporation is a member.

**(2) Effective date.** Paragraph (f)(1) of this section applies, and §1.1502-13(f)(2)(ii)(a) does not apply, when the selling member or the member which owns the property ceases to be a member of the group in a taxable year for which the due date (without extensions) of the income tax return is after April 14, 1988. In the case of a transaction to which this paragraph (f) applies, a reference in this part to §1.1502-13(f) is treated as including a reference to this paragraph (f).

**(g)** [Reserved]

**(h)** [Reserved]

**(i)** [Reserved]

**(j)** [Reserved]

**(k) Priority of sections 267(f).** For application of section 267(f) when a consolidated return is filed, see §1.267(f)-2T.

***(l) Restoration of deferred gain before disposition outside group—(1) In general.*** *For purposes of §1.1502-13, gain (or loss) deferred with respect to property sold or exchanged in an intercompany transaction shall be taken into account for any taxable year (whether consolidated or separate) in an amount equal to any increase (or decrease) in a deduction or basis recovery for the taxable year that is attributable to an increase (or decrease) in the basis of the property (or to the basis of any other property the basis of which is determined, directly or indirectly, in whole or in part, by reference to the basis of such property) resulting from the sale or exchange. For purposes of the preceding sentence, basis shall not be treated as recovered by reason of a subsequent deferred intercompany transaction or distribution described in §1.1502-14(a) or (b).*

***(2) Examples.*** *The application of this paragraph (l) is illustrated by the following examples.*

***Example (1).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. P owns a 40% interest in the capital and profits of XYZ, a partnership. P has a basis of $20 in its partnership interest. XYZ owns a single depreciable asset. P's share of the basis of the asset is $20 and its share of the value of the asset is $60. In 1989, P sells its partnership interest to S for $60 and recognizes a gain of $40, all of which is deferred under §1.1502-13(c). S's basis in the XYZ interest is increased to $60 under §1.1502-31(a). Because XYZ has made an election under section 754, the basis of the asset with respect to S is increased, under section 743, to $60 by reference to S's basis in the XYZ interest.*

*(ii) If P had not transferred its partnership interest to S, its allocable share of depreciation with respect to the asset would have been $5 for 1990. As a result of the basis adjustment under section 743 resulting from the sale of the XYZ interest to S, S's depreciation with respect to the asset for 1990 is $15 ($10 of which is attributable to the basis adjustment). P is therefore required to take into account $10 of deferred gain under this paragraph (l).*

*(iii) In 1991, XYZ sells the asset and S's share of the amount realized with respect to the sale is $65. Without regard to depreciation for 1991, if P had not transferred its XYZ interest to S, its basis recovery on the sale of the asset would have been $15. As a result of the basis adjustment under section 743 resulting from the sale of the XYZ interest to S, S's share of the basis of the asset at the time it is sold is $45 ($60 minus $15). Accordingly, there has been a $30 increase in basis recovery in 1991 as a result of the sale of the XYZ interest to S and, under this paragraph (l), P must therefore take into account the remaining $30 of deferred gain at the time of the sale.*

***Example (2).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. S purchases and places in service on August 1, 1989, construction equipment costing $1,000,000. S elects to use the straight-line method over the equipment's recovery period (5 years) and appropriately applies the half-year convention to compute its depreciation deduction for the equipment. Thus, S's depreciation deduction for the equipment for 1989 is $100,000 (1/2 of 20% of $1,000,000). In 1990, S sells the equipment to P and recognizes a gain of $500,000, all of which is deferred under §1.1502-13(c). P does not dispose of the equipment before 1996.*

*(ii) Under section 168(i)(7), P must use the same depreciation method that S used over S's remaining recovery period for so much of the adjusted basis of the equipment in P's hands as does not exceed the adjusted basis of the equipment in S's hands immediately before the sale (the "carryover portion"). Therefore, P's depreciation deduction that is attributable to the carryover portion is the same in each year as S's deduction would have been if S had not sold the equipment to P. The amount of the deferred gain attributable to the equipment that S must take into account in any year (that is, the amount of the increased depreciation deduction to the group) is the amount of the depreciation deduction attributable to the portion of P's basis which exceeds the carryover portion (the "excess portion"). P appropriately depreciates the excess portion ($500,000) under the 200-percent declining balance method over a 5-year recovery period, applying a half-year convention. Thus, the amount of deferred gain that S is required to take into*

**[Footnote Temp. Reg. §1.1502-13T]** Matter in *italic* added by TD 8295.

©1991 Macmillan, Inc.

*(Example (2) cont.)*

*account, which equals the amount of depreciation claimed by P on the excess portion, is $100,000 for 1990, $160,000 for 1991, $96,000 for 1992, $57,600 for 1993, $57,600 for 1994, and $28,800 for 1995.*

*(3)* ***Effective date.*** *This paragraph (l) applies to intercompany transactions in taxable years for which the due date (without extensions) of the income tax return is after March 14, 1990.*

*(m)* ***Restoration of deferred gain on disposition outside group—(1) In general.*** *Except as provided in paragraph (m)(2) of this section, for purposes of §1.1502-13, if property sold or exchanged in an intercompany transaction (or property the basis of which is determined, directly or indirectly, in whole or in part, by reference to the basis of such property) is disposed of outside the group, any remaining deferred gain (and any associated tax consequences) shall be taken into account as if the selling member had disposed of the property at the same time and in the same manner as the property is disposed of outside the group. Notwithstanding the previous sentence, the source and character of the gain to the selling member and the status of the selling member for tax purposes (e.g., as a dealer or non-dealer in the property sold) shall be determined as of the time of the intercompany transaction. Any event requiring the restoration of gain pursuant to §1.1502-13(e) or §1.1502-13(f), as modified by paragraph (f) of this section, is treated as a disposition outside the group.*

*(2)* ***Exception.*** *Paragraph (m)(1) of this section does not apply, and §1.1502-13(e) and §1.1502-13(f), as modified by paragraph (f) of this section, apply, to the extent that gain or loss is not recognized in a transaction in which property, which was sold or exchanged in an intercompany transaction, (or property the basis of which is determined, directly or indirectly, in whole or in part, by reference to such property) is disposed of outside the group. However, to the extent gain or loss is recognized in such transaction, paragraph (m)(1) of this section applies.*

