IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1278 T
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE COMPANY
AND SUBSIDIARIES,
Plaintiff

v.

THE UNITED STATES,
Defendant

DEFENDANT'S PROPOSED FINDINGS
OF UNCONTROVERTED FACT

Defendant, the United States, respectfully requests that the Court find the following facts:

## **Background Facts**

1. During the years in issue (1991-1994), plaintiff (Principal) was an Iowa mutual life insurance company, filing consolidated returns as the parent corporation of a consolidated group of corporations, including its non-life insurance subsidiaries. (Stip. ¶ 1.)[1]

[1]Citations herein to the parties' Stipulation of Facts, filed March 2, 2005, are abbreviated as "Stip." It should be noted that an inadvertent numbering error occurred in the stipulation's paragraph numbers. There is a second ¶ "42" on page 20, following ¶ 44, that could be redesignated as ¶ "44A."

2. During tax years 1991-1994, Principal was known as Principal Mutual Life Insurance Company, and at all times relevant to this action, Principal was a calendar-year, accrual-basis taxpayer subject to tax under the provisions of Subchapter L of the Internal Revenue Code (the "Code").[2] (Stip. ¶ 1.)

3. Principal's income tax returns for the years 1991-1994 were timely filed, and the tax shown on such returns was timely paid, on or before the extended due dates. (Stip. ¶ 2.)

4. Following examination of Principal's 1991-1994 returns, the Internal Revenue Service (IRS) assessed income tax deficiencies and interest which Principal thereafter paid. (Stip. ¶ 2.)

5. Principal subsequently filed timely claims for refund seeking refund of a portion of the additional tax and interest paid for tax years 1991-1994. (Stip. ¶ 2.)

6. Following administrative appeals, Principal's claims for refund for tax years 1991-1994 were disallowed in part by the IRS, and Principal thereafter timely commenced this suit seeking refund of a portion of the amounts disallowed. (Stip. ¶ 2.)

**Interest on Deferred Tax Issue (Internal Revenue Code § 453A)**

7. For the years 1991-1994, the IRS's assessments against Principal included interest on deferred tax under § 453A of the Code.[3] (Stip. ¶ 3.)

---

[2]On July 1, 1998, Principal changed its name to "Principal Life Insurance Company" in the course of a reorganization through which it became a subsidiary of a mutual insurance holding company. The holding company demutualized in 2001. (Stip. n.1.)

[3]Principal denies it is liable for such interest on deferred tax and claims refund of the portion of the assessments attributable thereto. The IRS allowed deductions for the interest on deferred tax assessed and paid for each of the years in suit. In the event that plaintiff were to prevail on this issue, these deductions must be reversed and the resulting additional tax liability offset against any tax refund or credit for the years in suit. (Stip. ¶ 3 and n.2.)

8. The interest on deferred tax was assessed in connection with a 1991 transaction between Principal and Prudential Life Insurance Company ("Prudential") involving commercial mortgage loans and a subsidiary of Principal called Principal, FC, Ltd. ("Principal FC"). (Stip. ¶ 3.)

9. In 1985, Principal (then known as "Bankers Life Company") sold and conveyed to Prudential Life Insurance Company 155 commercial real estate mortgage loans that Principal had originated. At the same time, Principal purchased and acquired from Prudential 105 commercial real estate mortgages that Prudential had originated. (Stip. ¶ 4.)

10. The commercial mortgage loans sold by Principal to Prudential had an aggregate principal balance of $649,361,728, while the commercial mortgage loans purchased by Principal from Prudential had an aggregate principal balance of $743,511,080. (Stip. ¶ 4.)

11. The sale/purchase price in each transaction was determined by valuing each of the mortgage loans in the portfolio individually, determining the fair market value of each by discounting the future payments at the bond-equivalent yield. (Stip. ¶ 4.)

12. The 155 mortgage loans sold by Principal to Prudential were sold at an aggregate price of $598,786,278, while the 105 mortgage loans purchased by Principal from Prudential were purchased at an aggregate price of $649,888,398. (Stip. ¶ 4.)

13. As a part of the sale agreements, each party agreed to continue servicing the loans it had originated, remitting all collections of principal and interest (less servicing fees) to the purchaser monthly. (Stip ¶ 4.)

14. As years elapsed, the 1985 transaction with Prudential gave rise to a number of

problems for Principal, including declining interest rates after 1985 that often prompted prepayments of the mortgage loans by the borrowers. (Stip. ¶¶ 5, 6.)

15. Under the terms of the 1985 Principal/Prudential transaction, the amount of any prepayment premium was required to be paid to Prudential. (Stip. ¶ 6.)

16. Prepayments on the mortgage loans by the commercial borrowers gave rise to what was referred to in the 1985 agreements as the "post-settlement purchase price adjustment" ("PSPPA"). (Stip. ¶ 7.)

17. The PSPPA was a post-closing adjustment required to be computed monthly under which the purchaser of the mortgage loans was required to pay to the seller monthly a portion of the prepayment it would otherwise have been entitled to retain. When any mortgage loan was prepaid in full, the purchaser was required to remit 98 percent of the excess of the principal balance over the present value of the loan. Upon any partial prepayment, the purchaser was required to remit the excess of 98 percent of the partial prepayment over the difference between the present values of the loan before and after the partial prepayment. (Stip. ¶ 7.)

18. In 1990, Principal was considering various ways in which it could increase its statutory surplus [*i.e.*, its surplus reported to state insurance regulators]. (Jt. Ex. 63 at 500.)[4]

19. Principal's senior management thought it would be necessary to increase its statutory surplus by roughly $150-200 million. (Stip. ¶ 9; *see* Jt. Ex. 61 at 493, Jt. Ex. 20 at 166.)

20. In 1991, Prudential approached Principal with the idea of "unwinding" or "unraveling"

---

[4]Citations herein to the parties' joint exhibits are abbreviated as "Jt. Ex.")

the 1985 transaction, and doing so before December 31, 1991. (Stip. ¶ 8; Jt. Ex. 17 at 162.)

21. Principal anticipated that the proposed new transaction with Prudential could generate gain of $75 million (a significant portion of management's desired increase in surplus). (Stip. ¶ 9.)

22. As early as April 1991, Principal employees who were considering the feasibility of a mortgage loan swap recognized that there would be potential tax problems, and that they should start considering what the tax effects would be. (Jt. Ex. 65 at 567; *see* Stip. ¶ 10 re: names of Principal employees.)

23. Principal continued to explore the various pros and cons of the proposed new transaction with Prudential throughout July and August of 1991. (Stip. ¶ 9.)

24. On August 26, 1991, Kurt Lettow (Principal's Investment Accounting Analyst in its Investment Accounting and Treasury Department) prepared a detailed analysis of the tax cost of exchanging mortgages with Prudential, which he estimated would be $10,250,000. (Jt. Ex. 89 at 635; Jt. Ex. 13, ¶ 1.)

25. In September/October, a team of Principal employees from Principal's commercial real estate, mortgage loan, accounting, legal, and tax departments (John Schmidt, Kurt Lettow, Brad Jensen, Cynthia (Cindy) Cannon, JoEllen Watts, Lillian Chen, Jed Fisk, Pat Halter, and Margie Johnson) was assembled to bring to fruition the "unraveling" of the 1985 Prudential transaction through a new 1991 transaction. (Stip. ¶¶ 10, 11.)

26. In the third quarter of 1991, Principal lost its triple-A ratings from both Moody's and Standard & Poor's. (Stip. ¶ 9; Jt. Ex. 60.) Principal had a long-standing policy against showing debt

on its Annual Statements,[5] and it did not want to show a new $503 million liability to Prudential on its books because of the potential that ratings agencies, insurance regulators, customers, and marketers would consider it a sign of financial weakness in troubled times. (Stip. ¶ 12.)

27. To address the problems in accounting for the transaction with Prudential, the idea of "defeasance" was explored; that is, "defeasing" the liability, or causing it to be nonreportable, by the assignment of high-quality assets to it in accordance with FASB 76.[6] Among the ideas considered to accomplish defeasance were creation of a trust and assignment of Treasury obligations to the debt. (Stip. ¶ 13.)

28. In addition, Prudential insisted that Principal's liability to it as a result of the new transaction be made "bankruptcy remote," that is, that Prudential be insulated against any possibility of Principal's insolvency through preservation of a right of offset against any unpaid balance of the purchase price. (Stip. ¶ 14.)

29. On September 11, 1991, Principal's John Schmidt discussed with Prudential's tax attorney, Frank Gould, alternative ways (mortgage loan sale, real estate investment trust (REIT), leveraged asset trust) to structure the unraveling in order to minimize its tax effects. (Jt. Ex. 106 at 693.)

30. In a meeting of the Principal team on September 12, 1991 (recorded in Mr. Schmidt's notes), Mr. Lettow suggested that the anticipated $10 million gain on a mortgage sale to Prudential be deferred under Code § 453, and noted that there is an interest charge on deferred tax gain. (Jt. Ex.

---

[5]Citations herein to the transcript of the trial in this case are abbreviated as "Tr.")

[6]"FASB 76" is Financial Accounting Standards Board Statement 76. (Stip. n.4; Jt. Ex. 158.)

107 at 695.)

