IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1278T
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**PLAINTIFF'S REPLY BRIEF**

Bruce Graves
Brown, Winick, Graves, Gross,
Baskerville and Schoenebaum, P.L.C.
Suite 2000, Ruan Center
666 Grand Avenue
Des Moines, Iowa 50309
Telephone: 515/242-2400
Fax: 515/283-0231

ATTORNEY FOR PLAINTIFF

# TABLE OF CONTENTS

**Page**

**Table Of Authorities ........................................................................ ii**

**Argument ...........................................................................................1**

**I. Section 453A Does Not Apply Because Principal Properly Avoided It. ...........................................................................................1**

**A. Because Neither Transaction Was Tax Motivated, Principal's Tax Planning Is Not Relevant .........................................1**

**B. The Step Transaction Doctrine Does Not Apply ..........................4**

**C. The Prudential Notes Were *Sold* By Principal To Principal, FC...........................................................................................6**

**II. Guaranty Fund Assessments Are Deductible Currently As Taxes. ...........................................................................................9**

**A. The Assessments Are A State Tax Within The Meaning Of §164 ...........................................................................................9**

**B. There Is No Contingency That Precludes Deductibility ..........12**

**C. Treating Similar Items Similarly Is Not A Change Of Accounting Method ...........................................................13**

**Conclusion ..........................................................................................21**

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Associated Wholesale Grocers, Inc. v. U.S.*, 927 F.2d 1517 (10th Cir. 1991) .......... 4

*Bragdon v. Abbott*, 524 U.S. 624 (1998) .......... 12

*Burrell Groves, Inc. v. Comm.*, 223 F.2d 526 (5th Cir. 1955) .......... 7

*Cargill, Inc. v. U.S.*, 91 F. Supp.2d 1293 (D. Minn. 2000) .......... 13, 14, 17

*Charles Baloian Co. v. Comm.*, 68 T.C. 620 (1977) .......... 12, 13

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)* .......... 12

*Chicago & Northwestern Transportation Co. v. Webster County Board of Supervisors*, 71 F.3d 265, 267 (8th Cir. 1995) .......... 11

*Comm. v. Brookshire Bros. Holding, Inc.*, 320 F.3d 507 (5th Cir. 2003) .......... 20

*Comm. v. Brown*, 380 U.S. 563 (1965) .......... 8

*Comm. v. Newman*, 159 F.2d 848 (2nd Cir. 1947) .......... 1

*Convergent Technologies, Inc. v. Comm.,* 70 TCM (CCH) 87 (1995) .......... 20

*Cottage Savings Assoc. v. Comm.*, 409 U.S. 559 (1991) .......... 6

*Coulter Electronics, Inc. v. Comm.*, 59 TCM (CCH) 350 (1990) .......... 20

*Cox v. Comm.*, 41 T.C. 161 (1963) .......... 10

*Cunningham v. Comm.*, 47 TC 103 (1965) .................................................. 7

*Diebold v. U.S.*, 16 Cl.Ct. 193, *aff'd* 891 F.2d 1579
(Fed. Cir. 1989) ............................................................. 13, 14, 16, 17

*Dubitzky v. Comm.*, 60 T.C. 29 (1973) ..................................................... 10

*FDIC v. Isham*, 782 F. Supp. 524 (D. Co. 1992) ........................................ 11

*FDIC v. Wentz*, 155 F.3d 905 (3d Cir. 1995) ............................................. 11

*Frank Lyon Co. v. U.S.*, 435 U.S. 561 (1977) .............................................. 1

*Gimbel Brothers, Inc. v. U.S.*, 535 F.2d 14 (Ct. Cl. 1976) .........13, 14, 16, 17

*Gregory v. Helvering*, 293 U.S. 465 (1935) ................................................. 1

*Gunther v. Hutcheson*, 674 F.2d 862, 870 (11th Cir. 1982) ......................... 11

*INDOPCO, Inc. v. Comm.*, 503 U.S. 79 (1992) .......................................... 12

*J.C. Wynne v. Comm.*, 47 BTA 731 (1942) .................................................. 7

*King Enterprises, Inc. v. U.S.*, 418 F.2d 511 (Ct.Cl. 1969) ........................... 5

*Korn Industries, Inc. v. U.S.*, 532 F.2d 1352 (Ct.Cl.
1976) ................................................................ 13, 14, 15, 16, 17, 18

*Long Term Capital Holdings v. U.S.*, 330 F.Supp.2d 122
(D. Conn. 2004) ............................................................................. 4

*New Jersey v. Anderson*, 203 U.S. 483 (1906) ............................................. 9

*Northern States Power Company v. U.S.*, 151 F.3d 876
(8th Cir. 1998) ............................................................................ 20

*O'Shaughnessy v. Comm.*, 323 F.3d 1125 (8th Cir. 2003) ........................... 20

*Reimer's Estate v. Comm.*, 12 T.C. 913, *aff'd* 180 F.2d 159
(6th Cir. 1949) ........................................................................ 10

*Santa Monica Pictures, LLC v. Comm.*, T.C. Memo 2005-104,
154 (2005) ........................................................................... 4

*Security Industrial Ins. Co. v. U.S.*, 702 F.2d 1234 (5th Cir. 1983) ............... 5

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ........................................... 12

*Snyder v. Comm.*, 894 F.2d 1337 (6th Cir. 1990) ........................................ 13

