IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1278 T

(Judge Fra ncis M. Allegra)

PRINCIPAL LIFE INSURANCE
COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S POST-TRIAL REPLY BRIEF

EILEEN J. O'CONNOR
Assistant Attorney General

MILDRED L. SEIDMAN
WILLIAM K. DREW
MARY M. ABATE
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
(202) 307-6507
(202) 307-9440 (facsimile)

# TABLE OF CONTENTS

**Page**

Defendant's post-trial reply brief
Interest on deferred tax issue (Internal Revenue Code § 453A . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
The guaranty fund assessments issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## CITATIONS

**Cases:**

*Assoc. Wholesale Grocers, Inc. v. United States*,
927 F.2d 1517 (10th Cir.. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4
*Black & Decker Corp. v. United States*, 340 F. Supp. 2d 621 (D. Md. 2004) . . . . . . . . . . . 4
*Coltec Ind., Inc. v. United States*, 62 Fed. Cl. 716 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 4
*Diebold, Inc. v. United States*, 16 Cl. Ct. 193, *aff'd*, 891 F.2d 1579 (Fed. Cir. 1989),
*cert. denied*, 498 U.S. 823 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*Diebold, Inc. v. United States*, 891 F.2d 1579 (Fed. Cir. 1989),
*cert. denied*, 498 U.S. 823 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*Greene v. United States*, 13 F.3d 577 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*King Enter., Inc. v. United States*, 189, Ct. Cl. , 418 F.2d 511 (Ct. Cl. 1969) . . . . . . . 3, 5
*Long Term Capital Holdings v. United States*,
330 F.Supp. 2d 122 (D. Conn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4
*Reimer's Estate v. Commissioner*, 12 T.C. 913 (1949), *aff'd*,
180 F.2d 159 (6th Cir. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Sims v. Commissioner*, 72 T.C. 996 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12
*TIFD II-E, Inc. v. United States*, 342 F.Supp. 2d 94 (D. Conn. 2004) . . . . . . . . . . . . . . . . 4
*True v. United States*, 190 F.3d 1165 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 2, 4-6, 10
*Vons Co., Inc. v. United States*, 55 Fed. Cl. 709 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C):
§ 162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
§ 164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
§ 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
§ 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
§ 453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,6,7,9

**Page**

**Statutes (continued):**

Iowa Code Annotated (West):
§ 508C.9(4) . . . . . . . . . . 11
§ 508C.9(6) . . . . . . . . . . 10
§ 508C.11(2) . . . . . . . . . . 10
§ 508C.19(1) . . . . . . . . . . 11
§ 508C.19(2) . . . . . . . . . . 11
Treas. Reg. (26 C.F.R.), § 1.263-4 . . . . . . . . . . 12
Treas. Reg. (26 C.F.R.), § 1.1502-13 . . . . . . . . . . 6,7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1278T
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE
COMPANY AND SUBSIDIARIES,

Plaintiff

v.

THE UNITED STATES,

Defendant

DEFENDANT'S POST-TRIAL REPLY BRIEF

**Interest on Deferred Tax Issue (Internal Revenue Code § 453A)**

The gist of plaintiff's position on this issue is that the step transaction doctrine does not apply "[b]ecause Principal FC and the transaction between it, Principal, and Prudential's subsidiaries had both business purpose and economic substance, and because tax reasons were not the main reasons for either creation of the subsidiary or the transaction with it."[1] (Plt. Br. 4;

[1]Defendant's position on the interest-on-deferred-tax issue is based on **two** alternative grounds–(1) under the step transaction doctrine there was no sale or other disposition by Principal of the Prudential notes (installment obligations); and (2) there was no disposition by Principal of the Prudential installment obligations within the meaning of Code § 453B. (*See* Def. Op. Brief 1, 3-24, 31-38.)

Although we discussed point (2) in our pretrial memorandum (at 13-18), plaintiff did not comment on this point in its post-trial brief filed June 8, 2005.

*see* Plt. Br. 21-24.) The significant flaw in plaintiff's position is that it is well established that neither the presence of a business purpose or of economic substance, nor the absence of a tax-avoidance motive, is a bar to application of the step transaction doctrine.[2]

Plaintiff's principal contention, set forth at pages 17-26 of its opening brief, seems to be that the step transaction doctrine (which does not turn on whether there was a business purpose or economic substance) and the sham transaction doctrine (which does turn on whether there was a business purpose or economic substance) are one and the same, because they both involve a substance/form analysis. But, as the Court of Appeals for the Tenth Circuit made clear–

> Although both the step transaction and sham transaction doctrines are corollaries of the basic substance over form principle . . ., the sham transaction doctrine focuses on whether a questionable transaction has a business purpose and economic effects other than the creation of tax benefits . . . . As described above, the step transaction doctrine is particularly tailored to the examination of transactions involving a series of potentially interrelated steps for which the taxpayer seeks independent tax treatment.

