IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1278T
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE
COMPANY AND SUBSIDIARIES,

Plaintiff

v.

THE UNITED STATES,

Defendant

DEFENDANT'S RESPONSE TO PLAINTIFF'S
STATEMENT PURSUANT TO THE COURT'S
ORDER OF MARCH 2, 2006

Defendant interprets the "Second Stipulation of Facts" filed electronically by plaintiff on March 10, 2006, to be plaintiff's statement filed in response to the Court's March 2 order, which requires "a summary by year of all expenditures made by Principal FC, Ltd. in 1991-2002, other than payments made to Prudential Life Insurance Company on the purchase money notes," and a list of "all Principal FC, Ltd. employees during the same period." Defendant responds to plaintiff's statement as follows:

Defendant does not dispute that Principal FC, Ltd. had no employees during the period 1991 through 2002 (Plt. State. ¶ 1), and that Principal FC's expenditures during the period 1991-2002 consisted virtually exclusively of federal and state taxes, and state

filing fees. (Plt. State. ¶ 8, and accompanying documentation.)[1]

Defendant objects to the implication in plaintiff's statement that Principal FC, Ltd. was an "operating company" (Plt. State. ¶¶ 1, 3, 4), and to plaintiff's implication that Principal FC retained ownership, throughout the entire period 1991-2002, of all of the "securities" that it purchased on "45 separate occasions" (Plt. State. ¶¶ 5, 8). There is no supporting evidence in the record; indeed, both the documentation filed electronically by plaintiff on March 10, 2006 and defendant's exhibits attached to this response directly refute those propositions.[2]

The supplemental documentation filed by the parties in response to the Court's March 2 order demonstrates that the only functions of Principal FC, Ltd. were to hold and to receive principal and interest payments on the Prudential notes; to pay the principal and interest to Prudential on the Principal notes; to keep the major portion of the $1,000,000 capital contribution from Principal Life Insurance Company to Principal FC (*i.e.*, roughly $900,000) in a long-term Treasury bill, with the remainder constantly rolled over in short-

[1]Paragraph 8 of plaintiff's statement alludes to the payments made by Principal FC for the "purchase of securities" referred to in ¶ 5 of plaintiff's statement. Those payments are addressed below.

[2]Defendant's Exhibits 1-4, electronically filed as attachments to this response, are documents forwarded to defendant's counsel by plaintiff's counsel, through plaintiff's counsel's outside copying service, and received February 27, 2006. (*See* "Plaintiff's Post-Trial Submission Regarding Principal FC, Ltd.," ¶ 1, filed electronically by plaintiff on March 10, 2006; and the Declaration of Mary M. Abate filed as an attachment to this response.

term commercial paper; and to keep a small amount of cash on hand to pay taxes and license fees; and that these functions were to continue only until 2002, when the payments on the Prudential and Principal notes were completed. These conclusions are demonstrated by the following:

1. A "Non-Life Insurance Subsidiary Tax Questionnaire for the Period 1/1/91-12/31/91," prepared by Principal Life Insurance Company ("Principal") employee Jill Bohr with respect to the operations of Principal FC, Ltd. ("FC") answered "no" to all but two questions. (Def. Ex. 1, pp. 3-8.) The "yes" response to question 2 ("Any investments?") was explained as an investment of $948,078.89 in "Commercial Paper," and an investment of $478,476,694 in "Note Receivable" (*i.e.*, from Prudential) (Def. Ex. 1, pp. 3, 6.) The source of the $948,078.89 invested in Commercial Paper (a $950,000 bond) was that portion of Principal's $1,000,000 capital contribution to FC (Def. Ex. 1, p. 7). (*See* Def. Ex. 2.) The "yes" response to question 9 was explained as a "Note Payable" (*i.e.*, to Prudential). (Def. Ex. 1, p. 6.)

The Tax Questionnaire also reflects that FC's financial statements were not audited. (Def. Ex. 1, pp. 4, 5, 7, 8; *see* Def. Ex. 4, pp. 2, 3, 7, 8.)