*(3)* ***Examples.*** *The application of this paragraph (m) is illustrated by the following examples.*

***Example (1).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. P regularly sells real property in the ordinary course of business. In 1990, P sells nondepreciable real property with a basis of $7,000 to S for $10,000 and P recognizes $3,000 of gain, all of which is deferred under §1.1502-13(c).*

*(ii) In 1991, S, which does not regularly sell real property in the ordinary course of business, sells the real property to X, an unrelated third party, for a $12,000 obligation, bearing interest at the applicable federal rate and payable in two equal annual installments of $6,000 in 1992 and 1993. If, instead of selling the property to S in 1990, P had sold it to X, P would not have been eligible, under section 453(b), to use the installment method of reporting with respect to its $3,000 gain because it was a dealer in real property in 1990. When S sells the real property to X in 1991, P must therefore take into account its entire $3,000 of deferred gain.*

***Example (2).*** *(i) Corporations P and S file consolidated returns on a calendar year basis. S owns depreciable property described in section 1245 that it purchased for $10 million. At the end of 1989, when S's basis in the property has been reduced to $7 million as a result of depreciation deductions, S sells the property to P for $20 million and recognizes $13 million of gain, $3 million of which is subject to recapture under section 1245. All of the gain is deferred under §1.1502-13(c).*

*(ii) At the end of 1990, P sells the property to X, an unrelated third party, for a $25 million obligation, bearing interest at the applicable federal rate and payable in two equal annual installments of $12.5 million in 1991 and 1992. Without regard to depreciation in 1990, P realizes $5 million of gain, which it reports on the installment method under section 453. If, instead of selling the property to P, S had sold it to X in an installment sale, S would have been required to report under section 453(i) the $3 million of recapture income. When P sells the property to X, S must therefore take into account $3 million of deferred gain that is subject to recapture under section 1245.*

*(iii) Under §1.1502-13(e)(2), S takes into account the $10 million of deferred gain not subject to recapture as P receives the installment payments. Thus, P recognizes $2.5 million of gain under section 453, and S takes into account $5 million of its deferred gain, in each of 1991 and 1992. Section 453A requires interest to be paid on a group's tax liability deferred by reason of section 453 if the installment obligations of the group (and related persons) outstanding at the close of the group's taxable year exceed an aggregate face amount of $5 million. Because the aggregate face amount of the group's installment obligations, $25 million, exceeds $5 million, the deferred tax liabilities of both P and S must be taken into account in determining the interest charge under section 453A beginning with the taxable year in which P's sale occurs.*

***Example (3).*** *(i) Corporation's P, S and T file consolidated returns on a calendar year basis. S holds nondepreciable property A and T holds nondepreciable property B. Properties A and B each have a basis of $1,000 and a fair market value of $10,000. In 1989, T sells the property B to P for $10,000. T recognizes $9,000 of gain in 1989 on its sale of property B to P, all of which is deferred under §1.1502-13(c). Under §1.1502-31(a), P's basis in property B is $10,000.*

*(ii) In 1991, P and S exchange property A and property B in an exchange that qualifies*



©1991 Macmillan, Inc

INTER-CO.

*(Example (3)*
*for nonrecogn*
*tion 1031 wi*
*does not reco*
*change, and*
*$10,000.*
*(iii) In 19*
*section 1031(f*
*property A to*
*for $10,000. F*
*property A to*
*account the*
*respect to pro*
*erty A (the b*
*reference to th*
*posed of outsi*
*(4)* ***Effecti***
*cept as provi*
*this section,*
*dispositions (*
*of property i*
*due date (wit*
*tax return is*
*(ii) Except*
*graph (m)(4)(i*
*(m) does not*
*into account*
*fore March 9,*
*in an intercon*
*(A) after*
*that, at the t*
*action, there*
*pose of the p*
*the taxpayer*
*the taxpayer's*
*which such*
*closing—*
*(1) a descr*
*erty and the c*
*action and th*
*(2) the nai*
*number (E.I.N*
*the property*
*gain realized*
*sition, and*
*(3) the am*
*by the selling*
*transaction w*
*the name and*
*or*
*(B) before*
*(n)* ***Excep***
*(1)* ***In gener***
*not apply to d*
*a sale or exch*
*action of prop*

**Reg. §1.15**
12-29-66; am
3-14-89; TD

**(a) Interc**
**respect to st**
dend distribut
member duri
shall be elin
paragraph, th
distribution v
301(c)(1) other
in section 243

©1991 Macmillan, I

*, P would not have been ion 453(b), to use the in- f reporting with respect to :ause it was a dealer in 90. When S sells the real 91, P must therefore take ntire $3,000 of deferred*

*) Corporations P and S turns on a calendar year eciable property described .at it purchased for $10 l of 1989, when S's basis : been reduced to $7 mil- lepreciation deductions, S o P for $20 million and ion of gain, $3 million of ) recapture under section gain is deferred under*

*of 1990, P sells the prop- ited third party, for a $25 bearing interest at the rate and payable in two illments of $12.5 million Without regard to depreci- alizes $5 million of gain, ı the installment method If, instead of selling the id sold it to X in an in- vould have been required tion 453(i) the $3 million e. When P sells the prop- herefore take into account red gain that is subject to tion 1245. 502-13(e)(2), S takes into llion of deferred gain not : as P receives the install- us, P recognizes $2.5 mil- section 453, and S takes llion of its deferred gain, id 1992. Section 453A re- be paid on a group's tax y reason of section 453 if igations of the group (and tstanding at the close of year exceed an aggregate million. Because the ag- nt of the group's install- $25 million, exceeds $5 d tax liabilities of both P een into account in deter- st charge under section vith the taxable year in rs.*

*) Corporation's P, S and d returns on a calendar 's nondepreciable property ondepreciable property B. B each have a basis of market value of $10,000. the property B to P for zes $9,000 of gain in 1989 rty B to P, all of which is 1502-13(c). Under §1.1502- property B is $10,000. and S exchange property A an exchange that qualifies*

©1991 Macmillan, Inc.