31. In a memorandum dated September 18, 1991, Principal's Kathy Ennis reported her conclusion that a sale of commercial mortgage loans would qualify for installment-sale treatment under Code § 453, but that "we will also have to calculate interest on the deferred tax over the life of the installment note. This interest will be treated as both an additional tax and an interest expense deduction." (Jt. Ex. 104 at 691.)

32. Mr. Lettow documented his assumptions regarding the present value tax liabilities of either holding the mortgages or selling them to Prudential, in a memorandum to other team members dated September 19, 1991. (Jt. Ex. 90.)

33. In his memorandum of September 19, 1991, Mr. Lettow concluded:

> From a tax standpoint we would be worse off selling the loans to Prudential even with a 20 year installment note. This is due partly to the method we employ in amortizing discount and also to the rules under IRC § 453A requiring interest on the deferred tax liability. Extending the term of the installment note would not achieve further substantial tax savings.

(Jt. Ex. 90 at 640.)

34. On September 20, 1991, Mr. Lettow sent another memorandum, with detailed analyses in four attachments, to 19 Principal employees, reporting his tax analysis of a sale of the commercial mortgage loans to Prudential. (Jt. Ex. 91.)

35. Mr. Lettow's preliminary findings showed "a wide spread between the present value tax liabilities under the two alternatives and favors holding our current portfolio (Attachment 2)." (Jt. Ex. 91 at 644.)

36. Mr. Lettow's September 20 memorandum also noted that application of the Code §

453A interest rules would mitigate the favorable installment-sale tax treatment under § 453. (Jt. Ex. 91 at 644, 647.)

37. In an e-mail to other Principal team members on October 2, 1991, Principal's attorney John Schmidt reported on his preliminary analysis of the suggestion by Prudential's tax attorney (Frank Gould) that Principal use a trust, taxable as a corporation, to avoid the interest charge under Code § 453A. (Jt. Ex. 109. Tr. 13, ll. 18-21 re: Mr. Schmidt's status as an in-house attorney for Principal.)

38. Mr. Schmidt noted that Mr. Gould--

> maintains that a sale of the installment note to a subsidiary corporation avoids application of this rule because the transfer to the sub results in a deferred intercompany transaction, and gain is not recognized until the earlier of (1) transfer of the property to an unrelated third party, or (2) payments are received from the buyer. Gould's interpretation is based on the theory that the transfer to the sub accelerates recognition of the entire gain, taking it out of the installment sale rules, but then deferring the gain under the consolidated return regulations.

(Jt. Ex. 109 at 698.)

39. In his October 2 e-mail, Mr. Schmidt described the anticipated problems with the IRS regarding Mr. Gould's theory, noting that there was no authority "(cases, reg[ulation]s or rulings)" to support an argument that a trust could join in a consolidated return with Principal. He concluded that "the question is whether we want to assume the risk in order to get the statutory gain in 1991." (Jt. Ex. 109 at 698; *see* Jt. Ex. 108.)

40. In an e-mail to Mr. Schmidt on October 3, 1991, Mr. Lettow inquired why Principal could not "use an established subsidiary like Petula to sell the installment note to. . . . Once the sub has assumed the liability and the installment note receivable, it could then transfer the note and liability to a trust if desired to get it off its books." (Jt. Ex. 69.)

41. Mr. Schmidt replied to Mr. Lettow's inquiry, by e-mail on October 3, 1991, that it might be necessary to use a trust in order to "get the liability off the [annual] statement."[7] (Jt. Ex. 69.)

42. Margie Johnson (Principal's Mortgage Underwriter--Commercial Real Estate) sent other team members an e-mail on October 3, 1991, suggesting that they meet between 8:00 and 9:00 the next morning, before their discussion with senior management, "especially in light of the recent suggestion by Pru for us to establish a trust to hold both the note payable and receivable." (Jt. Ex. 111; *see* Jt. Ex. 86 re: Ms. Johnson's position.)

43. Mr. Schmidt's notes recording that meeting at 8:00 the morning of October 4 reflect that he had stated that a trust would "need some equity - but I don't think we need a lot. $100,000 to $1 MM." (Jt. Ex. 112.)

44. In a memorandum to the file dated October 4, 1991, Mr. Schmidt analyzed in detail whether the interest charge under Code § 453A could be avoided by the sale of the installment note to a subsidiary, and whether a subsidiary trust could be eligible under the Consolidated Return Regulations (§§1.1502, *et seq.*) to enter into a "deferred intercompany transaction" as a member of an affiliated group. (Jt. Ex. 70.) He concluded:

> [I]t is my opinion that we can avoid application of the interest charge under Section 453A by a sale of the installment note to a subsidiary.

---

[7]*See Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 150 (1977):

> This national organization of state regulatory officials [the National Association of Insurance Commissioners, or NAIC], which acts on behalf of the various state insurance departments, performs audits on insurance companies like [Principal] which do business in many States. The NAIC accounting form, known in the industry as the "Annual Statement," is used by [Principal] for its financial reporting.

* * *

> [I]t is my opinion that a trust may be treated as a corporation and as a member of an affiliated group.

(Jt. Ex. 70 at 591, 594.)

45. Mr. Schmidt forwarded his October 4 file memorandum to other team members, noting that he expected the IRS auditors would challenge the proposed treatment of the Prudential transaction. (Jt. Ex. 71.)

46. In another memorandum to other team members on October 4, 1991, Mr. Schmidt stated that he and Jed Fisk (Principal's Associate Director for Corporate Tax) had narrowed the possibilities of which subsidiary should be used to hold the Prudential note and assume the liability to Prudential, "based on the following points:"

> 1. We do not wish to use an insurance company, as this creates regulatory road blocks.
>
> 2. We do not wish to use any company subject to regulation by the Securities and Exchange Commission, as it may create road blocks.
>
> 3. We do not wish to use any company that is generating losses, or that will generate losses during the next five years, as we believe that such losses will become ineligible (that is, they cannot be used to offset income from the life insurance companies).
>
> 4. We do not wish to use any company that has a substantial amount of equity, as we do not wish to place a large amount of equity at risk.
>
> 5. We do not wish to use any company that is engaged in business in a large number of states such that the transfer would generate state tax problems.
>
> The logical choice, in our view, is The Principal Financial Group, Inc.

(Jt. Ex. 93.)

47. Principal's Margie Johnson informed other team members in an e-mail on October 4,

1991, that Principal's senior management was still concerned about the potential cost of the proposed Prudential transaction "and may need some consideration to go forward." She therefore requested that Prudential be given--

> only limited feedback at this time re. our opinion of the tax avoidance. Craig [Barnes] did indicate to Pru that we were fairly confident that the proposal to avoid the tax hit would work, but he also postured the conversation by relaying that certain members of sr. mgmt. were not comfortable with even the small level of uncertainty concerning this proposal.

(Jt. Ex. 105.)

48. In an October 8, 1991, e-mail message to John Schmidt (with copies to Brad Jensen and Kurt Lettow, and then forwarded by Mr. Schmidt to Jed Fisk and Lillian Chen), Principal's Pat Bailey pointed out a problem with using The Principal Financial Group, Inc., as Mr. Schmidt had suggested. A law suit had been filed against that company, and there was also concern about the potential for losing the company name if bankruptcy, for example, should occur. The message concluded: "Do we not have the option of opening a new company in which to house this transaction?" (Jt. Ex. 99 at 671-72.)

49. Pat Halter sent an e-mail message to other team members on October 8, 1991, informing them that, in a phone conversation that day, Prudential was reluctant to agree to provide any additional consideration for the proposed transaction, and that Prudential–

> also noted that the installment sale idea with the sale of the receivable to an affiliate was passed on to their accounting firm DeLoitte Touche and their tax partner relayed to Pru that the structure would be effective in achieving it's [sic] purpose. . . . Frank [Gould] will be providing to Craig [Barnes] the name of the tax partner who we can call to discuss the Deloitte Touche opinion with. If this checks out Craig and myself are somewhat reluctant to pursue the consideration matter much further.

(Jt. Ex. 99 at 677.)

50. On October 9, 1991, Craig Barnes e-mailed Messrs. Schmidt and Fisk, noting that Pru's accountants (DeLoitte Touche) planned to recommend Frank Gould's "thinking on the tax deferral through consolidation" to all their tax partners. Mr. Barnes asked Mr. Schmidt if he would call Gene Ferraro to explore Deloitte Touche's opinion further. (Jt. Ex. 113.)

51. Mr. Schmidt called Mr. Ferraro, at Deloitte Touche, on October 10, 1991. Mr. Ferraro told him that some people in the firm agreed with Mr. Gould's analysis, but the firm had not written an opinion, and Mr. Ferraro "thinks there is some degree of risk here." Mr. Ferraro would charge $10,000 or more to write an opinion on the issue. Mr. Schmidt then noted, "Avoid § 6694, § 6662 penalties." (Jt. Ex. 114.)

52. On October 14, 1991, Principal's Vice President and Corporate Secretary, Joyce Hoffman, e-mailed Mr. Schmidt, stating:

> We could get an Iowa sub set up within a week, I believe. There are no capital requirements per se for a general purpose business corporation. If we undercapitalize, however, in comparison to the amount of capital the corporation needs to reasonably be able to meet its obligations, we . . . [remainder of message not provided by plaintiff].

(Jt. Ex. 99 at 678; *see* Jt. Ex. 80 at 614 re: Ms. Hoffman's title.)