*Standard Oil Company v. Comm.*, 77 T.C. 349
(1981) ........................................................... 13, 14, 17, 18, 19, 20

*State of Iowa v. McFarland*, 110 U.S. 471 (1884) ........................................ 8

*Thompson-King-Tate v. U.S.*, 296 F.2d 290 (6th Cir. 1961) ........................ 20

*U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950) ............................ 1

*U.S. v. LaFranca*, 282 U.S. 568 (1931) .................................................... 10

*U.S. v. Mead Corp.*, 533 U.S. 218 (2001) .................................................. 12

*U.S. v. Reorganized CF&I Fabricators Of Utah, Inc.*,
518 U.S. 213 (1996) ................................................................ 9

*U.S. v. Sweeney*, 226 F.3d 43, 45-46 (1st Cir. 2000) .................................. 11

*Underhill v. Comm.*, 45 T.C. 489 (1966) .................................................. 20

*Wayne Bolt & Nut Co. v. Comm.*, 93 T.C. 500 (1989) .................... 15, 17, 18

**Statutes:**

Internal Revenue Code:

§164 ....................................................................9, 11, 12, 20, 21

§263(c) ....................................................................................... 19, 20

§269 ..................................................................................................1-2

§351 ......................................................................................................3

§446(e) .................................................................................. 19, 20, 21

§453(b) ..................................................................................................6

§453(c) ...................................................................................................9

§453A ...................................................................................... 1, 3, 5, 21

§453A(c)..................................................................................................6

§453A(c)(3)(A).........................................................................................9

§453B ...............................................................................................6, 8

§453B(a) ..................................................................................................9

§811(a) ..................................................................................................12

Treasury Regulations:

§1.446-1(e)(2)(ii)(a)...............................................................................14

§1.481-4(g)(3)........................................................................................14

§1.1502-13(c) ........................................................................................21

§1.6662-4(g)(2)(i) .......................................................................... 2

§1.6662-4(g)(2)(ii) ......................................................................... 2

**Other:**

Antognini, *New Regs Affect Installment Accounting for Corporations Filing Consolidated Returns*, 72 J. Tax'n 356 (1990) ........................ 4

Federal Deposit Insurance Corporation (11 U.S.C. §1811) ........................ 11

*The Role Of Professional Firms In The U.S. Tax Shelter Industry*, S. Rep. 109-54, 109th Cong., 1st Sess., p. 1 (2005) ............................ 1

H.R. Rep. No. 2, 70th Cong., 1st Sess. 16 (1928)........................................... 7

Rev. Rul. 57-345, 1957-2 CB 132 ............................................................ 11

Rev. Rul. 61-52, 1961-2 CB 42 ................................................................ 12

Rev. Rul. 75-457, 1975-2 C.B. 196 ............................................................ 7

Rev. Rul. 76-350, 1976-2 C.B. 132 ............................................................ 7

Rev. Rul. 77-29, 1977-1 CB 44 ................................................................ 10

Rev. Rul. 82-122, 1982-1 C.B. 80 .............................................................. 7

## ARGUMENT

### I. Section 453A Does Not Apply Because Principal Properly Avoided It.

#### A. Because Neither Transaction Was Tax Motivated, Principal's Tax Planning Is Not Relevant.

If, as the Defendant suggests, the existence of planning to minimize tax costs associated with business transactions is itself held sufficient to warrant imposition of income taxes, administration of the tax laws will be revolutionized and shock waves will reverberate throughout the offices of American businesses. But, thankfully, that is not the law. The law rightfully penalizes tax evasion and improper tax avoidance, such as through abusive tax shelters,[1] but there has never been anything evil, sinister, or wrong with the proper tax planning that normally accompanies complex business transactions. *Gregory v. Helvering,* 293 U.S. 465, 469 (1935); *U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 580 (1977); *Comm. v. Newman,* 159 F.2d 848, 850-851 (2nd Cir. 1947) (Hand, J., dissenting).

This is not a case of either criminal or civil tax evasion. No penalties of any kind have been asserted against the taxpayer, as no grounds exist for assessment of any penalties. It is not an abusive tax shelter case. It is not even a case where tax avoidance is alleged to have been the "principal purpose" of the transaction, for the Defendant makes no contention under the "principal purpose" provision of Section

---

[1] Concluding that "[t]hese transactions had no economic substance or business purpose other than to reduce taxes," the U.S. Senate has issued the report of its investigation of abusive tax shelters. *The Role Of Professional Firms In The U.S. Tax Shelter Industry,* S. Rep. 109-54, 109th Cong., 1st Sess., p. 1 (2005).

269. (Stip. ¶31) Treasury Regulation §1.6662-4(g)(2)(i) states that "the principal purpose of an entity, plan or arrangement is to avoid or evade Federal income tax if that purpose exceeds any other purpose," and that is clearly not the case here.[2] Nor is this a case where it is contended that the transaction lacked either economic substance of business purpose. (Stip. ¶32)

Indeed, the following facts are undisputed -

- there were numerous non-tax business reasons that were the primary motivation for Principal's transaction with Prudential, including recovering the better-quality mortgage loans originated by Principal, elimination of the burdensome annual PSPPA adjustment, avoidance of future prepayments, and enhancement of surplus by $75 million (Stip. ¶5-7, 18);
- there were also valid non-tax business reasons that were the primary motivation for creation of the new subsidiary, Principal FC, and the sale of the Prudential notes to it, including removal of the associated liability to Prudential from Principal's balance sheet and assuring Prudential that its claim on the Principal promissory notes was "bankruptcy proof" (Stip. ¶¶12-14, 16);
- the tax planning that was engaged in during the course of the transactions was not done to capture for Principal some tax loss or undeserved chimerical benefit, but only to insure that the transaction with Prudential would be "tax neutral" (Stip. ¶¶15, 18).