*True v. United States*, 190 F.3d 1165, 1177, n.11 (10th Cir. 1999).

Plaintiff cites (at 21) *Long Term Capital Holdings v. United States*, 330 F.Supp.2d 122 (D. Conn. 2004), for the erroneous proposition that the step transaction doctrine is applied only

---

[2]Plaintiff misleadingly asserts (Plt. Br. 22, 23, emphasis in original) that defendant stipulated that tax reasons "were **not** the main reasons" for Principal's "transaction with [Principal FC]." We actually stipulated that the § 453A interest problem was not the main reason for "establishing and using the new subsidiary in this manner"–*i.e.*, establishing and using Principal FC as a means of "solv[ing] the defeasance problem and avoid[ing] showing the new debt as a liability on Principal's books." (Fact Stip. ¶ 17.) Although in the Argument portion of our opening brief we did not emphasize the significant role of the tax considerations in the planning by Principal and Prudential of the Principal/Prudential/Principal FC/Prudential-subsidiaries transaction, there is substantial evidence thereof in the record, cited in our opening brief and proposed findings of uncontroverted fact. In addition, there is substantial evidence in the record (also quoted in our opening brief and in our proposed findings) that the decision to characterize the transaction between Principal and Principal FC as a "sale" rather than as a contribution to capital was motivated **solely** by tax considerations.

where the court first finds a transaction "conceived only for tax purposes 'to buy tax losses,' with no substantive business purpose other than tax avoidance . . . ."[3] Although the district court in *Long Term Capital* found a tax-avoidance motive, that was **not** the basis of its application of the step transaction doctrine. To the contrary, the district court affirmatively analyzed--and rejected

--arguments advanced by Long Term, based on business purpose and economic substance, that were virtually the same as plaintiff's here. The district court stated (*id.* at 191-94, footnotes and most citations omitted):

> "The step-transaction doctrine developed as part of the broader tax concept that substance should prevail over form." *Associated Wholesale Grocers, Inc. v. U.S.*, 927 F.2d 1517, 1521 (10th Cir.1991) (quotation omitted). "The doctrine treats the steps in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan." *Greene v. U.S.*, 13 F.3d 577, 583 (2d Cir.1994). Courts have identified three tests for determining whether to apply the doctrine, the "end result," the "interdependence," and the "binding commitment" tests. . . . The doctrine will operate where the circumstances satisfy only one of the tests. . . .[[4]]
>
> "Under the end result test, the step transaction doctrine will be invoked if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." . . . A prerequisite to application of

---

[3]Plaintiff's opening brief does not contain a statement of the facts underlying this issue, but instead weaves purported "facts" among arguments (Plt. Op. Br. 6-13, 16) that are apparently designed to demonstrate that Principal's planners of the transaction at issue were not avoiding tax liability but instead were "guided" by then-current tax pronouncements. While, as our briefs make clear, a tax-avoidance motive is not a prerequisite for application of the step transaction doctrine, we must point out that there is **no** evidence in the record that Principal's planners consulted or were even aware of any of the cited works.

[4]As noted in our opening brief (at 33-34, n.10), *King Enterprises, Inc. v. United States*, 418 F.2d 511, 518 (Ct. Cl. 1969), clarified that only the "interdependence test" and the "end result test" are applied in this Circuit.

the end result test is proof of an agreement or understanding between the transacting parties to bring about the ultimate result, here, the transference of OTC's preferred stock into the control of Long Term. . . . Relevant to this inquiry is the taxpayer's subjective intent to reach a particular result by directing a series of transactions to an intended purpose or structuring them in a certain way. . . .