2. On September 1, 1992, Principal employee Jill Bohr suggested to Principal employees Pat Halter and Margie Johnson that, rather than having the major portion of the $1,000,000 in commercial paper, $900,000 of it be invested in a 5-year Treasury bill (Def. Ex. 1, p. 11):

> Principal FC has $975,000 in commercial paper rolling today. I have spoken with Jerry about their continued investment strategy. We would propose that they now invest $900,000 in a 5 year Treasury with the remainder invested short term. This would leave about $119,000 in the bank account and in short terms investments to cover filing fees, wire transfer fees, federal and state income taxes, etc. Can you think of any major expenses which I am missing?

Margie Johnson replied that same morning (Def. Ex. 1, p. 10):

> That strategy sounds fine with me. The only other expense I can think of is an annual audit. This is not required by the documents, but I assume it is required for FC for inclusion in the holding co. statements. In the event that the IRS audits us on this transaction in a few years, I assume any costs associated with this will be borne by Mutual [Principal].

Pat Halter also agreed (Def. Ex. 1, p. 9):

> I think this also sounds fine. . . We just need to assure ourselves that enough annual income and money in the ST [short term] accounts exist to cover all expenses on a annual basis over the next 5 years.

Five years later, when that Treasury bill came due, the $900,000 was immediately rolled over into another 5-year Treasury bill:

> On Friday we had a maturity of our long-term investment and we should have seen $925,312.50 coming into Principal FC. They are repurchasing a long term Treasury as of today and you should see $900,155.39 going out of the account today.

(Def. Ex. 1, p. 17; *see id.*, pp. 18-19.)

3. On September 28, 1992, Principal employee Angie Sanders asked Jill Bohr what FC's function was (Def. Ex. 1, p. 14):

> Could you please defin[e] what Principal FC does in about one or two sentences? For recruiting we have a brochure that lists all of the subsidiaries and a little bit about what they do. I guess the first question I should ask is whether or not they should be included at all?

Jill Bohr replied (Def. Ex. 1, p. 13):

> Principal FC is an investment subsidiary. It was set up to hold notes receivable and notes payable for the Prudential mortgage swap. This design or structure is primarily tax driven so I am not sure how much you would want to elaborate on that.
>
> The articles of incorporation refer to [it as] a single purpose subsidiary which can either own or assume limited forms of assets.

The "Notes" to FC's financial statements reflect that FC's function was to process the payments and receipts on the Principal/Prudential notes:

> Description of Business: Principal FC, LTD. was incorporated on December 17, 1991 as an Iowa Corporation to primarily engage in the ownership of certain mortgages and short-term investments.

(Def. Ex. 4, pp. 5 (1995), 10 (1999).)[3]

4. Plaintiff's Document 96, Part 5, at pp. i-ii ("Principal FC, Ltd. Summary of Securities Purchased 1991-2002"), electronically filed on March 10, 2006, demonstrates that FC's 45 separate purchases were not held by FC throughout the entire period 1991-2002. Rather, as each separate short-term note came due, that amount was simply rolled over into another short-term note, which amount was in turn rolled over when that note came due, and so on.

5. After the second set of Principal/Prudential notes was paid off in 2002, FC had no income or activity. (Def. Ex. 1, p. 37 (Amy Mills to Kari Babel, 8/17/04, 1:03

[3]Defendant's Exhibit 3 shows the reciprocal amounts of principal and interest accrued and paid by and to FC on the Principal/Prudential notes throughout the period 1991-2002.

p.m.).) FC was kept alive only long enough to assure that nothing further was needed from it for this tax litigation. (Def. Ex. 1, pp. 25-39, 44-47.) FC was dissolved in 2004. (Def. Ex. 1, p. 25.)

Respectfully submitted,

S/Mary M. Abate

MARY M. ABATE
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6507

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Acting Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

S/Steven I. Frahm
Of Counsel

March 15, 2006