*(Example (3) cont.)*
*for nonrecognition of gain or loss under section 1031 with respect to both P and S. P does not recognize gain or loss on the exchange, and P's basis in property A is $10,000.*

*(iii) In 1993, in a transaction to which section 1031(f) and (g) do not apply, P sells property A to X, an unrelated third party, for $10,000. P realizes no gain on the sale of property A to X. T is required to take into account the $9,000 of deferred gain with respect to property B in 1993, because property A (the basis of which is determined by reference to the basis of property B) was disposed of outside the group.*

*(4)* ***Effective date***—*(i) In general. Except as provided in paragraph (m)(4)(ii) of this section, this paragraph (m) applies to dispositions (as described in this paragraph) of property in taxable years for which the due date (without extensions) of the income tax return is after March 14, 1990.*

*(ii) Exception. Notwithstanding paragraph (m)(4)(i) of this section, this paragraph (m) does not apply to deferred gain taken into account on a disposition of property before March 9, 1990, if the gain was deferred in an intercompany transaction—*

*(A) after December 31, 1988, provided that, at the time of the intercompany transaction, there was no plan or intention to dispose of the property outside the group and the taxpayer files a separate statement with the taxpayer's return for the taxable year in which such property is disposed of disclosing—*

*(1) a description of the transferred property and the dates of the intercompany transaction and the disposition,*

*(2) the name and employer identification number (E.I.N.) of the member disposing of the property and the amount realized and gain realized by such member on the disposition, and*

*(3) the amount realized and gain realized by the selling member on the intercompany transaction with respect to the property and the name and E.I.N. of the selling member; or*

*(B) before January 1, 1989.*

*(n)* ***Exception to deferral rules***—*(1)* ***In general.*** *Section 1.1502-13(c) shall not apply to defer gain or loss with respect to a sale or exchange in an intercompany transaction of property to the extent the gain (or loss) is attributable to any income and expense (i) accounted for (or required to be accounted for) by the selling member in accordance with the percentage of completion method and (ii) arising from any activity performed by the selling member for the benefit of, or by reason of, a long term contract between a member and a person not a member that is accounted for by such member, in whole or part, under the percentage of completion method.*

*(2)* ***Example.*** *This paragraph (n) is illustrated by the following example.*

***Example.*** *(i) Corporations P and S file consolidated returns on a calendar year basis. In 1990, P enters into a contract with X, a person not a member of the group, for the manufacture and sale of 5 airplanes for a total contract price of $500 million. The contract is a long term contract within the meaning of section 460(f) and P is required to account for income and expense attributable to the contract under the percentage of completion method. By reason of the contract, S manufactures and sells engines for the airplanes to P for a total price of $50 million. S begins to manufacture the engines in 1991 and delivers them in 1992. In 1991, S incurs $20 million out of total estimated costs of $40 million, and, in 1992, S incurs an additional $20 million of costs to complete manufacture of the engines. S accounts for income and expense attributable to the production of the engines pursuant to the percentage of completion method.*

*(ii) S's sale of the engines to P is a deferred intercompany transaction. However, §1.1502-13(c) does not apply to defer gain attributable to the income and expense accounted for by S under the percentage of completion method. Under the percentage of completion method, S takes into account $20 million in costs and $25 million in income in each of 1991 and 1992.*

*(3)* ***Effective date.*** *This paragraph (n) applies to intercompany transactions in taxable years for which the due date (without extensions) of the income tax return is after March 14, 1990 that are attributable to long term contracts entered into by a member after June 20, 1988.*

*(o)* ***References.*** *A reference in this part to §1.1502-13 is treated as including a reference to this section.*

**Reg. §1.1502-14 Stock, bonds, and other obligations of members.** (TD 6909, filed 12-29-66; amended by TD 7246, filed 12-29-72; TD 8196, filed 4-14-88; TD 8245, filed 3-14-89; TD 8295, filed 3-9-90.)

**(a) Intercompany distributions with respect to stock**—**(1) Dividends.** A dividend distributed by one member to another member during a consolidated return year shall be eliminated. For purposes of this paragraph, the term "dividend" means a distribution which is described in section 301(c)(1) other than a distribution described in section 243(c)(1).

**(2) Nondividend distributions.** No gain shall be recognized to the distributee on a distribution with respect to stock, from one member to another member during a consolidated return year, which is described in section 301(c)(2) or (3). Such distribution shall be applied against and reduce the adjusted basis (determined after taking into account any adjustment under §1.1502-32) of

©1991 Macmillan, Inc

Code of Iowa (1991)

TITLE XX. INSURANCE

CHAPTER 508C. IOWA LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION

508C.1. Title

This chapter shall be cited as the "Iowa Life and Health Insurance Guaranty Association Act".

508C.2. Purpose

1. The purpose of this chapter is to protect, subject to certain limitations, the persons specified in section 508C.3, subsection 1, against failure in the performance of contractual obligations under life and health insurance policies and annuity contracts specified in section 508C.3, subsection 2, because of the impairment or insolvency of the member insurer which issued the policies or contracts.
2. To provide this protection, an association of insurers is created to enable the guaranty of payments of benefits and of continuation of coverages as limited in this chapter. Members of the association are subject to assessment to provide funds to carry out the purpose of this chapter.

508C.3. Scope

1. This chapter shall provide coverage under the policies and contracts specified in subsection 2 to all of the following:
    a. Except for nonresident certificate holders under group policies or contracts, persons who are the beneficiaries, assignees, or payees of the persons covered under paragraph "b".
    b. Persons who are owners of the policies or contracts specified in subsection 2, or are insureds or annuitants under the policies or contracts, and who are either of the following:
        (1) Residents of this state.
        (2) Nonresidents of this state if all of the following conditions are met:
            (a) The state in which the person resides has an association similar to the association created in this chapter.
            (b) The person is not eligible for coverage by an association described in subparagraph part (a).
            (c) The insurer which issued the policy or contract never held a license or certificate of authority in the state in which the person resides.
            (d) The insurer is domiciled in this state.
2. This chapter shall provide coverage to the persons specified in subsection 1 under direct life insurance policies, health insurance policies, annuity contracts, supplemental contracts, certificates under group policies or contracts, and unallocated annuity contracts issued by member insurers.
3. This chapter does not apply to:

a. Any portion of a life, health, or annuity benefit payment liability arising on or after the date of insolvency to the extent that it is based upon a rate of interest which exceeds the lesser of the following:

(1) The minimum rate of interest guaranteed under the policy or contract.