53. Mr. Schmidt attended a meeting on October 15, 1991, at which--

> the consensus of the group was that we should create a new sub under Principal Holding Company to hold the asset and liability acquired from Principal Mutual that relate to the transactions.

He relayed this information in an e-mail to Ms. Hoffman on October 15, 1991, asking how to go about establishing the sub. (Jt. Ex. 115.)

54. Principal's Kris Anderson suggested possible names for the new subsidiary, all

beginning with "Principal," in an e-mail to Mr. Schmidt on October 16, 1991. The suggested names–

> are based on the idea that the name should contribute to our corporate identity by adding a name that we may find useful to have in the future, or which describes services Principal Mutual or its subsidiaries now do. In that way, we will already have a name "reserved" for possible future use.

(Jt. Ex. 115.)

55. Mr. Schmidt e-mailed other team members on October 24, 1991, with the news that Mr. Gould had informed his clients at Prudential "that Principal was going to put both the asset and liability in a sub, and that Pru would have a sub purchase the note it receives from Principal Mutual. Pru intends to retain the liability . . . ." (Jt. Ex. 99 at 671.)

56. On October 24, 1991, Margie Johnson discussed with Prudential's business people how to structure the installment notes, "and how they propose to do their intercompany sale to avoid the tax charges." They also discussed other potential problems, such as the documentation of the notes. "If the documentation shows that the notes are essentially secured by each other, do we take on any additional risk of not getting the tax treatment we desire?" Ms. Johnson e-mailed Mr. Schmidt and other team members on October 25, 1991, relaying this information, and noted that Prudential was still exploring the various options. "They have not ruled out doing the sale as we proposed and sell both the asset and liability to a single purpose sub, with the notes being non-recourse and essentially secured by each other." (Jt. Ex. 72.)

57. The "unraveling" transaction contemplated a sale to Prudential of the remaining mortgage loans acquired from it in 1985 (*i.e.*, those that had not been paid off through prepayments and scheduled amortization), consisting of approximately 71 loans having an aggregate principal balance of

$473 million, for an approximate aggregate sale price of $486 million, and the simultaneous purchase from Prudential of the remaining mortgage loans sold to Prudential in 1985 (*i.e.*, those not paid off through prepayments and scheduled amortization), consisting of approximately 131 loans having an aggregate principal balance of $494 million, for an approximate aggregate purchase price of $521 million. (Stip. ¶ 10.)

58. In a letter to Prudential's Mark Warner of November 7, 1991, Margie Johnson memorialized the highlights of the planned structuring of the transaction that had been determined among Prudential's and Principal's business, legal, and tax/accounting personnel in a conference call the previous week. (Jt. Ex. 86.)

59. *Inter alia*, in that conference the parties had determined:

> - Principal Mutual will issue a non-recourse note to Prudential in exchange for the purchase of the loans currently held by Prudential. This note payable will be secured by a note received by Principal Mutual from Prudential. The note receivable securing the note payable represents Prudential's consideration for its purchase of the loans held by Principal Mutual. Principal Mutual will sell the note from Prudential to a newly formed subsidiary in exchange for that subsidiary assuming Principal Mutual's obligation for the note payable to Prudential.
>
> - Prudential will issue a recourse unsecured obligation to Principal Mutual in exchange for the purchase of the loans currently held by Principal Mutual. . . . To the extent Prudential desires to assign this note to a subsidiary in the future, Prudential will remain liable.
>
> * * *
>
> - Both notes will need to mirror each other in terms of payments and maturity date with the exception of the $20 million approximate difference in principal balance which will need to be treated separately. . . .
>
> - Both parties need to consider how to treat the approximately $20 million difference in the total principal balance of the pools. Prudential prefers that Principal Mutual issue a note versus paying cash. Security and an appropriate

rate of return for this note need to be identified.

(Jt. Ex. 86 at 621-22.)

60. In his notes of a meeting of team members on November 7, 1991, Mr. Schmidt noted that if the Iowa Insurance Department characterized the transaction as an investment, there would be a problem. "It needs to be treated as a sale." (Jt. Ex. 116.)

61. In an e-mail to team members on October 25, 1991, Margie Johnson had informed them that she had created a "Mail ID" for the Prudential transaction--*i.e.*, "CRE.PRU"--so she would not have to type everyone's name. She identified the members as Pat Halter, Craig Barnes, Brad Jensen, Kurt Lettow, Cindy Cannon, John Schmidt, Jed Fisk, Lillian Chen, JoEllen Watts, and herself, along with anyone else they thought should be included. (Jt. Ex. 99 at 676.)

62. On November 11, 1991, Mr. Schmidt notified the other team members that Frank Gould had identified potential tax problems if Principal issued a non-recourse note to Prudential and used that note as security for Principal's subsidiary's payment of the liability to Prudential. When Mr. Schmidt told Mr. Gould that Principal would want its subsidiary to assume recourse liability, Mr. Gould–

> said that was not acceptable to Pru--Pru would have no ability to recover the debt should we refuse to pay, and they must have that legal right to recovery. So they want the original note to be recourse, even if only for a moment.
>
> I am still reviewing the tax rules, but I think Gould's concern is valid. I think it's time to request help from outside counsel on the tax side . . . .

(Jt. Ex. 74.)

63. Outside counsel Cynthia Williams of Day, Berry & Howard faxed a memorandum to

Margie Johnson, and Principal attorneys JoEllen Watts and John Schmidt, on November 12, 1991. The memorandum proposed a revised structure addressing the non-recourse note problem. *Inter alia*, the proposal stated:

> The NEWCO [*i.e.*, Principal's proposed newly-formed subsidiary] charter will provide that NEWCO may enter into no business or transactions other than the holding of these assets and the assumption of the Principal Notes payable. Any transfer or encumbrance of NEWCO's assets must be consented to by a majority of the shareholders of NEWCO. The NEWCO charter will also provide that the pledgee of such shares is entitled to vote as a stockholder. This should provide comfort that NEWCO cannot become bankrupt or engage in any business or transaction which might otherwise create a concern on Pru's part that the assets of NEWCO are not available for repayment of the nonrecourse Principal Notes.

(Jt. Ex. 76 at 602; *see* Jt. Ex. 152 at 806 re: Ms. Williams' affiliation with Day, Berry & Howard.)

64. Ms. Williams' proposal was faxed to the team members after a conference call the morning of November 12, 1991, during which they discussed the non-recourse note problem. In response to Margie Johnson's question whether they could show a payment guarantee by Principal on Principal's Annual Statement, Mr. Schmidt reminded the others that they needed to have no such disclosure on the Annual Statement in order "to support our tax position, ie [sic] business reason for sale to sub." (Jt. Ex. 76 at 603; *see* Jt. Ex. 64 (Margie Johnson's notes) at 518, 519.)

65. After reviewing Ms. Williams' faxed proposal, the team members added the Prudential people to the conference call and relayed her proposal to them. Mr. Gould wondered if Principal could be in a better tax position "if at moment of closing, we issue a recourse note, have it assumed by someone else if certain conditions were met. Then have sub assume liability." (Jt. Ex. 76 at 603-04.)

66. Mr. Schmidt then prepared a memorandum, dated November 12, 1991, to Pat Halter (Principal's Assistant Director--Commercial Real Estate) and Margie Johnson analyzing the tax

considerations of the non-recourse note problem. He concluded "that there is a significant risk that the Internal Revenue Service will maintain that we cannot defer recognition of the gain on the loans we sell if we use Prudential's note as security for our debt." (Jt. Ex. 77 at 605; *see* Jt. Ex. 31 at 290 re: Pat Halter's title.)

67. On November 13, 1991, attorney Cynthia Williams of Day, Berry & Howard faxed another memorandum, "Proposed Structure of Principal/Pru Portfolio Sales," to Principal attorneys Watts and Schmidt, and Margie Johnson. *Inter alia*, this proposal provided that Principal would pay the contemplated $520 million purchase price for its original mortgage loans by issuing two recourse unsecured purchase money notes payable to Prudential. It also provided that Principal, Prudential, and "a newly formed single purpose subsidiary of Principal ('NEWCO')" would enter into an agreement whereby, *inter alia*, Principal would sell its rights as payee under Prudential's note to NEWCO in exchange for NEWCO's assumption of Principal's obligations under its notes to Prudential; and that NEWCO would--

> agree for the benefit of Pru . . . that NEWCO may enter into no business or transactions other than the holding of these assets and the assumption of the Principal Notes payable. NEWCO will agree that any transfer or encumbrance of NEWCO's assets must be consented to by Pru.

(Jt. Ex. 78 at 608.)

68. Principal wrote to the Iowa Division of Insurance on November 15, 1991, enclosing a "Form D - Prior Notice of a Transaction," providing notice of the contemplated transaction with Prudential. *Inter alia*, Principal stated:

> We are carefully structuring the transaction so as to minimize adverse tax consequences. . . . We propose to sell the note we receive from Prudential to a subsidiary; the subsidiary would assume our liability on the note Principal Mutual issues to Prudential in consideration for the

> note purchased by the subsidiary. We will sell additional assets to the subsidiary to permit it to match cash flows on the asset and liability. As a result, the subsidiary will purchase assets with a fair market value of approximately $520 million and it will assume liabilities with a fair market value of approximately $520 million.
>
> We have not yet determined whether we will use an existing subsidiary or create a new subsidiary. We expect to close the transaction in 1991.