[2] Conversely, Regulation §1.6662-4(g)(2)(ii) states that "the principal purpose of an entity, plan or arrangement is **not** to avoid or evade Federal income tax if [it] has as its purpose the claiming of . . . tax benefits in a manner consistent with the statute and Congressional purpose," and that is exactly the case here.

Yet the Defendant devotes many pages in both its brief and its Proposed Findings Of Uncontroverted Fact to the details of the tax planning that occurred within Principal, and between Principal and Prudential, in connection with the transactions. Plaintiff objected at trial (Tr. 20) to the relevancy of many memoranda of and communications to and from Plaintiff's in-house tax lawyer, John Schmidt, on the ground that they are irrelevant, and Plaintiff continues to maintain that objection in the belief that they and all similar communications and memoranda cited by the Defendant in its brief and Proposed Findings are irrelevant because neither tax planning nor tax avoidance is present as an issue in the case and it is not contended that either transaction was principally tax motivated. Contrary to what the Defendant apparently believes, such memoranda and communications represent no "smoking gun."

It was for this reason that Principal chose not to assert either the attorney-client privilege or work product doctrine with respect to such memoranda and communications. Principal has no reason to be embarrassed by the tax planning that went into the Prudential transaction, as part of the overall planning that was necessary to accomplish the transaction, and therefore Principal chose to disclose it rather than attempt to hide it. It shows that Principal carefully navigated the tax waters, avoiding such shoals as §351 (JE 124; JE 126 at 724-25; JE 128; JE 131), the effects of set-off (JE 87), and the effects of using Prudential's note as security for Principal's debt (JE 77 at 605), as well as the hazards of §453A. Principal even disclosed that it anticipated that IRS would challenge its treatment of the transaction, but it believed its position would prove correct. (JE 71, 77, 131)

The tax analyses and planning cited by the Defendant over many pages were not, of course, taking place in a vacuum. Rather, they were simply a part of

Principal's "due diligence," its careful analysis of every aspect of the transaction. Equal or even greater numbers of pages could be filled with descriptions of the communications and memoranda of and among Principal's employees with reference to other aspects of the transaction, such as valuation and pricing of the 202 (71+131) mortgage loans using bond-equivalent yields, structuring of the transaction, making Prudential's claim on the Principal notes "bankruptcy proof," securing approval from the Iowa insurance regulatory authorities, terms of the escrow, and the transaction documents and drafts thereof (JE 48, 64, 67, 68, 75, 76, 78, 82, 86, 102, 139, 152, 154).

Nor was there anything nefarious about Principal confirming its tax analysis with Mr. Schmidt's counterpart at Prudential, Frank Gould, or with Gene Ferraro at Deloitte & Touche. (Def. Br. 8) The comments and advice received from those sources did no more than mirror the opinion of a tax expert previously published on the subject in the venerable Journal of Taxation. Antognini, *New Regs Affect Installment Accounting for Corporations Filing Consolidated Returns*, 72 J. Tax'n 356 (1990).

**B. The Step Transaction Doctrine Does Not Apply.**

The Defendant admits in its brief (Def. Br. 32) that the step transaction doctrine is a part of the substance-over-form doctrine. The latter was developed to deal with transactions that were a "mere device," a "disguise," or an "artifice." *Associated Wholesale Grocers, Inc. v. U.S.*, 927 F.2d 1517, 1522 (10th Cir. 1991). Examples are found in the tax shelter cases that "cross the line." *Long Term Capital Holdings v. U.S.*, 330 F.Supp.2d 122 (D. Conn. 2004); *Santa Monica Pictures, LLC v. Comm.*, T.C. Memo 2005-104, 154 (2005).

Citing *Security Industrial Ins. Co. v. U.S.*, 702 F.2d 1234, 1245 (5th Cir. 1983), the Defendant argues that the step transaction doctrine may be invoked whenever a series of actions are "part of a single, integrated transaction aimed at reaching an intended result." (Def. Br. 34) This, of course, is the "end result" test enunciated by the Court of Claims in *King Enterprises, Inc. v. U.S.*, 418 F.2d 511, 516 (Ct.Cl. 1969), and employed by the court in that case to reach a pro-taxpayer result. *Security Industrial*, however, was a reorganization case where, through a series of corporate machinations disguised as a reorganization, the taxpayer reached the end result that it intended all along. Accordingly, the court held that the corporate acquisitions involved in a series of steps "should be amalgamated and viewed as a single transaction." *Security Industrial, supra* at 1247.