. . . Long Term asserts that, because . . . LTCP and Portfolio had economic substance independent from the OTC transaction, operated for valid and substantial business purposes to make a material pre-tax profit, and expected to continue in the same manner for the foreseeable future, therefore application of the step transaction doctrine is precluded. . . . The Tenth Circuit has rejected this argument, see *Associated*, 927 F.2d at 1526-27, holding that the presence of a valid business purpose and independent economic substance in the entity used as a transactional vehicle or some valid business purpose for the transaction itself does not bar application of the step transaction doctrine, rather both are circumstances to be considered in a multi-factor analysis. . . . *Associated,* 927 F.2d at 1527 n.15.
. . .
Relatedly, . . . application of the step transaction doctrine by its nature may ignore economic relations created by the parties, notwithstanding impact on bona fide economic effects:

> To ratify a step transaction that exalts form over substance merely because the taxpayer can either (1) articulate some business purpose allegedly motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps, would frequently defeat the purpose of the substance over form principle. Events such as the actual payment of money, legal transfer of property, adjustment of company books, and execution of a contract all produce economic effects and accompany almost all business dealing. Thus, we do not rely on the occurrence of these events alone to determine whether the step transaction doctrine applies.

*True*, 190 F.3d at 1177.[[5]]

---

[5]Plaintiff cites (Plt. Op. Brief 20-21) three cases that supposedly support its assertion that the presence of economic substance or business purpose will validate a taxpayer's transaction even where a tax avoidance motive has been found: *Black & Decker Corp. v. United States*, 340 F.Supp.2d 621 (D. Md. 2004); *Coltec Ind., Inc. v. United States*, 62 Fed. Cl. 716 (2004); *TIFD II-E, Inc. v. United States*, 342 F.Supp.2d 94 (D. Conn. 2004). Suffice it to say that *Black & Decker* and *TIFD* both involved the question whether the transaction at issue was a **sham**–a question that is negated by a finding that the transaction had economic substance. *Coltec* involved the application of Code § 358, turning on whether tax avoidance was the **principal** purpose of the transaction.

Plaintiff contends (Plt. Op. Br. 26-28) that its transaction "passes" the "end result" test because the transaction with Principal FC was intended for non-tax reasons, it had economic substance, and Principal did not "control" the transaction with Principal FC. Plaintiff further contends (Plt. Op. Br. 28-30) that its transaction with Principal FC "passes" the "interdependence" test because "there were strong business reasons for the sale and assignment of the Prudential promissory notes by Principal to its subsidiary, Principal FC, and the sale and assignment had ample economic substance when it took place." In other words, plaintiff is simply falling back on its basic (irrelevant) argument that the overall transaction was not a sham.

In our opening brief (at 11-12), we quoted the Court of Claims' description of the application of the "end result" and "interdependence" tests, both of which operate "to assure that tax consequences turn on the substance of a transaction rather than on its form." *King Enterprises, Inc. v. United States*, 418 F.2d 511, 516-17 (Ct. Cl. 1969). The Tenth Circuit, in *True*, expanded on that explanation as follows:

> The end result test combines "into a single transaction separate events which appear to be component parts of something undertaken to reach a particular result." Under this test, if we find the series of closely related steps in a transaction are merely the means to reach a particular result, we will not separate those steps, but instead treat them as a single transaction. The taxpayer's subjective intent is especially relevant under this test because it allows us to determine whether the taxpayer directed a series of transactions to an intended purpose. The intent we focus on under the end result test is not whether the taxpayer intended to avoid taxes. Prior case law clearly instructs that tax reduction and avoidance motives are permissible and do not alone invalidate a transaction. Instead, the end result test focuses on whether the taxpayer intended to reach a particular result by structuring a series of transactions in a certain way.
>
> The interdependence test takes a slightly different approach. Under this test, we disregard the tax effects of individual transactional steps if "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts." The interdependence test relies to a lesser degree on the taxpayer's subjective intent than

> the end result test. It focuses not on a particular result, but on the relationship between the individual steps and "whether under a reasonably objective view the steps were so interdependent that the legal relations created by one of the transactions seem fruitless without completion of the series." In order to maintain this objectivity and ensure the steps have independent significance, we find it useful to compare the transactions in question with those we might usually expect to occur in otherwise bona fide business settings.

190 F.3d at 1175-76 (citations and footnotes omitted). The court also noted (at 1175, n.9):

> We emphasize that under the end result test, our focus is not on the legitimacy of the intended result, but instead on whether the taxpayer undertook multiple steps to achieve a particular result. Thus, if a taxpayer engages in a series of steps that achieve a particular result, he cannot request independent tax recognition of the individual steps unless he shows that at the time he engaged in the individual step, its result was the intended end result in and of itself. If this is not what the taxpayer intended, then we collapse the series of steps and only give tax consideration to the intended end result.