(2) The rate of interest calculated as prescribed in the standard valuation law of this state for determining the minimum standard for the valuation of life insurance policies issued during the year of insolvency which have an interest-guaranteed duration of ten or fewer years.

b. That portion or part of a policy or contract under which the risk is borne by the policyholder.

c. A policy or contract or part of a policy or contract assumed by the impaired or insolvent insurer under a contract of reinsurance, other than reinsurance for which assumption certificates have been issued.

d. An unallocated annuity contract issued to an employee benefit plan protected under the federal pension benefit guaranty corporation, which is not issued to or in connection with a specific employee, union, or association of natural persons, or any portion of a financial guarantee.

e. A policy or contract issued by a company which is licensed under chapter 509A, 512A, 512B, 514, 514B, 518, 518A, or 520.

f. Except for a policy issued pursuant to section 515.48, subsection 5, paragraph "a", a policy or contract issued by a company which is licensed under chapter 515.

g. An insurer which was placed under an order of liquidation, rehabilitation, or conservation by a court prior to July 1, 1987, is not an impaired insurer or an insolvent insurer for the purposes of this chapter.

h. An annuity contract issued to a government lottery or to a liability insurer in connection with a structured settlement.

508C.4. Construction

This chapter shall be liberally construed to effect its purpose as provided under section 508C.2.

508C.5. Definitions

As used in this chapter, unless the context otherwise requires:

1. "Account" means any of the four accounts created under section 508C.6.
2. "Association" means the Iowa life and health insurance guaranty association created in section 508C.6.
3. "Commissioner" means the commissioner of insurance.
4. "Contractual obligation" means an obligation under a covered policy.
5. "Covered policy" means a policy or contract within the scope of this chapter as provided under section 508C.3.
6. "Impaired insurer" means a member insurer which, after July 1, 1987, is either of the following:

   a. Deemed by the commissioner to be potentially unable to fulfill its contractual obligations but is not an insolvent insurer.

   b. Placed under an order of rehabilitation or conservation by a court of competent jurisdiction.
7. "Insolvent insurer" means a member insurer which, after July 1, 1987, becomes insolvent and is placed under a final order of liquidation by a court of competent jurisdiction.
8. "Member insurer" means a person licensed or who holds a certificate of authority to transact

in this state any kind of insurance to which this chapter applies under section 508C.3, including a person whose license or certificate of authority has been suspended, revoked, not renewed, or voluntarily withdrawn.

9. "Person" means an individual, corporation, partnership, association, or voluntary organization.

10. "Premiums" means direct gross insurance premiums and annuity considerations received on covered policies, less return insurance premiums and annuity considerations and dividends paid or credited to policyholders on the direct business. "Premiums" do not include premiums and considerations on contracts between insurers and reinsurers.

11. "Resident" means a person who resides in this state, or if a corporation has its principal place of business in this state, at the time a member insurer is determined to be an impaired or insolvent insurer, and to whom contractual obligations are owed.

12. "Supplemental contract" means an agreement entered into for the distribution of policy or contract proceeds.

13. "Unallocated annuity contract" means a guaranteed investment contract, deposit administration contract, unallocated funding agreement, or any other annuity contract which is not issued to and owned by an individual, except to the extent of any annuity benefits guaranteed to an individual by an insurer under such a contract or certificate.

508C.6. Creation of the association

1. A nonprofit legal entity is created to be known as the Iowa life and health insurance guaranty association. All member insurers shall be and shall remain members of the association as a condition of their authority to transact insurance business in this state. The association shall perform its functions under the plan of operation established and approved under section 508C.10 and shall exercise its powers through the board of directors established in section 508C.7. For purposes of administration and assessment, the association shall maintain all of the following accounts:
   a. A health insurance account.
   b. A life insurance account.
   c. An annuity account. A plan established under section 403(b) of the United States Internal Revenue Code shall be covered by the annuity account.
   d. An unallocated annuity contract account.

2. The association is subject to the immediate supervision of the commissioner and the applicable provisions of the insurance laws of this state.

508C.7. Board of directors

1. The board of directors of the association shall consist of not less than five nor more than nine member insurers serving terms as established in the plan of operation. The members of the board shall be selected by member insurers, subject to the approval of the commissioner. Vacancies on the board shall be filled for the remaining period of the term by a majority vote of the remaining board members, subject to the approval of the commissioner. To select the initial board of directors, and initially organize the association, the commissioner shall give notice to all member insurers of the time and place of the organizational meeting. In determining voting rights at the organizational meeting each member insurer is entitled to one vote in person or by proxy. If the board of directors is not selected within sixty days after notice of the organizational meeting, the commissioner may appoint the initial members.

2. In approving selections or in appointing members to the board, the commissioner shall consider, among other factors, whether all member insurers are fairly represented.

3. At the option of the association, members of the board may be reimbursed from the assets of the association for expenses incurred by them as members of the board of directors. However, members of the board shall not otherwise be compensated by the association for their services.