(Jt. Ex. 80 at 612.)

69. Principal's prior notice of the contemplated transaction with Prudential was sent to the Iowa Division of Insurance pursuant to § 521A.5(1)(b) of the Iowa Code, which provides:

> b. A domestic insurer and a person in its holding company system shall not enter into any of the following transactions between each other involving amounts equal to or exceeding the lesser of three percent of a nonlife insurer's admitted assets or twenty-five percent of the surplus as regards policyholders with respect to nonlife insurers, and equal to or exceeding three percent of the insurer's admitted assets with respect to life insurers, each as of the next preceding December 31, unless the domestic insurer notifies the commissioner in writing of its intention to enter into the transaction at least thirty days prior to entering into the transaction or within a shorter time permitted by the commissioner and the commissioner has not disapproved of the transaction within the time period:
>
> (1) Sales.
> (2) Purchases.
> (3) Exchanges.
> (4) Loans or extensions of credit.
> (5) Guarantees.
> (6) Investments.
> (7) Loans or extensions of credit to a person who is not an affiliate . . . .

(Jt. Ex. 80 at 611; Iowa Code § 521A.5(1)(b).)

70. Principal's prior-notice letter to the Iowa Division of Insurance was stamped "No objection" by the Division of Insurance, on December 18, 1991. (Jt. Ex. 119.)

71. Margie Johnson e-mailed the other Principal team members, on November 19, 1991, with the news that Prudential did not want specific rights of set-off specified in the transaction

documents. Ms. Johnson observed that–

> there is probably no risk in omitting the set off language from the documents. What it does mean, however, is that if there is a default by Pru, we will be forced to sue them on a monthly basis under their recourse obligation if we don't want to accelerate our tax hit.

(Jt. Ex. 87.)

72. Mr. Schmidt responded by e-mail the same day to Ms. Johnson's message, stating:

> I agree that the rights of setoff weaken our tax case, and I prefer to delete them if you are willing to accept the business risk.
>
> I do think we should retain the acceleration clause upon default--just in case we decide the business needs override the tax cost.

(Jt. Ex. 87.)

73. On December 6, 1991, Pat Halter and Margie Johnson submitted a memorandum to Principal's Investment Committee, recommending approval of the proposed transaction with Prudential. Describing the transaction structure, the memorandum stated, *inter alia*:

- Simultaneous with closing, Principal Mutual will sell the $486 million note from Pru and $34 million in Treasury obligations to a newly-formed, single-purpose subsidiary. Subsidiary will assume recourse obligation for the notes from Principal for $520 million.
- Principal Mutual is released from any recourse obligation.
- An additional $1-2 million will be required for capitalization of the subsidiary.

(Jt. Ex. 22 at 174.) The memorandum noted; "Anticipate transaction will be tax neutral (hold vs. sell), although the possibility exists for the IRS to challenge the structure. If the IRS is successful, the potential tax cost may be $9-10 million." (Jt. Ex. 22 at 175.)

74. Principal's Investment Committee approved the proposed transaction with Prudential. (Jt. Ex. 22 at 174, 175; Jt. Ex. 23.)

75. During several telephone conferences on December 9, 1991, among the various

Principal and Prudential transaction planners, recorded in John Schmidt's notes, the potential tax problems related to the proposed structuring of the transaction, and possible solutions, were discussed. (Jt. Exs. 121-23.)

76. Mr. Schmidt noted that there was a risk that, if Principal guaranteed its contemplated subsidiary's net worth, the IRS could use it as a "basis for reallocation to [Principal] Mutual or a finding of a sham." Frank Gould observed that they wanted to "give appearance that assets inside sub can be [with]drawn." (Jt. Ex. 121 at 713.)

77. Cindy (Cynthia) Williams noted the "tension" between Principal's goal of getting the liability to Prudential off its balance sheet and the "tax deal." (Jt. Ex. 122 at 715.)

78. The "tension" between the tax concerns and the recourse problem was the issue during the conference call beginning at 4:40 p.m. on December 9, 1991. In response to the question regarding how Prudential would protect itself if Principal would not issue a recourse note, Pat Halter stated that Principal "would accept a condition that we would not cause sub to violate charter," and Cindy Williams commented that Prudential would then be able to sue Principal for a violation by the subsidiary, since Principal was the sole shareholder. The Prudential people agreed to accept a covenant that the parent (Principal) would not cause the subsidiary to violate its charter, and the subsidiary would make covenants. (Jt. Ex. 123 at 718-19.)

79. In a conference call on December 11, 1991, with outside counsel Cindy Williams and Martin Allen, of Day, Berry & Howard, Principal's Assistant Counsel JoEllen Watts and John Schmidt again discussed the "tension" between the tax and economic goals. (Jt. Ex. 126 at 724.) Mr. Allen raised the issue whether the IRS could question whether the transfer to the subsidiary was "a good sale

or exchange. IRS could say that [it's] a § 351 transfer." (Jt. Ex. 126 at 724-25; *see* Jt. Ex. 139 at 747 re: Ms. Watts' title; *see* Jt. Ex. 152 at 806-07 re: Mr. Allen's affiliation with Day, Berry & Howard.)

80. In an e-mail to Margie Johnson, Pat Halter, and JoEllen Watts after that discussion with Mr. Allen, Mr. Schmidt stated:

> I don't think there is much risk with the section 351 incorporation issue; the only way to truly minimize the risk is to use an existing corporation that has other business, and we don't want to risk the assets in another corporation. Assuming we use a new, single-purpose sub, the best thing to do is to have the documents clearly state that this is a sale, not a capital contribution or transfer in exchange for stock. I recommend we proceed to close the deal.

(Jt. Ex. 125.)

81. In another conversation with John Schmidt later that day (December 11, 1991), Mr. Allen emphasized that Principal needed a sale "to get deferral under § 1.1502-13 of the [Regulations]." They also discussed the possibility that the IRS would find that the transfer to the subsidiary was a § 351 transaction, and also whether the IRS could take the position that there was no installment sale, but rather an exchange. (Jt. Ex. 124.)

82. Mr. Schmidt notified Johnson, Halter, and Watts about this call and that he and Mr. Allen had reviewed most of the potential tax problems, yet he stated, "Please proceed." (Jt. Ex. 125.)

83. On December 11, 1991, Cindy Williams faxed a draft of the proposed purchase agreement to JoEllen Watts, who forwarded it to John Schmidt, Margie Johnson, and Pat Halter with a handwritten note that stated in part: "Cindy has not yet incorporated John's suggestion re making clear that this is a sale, not a capital contribution or transfer in exchange for stock. She intends to add more explicit language." (Jt. Ex. 135.)

84. The next day, December 12, 1991, JoEllen Watts e-mailed Schmidt, Halter, and Johnson regarding a question raised by Cindy Williams in connection with "getting the sub rolling"--

> whether we intend to capitalize the sub and for how much and then [sell] the stock say for $1, or whether we want to forego any capitalization per se and put a price on the stock in the amount of money that [Principal] intends to move down. Cindy thought you may have an opinion due to tax reasons.

Mr. Schmidt replied:

> I prefer to issue the stock in exchange for the amount of capital we are placing in the sub, i.e., $1--2 million. This action supports our position that the transfer of the note and liability are a sale, rather than part of the incorporation of the sub in exchange for stock.

(Jt. Ex. 127.)

85. Mr. Schmidt spoke with Martin Allen again on December 12, 1991. Mr. Allen was still concerned about the possibility that the IRS would view the transfer to the subsidiary as a § 351 transaction. In that event, he concluded the subsidiary's assumption of Principal's liability would not be treated as **recognized** gain, by virtue of Code § 357, and thus Principal "can't rely on 357 to give us recognized gain. So the tension is on the sale, need § 1001 to apply, not 351." (Jt. Ex. 128.)

86. In an e-mail message that day (December 12, 1991) to Watts, Halter, and Johnson, Mr. Schmidt relayed Mr. Allen's concerns "whether the transfer to the sub is a sale, and whether the transfer allows us to escape the charge for interest on the deferred tax liability," and he noted that they would be having a conference call with Frank Gould the next day. (Jt. Ex. 129.)

87. Mr. Schmidt reported the gist of the next day's conference call to Watts, Halter, and Johnson, in an e-mail on December 13, 1991, stating:

> I talked to Martin Allen and Frank Gould this morning regarding some of the tax issues arising from this transaction. Allen is very concerned about the section 351 transfer issue (i.e., that the

> transfer of the note to the sub is a capital contribution), but we don't think Prudential has much risk on that point because they are using an existing sub that has some business, rather than a new shell corporation.
>
> Allen focused on the risk that the IRS would continue to charge the interest on the deferred tax liability even after the transfer of the note to the sub. We reviewed the example in the consolidated return regulations, discussed in my memo of October 28, which deals with the reverse situation: sub buys property, later sells to parent corp for a gain, then parent sells to third party in an installment sale. Gould does not think the example is a correct statement of the law (I agree). . . . Pru is willing to take this risk, as am I. But you should recognize that Allen has considerable discomfort with the position Pru and I am [sic] taking – that we can avoid the interest charge on the deferred tax liability.

(Jt. Ex. 131; *see* Jt. Ex. 130.)