In Principal's case, however, the end result sought all along, the overriding goal from the beginning, was accomplishment of the transaction with Prudential for the purpose of "unwinding" the 1985 exchange of mortgages. (Stip. ¶¶4-8; JE 20, pp. 121, 123; JE 21, p. 168; JE 22, p. 175) The "ultimate goal" was not, as the Defendant argues, "lodging their mutual financial obligations in their respective subsidiaries, while avoiding the interest charge under §453A." (Def. Br. 34) Since the Principal/Prudential transaction was thus motivated by valid non-tax business reasons, and since the creation of Principal FC and the sale of the Prudential notes by Principal to it also occurred primarily for valid non-tax business reasons and were not the end result sought for itself from the beginning, the step transaction doctrine simply does not apply to this case.

The step transaction doctrine should also be rejected in this case because the Defendant is attempting to apply it selectively, to only a portion of the transaction (the sale of the Prudential notes by Principal to Principal FC) rather than to the

entire set of transactions involving Principal, Prudential and their affiliates. While arguing that "all of the participants to the Principal/Prudential transaction treated it as a single, integrated transaction" (Def. Br. 34), it is easy to see why the Defendant seeks to apply the step transaction doctrine to only a part. Viewed in its entirety as a "single, integrated transaction," the Principal/Prudential exchange of mortgage loans would be properly characterized as exactly that, an **exchange** of the type involved in *Cottage Savings Assoc. v. Comm.*, 409 U.S. 559 (1991). The "single, integrated transaction" would have thus been completed in its entirety when the mortgage loans were exchanged on December 20, 1991 (JE 49, 58), no payments would remain to be received after the close of the 1991 taxable year, and therefore the transaction would not have constituted an installment sale within the meaning of §453(b). In such circumstances, the entire amount of gain on the exchange would have been taxable in 1991, an assertion never made by the Internal Revenue Service and now precluded by the statute of limitations. Likewise, because there would have been no installment sale under §453(b), there would be no deferred tax liability to which the interest charge under §453A(c) could apply. Thus, the Defendant should not be allowed to apply the step transaction doctrine to only a limited number of activities within a large group in such a manner as to achieve its desired result while ignoring related transactions that would cause a different conclusion to be reached upon application of the same doctrine.

### C. The Prudential Notes Were *Sold* By Principal To Principal, FC.

The Defendant argues (Def. Br. 34) that the transfer of the Prudential notes by Principal to Principal FC did not constitute a "disposition" within the meaning of §453B, and thus there was no recognition of the gain realized by Principal upon

the sale of the mortgage loans. In support of its argument, the Defendant cites the Revenue Act of 1928, the House Ways and Means Committee report explaining it, a 1942 Board of Tax Appeals case rejecting the IRS' argument in favor of a "disposition," *J.C. Wynne v. Comm.*, 47 BTA 731 (1942), a Tax Court case decided in 1965, *Cunningham v. Comm.*, 47 TC 103 (1965), and two revenue rulings, Rev. Rul. 75-457, 1975-2 C.B. 196, and Rev. Rul. 82-122, 1982-1 C.B. 80.

All of these authorities have one common thread which readily distinguishes them from this case. All of them hold that a mere change in the obligor under an installment note does not result in acceleration of the installment gain. *J.C. Wynne, supra,* states that "it is only the disappearance of the installment obligation **or its removal from the hands of the obligee** that creates the occasion for invoking [acceleration] . . . ." *Id.* at 735 (Emphasis supplied). The House Ways and Means Committee report stated, "the [new] subsection terminates the privilege of longer deferring the profit if the **seller** at any time transmits, distributes, or disposes of the installment obligations . . . ." H.R. Rep. No. 2, 70th Cong., 1st Sess. 16 (1928) (Emphasis supplied). *See also, Burrell Groves, Inc. v. Comm.*, 223 F.2d 526 (5th Cir. 1955); Rev. Rul. 76-350, 1976-2 C.B. 132. In this case, of course, there was a change in the seller or obligee, Principal, when it sold the Prudential notes to its subsidiary, Principal FC.

It is important to note in this case that, while the Defendant argues that the sale of the Prudential notes by Principal to Principal FC should be ignored upon application of the legal doctrine known as the "step transaction" doctrine, the Defendant makes no contention that the Prudential notes were not sold or transferred **factually** by Principal to Principal FC. Indeed, it can make no such contention, as all of the evidence shows that a sale was in fact intended and that a

sale in fact took place. Internal memoranda and communications before and after the transaction with Principal FC show that it was Principal's intention to treat it as a sale. (JE 22 at 174; JE 86 at 621-22; JE 116; JE 135; JE 127) The approval sought from the Iowa Insurance Department under the Iowa Insurance Company Holding Act was sought and granted on the ground that the transaction between the parent and the subsidiary was a sale. (JE 80, 119) All of the formal documentation and agreements relating to the transaction described it as a sale, i.e., sale and transfer of the Prudential notes to Principal FC in exchange for the latter's assumption of the indebtedness from Principal to Prudential. (JE 53; Stip. ¶24) It was recorded on the books as a sale (Stip. ¶28 ), and even the counterparty (Prudential) treated it as a sale and released Principal from the indebtedness assumed. (JE 45,46,47) Therefore, not only did the transaction have the "appearance of a sale" as the Defendant acknowledges (Def. Br. 38, n. 15), it was in fact a sale. Upon such facts, the transaction deserves to be recognized legally as a sale. *Comm. v. Brown*, 380 U.S. 563, 571 (1965) ("A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent," quoting *State of Iowa v. McFarland*, 110 U.S. 471, 478 (1884).