The evidence in this case shows that there were actually four separate parties to the Principal/Principal FC transaction: Principal; Prudential; Principal FC; and Prudential's three subsidiaries (collectively referred to as the "Payees"). As early as September 1991, attorneys for Principal (John Schmidt) and Prudential (Frank Gould) were discussing ways to structure the mortgage deal in order to minimize its tax effects. The idea of selling the installment notes to a subsidiary in a "deferred intercompany transaction" under the consolidated return regulations, as a way to avoid the § 453A interest charge,[6] was first raised by Prudential's Frank Gould. The

---

[6]Plaintiff attempts to show that this theory was tenable by citing several IRS private letter rulings (Plt. Op. Br. 11-12). Plaintiff acknowledges that private rulings cannot be relied on by other taxpayers, but asserts the "red herring" that "they were entitled to be considered by Principal as authoritative" because they are agency interpretations. Aside from the fact (as noted above) that there is no record evidence that Principal's planners were even aware of these rulings, they have no bearing on the interpretation of the transaction at hand. *Cf., Vons Companies, Inc. v. United States*, 55 Fed. Cl. 709, 718 (2003).

In addition, plaintiff contends (Plt. Op. Br. 15, 18) that the "law" under the consolidated return regulations was "changed" in 1995, when Treasury added a new Example 6 to §1.1502-

various considerations associated with the idea (*e.g.*, documentation of the notes, whether they would be recourse or non-recourse, whether a payment guarantee should be shown on the parent's Annual Statement, whether rights of set-off would be shown in the transaction documents) were worked out by Principal and Prudential together over the ensuing months.

It was important to Principal and Prudential that their installment notes "mirror each other," with simultaneous maturity dates and equal payment amounts, and for Prudential to have some sort of payment guarantee. Along the way, there were serious concerns that the IRS would find a transfer of the notes to a subsidiary to be a § 351 transfer (or contribution to capital). (If that happened, Frank Gould's theory for getting around § 453A would not work, because the theory depended on having the transfer of the notes to the subsidiary trigger recognition of the deferred installment gain, under § 453B. The attorneys for Principal and Prudential decided that Principal would have more risk on that issue than Prudential, since Prudential was contemplating using an existing subsidiary that had independent business (it ultimately used three existing subsidiaries), while Principal envisioned creating a new, single-purpose subsidiary (the purpose

---

13(c)(7)(ii), stating that, in a similar transaction, "the deferred tax liability remains subject to the interest charge under section 453A(c)." Plaintiff contends that its transaction should be judged by the "law" that existed prior to 1995–*i.e.*, in 1991, when the transaction was planned and consummated. That argument avails plaintiff nothing. In 1991, § 1.1502-13T(m)(3) contained an example discussing a similar transaction (Example (2)(iii)) that concluded:

> Section 453A requires interest to be paid on a group's tax liability deferred by reason of section 453 if the installment obligations of the group (and related persons) outstanding at the close of the group's taxable year exceed an aggregate face amount of $5 million. Because the aggregate face amount of the group's installment obligations, $25 million, exceeds $5 million, the deferred tax liabilities of both P and S must be taken into account in determining the interest charge under section 453A beginning with the taxable year in which P's sale occurs.

being to hold the "Prudential" notes and to assume Principal's liability on its notes). They decided for that reason that the transaction documents would have to specify that the transfer to Principal's subsidiary was a "sale," not a capital contribution.

Eventually, Principal and Prudential agreed on the terms of the arrangement. Their identical Purchase and Sale Agreements placed significant restrictions on the notes and on the assignees (Principal FC and the three Prudential subsidiaries). The notes could be assigned, but only once, and the assignee must have articles of incorporation that contained the identical covenants, requirements, and prohibitions that were contained in Principal FC's Articles of Incorporation. Principal FC's articles specified, *inter alia*, that it was a single-purpose corporation, that it could not engage in any business other than holding the Prudential notes (or any notes exchanged for the Prudential notes) and assuming the Principal notes (or any notes exchanged for the Principal notes), that it would not incur any indebtedness except for the notes, and that those provisions could not be amended or modified without the prior written consent of the registered owners of two-thirds of the outstanding principal balance of the notes (*i.e.*, Prudential's three subsidiaries--the "Payees").

In addition, each purchaser covenanted that it would remain the sole shareholder of the assignee and would not permit or cause the assignee to commit any act of insolvency. The assignee covenanted that it would not violate its articles or transfer its obligations regarding the notes.

On December 6, 1991, the Principal planners advised Principal's Investment Committee that, "simultaneously" with the closing between Principal and Prudential, the Prudential notes would be "sold" to Principal FC and Principal FC would assume Principal's liability on its notes.