508C.8. Powers and duties of the association

1. If a domestic, foreign, or alien insurer is an impaired insurer, the association, subject to conditions imposed by the association and approved by the impaired insurer and the commissioner, may:
   a. Guarantee, assume, reinsure, or cause to be guaranteed, assumed, or reinsured, any or all of the covered policies of the impaired insurer.
   b. Provide moneys, pledges, notes, guarantees, or other means as proper to effectuate paragraph "a" and assure payment of the contractual obligations of the impaired insurer pending action under paragraph "a".
   c. Loan money to the impaired insurer and guarantee borrowings by the impaired insurer, provided the association has concluded, based on reasonable assumptions, that there is a likelihood of repayment of the loan and a probability that unless a loan is made the association would incur substantial liabilities under subsection 2.
2. a. If a domestic, foreign, or alien insurer is an impaired insurer and the insurer is not paying claims timely, then, subject to the approval of the commissioner and to the preconditions specified in this subsection, the association may do either or both of the following:
      (1) Take any of the actions specified in subsection 1, subject to the conditions in that subsection.
      (2) Provide substitute benefits in lieu of the contractual obligations of the impaired insurer solely for health claims, periodic annuity benefits, death benefits, supplemental benefits, and cash withdrawals for policy or contract owners who petition for the benefits under claims of emergency or hardship in accordance with standards proposed by the association and approved by the commissioner.
   b. The association is subject to this subsection only if all of the following conditions are met:
      (1) The laws of the state of domicile provide that until all payments of or on account of the impaired insurer's contractual obligations by all guaranty associations, along with all interest on the payments and expenses have been repaid to the guaranty associations or a plan of repayment by the impaired insurer has been approved by the guaranty associations all of the following apply:
         (a) The delinquency proceeding shall not be dismissed.
         (b) Neither the impaired insurer nor its assets shall be returned to the control of its shareholders or private management.
         (c) The impaired insurer shall not be permitted to solicit or accept new business or have any suspended or revoked license restored.
      (2) If the impaired insurer is a domestic insurer it has been placed under an order of rehabilitation by a court of competent jurisdiction in this state; or, if the impaired insurer is a foreign or alien insurer it has been prohibited from soliciting or accepting new business in this state, its certificate of authority has been suspended or revoked in this state, and a petition for rehabilitation or liquidation has been filed in a court of competent

jurisdiction in its state or nation of domicile by the commissioner of that state or similar authority in an alien nation.

3. a. In carrying out its duties under subsection 2, permanent policy liens or contract liens may be imposed in connection with a guarantee, assumption, or reinsurance agreement, if the court does both of the following:

(1) Finds either that the amounts which can be assessed under this chapter are less than the amounts needed to assure full and prompt performance of the insolvent insurer's contractual obligations, or that the economic or financial conditions as they affect member insurers are sufficiently adverse to the public interest to justify the imposition of policy or contract liens.

(2) Approves the specific policy liens or contract liens to be used.

b. Before being obligated under subsection 2, the association may request the imposition of a temporary moratorium, not exceeding three years, or liens on payments of cash values, termination values, and policy loans in addition to any contractual provisions for deferral of cash values, termination values, or policy loans. The temporary moratoriums and liens may be imposed by the court as a condition of the association's liability with respect to the insolvent insurer.

c. The obligations of the association under subsection 2 regarding a covered policy shall be reduced to the extent that the person entitled to the obligations has received payment of all or any part of the contractual benefits payable under the covered policy from any other source.

d. The association may offer modifications to the owners of policies or contracts or classes of policies or contracts issued by the insolvent insurer, if the association finds that under the policies or contracts the benefits provided, provisions pertaining to renewal, or the premiums charged or which may be charged are not reasonable. If the owner of a policy or contract to be modified fails or refuses to a accept the modification as approved by the court, the association may terminate the policy or contract as of a date not less than one hundred eighty days after the modification is sent to the owner. The association shall have no liability under the policy or contract for any claim incurred or continuing beyond the termination date.

4. If the association fails to act within a reasonable period of time as provided in subsection 2, the commissioner shall have the powers and duties of the association under this chapter with respect to insolvent insurers.

5. Upon request the association may give assistance and advice to the commissioner concerning the rehabilitation, payment of claims, continuance of coverage, or the performance of other contractual obligations of an impaired or insolvent insurer.

6. The association has standing to appear before any court in this state with jurisdiction over an impaired or insolvent insurer concerning which the association is or may become obligated under this chapter. Standing shall extend to all matters germane to the powers and duties of the association including, but not limited to, proposals for reinsuring or guaranteeing the covered policies of the impaired or insolvent insurer and the determination of the covered policies and contractual obligations.

7. a. A person receiving benefits under this chapter is deemed to have assigned the rights under the covered policy to the association to the extent of the benefits received under this chapter, whether the benefits are payments of contractual obligations or a continuation of coverage. The association may require an assignment to the association of the rights by a payee, policyholder or contract owner, beneficiary, insured, or annuitant as a condition precedent to the receipt of any rights or benefits conferred by this chapter upon the person. The association shall be subrogated to these rights against the assets of the insolvent insurer.

b. The subrogation rights of the association under this subsection have the same

priority against the assets of the insolvent insurer as that possessed by the person entitled to receive benefits under this chapter.

c. In addition to the rights pursuant to subsection 3, paragraphs "a" and "b", the association shall have all common law rights of subrogation and any other equitable or legal remedy which would have been available to the insolvent insurer or holder of a policy or contract.

8. The contractual obligations of the insolvent insurer, for which the association becomes or may become liable, are as great as but not greater than the contractual obligations of the insolvent insurer would have been in the absence of an insolvency, unless the obligations are reduced as permitted in this chapter. However, with respect to any one life, the aggregate liability of the association shall not exceed one hundred thousand dollars in cash and termination values, or three hundred thousand dollars for all benefits, including cash and termination values, death benefits, annuity payments, accident and health benefits, and all other amounts payable under all policies or contracts of the insolvent insurer. With respect to any one holder of an unallocated annuity contract, the aggregate liability of the association shall not exceed one million dollars of contract benefits, irrespective of the number of contracts held by the contract holder.

9. The association has no obligation for either of the following:

a. To continue coverage, or to pay a claim for benefits to any person under an individual accident, health, or disability policy accruing more than three years following the date the member insurer is adjudicated to be insolvent.

b. To issue a group conversion policy of any nature to a person or to continue a group coverage in force for more than sixty days following the date the member insurer was adjudicated to be insolvent.