88. By e-mail on December 16, 1991, to the other team members, Mr. Schmidt noted that most of the details had been worked out, except for the language for § 4.02 of the purchase agreement--

> (dealing with the assigment [sic] to the sub and containing language that must be in the articles of incorporation of the new sub).
>
> The name of the sub will be "Principal FC, LTD." The articles will be filed on Tuesday. Our outside counsel recommends that the $1 million in capital be transferred from Principal Holding Company and that Principal Mutual not make a transfer to the holding company until some later date.

(Jt. Ex. 83; *see* Jt. Ex. 132.)

89. The consideration to be paid by each party was to include two reciprocal promissory notes issued by Principal and Prudential, respectively, one payable by each purchaser in 1999, and the other payable by each purchaser in 2002. (Stip. ¶ 11.)

90. Cindy Cannon reported on December 16, 1991–

> The holding company has no money! Craig Bassett indicated that the transfer of money to the holding company did not take place this week because the name of the new sub was not

approved. He indicated that the money now could not be transferred until the end of the week. (Jt. Ex. 133.)

91. On December 17, 1991, the Articles of Incorporation of Principal FC, LTD. ("Principal FC") were filed with the Iowa Secretary of State. *Inter alia*, the Articles provided:

> 5. . . .
>
> (a) The corporation shall be and remain a single purpose corporation organized under the laws of a state in the United States.
>
> (b) The corporation shall not engage directly or indirectly in any business other than:
>
> (i) the ownership of the following (each an "Eligible Investment"):
>
> * * *
>
> (D) Purchase Money Notes due in 1999 and 2002 issued in an aggregate original principal amount not in excess of $525,000,000 by The Prudential Insurance Company of America pursuant to the Purchase and Sale Agreement, dated December 20, 1991, between The Prudential Insurance Company of America, as purchaser, and Principal Mutual Life Insurance Company, as seller, together with any note or notes issued in exchange therefor or replacement thereof pursuant to Article V of such Purchase and Sale Agreement; and . . . .
>
> (ii) the assumption of
>
> (A) The Purchase Money Notes due in 1999 and 2002 (the "Notes") issued in an aggregate original principal amount not in excess of $525,000,000 by Principal Mutual Life Insurance Company pursuant to the Purchase and Sale Agreement, dated December 20, 1991, between Principal Mutual Life Insurance Company, as purchaser, and The Prudential Insurance Company of America, as seller, together with any note or notes issued in exchange therefor or replacement thereof pursuant to Article V of such Purchase and Sale Agreement, and . . . .
>
> (c) The corporation shall not incur, permit or suffer to exist any indebtedness of the corporation except for the Notes.

(Jt. Ex. 25 at 180-81.)

92. Paragraphs 5(d)-(h) of Principal FC's Articles of Incorporation prohibited the corporation from disposing of any Eligible Investments unless they were replaced with others with the same characteristics, encumbering any of its assets, distributing any dividends to shareholders if such distributions would result in a negative net worth, making any loans or guarantees, owning or acquiring any stock (other than Eligible Investments), and merging with or transferring assets to any entity other than one having articles of incorporation identical to those of Principal FC. (Jt. Ex. 25 at 182.)

93. Paragraph 5(i) of Principal FC's Articles of Incorporation stated:

> The provisions of this paragraph 5 may not be amended or modified without the prior written consent of the registered owners of not less than 66 2/3 % of the aggregate outstanding principal balance of the Notes.

(Jt. Ex. 25 at 182.)

94. The following day Principal capitalized the new subsidiary with capital of $1 million, which was provided through a wire transfer of funds to the new subsidiary's account. Such capital remained intact in the subsidiary's account continuously throughout the years in suit, in the form of cash and/or investments. (Stip. ¶ 20.)

95. Because Prudential did not receive approval from its Board of Directors to accept cash for any part of the transaction, Principal would be giving Prudential a note for the $26 million asymmetrical piece at the closing, and Principal FC would have no involvement with that aspect of the deal. (Jt. Ex. 99 at 674; Stip. n.5.)

96. On December 20, 1991, a Purchase and Sale Agreement was executed between Principal as purchaser and Prudential as seller, with respect to a portfolio of 131 commercial mortgage loans that had been sold to Prudential in 1985. (Stip. ¶ 22; Jt. Ex. 31.)

97. Also on December 20, 1991, another Purchase and Sale Agreement was executed between Principal as seller and Prudential as buyer, with respect to a portfolio of 71 commercial mortgage loans that had been purchased from Prudential in 1985. (Stip. ¶ 23; Jt. Ex. 30.)

98. Section 4.02 ("Assignment of the Purchase Money Notes and Other Obligations") of each Purchase and Sale Agreement mandated in subsection (a) that the articles of incorporation of any assignee contain the identical covenants, requirements, and prohibitions that were contained in the Articles of Incorporation of Principal FC. (Jt. Ex. 30 at 222-23; Jt. Ex. 31 at 279-80; *see* Jt. Ex. 25 at 180-82.)

99. In addition, under § 4.02(b) of each Purchase and Sale Agreement, the purchaser covenanted that it would remain the sole shareholder of the assignee, that it would not cause or permit the assignee to violate any of its covenants, and that it would not cause any of the described "Insolvency Events" to occur. (Jt. Ex. 30 at 224; Jt. Ex. 31 at 281.)

100. In addition, under § 4.02(c) of each Purchase and Sale Agreement, the assignee covenanted that it would not violate its articles of incorporation, and that it would not sell, transfer, assign, or delegate its obligations regarding the Purchase Money Notes. (Jt. Ex. 30 at 224-25; Jt. Ex. 31 at 281-82.)

101. Section 4.02(d) of each Purchase and Sale Agreement provided:

> Purchaser's right to delegate its obligations under the Purchase Money Notes and to be released from liability thereunder as provided in this Section 4.02 is a one-time right. If Purchaser exercises its right to delegate its obligations under the Purchase Money Notes and is released from liability thereunder, and Purchaser thereafter assumes liability under one or more Purchase Money Notes, Purchaser shall have no further right to delegate its obligations under such Purchase Money Note and be released from liability thereunder.

(Jt. Ex. 30 at 226; Jt. Ex. 31 at 283.)

102. Article V of each Purchase and Sale Agreement governed the Notes. Section 5.01 of each agreement mandated:

> Each Purchase Money Note delivered by the Issuer on the Closing Date shall be dated as of the Closing Date. All other Purchase Money Notes that are delivered after the Closing Date for any other purpose under this Agreement shall be dated the date of their execution.

(Jt. Ex. 30 at 227; Jt. Ex. 31 at 284.)

103. Article I of each Purchase and Sale Agreement defined "Issuer" as follows:

> Issuer: The obligor under the Purchase Money Notes. The initial Issuer shall be the Purchaser. If the Purchaser is released from its obligations with respect to the Purchase Money Notes pursuant to Section 4.02, its assignee shall become the Issuer.

(Jt. Ex. 30 at 207; Jt. Ex. 31 at 264.)

104. The Purchase Money Notes were listed and described in Schedule V to each Purchase and Sale Agreement. (Jt. Ex. 30 at 258; Jt. Ex. 31 at 334.)

105. Representing the purchase price, Principal executed in favor of Prudential three promissory notes ("Purchase Money Notes") totaling $504,637,639. (Stip. ¶ 22.) Two of the notes, designated Purchase Money Notes Nos. 2 and 3, were each in the amount of $239,238,347; one was payable in full on January 1, 1999, and the other was payable in full on January 1, 2002. (Jt. Exs. 33, 34; Stip. ¶ 22.)[8] Both of these Purchase Money Notes were dated December 20, 1991. (Jt. Ex. 33 at 341, 348; Jt. Ex. 34 at 349, 355.)

106. Principal also executed promissory notes ("Purchase Money Notes" Nos. 4-7) to

---

[8] Purchase Money Note No. 1, in the amount of $26,160,945, was payable in full on January 1, 1999. (Jt. Ex. 32; Stip. ¶ 22.)

Prudential's subsidiaries PruSupply Capital Assets, Pruco Life Insurance Company, and Prudential Realty Securities II, Inc. (two notes) in the same total amount as that of Purchase Money Notes Nos. 2 and 3. (Jt. Exs. 35-38; Stip. ¶ 22.) All four of these Purchase Money Notes were dated December 20, 1991. (Jt. Ex. 35 at 356, 362; Jt. Ex. 36 at 363, 368; Jt. Ex. 37 at 369, 374; Jt. Ex. 38 at 375, 380.)

107. Thus, Principal executed:

- Purchase Money Note No. 1 ($26,160,945) payable to Prudential on January 1, 1999;[9]
- Purchase Money Note No. 2 ($239,238,347) payable to Prudential on January 1, 2002;
- Purchase Money Note No. 3 ($239,238,347) payable to Prudential on January 1, 1999;
- Purchase Money Note No. 4 ($100,000,000) payable to Prudential's subsidiary PruSupply Capital Assets on January 1, 2002;
- Purchase Money Note No. 5 ($70,000,000) payable to Prudential's subsidiary Pruco Life Insurance Company on January 1, 2002;
- Purchase Money Note No. 6 ($69,238,347) payable to Prudential's subsidiary Prudential Realty Securities II, Inc., on January 1, 2002; and
- Purchase Money Note No. 7 ($239,238,347) payable to Prudential's subsidiary Prudential Realty Securities, Inc., on January 1, 1999.