These very facts are themselves sufficient to dispose of the Defendant's argument that there was no "disposition" within the meaning of §453B. The Defendant's argument overlooks the clear language of §453B that makes it unnecessary to examine the cases and revenue rulings to determine whether a "disposition" occurred. This is because §453B causes acceleration and recognition of the installment gain if the installment obligation is "satisfied . . ., distributed, transmitted, **sold,** or otherwise disposed of . . . ." (Emphasis supplied.) Because the Prudential notes were **sold** by Principal to Principal FC, §453B is clearly

invoked despite the Defendant's argument to the contrary. Accordingly, the gain attributable to Principal's sale of mortgage loans to Prudential was, by virtue of the last sentence of §453B(a), no longer entitled to be recognized in part in future taxable years under the installment method defined in §453(c), and thus there was no gain to be recognized in future years to which the interest on deferred tax could apply under §453A(c)(3)(A).

## II. Guaranty Fund Assessments Are Deductible Currently As A Taxes.

### A. The Assessments Are A State Tax Within The Meaning Of §164.

The authorities cited by the Defendant for the definition of a "tax" (Def. Br. 39-40) are actually support for Principal's position.

*U.S. v. Reorganized CF&I Fabricators Of Utah, Inc.*, 518 U.S. 213 (1996), while holding that the exaction at issue was not an "excise tax" within the meaning of the Bankruptcy Code, represents an acknowledgement by the Supreme Court that an exaction might not be a "tax" under one statute, (e.g., the Guaranty Association Act) yet could well be under another (e.g., the Internal Revenue Code). A functional analysis is what is important, it said, including such factors as whether it was an "**enforced contribution** to provide for the support of government" or "for the purpose of defraying the expenses of government **or undertakings authorized by it**." *Id.* at 224 (Emphasis supplied.) The creation of guaranty fund associations by state legislatures, and the operation of such associations, represent just such an undertaking.

"For the support of the government" was also the concept stressed by the courts in other cases cited by the Defendant, such as by the Supreme Court in *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906) (corporate franchise tax held to be a

tax within the meaning of federal bankruptcy law), and *U.S. v. LaFranca,* 282 U.S. 568, 572 (1931) (penalty upon liquor dealer for violation of Prohibition Act held to be a penalty, not for the support of government), and by the Tax Court in a morsel of dictum in *Reimer's Estate v. Comm.*, 12 T.C. 913, 920, *aff'd*, 180 F.2d 159 (6th Cir. 1949).

Similarly, *Dubitzky v. Comm.*, 60 T.C. 29 (1973), stated that "the exaction must be intended as a means of raising revenue for the carrying on of the Government," and accordingly held that a city ordinance requiring a developer to donate land for roads as a condition to his requested rezoning was not a tax. In *Cox v. Comm.*, 41 T.C. 161 (1963), a turnpike toll was not a tax but rather a fee for a special privilege because drivers had the option not to pay it by using other roads. In Revenue Ruling 77-29, 1977-1 CB 44, sanitation fees based in part on an hourly rate, on the amount of refuse collected, or the type of container used were held to be a service fee and not a tax.

While the exactions in these cases are clearly distinguishable on their facts from the guaranty fund assessments at issue here, the pronouncements of these courts can nevertheless be distilled into principles that are helpful here. There is no option not to pay the guaranty fund assessments, nor is there an alternative to payment if the insurance company wishes to continue to doing business in the state. They are contributions enforced upon penalty of forfeiture of license to conduct the insurance business in the state. (JE 168, §11B; Tr. 67) They are based on premiums collected within the state (JE 168, §9C(2)) and are imposed for the purpose of raising revenue for the support of a governmental undertaking, or defraying the expenses of a governmental undertaking, namely, the operation of the guaranty fund associations created under legislation enacted by the state

legislatures. (JE 168, §2; JE 197,198) The associations are quasi-public entities that report to and are supervised by the state agency responsible for insurance industry oversight. (Stip. ¶36; JE 168, §6E; Tr. 43-47) They are not, as the Defendant contends (Def. Br. 41) imposed merely as part of a "regulatory scheme," and are not a "regime" to protect the policyholders of the insurance companies who are members of the association. Rather, they are imposed to raise revenue to reimburse the policyholders of **any** insurance company that becomes insolvent. (JE 168, §3A(2)(a); Stip. ¶35)

They thus serve a clear public purpose (Tr. 42-43), just as the Federal Deposit Insurance Corporation (FDIC) created by the federal government (11 U.S.C. §1811) serves a public purpose by assessing banks to provide a fund for the protection of banks' depositors. *U.S. v. Sweeney*, 226 F.3d 43, 45-46 (1st Cir. 2000; *FDIC v. Wentz,* 155 F.3d 905, 909 (3d Cir. 1995); *FDIC v. Isham,* 782 F. Supp. 524, 531 (D. Co. 1992); *Gunther v. Hutcheson*, 674 F.2d 862,870 (11th Cir. 1982). As such, the guaranty fund assessments are readily distinguishable from exactions to cover the cost of a benefit provided by the government to the payor, as exemplified by *Chicago & Northwestern Transportation Co. v. Webster County Board of Supervisors*, 71 F.3d 265, 267 (8th Cir. 1995), cited by the Defendant. There the Eighth Circuit correctly held that a county assessment for a culvert was not a tax because the culvert benefited only the railroad and not the general public.