Simultaneously, on December 20, 1991, the Principal/Prudential closing took place, Principal's notes to Prudential were issued and cancelled, Principal's notes to Prudential's three subsidiaries were issued, Prudential's notes to Principal were issued and cancelled, Prudential's notes to Principal FC were issued, the assignment agreements were executed[7] (assigning Principal's notes to Prudential's three subsidiaries and assigning Prudential's notes to Principal FC). Principal FC's assignment agreement provided, *inter alia*, that Prudential's three subsidiaries agreed to the assignment, and Principal FC covenanted not to violate its Articles of Incorporation, or to amend or modify the restrictive provisions without the Prudential subsidiaries' prior written consent. Principal also covenanted in that agreement that it would remain the sole shareholder of Principal FC and would not permit or cause it to violate its articles or commit any act of insolvency,

When the dust had settled, it is apparent that all that had happened was that the mortgages had been swapped; and Principal and Prudential had also arranged for swapping, on an installment basis, the identical "payments" to each other, through the medium of their wholly-owned subsidiaries (and free of the interest charge imposed by § 453A)–a result that was intended by Principal and Prudential throughout the planning of the transaction and was ensured by the restrictions, imposed by the Purchase and Sale Agreements and the assignment agreements, on the notes, on Principal and Prudential, and on the assignees. In light of the record evidence, plaintiff cannot show that the purported "sale" of the Prudential notes to

[7]Although the assignment agreement for Principal FC was dated December 23, 1991, it had already been executed when Principal, Principal FC, Prudential, and Prudential's three subsidiaries requested (on December 20, 1991) that the Cadwalader law firm acknowledge that it was holding the executed assignment agreement in escrow.

Principal FC "was the intended end result in and of itself"; and cannot dispute that "'it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts.'" *True* at 1175, n.9, 1176. Thus Principal's "sale" of Prudential's notes to Principal FC had no independent tax effect.

**The Guaranty Fund Assessments Issue**

With respect to this issue, we anticipated and responded to plaintiff's principal contentions, in our opening brief. Accordingly, we offer only the following comments here:

1. The guaranty fund assessments at issue ultimately benefit the policyholders of an insolvent insurance company doing business in the state. While, very broadly speaking, that function may be considered a "public" purpose, it is limited to the extremely restricted universe of that one insurance company's policyholders. The guaranty fund does not use assessments for the general public welfare. Indeed, it does not even use assessments for the benefit of the policyholders of solvent insurers doing business in the state. Furthermore, § 508C.9(6) of the Iowa Code provides for the refund to the insurers of unused assessments:

> By an equitable method as established in the plan of operation, the board may refund to member insurers, in proportion to the contribution of each insurer to that account, the amount by which the assets of the account, including assets accruing from net realized gains and income from investments, exceed the amount the board finds is necessary to carry out during the coming year the obligations of the association with regard to that account.

In addition, a guaranty fund assessment is not a "forced charge" that "is in no way dependent upon the will . . . of the person taxed." (*Reimer's Estate v. Commissioner*, 12 T.C. 913, 920 (1949), *aff'd*, 180 F.2d 159 (6th Cir. 1950). There is no civil or criminal penalty for failure to pay the assessments, and an insurer may simply choose not to pay an assessment. The

consequence of failure to pay is the potential of losing a license to do business in the state, but even that consequence is discretionary with the State Insurance Commissioner. § 508C.11(2) of the Iowa Code provides:

> As an alternative, the commissioner may levy an administrative penalty on any member insurer which fails to pay an assessment when due. The administrative penalty shall not exceed five percent of the unpaid assessment per month. However, an administrative penalty shall not be less than one hundred dollars per month.

Not only that, § 508C.9(4) of the Iowa Code provides:

> The association may abate or defer, in whole or in part, the assessment of a member insurer if, in the opinion of the board, payment of the assessment would endanger the ability of the member insurer to fulfill its contractual obligations. If an assessment against a member insurer is abated or deferred, in whole or in part, the amount by which the assessment is abated or deferred may be assessed against the other member insurers in a manner consistent with the basis for assessments set forth in this section.