10. The association may do any of the following:

a. Enter into contracts as necessary or proper to carry out this chapter.

b. Sue or be sued, including taking any legal actions necessary or proper for recovery of any unpaid assessments under section 508C.9.

c. Borrow money to effect the purposes of this chapter. Any notes or other evidence of indebtedness of the association held by domestic insurers and not in default qualify as investments eligible for deposit under section 511.8, subsection 16.

d. Employ or retain persons as necessary to handle the financial transactions of the association, and to perform other functions as necessary or proper under this chapter.

e. Negotiate and contract with a liquidator, rehabilitator, conservator, or ancillary receiver to carry out the powers and duties of the association.

f. Take legal action as necessary to avoid payment of improper claims.

g. For the purposes of this chapter and to the extent approved by the commissioner, exercise the powers of a domestic life or health insurer. However, the association shall not issue insurance policies or annuity contracts other than those issued to perform the contractual obligations of the impaired or insolvent insurer.

h. Join an organization of one or more other state associations of similar purposes to further the purposes and administer the powers and duties of the association.

508C.9. Assessments

1. For the purpose of providing the funds necessary to carry out the powers and duties of the association, the board of directors shall assess the member insurers, separately for each account established pursuant to section 508C.6, at the time and for the amounts the board finds necessary. An assessment is due not less than thirty days after prior written notice has been sent to the member insurers and accrues interest at ten percent per annum

commencing on the due date.

2. There are two classes of assessments as follows:

a. Class A assessments shall be made for the purpose of meeting administrative costs and other general expenses and examinations conducted under section 508C.12, subsection 5, not related to a particular impaired or insolvent insurer.

b. Class B assessments shall be made to the extent necessary to carry out the powers and duties of the association under section 508C.8 with regard to an impaired domestic insurer or an insolvent domestic, foreign, or alien insurer.

3. a. The amount of a class A assessment shall be determined by the board and to the extent that class A assessments do not exceed one hundred dollars per company in any one calendar year may be made on a per capita basis. The amount of a class B assessment shall be allocated for assessment purposes among the accounts as the liabilities and expenses of the association, either experienced or reasonably expected, are attributable to those accounts, all as determined by the association and on as equitable a basis as is reasonably practical.

b. Class A assessments in excess of one hundred dollars per company per calendar year and class B assessments against member insurers for each account shall be in the proportion that the aggregate premiums received on business in this state by each assessed member insurer on policies or contracts related to that account for the three most recent calendar years for which information is available, preceding the year in which the insurer became impaired or insolvent, is to the aggregate premiums received on business in this state by all assessed member insurers on policies related to that account for the three most recent calendar years for which information is available preceding the assessment.

c. Assessments for funds to meet the requirements of the association with respect to an impaired or insolvent insurer shall not be made until necessary to implement the purposes of this chapter. Classification of assessments under this subsection shall be made with a reasonable degree of accuracy, recognizing that exact determinations may not always be possible.

4. The association may abate or defer, in whole or in part, the assessment of a member insurer if, in the opinion of the board, payment of the assessment would endanger the ability of the member insurer to fulfill its contractual obligations. If an assessment against a member insurer is abated or deferred, in whole or in part, the amount by which the assessment is abated or deferred may be assessed against the other member insurers in a manner consistent with the basis for assessments set forth in this section.

5. a. The total of all assessments upon a member insurer for each account shall not in any one calendar year exceed two percent of the insurer's premiums received in this state during the three most recent calendar years for which information is available, preceding the year in which the insurer becomes impaired or insolvent, on the policies related to that account. If the maximum assessment for an account, together with the other assets of the association in the account, does not provide in any one year in the account an amount sufficient to carry out the responsibilities of the association, the necessary additional funds shall be assessed for the account in succeeding years as soon as permitted by this chapter.

b. If the maximum assessment under paragraph "a" for any account, other than the health insurance account, does not provide an amount sufficient to carry out the responsibilities of the association in any succeeding year, the board, pursuant to subsection 3, paragraph "a", shall assess the necessary additional amount and allocate the amount for assessment among the accounts, other than the health insurance account, in the following sequence: from the life insurance account, to the annuity account, to the unallocated annuity contract account; from the annuity account, to the

unallocated annuity contract account, to the life insurance account; from the unallocated annuity contract account, to the annuity account, to the life insurance account; provided that no amount shall be allocated to an account for assessment until the maximum amount has been allocated to the preceding account.

6. By an equitable method as established in the plan of operation, the board may refund to member insurers, in proportion to the contribution of each insurer to that account, the amount by which the assets of the account, including assets accruing from net realized gains and income from investments, exceed the amount the board finds is necessary to carry out during the coming year the obligations of the association with regard to that account. A reasonable amount may be retained in any account to provide funds for the continuing expenses of the association and for future losses if refunds are impractical.

7. In determining its premium rates and policyowner dividends as to any kind of insurance within the scope of this chapter, it is proper for a member insurer to consider the amount reasonably necessary to meet its assessment obligations under this chapter.

8. The association shall issue to each insurer paying a class B assessment under this chapter, a certificate of contribution in a form prescribed by the commissioner for the amount of the assessment so paid. All outstanding certificates shall be of equal dignity and priority without reference to amounts or dates of issue. A certificate of contribution may be shown by the insurer in its financial statement as an asset in the form, for the amount and for a period of time as the commissioner may approve.