Purchase Money Notes Nos. 2 and 3 (payable to Prudential) totaled $478,476,694. Purchase Money Notes Nos. 4-7 (payable to Prudential's subsidiaries) also totaled $478,476,694. (Purchase Money Notes 2 and 3, from Principal to Prudential were cancelled.) (Stip. ¶ 25.)

---

[9]This note did not figure in the arrangement with Principal FC. (Stip. n.5.)

108. Representing the purchase price, Prudential executed in favor of Principal its promissory notes ("Purchase Money Notes"), designated Purchase Money Notes 1 and 2, each in the amount of $239,238,347, payable in full on January 1, 2002, and January 1, 1999, respectively. (Jt. Exs. 39, 40; Stip. ¶ 23.) Both of these Purchase Money Notes were dated December 20, 1991. (Jt. Ex. 39 at 381, 386; Jt. Ex. 40 at 387, 392.)

109. On December 20, 1991, Prudential executed promissory notes ("Purchase Money Notes" Nos. 3 and 4) to Principal FC in the same total amount as that of Purchase Money Notes Nos. 1 and 2. (Jt. Exs. 41, 42; Stip. ¶ 24.) Both of these Purchase Money Notes were dated December 20, 1991. (Jt. Ex. 41 at 393, 398; Jt. Ex. 42 at 399, 404.)

110. Thus, Prudential executed:

- Purchase Money Note No. 1 ($239,238,347) payable to Principal on January 1, 2002;
- Purchase Money Note No. 2 ($239,238,347) payable to Principal on January 1, 1999;
- Purchase Money Note No. 3 ($239,238,347) payable to Principal FC, Ltd., on January 1, 2002; and
- Purchase Money Note No. 4 ($239,238,347) payable to Principal FC, Ltd., on January 1, 1999.

Purchase Money Notes Nos. 1 and 2 (payable to Principal) totaled $478,476,694. Purchase Money Notes Nos. 3 and 4 (payable to Principal's subsidiary, Principal FC) also totaled $478,476,694. (Stip. ¶ 26.)

111. On December 20, 1991, Prudential's Purchase Money Notes Nos. 1 and 2, payable to Principal, were cancelled. (Jt. Exs. 43, 44; Stip. ¶¶ 24, 26; *see* Jt. Ex. 142.)

112. Principal's Purchase Money Notes Nos. 1-3, payable to Prudential, were also cancelled. (Jt. Exs. 45-47; Stip. ¶¶ 22, 25.)

113. Principal's Closing Agenda for the closing on December 20, 1991, reflects that, among the documents delivered at Closing were the Purchase Money Notes payable to Principal, copy of the cancelled Purchase Money Notes payable to Principal, and the Purchase Money Notes payable to Principal FC, and a related "escrow letter." (Jt. Ex. 52 at 451, 452, 454.)

114. The escrow letter, dated December 20, 1991, signed by the representatives of Principal, Principal FC, Prudential, and Prudential's subsidiaries, requested that the law firm Cadwalader, Wickersham & Taft acknowledge that it was holding in escrow, *inter alia*, the Purchase Money Notes from Prudential to Principal (totaling $478,476,694); the Purchase Money Notes from Principal to Principal FC (totaling $478,476,694); an executed "Sale, Assignment, Assumption and Release Agreement" that was stated in its opening paragraph as being dated December 23, 1991; Principal's letter of instructions to Prudential (executed and dated December 23, 1991) regarding the "transfer of Purchase Money Notes from [Principal] to Principal FC"; and other documents related to Principal FC. (Jt. Ex. 139 at 745, 747, 748, 750.)

115. In the Principal/Prudential December 20 letter, Cadwalader was instructed to cancel the Purchase Money Notes from Prudential to Principal (totaling $478,476,694), and to deliver the other documents to the parties, upon faxed instructions from Principal expected on December 23, 1991. (Jt. Ex. 139 at 745.)

116. Cadwalader countersigned the escrow letter, "Accepted and Agreed." (Jt. Ex. 139 at 747.)

117. Also on December 20, 1991, Principal and Principal FC each gave a separate letter of instruction to Prudential for wire transferring Prudential's payments with respect to "the Purchase Money Notes issued by you pursuant to that certain Purchase and Sale Agreement, dated December 20, 1991 . . . and payable to the undersigned . . . ." (Jt. Exs. 140, 141.)

118. One instruction letter directed that Prudential's payments should be "for credit to Principal Mutual Life Insurance Company Account No. 014752." (Jt. Ex. 140.) The other letter directed that Prudential's payments should be "for credit to Principal FC, Ltd. Account No. 7051417." (Jt. Ex. 141.)

119. The parties to the "Sale, Assignment, Assumption and Release Agreement," which bore a date of December 23, 1991, were PruSupply Capital Assets, Inc., Pruco Life Insurance Company, and Prudential Realty Securities II, Inc. (the "Payees"); and Principal Mutual Life Insurance Company, and Principal FC. Prudential was not a party to that agreement. (Jt. Ex. 53 at 455.)

120. The "Sale, Assignment, Assumption, and Release Agreement" ("Assignment Agreement") stated, *inter alia*, that Principal desired to "sell" the "Assets" (defined as the Purchase Money Notes Nos. 1 and 2 from Prudential payable to Principal, listed in the attached Schedule B) to Principal FC in return for Principal FC's assumption of liability on Principal's two notes to Prudential (Principal's Purchase Money Notes Nos. 2 and 3). (Jt. Ex. 53 at 455, 456, 465.)

121. The Assignment Agreement also stated, in § 2.02, that the "Payees" (*i.e*, Prudential's subsidiaries) agreed to the transfer, and (in § 2.01) that Principal and Principal FC intended the transaction was "a sale . . . and not a capital contribution or a transfer in exchange for stock." (Jt. Ex. 53 at 458, 457.)

122. In § 3.01 of the Assignment Agreement, Principal FC covenanted that it would not violate its Articles of Incorporation, that it would not amend or modify ¶ 5 of its Articles of Incorporation "without the prior written consent thereto of the Payees who are the registered owners of not less than 66 2/3 % of the aggregate outstanding principal balance of the Notes." in addition, Principal FC covenanted that it would not transfer its obligations related to the Notes without the owners' prior written consent, except if the obligations were assumed by Principal. (Jt. Ex. 53 at 458-59.)

123. In § 3.02 of the Assignment Agreement, Principal also agreed, *inter alia*, to remain "the sole direct or indirect shareholder of [Principal FC]," to not cause or permit any "Insolvency Events" with respect to Principal FC, and to not cause or permit any violation of Principal FC's Articles of Incorporation. (Jt. Ex. 53 at 459-60.)

124. At 8:56 a.m. on December 23, 1991, Margie Johnson sent the following e-mail to the team members and others:

> Subject: It's over!!!!
>
> Just wanted to let you all know that the Pru transaction officially closed on Friday. The final gain ended up to be approx. $65.1 million for statutory purposes. The mortgage loan account increased by approx. $90 million. Thanks for all of your help.

(Jt. Ex. 99 at 673.)

125. On December 26, 1991, John Schmidt e-mailed Lillian Chen, Jed Fisk, *et al.*--

> The commercial mortgage loan purchase and sale closed last Friday, resulting in a gain of $65 million. I will try to get my files in order for the IRS auditors.
>
> * * *
>
> I plan to do memos summarizing each transaction next month. I am pretty confident each will withstand attack by the IRS, but only time will tell.

(Jt. Ex. 99 at 673.)

126. As of December 31, 1991, the books of Principal FC showed the following:

| | Debits | Credits |
|---|---|---|
| Cash in Bank - Checking | 53,602.08 | |
| Interest Receivable | 1,249,940.62 | |
| Bond Par | 950,000.00 | |
| Discount on Bond | | 1,921.11 |
| Note[s] Receivable | 478,476,694.00 | |
| Accrued Interest, Notes Payable | | 1,249,940.62 |
| Federal Income Tax Payable | | 571.53 |
| State Income Tax Payable | | 190.04 |
| Notes Payable | | 478,476,694.00 |
| Capital Stock | | 1,000,000.00 |
| Accrual of Discount on Bonds | | 1,680.97 |
| Miscellaneous Interest Income | | 937,455.46 |
| Miscellaneous Interest Expense | 937,455.46 | |
| Taxes - FIT | 571.53 | |
| Taxes - SIT | 190.04 | |
| Company Total | 481,668,453.73 | 481,668,453.73 |

(Stip. ¶ 28.)[10]

127. In the 1991 consolidated federal income tax return filed by Principal with its subsidiaries (including Principal FC Ltd.), Principal reported the mortgage loan sale to Prudential for the aggregate selling price of $477,057,257. The mortgage loans had an aggregate tax basis of $409,024,660, and Principal thus showed a gain on the sale of $68,032,598. Using IRS' Installment Sale Form 6252, Principal elected to report such gain for tax purposes on the installment method under Code § 453, and did not include any of the gain in its income for that year. Neither its 1991 return nor its consolidated returns for subsequent years showed any interest on deferred tax calculated pursuant to Code § 453A.

[10]The "Discount on Bond" figure in ¶ 28 of the stipulation contains a typographical error. The correct figure is "$1,921.11."

(Stip. ¶ 29.)