Accordingly, for the reasons cited in Principal's main brief (Br. 31-34), the state guaranty fund assessments meet all of the criteria for deduction as a tax under I.R.C. §164 as established in Revenue Ruling 57-345, 1957-2 CB 132, and its

progeny by the agency charged with administration of that statutory provision.[3] The fact that they are denominated "assessments" rather than "taxes" has no bearing on their proper characterization as taxes for purposes of §164. Revenue Ruling 61-52, 1961-2 CB 42 (despite being denominated as service charges or user fees, city charges imposed for the police and fire departments held to be taxes under §164).[4]

**B. There Is No Contingency That Precludes Deductibility.**

In a footnote, the Defendant cites *Charles Baloian Co. v. Comm.*, 68 T.C. 620 (1977), for the proposition that "expenditures which are to be reimbursed are not deductible" and therefore Principal "would be precluded from currently deducting the . . . assessments . . . in any event . . . ." (Def. Br. 43, n. 19). However, the Defendant neglects to mention the critical requirement of the *Baloian* case that the right of reimbursement (involving moving expenses in that case) must have "matured without substantial contingency." *Id.* at 628. Principal has no right to "reimbursement" of the assessments akin to the right of reimbursement for the moving expenses in *Baloian*, but some of Principal's assessments may be offset against the company's future premium taxes **if** there are future premium taxes in that state for them to be offset against, **if** the company

[3] The criteria established by the Internal Revenue Service for deductibility as a tax under §164 are entitled to judicial deference. *U.S. v. Mead Corp.*, 533 U.S. 218, 227-228 (2001), quoting *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998), *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944), and *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).

[4] Defendant's arguments concerning §811(a) and the "significant future benefits" standard under *INDOPCO, Inc. v. Comm.*, 503 U.S. 79 (1992), have been adequately refuted in Principal's main brief (Br. 35-39) and those refutations will not be repeated here.

continues in existence and continues business in that state, and **if** the state refrains from changing its law that permits such offsets. (Tr. 65-66,73) These "ifs" clearly represent contingencies sufficient to take Principal's case outside the ambit of *Baloian.*

The proper approach for dealing with such contingencies is that shown by the Sixth Circuit's decision in *Snyder v. Comm.*, 894 F.2d 1337 (6th Cir. 1990) (unpublished opinion), involving a racetrack operator's entitlement to a future reduction in the state wagering tax over six years for certain capital improvements made. The Court of Appeals held that the possibility of the future benefits should be taken into account only when and if they materialized, through reduction of the future expense. Likewise, the fact that Principal **may** be entitled to a future offset against premium taxes should be treated, not as a right of reimbursement, but as the possible reduction of a future expense to be taken into account when and if it occurs.

## C. Treating Similar Items Similarly Is Not A Change Of Accounting Method.

All of the Defendant's arguments concerning change of accounting method fail under the precedent established by the Court of Claims and Federal Circuit in *Gimbel Brothers, Inc.*, *Korn Industries*, and *Diebold*, and under the Tax Court's decision in *Standard Oil*, which fits squarely on all fours.

The Defendant begins by unhelpful references to the general rules of the statute and regulations regarding changes in method of accounting, including the rule that the consent of the IRS is required even where the change is from an improper method to a proper one. (Def. Br. 44-45, citing *Diebold v. U.S.*, 16 Cl.Ct. 193, *aff'd*, 891 F.2d 1579 (Fed. Cir. 1989), and (Def. Br. 50) *Cargill, Inc. v. U.S.*,

91 F.Supp. 1293, 1298 (D. Minn. 2000)). With those generalities, Principal has no quarrel. Principal's position, however, begins at the threshold by examining whether a change has in fact occurred in the first place, and, on the strength of *Gimbel Brothers, Korn Industries, Diebold,* and *Standard Oil,* Principal maintains that correcting an error to treat an item in the same manner as the broader universe of similar items is neither a change in the taxpayer's method of accounting nor a change in the treatment of a material item.[5]

While Regulation §1.446-1(e)(2)(ii)(a) defines "material item" obliquely as "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction," the term was defined in a more practical manner by the Court of Claims in *Korn Industries, Inc. v. U.S.,* 532 F.2d 1352 (Ct.Cl. 1976). That case involved omission of three categories of costs from the taxpayer's finished goods inventory, where the court upheld the taxpayer's correction of the omission as a permissible correction of an error rather than a prohibited change in accounting method. In so holding, the court adopted the taxpayer's view that "material item" referred to "entire classes of expenditures," such as research and experimental expenditures, soil and water conservation expenditures, last-in/first-out inventories, and exploration expenditures referred to in Regulation §1.481-4(g)(3), rather than the individual items of plywood, plastics, and finishing materials that had been omitted from the taxpayer's finished goods inventory.

[5] The Defendant makes reference in its Proposed Findings Of Uncontroverted Fact (¶¶ 152-169) to Principal's internal discussions about whether a change of accounting method was involved. Inasmuch as such discussions relate to a conclusion of law, they do not, of course, constitute factual admissions and are irrelevant for purposes of the Court's determination of that legal issue.