Moreover, if an insurer ceases doing business in the state, any assessments that have not yet been credited as an offset against state premium taxes are credited against the state premium taxes for the year it ceases doing business. Iowa Code § 508C.19(1).[8]

The guaranty fund assessments at issue simply have none of the characteristics of a "tax" (discussed in our opening brief at 38-41). *Cf.*, *Sims v. Commissioner*, 72 T.C. 996, 1007 (1979)

---

[8]Plaintiff asserts (Plt. Op. Br. 33) that "there is evidence that, at least in Iowa, excess monies received from guaranty fund assessments were deposited into the state's general fund." As noted above, however, assessments that are not needed for the fund's obligations for the coming year are refunded *pro rata* to the member insurers. Moreover, § 508C.19(2) (cited by plaintiff) does not substantiate plaintiff's assertion. That provision states (emphasis added):

> **Sums acquired by refund from the association which have been written off by contributing insurers and offset against premium taxes as provided in subsection 1 and are not then needed for purposes of this chapter** shall be paid by the association to the commissioner. The commissioner shall remit the moneys to the treasurer of state to deposit in the state general fund.

(Amounts paid into Judges' Retirement Fund not deductible as "taxes"; they "appear to be no different from employee contributions to a defined benefit pension plan of a private employer, where the contributions are required as a condition of employment").

2. Plaintiff notes that, in 2004, the Treasury Department issued final regulations under § 263 governing capitalization of intangible assets that essentially provide (§ 1.263-4) that capitalization is required on the ground that the asset produces significant future benefits, only with respect to those assets that are or will be identified in published guidance. (Plt. Op. Br. 35-36.) Plaintiff then argues that the Treasury Department has "admitted" that the assessments at issue do not produce significant future benefits and thus are not required to be capitalized, because guaranty fund assessments have not yet been so identified. This is another "red herring."

The approach taken in the new regulation does not indicate that the Government now believes that the "significant future benefit" standard for capitalization (which still applies to tax years prior to the regulation's effective date, December 31, 2003) is an erroneous standard.[9] Even if that were the case, however, plaintiff's reliance on § 1.263-4(a) is misplaced. Even if plaintiff's method of accounting for the assessments at issue in years prior to 1991 were erroneous, it still would be required to obtain the IRS's prior consent to change it. *Diebold, Inc. v. United States*, 16 Cl. Ct. 193, 212, n.20, *aff'd*, 891 F.2d 1579 (Fed. Cir. 1989), *cert. denied*, 498 U.S. 823 (1990) ("Where the proposed new method wold be more correct than the old, the

[9]Indeed, the Preamble to the Regulations indicates that the changes made to the capitalization principles "strike an appropriate balance between the capitalization provisions of the Code and the ability of taxpayers and IRS personnel to administer the law, and are a reasonable means of enforcing the requirements of section 263(a)."

Commissioner's consent is nonetheless essential"). (*See* Def. Op. Br. 45.)

3. Plaintiff asserts (Plt. Op. Br. 3) that "[i]n 1991, Principal realized that its capitalization and amortization of such assessments for federal income tax purposes had been erroneous, and that such assessments were deductible in full in the year paid as state taxes under Section 164." Based on that assertion, plaintiff contends that its change in the tax treatment of the assessments for tax year 1991 was not a change of accounting method requiring the IRS's prior consent. As demonstrated in our opening brief (at 27-29), however, in 1991, Principal learned that some other insurance companies were expensing the type of assessments at issue, and Principal's lawyers and accountants began trying to figure out what argument they could make to the IRS that would convince the IRS that Principal's assessments should be expensed. The first argument they thought of was that the assessments were ordinary and necessary business expenses deductible under § 162, but they were afraid that they might not be able to show that the all events test had been met.

In April 1992, Principal had not yet thought of contending that the assessments at issue were "taxes" deductible under § 164. That idea was developed, after a conversation with an employee of Peat Marwick, in a draft Form 3115 (Application for Change in Accounting Method), prepared by Principal in June 1992, that was never filed. As late as September 1999, Principal's lawyers were still conducting research to develop arguments to support the contention that the assessments at issue are § 164 "taxes."

Thus, even if plaintiff's "correction of error" argument were otherwise tenable (it is not, in light of *Diebold*, *Inc. v. United States*, 891 F.2d 1579 (Fed. Cir. 1989), *cert. denied*, 498 U.S. 823 (1990), and other authorities discussed in our opening brief at 43-51), it is refuted by the

contemporaneous record evidence.

**CONCLUSION**

For the reasons stated herein, in our opening brief, and in our proposed findings of uncontroverted fact, judgment should be entered for defendant and the complaint dismissed with prejudice, with costs assessed against the plaintiff.

Respectfully submitted,

S/Mary M. Abate
MARY M. ABATE
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6507

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section
WILLIAM K. DREW
Reviewer

S/William K. Drew
Of Counsel

July 11, 2005