508C.10. Plan of operation

1. a. The association shall submit to the commissioner a plan of operation and any amendments to the plan of operation necessary or suitable to assure the fair, reasonable, and equitable administration of the association. The plan of operation and any amendments to the plan are effective upon the commissioner's written approval.
   b. If the association fails to submit a suitable plan of operation within one hundred eighty days following July 1, 1987, or if at any time the association fails to submit suitable amendments to the plan, the commissioner shall, after notice and hearing, adopt rules pursuant to chapter 17A as necessary or advisable to effectuate this chapter. The rules shall continue in force until modified by the commissioner or superseded by a plan submitted by the association and approved by the commissioner.
2. All member insurers shall comply with the plan of operation.
3. In addition to other requirements established in this chapter the plan of operation shall establish all of the following:
   a. Procedures for handling the assets of the association.
   b. The amount and method of reimbursing members of the board of directors under section 508C.7.
   c. Regular places and times for meetings of the board of directors.
   d. Procedures for records to be kept of all financial transactions of the association, its agents, and the board of directors.
   e. Procedures for selecting the board of directors and submitting the selections to the commissioner.
   f. Any additional procedures for assessments under section 508C.9.
   g. Additional provisions necessary or proper for the execution of the powers and duties of the association.
4. The plan of operation may provide that any powers and duties of the association, except

those under section 508C.8, subsection 10, paragraph "c" and section 508C.9 are delegated to a corporation, association, or other organization which performs or will perform functions similar to those of this association, or its equivalent, in two or more states. Such a corporation, association, or organization shall be reimbursed for any payments made on behalf of the association and shall be paid for its performance of any function of the association. A delegation under this subsection shall take effect only with the approval of both the board of directors and the commissioner. The delegation shall be made only to a corporation, association, or organization which extends protection at least as favorable and effective as that provided by this chapter.

508C.11. Duties and powers of the commissioner

1. The commissioner shall:
   a. Upon request of the board of directors, provide the association with a statement of the premiums for each member insurer.
   b. When an impairment is declared and the amount of the impairment is determined, serve a demand upon the impaired insurer to make good the impairment within a reasonable time. Notice to the impaired insurer constitutes notice to its shareholders, if any. The failure of the insurer to promptly comply with the demand shall not excuse the association from the performance of its powers and duties under this chapter.
   c. In a liquidation or rehabilitation proceeding involving a domestic insurer, be appointed as the liquidator or rehabilitator.
2. After notice and hearing, the commissioner may suspend or revoke the certificate of authority to transact insurance in this state of a member insurer which fails to pay an assessment when due or fails to comply with the plan of operation. As an alternative, the commissioner may levy an administrative penalty on any member insurer which fails to pay an assessment when due. The administrative penalty shall not exceed five percent of the unpaid assessment per month. However, an administrative penalty shall not be less than one hundred dollars per month.
3. An action of the board of directors or the association may be appealed to the commissioner by a member insurer if the appeal is taken within thirty days of the action being appealed. A final action or order of the commissioner is subject to judicial review pursuant to chapter 17A in a court of competent jurisdiction.
4. The liquidator, rehabilitator, or conservator of an impaired insurer may notify all interested persons of the effect of this chapter.

508C.12. Prevention of insolvencies

1. To aid in the detection and prevention of insurer insolvencies or impairments the commissioner shall:
   a. Notify the commissioners or insurance departments of other states or territories of the United States and the District of Columbia when any of the following actions against a member insurer is taken:
      (1) A license is revoked.
      (2) A license is suspended.
      (3) A formal order is made that a company restrict its premium writing, obtain additional contributions to surplus, withdraw from the state, reinsure all or any part of its business, or increase capital, surplus, or any other account for the security of policyholders or creditors.

   Notice shall be mailed to the commissioners or departments within thirty days following

the earlier of when the action was taken or the date on which the action occurs. This subparagraph does not supersede section 507C.9, subsection 5.

b. Report to the board of directors when the commissioner has taken any of the actions set forth in paragraph "a" or has received a report from any other commissioner indicating that a member insurer is impaired or insolvent. Reports to the board of directors shall contain all significant details of the action taken or the report received from another commissioner.

c. Report to the board of directors when there is reasonable cause to believe from an examination, whether completed or in process, of a member company that the company may be an impaired or insolvent insurer.

d. Furnish to the board of directors the national association of insurance commissioners' early warning tests. The board may use the information in carrying out its duties and responsibilities under this section. The report and the information contained in the report shall be kept confidential by the board of directors until such time as it is made public by the commissioner or other lawful authority.

2. The commissioner may seek the advice and recommendations of the board of directors concerning any matter affecting the commissioner's duties and responsibilities regarding the financial condition of member companies and companies seeking admission to transact insurance business in this state.

3. The board of directors may upon majority vote make reports and recommendations to the commissioner upon any matter germane to the solvency, liquidation, rehabilitation or conservation of a member insurer or germane to the solvency of a company seeking to transact insurance business in this state. These reports and recommendations are not public records pursuant to chapter 22.

4. Upon majority vote, the board of directors shall notify the commissioner of any information indicating that a member insurer may be an impaired or insolvent insurer.

5. Upon majority vote, the board of directors may request that the commissioner order an examination of a member insurer which the board in good faith believes may be an impaired or insolvent insurer. The examination may be conducted as a national association of insurance commissioners examination or may be conducted by persons designated by the commissioner. The cost of the examination shall be paid by the association and the examination report shall be treated as are other examination reports. The examination report shall not be released to the board of directors prior to its release to the public, but this shall not preclude the commissioner from complying with subsection 1. The commissioner shall notify the board of directors when the examination is completed. The request for an examination shall be kept on file by the commissioner but it is not a public record pursuant to chapter 22 until the release of the examination report to the public.

6. Upon majority vote, the board of directors may make recommendations to the commissioner for the detection and prevention of insurer insolvencies.

7. At the conclusion of an insurer insolvency in which the association was obligated to pay covered claims, the board of directors shall prepare a report to the commissioner containing information as the board may have in its possession bearing on the history and causes of the insolvency. The board shall cooperate with the boards of directors of guaranty associations in other states in preparing a report on the history and causes of insolvency of a particular insurer, and may adopt by reference any report prepared by other associations.

508C.13. Miscellaneous provisions

1. This chapter does not reduce the liability for unpaid assessments of the insureds on an impaired or insolvent insurer operating under a plan with assessment liability other than

the plan of this chapter.

2. Records shall be kept of all negotiations and meetings in which the association or its representatives are involved to discuss the activities of the association in carrying out its powers and duties under section 508C.8. Records of the negotiations or meetings shall be made public pursuant to chapter 22 only upon the termination of a liquidation, rehabilitation, or conservation proceeding involving the impaired or insolvent insurer, upon the termination of the impairment of insolvency of the insurer, or upon the order of a court of competent jurisdiction. This subsection does not limit the duty of the association to render a report of its activities under section 508C.14.