128. On January 29, 1993, Prudential's tax attorney, Frank Gould, called John Schmidt with a question about the 1991 mortgage loan transaction which Mr. Schmidt described in an e-mail that day to Doug Cunningham:

> Pru wants to know whether we eliminated our liability to Pru from Principal Mutual's annual statement, and whether our outside auditors approved of that action (Gould called it defeasance), even though it may not have met the GAAP rules for defeasance. How should I respond?
>
> I assume Pru is considering a similar action, or already took such action and is not getting a favorable response from its auditors.

(Jt. Ex. 101.)

129. Mr. Cunningham responded by e-mail on February 1, 1993:

> We definitely did eliminate the liability from Principal Mutual's books when we assigned the notes and the receivable to Principal FC, Ltd. Ernst & Young were fully aware of the transaction, but apparently did not pass judgement on whether or not it met the rules for defeasance. I think they were only looking at the transaction in the sub up to the holding company level.
>
> It would seem clear to me the transaction would not meet FAS 76 requirements since that standard is very specific and restictive [sic] about what assets can be invested in in [sic] the trust. Such assets must be essentially risk free – like U.S. government obligations. The receivable clearly does not qualify.

(Jt. Ex. 101.)

130. The IRS audited Principal's consolidated returns for the taxable years 1991-1994.

(Stip. ¶ 30.)

131. In an e-mail regarding Principal FC on November 6, 1995, John Schmidt advised Mary Bricker, JoEllen Watts, and Rich Pullen:

> I reviewed my file regarding the purchase of commercial mortgage loans from Prudential in 1991. It appears that we set up a new subsidiary late that year for several reasons. First, we issued an installment note in consideration for the loans we purchased; we did not want to show that debt on Mutual's annual statement. By transferring the liability to a sub, with sufficient assets to cover the debt, we applied the concept of defeasance and eliminated the liability. Second, we set up a new sub in order to assure the seller the risk of default was very small; a new sub would not have any risk from prior business transactions or ownership of property. Thus the new sub was considered "bankruptcy remote." Finally, there were some tax considerations that related to the use of a sub. I would not mention those to the IRS, however, as there is a possibility the IRS would not understand.

(Jt. Ex. 134.)

132. In a memorandum dated November 6, 1995, Rich Pullen responded to IRS examiner Barry Leib's Information Document Request (IDR) No. FP-06 regarding Principal FC. Mr. Pullen discussed the first two reasons related by Mr. Schmidt for setting up the new subsidiary, and did not mention the "tax considerations." (Jt. Ex. 138.)

133. The IRS determined that Principal was liable for additional federal income tax consisting of interest on its deferred tax liability under Code § 453A. Principal paid the additional amounts assessed as a result of the Service's determination and was allowed a deduction by the IRS for those amounts. Principal later unsuccessfully sought refunds through the administrative process, and subsequently brought this suit for refund. (Stip. ¶ 30.)

<u>The Guaranty Fund Assessments Issue</u>[11]

134. The disallowed portions of Principal's claims for refund also included disallowance of certain deductions claimed by Principal for the years 1991-1994 for state insurance guaranty fund

[11]This issue also applies to Principal's subsidiary, Principal National Life Ins. Co. For the sake of brevity, references to Principal National are omitted here. The parties agree, however, that the ultimate disposition of this issue for the years in suit also applies to Principal National. (Stip. n.6.)

assessments paid by it in those years. (Stip. ¶ 33.)

135. In general, state guaranty fund associations are authorized to levy assessments against insurance companies licensed to do business in their states, in order to provide a fund for the protection of policyholders of companies that became insolvent, and to support the orderly rehabilitation or liquidation of insolvent insurers. (Stip. ¶ 35.)

136. State guaranty fund associations were created by state legislation, generally based on the Model Life and Health Insurance guaranty Fund Association Act adopted in 1970 by the National Association of Insurance Commissioners ("NAIC"). (Stip. ¶ 35; NAIC Model Laws, Regulations and Guidelines, Life and Health Insurance Guaranty Association Model Act, Legislative History Cited to the Proceedings of the NAIC (hereinafter, "Model Act Legis. Hist."), WestLaw citation NAIC 520-51 at 22.)

137. The Iowa Life and Health Insurance Guaranty Association Act, Chapter 508C, Code of Iowa ("the Iowa Act"), enacted in 1987, is illustrative of the state statutes that were enacted on the subject. (Stip. ¶ 37.)

138. Section 508C.5 of the Iowa Act provides[12] that a "person" licensed to transact any kind of insurance to which Chapter 508C applies is a "member insurer" of the association, and Section 508C.6 provides that such insurers are required to remain members "as a condition of their authority to transact insurance business in this state." Section 508C.2 provides that "members of the association are subject to assessment to provide funds to carry out the purpose" of providing protection against

[12]For stylistic purposes, the present tense is used. There is no dispute that the cited provisions were in effect during the tax periods at issue.

failure in the performance of contractual obligations under insurance policies and annuities as a result of the impairment or insolvency of the member that issued the policies. Section 508C.7 provides for a board of directors composed of member insurers whose selection is subject to approval of the state insurance commissioner, who is charged with ensuring that all member insurers are fairly represented. Section 508C.9(1) provides that "the board of directors shall assess the member insurers . . . at the time and for the amounts the board finds necessary." (Stip. ¶ 37.)

139. The NAIC Model Act contained an optional provision (Section 13) that would permit a member life insurance company to offset up to 20 percent of its assessment against its state premium tax, franchise tax, or income tax liability for each of the five succeeding calendar years until the assessment was recouped. The "Comment" to Section 13 of the Model Act stated, *inter alia*, that this treatment of the assessments would have the "positive effect" that "participation in the economic loss would be shared, to some degree, by the general public rather than solely by insureds, thus minimizing what might otherwise be a penalty on thrift and savings." The "Comment" stated that, in addition, the offset would give the states incentives to provide adequate funding for insurance department oversight functions. (Stip. ¶ 38.)

140. Most states had a state premium tax, which is in the nature of an excise tax, levied by a state on the premiums collected by an insurance company in that state, in lieu of a state income tax. (Tr. 72.)

141. A 1977 amendment to the Model Act clarified that the state tax offset is optional. (Model Act Legis. Hist. 22.)

142. During the years in suit, the statutes of 35 states included the 20-percent-per-year

offset provision, while another 8 states and the District of Columbia provided for offsets in different amounts. Seven states and Puerto Rico allowed no offsets. (Stip. ¶ 38.)

143. Section 508C.19(1) of the Iowa statutes provides credits against an insurer's state premium tax liability for guaranty fund assessments paid, up to 20 percent of the payment for each of the succeeding five calendar years. (Stip. ¶ 39.)

144. During the years in suit, Principal paid the total amounts of all assessments made by state guaranty fund associations in the states in which it did business. (Stip. ¶ 40.)

145. When Principal paid a guaranty fund assessment to a state that allowed no offset against future premium taxes, that payment was deducted by Principal in full in the year paid, both for NAIC Annual Statement purposes and for federal income tax purposes. The full amount of the payment was included in Line 6, entitled "All other taxes," on Exhibit 6 ("Taxes, Licenses and Fees") of the NAIC Annual Statement. (Stip. ¶ 41; *see* Jt. Ex. 185 at 1244.)

146 . A guaranty fund assessment payment recorded on Exhibit 6, Line 6, of the NAIC Annual Statement was also included on line 23, entitled "Insurance taxes, licenses, and fees," on the Summary of Operations page of the Annual Statement. (Stip. ¶ 41; *see* Jt. Ex. 185 at 1243.)

147. The same amount shown on line 23, "Insurance taxes, licenses, and fees," on the Summary of Operations page of the Annual Statement appeared as a deduction in the "Other Deductions" schedule of Principal's federal income tax returns. (Stip. ¶ 41; *see* Jt. Ex. 174 at 1199.)

148. When Principal paid a guaranty fund assessment to a state that did allow offsets against future premium taxes, that payment was capitalized as an asset and amortized by Principal over the five-year period permitted by the state, both for NAIC Annual Statement purposes and for federal

income tax purposes. Only the amortized amount of the payment was included in Exhibit 6, Line 6, as well as on Line 23 of the Summary of Operations, of the NAIC Annual Statement. (Stip. ¶ 42; Tr. 63-64, 66; *see* Jt. Ex. 148 at 787 (second paragraph under part II(A)).)

149. Some states required the payments of the guaranty fund assessments to be capitalized, in order for the insurer to qualify for the offset against premium taxes. (Tr. 74, 75.)

150. Another reason why Principal capitalized the payments to states that allowed premium tax offsets was that if the payments were not capitalized, Principal's statutory surplus would be reduced correspondingly. It was important to Principal to recognize the asset on its books so as not to take the surplus reduction. (Tr. 75.)

151. Thus, on its federal income tax returns for tax years prior to 1991, (1) Principal deducted in full only the assessments paid to guaranty fund associations in states which allowed no offset against future state taxes; (2) with respect to states that allowed offsets, Principal capitalized the assessments paid and amortized them ratably over the periods prescribed; and (3) only the sum of those amounts (full deductions for states that allowed no offsets plus amortized amounts for states that allowed offsets) was included in "Insurance Taxes" on Exhibit 6, line 6, of the Annual Statement, and deducted by Principal as a part of "Other Deductions" in its tax returns for those years. (Stip. ¶ 42.)