Applying the *Korn* decision in this case, the "material item" or "entire class of expenditures" is the category identified as "Insurance Taxes" in the "Other Deductions" schedule of Principal's tax returns. The "Insurance Taxes" class of expenditures was, in turn, made up of various individual items included in Exhibit 6 of Principal's NAIC Annual Statement, such as state premium taxes, state insurance department licenses and fees, "other state taxes" including state taxes on employee benefits, and "all other taxes" such as the guaranty fund assessments paid to states that allowed no offsets against future premium taxes and the amortized portion of the previously-capitalized guaranty fund assessments. (Pl. Ex. 1, p.9; Pl. Ex. 2, p.11; Pl. Ex. 3, p.12; Pl. Ex. 4, p.12; Tr. 55-57, 61, 64, 66, 69) Each year, the state taxes shown on Exhibit 6 of the NAIC Annual Statement that were also included in Line 23 of its Summary Of Operations Schedule were imported directly into the tax return, and were always deducted in full by Principal in such returns in the category identified as "Insurance Taxes." (Tr. 69) Under the *Korn* test, therefore, Principal's decision to include the full amounts of the state taxes known as guaranty fund assessments (which had been erroneously capitalized for tax purposes previously) along with the rest of the "Insurance Taxes," and to deduct them currently in the year paid or accrued in the same manner as the rest of the "Insurance Taxes," was neither a change in Principal's overall method of accounting nor a change in the treatment of a "material item."

The Defendant attempts to limit the holding of *Korn Industries,* and, in particular, its allowance of "correction of mathematical or posting errors," *Korn Industries, supra* at 1355-1356, through its reference to the Dickensonian definition of a "posting error" in *Wayne Bolt & Nut Co. v. Comm.,* 93 T.C. 500, 510 (1989) ("[a] posting error is an error in 'the act of transferring an original entry

to a ledger'"). Nevertheless, it can be seen in applying that definition in a computer age that Principal's failure to classify the state guaranty fund assessments as state taxes in the same manner as it so classified state premium taxes amounts to exactly that.

*Gimbel Brothers, Inc. v. U.S.*, 535 F.2d 14 (Ct. Cl. 1976), is another case cited by the Defendant (Def. Br. 46-48), which, like *Korn Industries*, actually supports Principal's position. In *Gimbel Brothers*, the taxpayer was a department store seller of merchandise that had properly elected to treat all of the income from its installment sales on the installment method, but failed to treat certain revolving credit plan sales in that manner. Just as Principal did, the taxpayer in *Gimbel Brothers* corrected its erroneous reporting of the income from the revolving credit plan sales by filing timely claims for refund to treat them in the same manner as the other installment sales.[6] The Court of Claims held, "An error was made by not applying the [installment] method to the rotating charge accounts. There was no change in accounting methods but, rather, the correction of an error." *Gimbel Brothers, Inc., supra* at 23.

In clear factual contrast stands *Diebold, Inc. v. U.S., supra*, relied upon by the Defendant. ( Def. Br. 44-45) There, the taxpayer, a manufacturer of ATM machines, sought to change the treatment of its ATM repair modules from nondepreciable inventory to depreciable capital assets. The Federal Circuit held that the taxpayer had established the inventory method of accounting for the

[6] Contrary to the Defendant's claim (Def. Br. 47), the fact that in *Gimbel Brothers* the taxpayer's claim for refund amended the first return in which it made its installment reporting election was **not** a compelling factor for the Court in reaching its conclusion that it was merely correction of an error, not a change in accounting method, to extend that installment reporting method to the revolving charge sales.

modules and its attempt to change to treat them as depreciable assets did not amount to correction of an error but instead was a change in method of accounting. Of particular importance in our case, however, is the manner in which the Federal Circuit distinguished *Gimbel Brothers* and *Standard Oil* to illustrate circumstances that would **not** constitute a change in method of accounting:

> Diebold does not seek to account for the replacement modules **in the same manner that it accounts for other similar items** or to correct the omission of an item from a method of accounting that it otherwise consistently applies to a single category of related items. In *Gimbel Bros.,* the taxpayer sought to change from the accrual method to the installment method of reporting the income from its rotating charge accounts. The court found that these accounts had "**substantially similar characteristics**" to other charge accounts that the taxpayer already reported on the installment method. . . . In *Standard Oil Co.,* the court characterized the taxpayer's error simply as a "failure to **report similar items consistently** under a fixed method of accounting.

*Diebold, supra,* at 1582. (Emphasis supplied.)

Likewise, *Cargill, Inc. v. U.S., supra,* where the taxpayer sought to change from a rent deduction to a depreciation deduction, bears no factual resemblance to Principal's case.

*Wayne Bolt And Nut Company, supra,* cited by the Defendant, also bears no similarity to this case. *Wayne Bolt And Nut* involved whether a change in calculating inventory from a perpetual book method to actual physical count was a change in method of accounting. In holding that it was, the Tax Court paid homage to *Korn Industries* and was compelled to distinguish it:

> The instant case is distinguishable from Korn. In Korn, the items omitted from inventory constituted a small percentage of the overall inventory. The omission was traceable to three cost elements that the taxpayer's accountants had mistakenly omitted. . . . The Court of Claims found the error to be analogous to a mathematical or posting error. In contrast, the error in petitioner's opening . . . physical inventory was ten times greater than the book inventory. . . . This practice and the other afore-mentioned systemic flaws in petitioner's pre-1982 system simply cannot be described as mere mathematical or posting errors.

*Wayne Bolt And Nut Company, supra*, at 512.