3. For the purpose of carrying out its obligations under this chapter, the association shall be deemed to be a creditor of the impaired or insolvent insurer to the extent of assets attributable to covered policies reduced by any amounts to which the association is entitled pursuant to its subrogation rights under section 508C.8, subsection 7. Assets of the impaired or insolvent insurer attributable to covered policies shall be used to continue all covered policies and pay all contractual obligations of the impaired or insolvent insurer as required by this chapter. As used in this subsection, "assets attributable to covered policies" means that proportion of the assets which the reserves that should have been established for the policies bear to the reserves that should have been established for all policies of insurance written by the impaired or insolvent insurer.

4. a. Prior to the termination of a liquidation, rehabilitation, or conservation proceeding, the court may take into consideration the contributions of the respective parties, including the association, similar associations of other states, the shareholders and policyowners of the insolvent insurer, and any other party with a bona fide interest, in making an equitable distribution of the ownership rights of the insolvent insurer. When considering the contributions, consideration shall be given to the welfare of the policyholders of the continuing or successor insurer.

b. A distribution to stockholders, if any, of an impaired or insolvent insurer shall not be made until the total amount of valid claims of the association and of similar associations of other states for funds expended in carrying out its powers and duties under section 508C.8 with respect to the insurer have been fully recovered by the association and the similar associations.

5. a. Subject to the limitations of paragraphs "b", "c", and "d", if an order for liquidation or rehabilitation of an insurer domiciled in this state has been entered, the receiver appointed under the order may recover, on behalf of the insurer, from any affiliate that controlled it, the amount of distributions other than stock dividends paid by the insurer on its capital stock made at any time during the five years preceding the petition for liquidation or rehabilitation.

b. Distributions are not recoverable if the insurer shows that when paid the distributions were lawful and reasonable and that the insurer did not know and could not reasonably have known that the distributions might adversely affect the ability of the insurer to fulfill its contractual obligations.

c. A person who was an affiliate that controlled the insurer at the time the distributions were paid is liable up to the amount of distributions received. A person who was an affiliate that controlled the insurer at the time the distributions were declared is liable up to the amount of distributions that would have been received if they had been paid immediately. If two persons are liable with respect to the same distributions, they are jointly and severally liable.

d. The maximum amount recoverable under this subsection is the amount needed in excess of all other available assets of the insolvent insurer to pay the contractual obligations of the insolvent insurer.

e. If a person liable under paragraph "c" is insolvent, all its affiliates that controlled it at the time the dividend was paid are jointly and severally liable for a resulting

deficiency in the amount recovered from the insolvent affiliate.

508C.14. Examination of the association--annual report

The association is subject to examination and regulation by the commissioner. The board of directors shall submit to the commissioner by May 1 of each year, a financial report for the preceding calendar year and a report of its activities during the preceding calendar year. The financial report shall be in a form approved by the commissioner.

508C.15. Tax exemptions

The association is exempt from payment of all fees and all taxes levied by this state or any of its subdivisions except taxes levied on the association's real property.

508C.16. Immunity--indemnification

A member insurer and its agents and employees, the association and its agents and employees, members of the board of directors, and the commissioner and the commissioner's representatives are not liable for any action taken by them or omission by them while acting within the scope of their employment and in the performance of their powers and duties under this chapter.
The provisions of section 496A.4A [FN1PP] shall apply to the association.

508C.17. Stay of proceedings--reopening default judgments

Proceedings in which the insolvent insurer is a party in a court in this state shall be stayed sixty days from the date an order of liquidation, rehabilitation, or conservation is final to permit proper legal action by the association on matters germane to its powers or duties. The association may apply to have a judgment under a decision, order, verdict, or finding based on default, set aside by the same court that entered the judgment, and shall be permitted to defend against the suit on the merits.

508C.18. Prohibited advertisements

A person, including an insurer, agent or affiliate of an insurer shall not make, publish, disseminate, circulate, or place before the public, or cause directly or indirectly, to be made, published, disseminated, circulated, or placed before the public in a newspaper, magazine, or other publication, or in the form of a notice, circular, pamphlet, letter, or poster, or over a radio station or television station, or in any other way, an advertisement, announcement, or statement which uses the existence of the insurance guaranty association of this state for the purpose of sales, solicitation, or inducement to purchase any form of insurance covered by this chapter. However, this section does not apply to the association or any other entity which does not sell or solicit insurance.

508C.19. Credits for assessments paid

1. An insurer may offset an assessment made pursuant to section 508C.9 against its premium tax liability pursuant to chapter 432 to the extent of twenty percent of the amount of the assessment for each of the five calendar years following the year in which the assessment was

paid. If an insurer ceases doing business, all uncredited assessments may be credited against its premium tax liability for the year it ceases doing business.

2. Sums acquired by refund from the association which have been written off by contributing insurers and offset against premium taxes as provided in subsection 1 and are not then needed for purposes of this chapter shall be paid by the association to the commissioner. The commissioner shall remit the moneys to the treasurer of state to deposit in the state general fund.

## CHAPTER 521A. INSURANCE HOLDING COMPANY SYSTEMS

### 521A.5. Standards

1. Transactions within a holding company system affecting domestic insurers.

*****

b. A domestic insurer and a person in its holding company system shall not enter into any of the following transactions between each other involving amounts equal to or exceeding the greater of five percent of the insurer's admitted assets or twenty-five percent of the surplus as regards policyholders as of the next preceding December 31, unless the domestic insurer notifies the commissioner in writing of its intention to enter into the transaction at least thirty days prior to entering into the transaction or within a shorter time permitted by the commissioner and the commissioner has not disapproved of the transaction within the time period:

(1) Sales.
(2) Purchases.
(3) Exchanges.
(4) Loans or extensions of credit.
(5) Guarantees.
(6) Investments.
(7) Loans or extensions of credit to a person who is not an affiliate, if the domestic insurer makes the loans or extensions of credit with the agreement or understanding that the proceeds of the transactions, in whole or in substantial part, are to be used to make loans or extensions of credit to, to purchase assets of, or to make investments in, an affiliate of the domestic insurer making the loans or extensions of credit.