152. In a memorandum dated September 30, 1991, to Lillian Chen (copies to Jed Fisk and John Schmidt), Kathy Ennis reported that she had learned at an industry meeting that other insurance companies were expensing rather than capitalizing their guaranty fund assessment payments. She raised the issue, "What argument should we use to persuade the [Internal Revenue] Service that we should be allowed to change our accounting method? " (Jt. Ex. 144 at 760.)

153. Ms. Ennis observed:

> Connecticut Mutual applied for a Category A change of accounting method for the 1984 tax year. The IRS denied the accounting mehtod change and currently this is being appealed. . . .
>
> * * *
>
> We will need to argue that the guaranty fees are ordinary and necessary business expenses under Code Sec. 162. In addition to the requirement that an expense must be "ordinary and necessary", [sic] no deduction may be claimed by a taxpayer until the "all events" test of Reg. Sec. 1.461-a(a)(2) is satisfied.
>
> * * *
>
> . . . Connecticut Mutual was able to convince the IRS that the guaranty fund assessment amounts were ordinary and necessary expenses under Code Sec. 162. However they had difficulties persuading them that the "all events" test under Code Sec. 461 had been satisfied.
>
> * * *
>
> Lillian, you indicated that you prefer to approach the auditors with this adjustment during the 1987-88 audit. Therefore, Bill Ng is summarizing the 1987 through 1990 amounts which would need to be adjusted.

(Jt. Ex. 144 at 760-61.)

154. Ms. Chen raised the issue during the IRS audit of Principal's 1987-1988 tax returns, and it was treated by the examiner as an informal claim. (Jt. Ex. 145 at 762, 763.) The IRS sent Principal a notice that it proposed to disallowed the claim, on February 10, 1992. (Jt. Ex. 145 at 762.)

155. The IRS's proposed disallowance of Principal's informal claim was based on two alternative grounds:

> . . . Since it is reasonably certain that the Company's assessments under a State Guaranty Act will be recovered as an offset to future state taxes, it is appropriate to capitalize the assessments over the period in which the tax offsets are applied. To the extent that the guaranty assessments are applied as an offset to state taxes in a future year, the Company should recognize the amount of the tax offset as a reduction in the deduction for state taxes in the taxable year the offset is applied.
>
> Alternative Position: The Company's method of accounting for assessments under a State Guaranty Act is to capitalize the assessments and amortize the amounts over a 5 year period. Under current law it is clear that accounting methods required for state regulatory purposes apply. Accordingly, to the extent not inconsistent with Federal income tax accounting rules, all

> such computations shall be made in a manner consistent with the manner required for purposes of the Annual Statement approved by the National Association of Insurance Commissioners. The NAIC requires capitalization since many states allow premiums tax credit for this amount of the payment taken over several years. Therefore, to claim a deduction for payments made in the current year constitutes a change in method of accounting subject to the Commissioner's consent and the rules thereunder.

(Jt. Ex. 145 at 763-64.)

156. On April 7, 1992, Principal attorney Randy Bergstrom sent a memorandum to IRS agent Paul Kamp (blind copies to John Schmidt and Jed Fisk), disagreeing with the proposed disallowance based on his contention that Principal's right to the state tax offsets was not fixed under the "all events" test. Mr. Bergstrom made no contention that the assessments were "taxes" deductible under Code § 164. (Jt. Ex. 146; *see* Tr. 13, ll. 18-21, re: Mr. Bergstrom.)

157. Mr. Bergstrom's handwritten notes of April 9 reflect that he was analyzing issues related to a change of accounting method, the "all events" test, and the treatment of guaranty fund assessments for book and Annual Statement purposes. (Jt. Ex. 136.) *Inter alia*, he wrote, "We show as admitted [assets for Annual Statement purposes] since 87." There was one tentative reference to § 164: Mr. Bergstrom wrote, "Tax? § 164." (Jt. Ex. 136 at 738, 737.)

158. John Schmidt discussed the guaranty fund assessments issue on June 20, 1992, with Dennis Nelson of Peat Marwick. Mr. Nelson advised that many companies had adopted the capitalization accounting method for these assessments, and were requesting permission to change their method. Mr. Schmidt noted that, under Revenue Procedure 92-20, since Principal was under audit, the deadline for filing a request was "Monday." (Jt. Ex. 200.)

159. Principal completed Form 3115 ("Application for Change in Accounting Method"), to

be effective for its tax year 1992, and an accompanying "Statement of Relevant Facts," along with a cover letter from John Schmidt dated June 29, 1992, requesting application of the transition rules under Revenue Procedure 92-20. (Jt. Ex. 147 at 768, 770,777, 778.)

160. Principal's Statement of Relevant Facts supporting the contemplated method-change request averred, *inter alia*, that "[t]he assessments by the state guaranty associations and the state comprehensive health insurance associations are best characterized as taxes . . . deductible in full in the year paid or accrued under section 164 of the Internal Revenue Code." (Jt. Ex. 147 at 778.)

161. Principal's Application for Change in Accounting Method with respect to the guaranty fund assessments was not filed. (Jt. Ex. 147 at 768.)

162. For the first time in 1993, the NAIC Annual Statement Instructions for Exhibit 6, Line 6 ("All Other Taxes") stated:

> Include: Guaranty fund assessments and taxes of Canada or of any other foreign country not specifically provided for elsewhere.

(Stip. ¶ 44; Jt. Ex. 159 at 832.) Prior to 1993, the Annual Statement Instructions for Exhibit 6, Line 6 did not mention guaranty fund assessments. (NAIC Annual Statement Instructions--Life, Accident & Health (1992) at 73-74.)

163. For the tax years 1991 through 1994, Principal claimed as deductions on its federal income tax returns the total amounts of all guaranty fund assessments paid in such years that are at issue in this suit. (Stip. ¶ 43.)

164. Principal did not obtain the prior consent of the IRS to treat the previously-capitalized and amortized guaranty fund assessment payments as state "taxex" currently deductible under § 164.

(Stip. ¶ 45.)

165. Principal's 1991 and 1992 returns were audited by the IRS in 1995. (Jt. Ex. 148 at 782.)

166. In May of 1995, Principal had received a guaranty fund assessment from the State of Pennsylvania that included annuities. By e-mail on May 24, 1995, Rich Pullen asked John Schmidt and Randy Bergstrom whether it should be expensed or capitalized. In that context, Mr. Pullen commented:

> First, for tax we currently expense all guaranty assessments in the year paid. I know this will be an audit issue in the next few years. . . .
>
> Next, for books it appears the capitalization policy is to capitalize all guarantee assessments for which we believe we may get a future benefit. . . . Currently, the method used for books does not affect the tax treatment. However the IRS may question why we capitalized it for books and not for tax.
>
> It appears that book and tax are at odds . . . .

(Jt. Ex. 151 at 803-04.)

167. In his e-mailed response on May 24, 2005, Mr. Bergstrom agreed that "[t]he tax treatment is totally separate," and he recommended expensing the Pennsylvania assessment for tax purposes, since "we are still left with our argument that expensing the payment is our method of accounting." (Jt. Ex. 151 at 803.)

168. After the IRS proposed to disallow expensing of the amortizable portion of the guaranty fund assessment payments claimed as deductions on Principal's 1991 and 1992 returns, Randy Bergstrom sent a memorandum, dated November 28, 1995, to IRS agents Bonnie Libby and Larry Wiese setting forth Principal's grounds for disagreeing with the proposed disallowance. (Jt. Ex. 148.)

169. In his memorandum to the IRS, Mr. Bergstrom contended that all of the guaranty fund assessments were taxes that were currently deductible under Code § 164, and that the treatment of these payments on Principal's Annual Statement did not clearly reflect its income for federal tax purposes. (Jt. Ex. 148 at 782-87.) He then stated:

> The taxpayer has deducted assessments paid to state guaranty associations in states that do not allow a tax offset in the year of payment. The taxpayer has shown the assessments paid to state guaranty associations in states that allow a tax offset on the Annual Statement and amortized those amounts over a period of five years.
>
> The present method of accounting does not clearly reflect income. . . .

(Jt. Ex. 148 at 787.)

170. As late as September of 1999, Principal was still trying to develop arguments to support its contention that the guaranty fund assessments are "taxes" deductible under Code § 164. (Jt. Ex. 150.) As part of that effort, Mr. Bergstrom ordered research on the characteristics and the operation of four states' guaranty associations and the enabling legislation. In a memorandum dated September 30, 1999, Jim Madden reported to Mr. Bergstrom that all four states' associations operated virtually identically, and concluded:

> In all cases, the taxing authority for the state is separate from the oversight authority for the fund association. Also, the monies collected by the fund associations are maintained separate from the state's general account. I will continue to look for additional information relating to the operation of these fund associations. However, for now, this is all I have found.

(Jt. Ex. 150 at 802.)

171. After Principal's treatment of the guaranty fund assessments on its 1991-1994 returns was disallowed by the IRS, Principal filed timely refund claims for tax years 1991-1994, based on virtually the same grounds alleged in Mr. Bergstrom's memorandum of November 28,

1995. (Jt. Exs. 1, 2, 6, 7; *see* Jt. Ex. 148.) The claims were disallowed (Jt. Ex. 4, 8.), and Principal timely filed this suit thereafter.

Respectfully submitted,

S/Mary M. Abate

MARY M. ABATE
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6507

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section
WILLIAM K. DREW
Reviewer

S/William K. Drew

Of Counsel

June 8, 2005