In Principal's case, as in *Korn Industries*, the guaranty fund assessments omitted as a current deduction are small in comparison to the overall category of Insurance Taxes deducted currently, as shown by the following table:

| Year | Insurance Taxes (JE 171-180) | Guaranty Fund Assmts. (JE 167) |
|---|---:|---:|
| 1991 | 97,031,786 | $3,165,933 |
| 1992 | 109,164,795 | 6,696,040 |
| 1993 | 122,663,518 | 6,369,527 |
| 1994 | 122,854,775 | 2,583,000 |

Finally, the Defendant's analysis of the Tax Court's decision in *Standard Oil Company v. Comm.*, 77 T.C. 349 (1981), also warrants rebuttal. The Defendant's contention with respect to that case (Def. Br. 50-51) appears to be an attempt to refute an argument that Principal is not making, namely, that Principal is entitled to change from an improper method of accounting to a proper one without

the consent of the Service. Principal, of course, makes no such argument, but maintains, rather, that treating guaranty fund assessments as a part of Insurance Taxes and deducting them in the year paid or accrued in the same manner as the other amounts included in Insurance Taxes is not a change of accounting method in the first place, but merely correction of an error. It is for that proposition that Principal invokes *Standard Oil.*

In *Standard Oil,* the Service argued that the taxpayer's attempt to deduct as intangible drilling costs payments for "other costs" such as labor, fuel, repairs, hauling, and supplies used in the first phase of construction of its oil drilling platforms, which "other costs" it had long capitalized, was a change in the treatment of a "material item" and thus a change in the taxpayer's method of accounting that required advance consent. Although the Tax Court "closed the circle" by noting, in an effort to make a "simple disposition" of the matter, that §446(e) begins with the words, "Except as otherwise provided in this chapter," and that §263(c) did so otherwise provide with respect to the current deductibility of intangible drilling costs, the court really held, not that no consent of the Service was required because §263(c) overrode §446(e), but that §446(e) was inapplicable because the taxpayer was "merely seeking a substantive recharacterization of *certain costs* [the "other costs"] as IDC" and that was merely correction of an internal inconsistency to **treat similar items consistently** and not a change in accounting method in the first place. *Standard Oil, supra*, at 383.

The many similarities between Principal's case and *Standard Oil* are apparent. In *Standard Oil,* the overall category or "material item" was IDCs; in Principal's case, it is Insurance Taxes. In *Standard Oil,* the subset was "other costs" consisting of labor, fuel, repairs, etc.; in Principal's case, it is state taxes

known as guaranty fund assessments. In both cases, all or portions of the subset had been capitalized in prior years. In both cases, the taxpayer discovered that capitalization of the subset was inconsistent with the treatment of the overall category, as specifically authorized by the Internal Revenue Code. In *Standard Oil*, it was §263(c) that allowed a current deduction for the intangible drilling costs; in Principal's case, it is §164 that allows a current deduction for the Insurance Taxes. And in Principal's case, as in *Standard Oil,* correction of the error to treat such similar items similarly was not a change in the taxpayer's method of accounting within the meaning of §446(e).[7]

*See also, Comm. v. Brookshire Bros. Holding, Inc.*, 320 F.3d 507 (5th Cir. 2003); *O'Shaughnessy v. Comm.*, 323 F.3d 1125 (8th Cir. 2003); *Northern States Power Company v. U.S.*, 151 F.3d 876 (8th Cir. 1998); *Convergent Technologies, Inc. v. Comm.*, 70 TCM (CCH) 87 (1995); *Coulter Electronics, Inc. v. Comm.*, 59 TCM (CCH) 350 (1990); *Thompson-King-Tate v. U.S.*, 296 F.2d 290 (6th Cir. 1961); *Underhill v. Comm.*, 45 T.C. 489 (1966).

[7] The Defendant has stipulated that "in early 1992, Principal determined that its prior capitalization of a portion of such guaranty fund assessments had been in error and that such assessments constituted a state tax deductible in full under Code §164." (Stip. ¶42) It has also stipulated that additional evidence inconsistent with the stipulated facts may not be admitted into evidence. (Stip., Preamble) Therefore, all of the paragraphs in Defendant's Proposed Findings Of Uncontroverted Fact that purport to describe how and when Principal arrived at the conclusion that the guaranty fund assessments constituted a tax deductible under §164 are inadmissible.

## CONCLUSION

Principal was not liable for interest on deferred tax under Section 453A of the Code because the gain realized upon sale of the installment obligations to its subsidiary was recognized gain the reporting of which was deferred under Regulation §1.1502-13(c). Because the transactions had business purpose and economic substance, and because they were not motivated primarily by tax reasons, the step transaction doctrine does not apply.

Principal was entitled to deduct its guaranty fund assessments as state taxes in the year paid or accrued under Section 164. Treating the guaranty fund assessments as state taxes and deducting them currently in the same manner as other Insurance Taxes is not a change in accounting method within the meaning of Section 446(e).

Dated July 11, 2005.

Respectfully submitted,

/s/ Bruce Graves
Bruce Graves
Brown, Winick, Graves, Gross,
Baskerville and Schoenebaum, P.L.C.
Suite 2000, Ruan Center
666 Grand Avenue
Des Moines, Iowa 50309
Telephone: 515/242-2400
Fax: 515/283-0231

ATTORNEY FOR PLAINTIFF

Filed electronically.