# In The United States Court of Federal Claims

No. 02-1278 T

(Filed: March 17, 2006)

_____

| | | |
|---|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES, | * * * | Tax refund suit; Trial; Treatment of installment obligations under 26 U.S.C. §§ 453, 453A, 453B; Substance over |
| Plaintiff, | * * | form; Transfer to subsidiary; Sale versus 26 U.S.C. § 351 contribution to capital; |
| v. | * * | Multi-factored analysis applied; Taxpayer characterization upheld; Payment to state |
| THE UNITED STATES, | * * | insurance guaranty associations; What is a "tax" under 26 U.S.C. § 164?; Payments |
| Defendant. | * * * | to state guaranty association, not a tax, but a regulatory fee. |

_____

## OPINION

_____

*Bruce Graves*, Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, Iowa, for plaintiff.

*Mary M. Abate*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Eileen J. O'Connor*, for defendant.

**ALLEGRA, Judge**:

> *"The principle of looking through form to substance is no schoolboy's rule; it is the cornerstone of sound taxation. . . ."*[1]

> *"Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."*[2]

_____

[1] *Weinart's Estate v. Comm'r of Internal Revenue*, 294 F.2d 750, 755 (5th Cir. 1961) (Wisdom, J.).

[2] *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J.), *aff'd*, 293 U.S. 465 (1935).

When does a taxpayer cross the fault line between the cheering fields of tax planning and the forbidding elevations of form over substance, far enough, at least, to require a transaction to be recharacterized for tax purposes?  No map – statutory, regulatory or otherwise – precisely reveals this point of no return.  Rather, in turn, the taxpayer, the government, and, ultimately, the judicial traveler are guided only by multi-factored analyses, balancing tests and other forms of *ad hocery*, which, if properly employed, serve hope that the terrain's true character will be revealed. This tax refund suit presents not one, but two opportunities to exercise these faculties.

This case is before the court following a brief trial, the brevity of which masks the complexity of the two issue presented:  The first concerns the treatment of the alleged disposition of certain installment obligations under sections 453, 453A and 453B of the Internal Revenue Code of 1986 (the Code).  Also at issue is whether state guaranty fund assessments in states that allow all or part of such assessments to be offset or credited against future premium, franchise, or income taxes are currently deductible under section 164 of the Code or must be capitalized and amortized over the time periods the assessments are to be offset or credited.  First, the facts.

## I.   FINDINGS OF FACT

Based on the record, including the parties' stipulations, the court finds as follows:

During the years in issue (1991-1994), plaintiff (Principal) was an Iowa mutual life insurance company, with assets in excess of $30 billion.  It filed consolidated returns as the parent corporation of a consolidated group of corporations.  During its tax years 1991-1994, and at all times relevant to this action, Principal was a calendar-year, accrual-basis taxpayer subject to tax under the provisions of Subchapter L of the Code.

As noted, two issues arise in this refund suit, the facts with respect to which are separately stated in the following segments.

### A.   Interest on Deferred Tax Issue

In 1985, Principal (then called Bankers Life Company) sold to Prudential Life Insurance Company (Prudential) 155 commercial real estate mortgage loans that Principal had originated. Contemporaneously, Principal purchased from Prudential 105 commercial real estate mortgages that Prudential had originated.  Each party agreed to continue servicing the loans it had originated.  In 1990, Principal was considering various ways to increase its surplus for state insurance regulation purposes by roughly $150-200 million.  By this time, the continued servicing of the loans held by Prudential had proven cumbersome and prepayments of some of the loans sold by Principal to Prudential had generated adjustments that were adversely affecting Principal's bottom line.

In 1991, Prudential approached Principal with the idea of "unraveling" the 1985 transaction, and doing so before December 31, 1991.  Principal immediately recognized that the proposed transaction could generate a gain of $75 million, representing a significant portion of

the desired increase in surplus; Prudential apparently also hoped to increase its surplus through the proposed transaction.  As early as April 1991, Principal employees considering the feasibility of a mortgage loan swap recognized that it could pose tax problems, particularly the possibility that deferred gain on the installment notes involved in the swap would generate an interest charge under section 453A of the Code.[3]  When, in the third quarter of 1991, Principal lost its triple-A bond rating, concerns also arose that having Principal assume any new liabilities to Prudential would be perceived as a sign of financial weakness by ratings agencies, insurance regulators, customers, and marketers.  Between August and October of 1991, Principal's employees considered various ways to avoid the section 453A interest charge.  Ultimately, they concluded that this could be accomplished by selling the installment notes to a subsidiary, asserting that, for this purpose, a trust could be treated as a corporation eligible under the Treasury Department's consolidated return regulations (Treas. Reg. §§1.1502, *et seq*.) to enter into a "deferred intercompany transaction" as a member of an affiliated group.[4]

In deciding what type of subsidiary to use in the transaction, Principal was concerned that using – (i) an insurance company or a company subject to regulation by the Securities and Exchange Commission would create regulatory difficulties; (ii) a subsidiary that was expected to generate losses could limit the deductibility of such losses; (iii) a subsidiary that had substantial equity would place that equity at risk; and (iv) a company engaged in business in a large number of states would generate state tax problems.  The selection process became more complicated in October of 1991, when a suit was filed against a subsidiary being considered for the transaction, The Principal Financial Group, Inc., raising the specter of bankruptcy.

By the middle of October of 1991, a consensus was building around creating a new, wholly-owned subsidiary to hold the assets and liabilities that were to be acquired from Prudential as part of the new transaction.  Discussions were held with Prudential concerning how

---

[3]  As will be discussed in greater detail below, section 453 of the Code generally allows for the deferral of gain on property sold for an installment obligation.  Section 453A essentially imposes an interest charge on this deferral.

[4]  In an e-mail to other Principal team members on October 2, 1991, one of Principal's attorneys first reported on the possibility of using a trust, taxable as a corporation, to avoid the section 453A interest charge.  He noted that a Prudential tax advisor –

> maintains that a sale of the installment note to a subsidiary corporation avoids application of this rule because the transfer to the sub results in a deferred intercompany transaction, and gain is not recognized until the earlier of (1) transfer of the property to an unrelated third party, or (2) payments are received from the buyer.  [This] interpretation is based on the theory that the transfer to the sub accelerates recognition of the entire gain, taking it out of the installment sale rules, but then deferring the gain under the consolidated return regulations.

to structure the transaction, and, in particular, the installment notes that would be exchanged in unraveling the 1985 transaction.  By November 7, 1991, the terms of the planned structure of the transaction had solidified and were summarized by Margie Johnson, Principal's mortgage underwriter for commercial real estate, in a letter to Prudential's Mark Warner, thusly –

– Principal Mutual will issue a non-recourse note to Prudential in exchange for the purchase of the loans currently held by Prudential. This note payable will be secured by a note received by Principal Mutual from Prudential.  The note receivable securing the note payable represents Prudential's consideration for its purchase of the loans held by Principal Mutual.  Principal Mutual will sell the note from Prudential to a newly formed subsidiary in exchange for that subsidiary assuming Principal Mutual's obligation for the note payable to Prudential.

– Prudential will issue a recourse unsecured obligation to Principal Mutual in exchange for the purchase of the loans currently held by Principal Mutual . . . . To the extent Prudential desires to assign this note to a subsidiary in the future, Prudential will remain liable.

\*          \*          \*          \*          \*

– Both notes will need to mirror each other in terms of payments and maturity date with the exception of the $20 million approximate difference in principal balance which will need to be treated separately.

When Prudential raised concerns that the note which Principal was to issue would be non-recourse, it was discussed, *inter alia*, that, under its charter, the new Principal subsidiary would be prevented from entering into any business or transactions other than the holding of these assets and the assumption of the Principal notes payable.  Principal asserted that Prudential could sue it if it caused its subsidiary to violate its charter.[5]

On November 13, 1991, one of Principal's outside counsel, Cynthia Williams, faxed a memorandum, entitled "Proposed Structure of Principal/Pru Portfolio Sales," to two Principal attorneys, proposing that Principal would pay $520 million for its original mortgage loans by issuing two recourse unsecured purchase money notes payable to Prudential.  The memorandum also provided that Principal, Prudential, and "a newly formed single purpose subsidiary of Principal ('NEWCO')" would enter into an agreement whereby Principal would sell its rights

---

[5]  As quotations below reflect, the parties vacillated somewhat on whether the Principal note would be recourse or nonrecourse; as will also be seen, ultimately, the note was nonrecourse.

under Prudential's notes to NEWCO in exchange for latter's assumption of Principal's obligations under its notes to Prudential.  NEWCO would –

> agree for the benefit of [Prudential] . . . that NEWCO may enter into no business or transactions other than the holding of these assets and the assumption of the Principal Notes payable. NEWCO will agree that any transfer or encumbrance of NEWCO's assets must be consented to by [Prudential].

On November 15, 1991, Principal sent the Iowa Division of Insurance a "Form D - Prior Notice of a Transaction," providing notice of the contemplated transaction with Prudential.  In this document, it stated:

> We are carefully structuring the transaction so as to minimize adverse tax consequences. . . . We propose to sell the note we receive from Prudential to a subsidiary; the subsidiary would assume our liability on the note Principal Mutual issues to Prudential in consideration for the note purchased by the subsidiary.  We will sell additional assets to the subsidiary to permit it to match cash flows on the asset and liability.  As a result, the subsidiary will purchase assets with a fair market value of approximately $520 million and it will assume liabilities with a fair market value of approximately $520 million.

Principal further indicated that it had "not yet determined whether we will use an existing subsidiary or create a new subsidiary," adding that it "expect[s] to close the transaction in 199l."[6] Principal's prior-notice letter was stamped "No objection" by the Division of Insurance, on December 18, 1991.

---

[6]  Principal's prior notice of the contemplated transaction with Prudential was sent to the Iowa Division of Insurance pursuant to § 521A.5(1)(b) of the Iowa Code, which provides:

> b. A domestic insurer and a person in its holding company system shall not enter into any of the following transactions between each other . . . unless the domestic insurer notifies the commissioner in writing of its intention to enter into the transaction at least thirty days prior to entering into the transaction or within a shorter time permitted by the commissioner and the commissioner has not disapproved of the transaction within the time period:
>
> > (1)  Sales.
> > (2)  Purchases.
> > (3)  Exchanges.
> > (4)  Loans or extensions of credit.
> > (5)  Guarantees.
> > (6)  Investments.
> > (7)  Loans or extensions of credit to a person who is not an affiliate . . . .

Meanwhile, on December 6, 1991, two Principal employees submitted a memorandum to Principal's Investment Committee, recommending approval of the proposed transaction. This memorandum described the mortgages that were to be the subject of the transaction thusly –

A.      Loans held by Principal Mutual Life Insurance Company

            Principal balance (as of 12/31):              $473,091,400
            Weighted average life:                        8.78 years
            Weighted average coupon:                      8.96%

            Approximate market value (as of 11/18):       $486,212,474 (102.77%)
            Approximate gain for statutory purposes:      $75,000,000

B.      Loans held by Prudential Life Insurance Company

            Principal balance (as of 12/31):              $494,051,767
            Weighted average life:                        8.49 years
            Weighted average coupon:                      9.67%

            Approximate market value (as of 11/18):       $520,995,430  (105.45%)
            Approximate gain for statutory purposes:      Estimated at $70-80 million

Describing the expected structure of the transaction, the memorandum stated, in pertinent part:

–       Sell loans to Prudential in exchange for a recourse unsecured note
        from Prudential for approx. $486 million.

–       Buy loans from Prudential in exchange for recourse unsecured
        notes from Principal Mutual Life Insurance Company for approx.
        $520 million.

–       Simultaneous with closing, Principal Mutual will sell the $486
        million note from Pru and $34 million in Treasury obligations to a
        newly-formed, single-purpose subsidiary. Subsidiary will assume
        recourse obligation for the notes from Principal for $520 million.

–       Principal Mutual is released from any recourse obligation.

–       An additional $1-2 million will be required for capitalization of the
        subsidiary.

It also noted that "[a]nticipate transaction will be tax neutral (hold vs. sell), although the possibility exists for the IRS to challenge the structure. If the IRS is successful, the potential tax

cost may be $9-10 million."  Principal's Investment Committee approved the proposed transaction.

On December 11, 1991, Cynthia Williams faxed a draft of the proposed purchase agreement to various Principal employees.[7]  On December 17, 1991, the Articles of Incorporation of Principal FC, Ltd. (Principal FC) were filed with the Iowa Secretary of State.  Paragraph 5 of the Articles provided:

    (a)        The corporation shall be and remain a single purpose corporation organized under the laws of a state in the United States.

    (b)        The corporation shall not engage directly or indirectly in any business other than:

        (i)  the ownership of the following (each an "Eligible Investment"):

    \*      \*      \*      \*      \*

        (D)  Purchase Money Notes due in 1999 and 2002 issued in an aggregate original principal amount not in excess of $525,000,000 by The Prudential Insurance Company of America pursuant to the Purchase and Sale Agreement, dated December 20, 1991, between The Prudential Insurance Company of America, as purchaser, and Principal Mutual Life Insurance Company, as seller, together with any note or notes issued in exchange therefor or replacement thereof pursuant to Article V of such Purchase and Sale Agreement; and

    \*      \*      \*      \*      \*

        (ii)  the assumption of

        (A)  The Purchase Money Notes due in 1999 and 2002 (the "Notes") issued in an aggregate original

---

[7]  Internal communications around this time reveal that certain Principal employees were concerned that the transfer of the notes between Principal and Principal FC would not be treated as a sale, but rather as a capital contribution or transfer in exchange for stock under section 351 of the Code.  They recognized that were the IRS to prevail on this point, the installment payments on the notes would be treated as generating a deferred tax liability, triggering the interest provisions of section 453A of the Code.

> principal amount not in excess of $525,000,000 by Principal Mutual Life Insurance Company pursuant to the Purchase and Sale Agreement, dated December 20, 1991, between Principal Mutual Life Insurance Company, as purchaser, and The Prudential Insurance Company of America, as seller, together with any note or notes issued in exchange therefor or replacement thereof pursuant to Article V of such Purchase and Sale Agreement, and . . .

    (c)    The corporation shall not incur, permit or suffer to exist any indebtedness of the corporation except for the Notes.

Paragraphs 5(d)-(h) of the Articles prohibited Principal FC from disposing of any Eligible Investments, unless they were replaced with others with the same characteristics; encumbering any of its assets; distributing any dividends to shareholders if such distributions would result in a negative net worth; making any loans or guarantees; owning or acquiring any stock, other than Eligible Investments; and merging with or transferring assets to any entity other than one having articles of incorporation identical to Principal FC's.  Paragraph 5(c)(i) of the Articles stated – "The provisions of this paragraph 5 may not be amended or modified without the prior written consent of the registered owners of not less than 66 2/3% of the aggregate outstanding principal balance of the Notes."

On December 18, 1991, Principal capitalized the new subsidiary with $1 million, provided through a wire transfer of funds to the new subsidiary's account.  Such capital survived relatively intact in the subsidiary's account continuously throughout the years in suit, in the form of cash and/or investments.

On December 20, 1991, a Purchase and Sale Agreement was executed between Principal (purchaser) and Prudential (seller), with respect to 131 commercial mortgage loans that had been sold to Prudential in 1985.  That same day, another Purchase and Sale Agreement was executed between Principal (seller) and Prudential (buyer), with respect to 71 commercial mortgage loans that had been purchased from Prudential in 1985.  Section 4.02 ("Assignment of the Purchase Money Notes and Other Obligations") of each Purchase and Sale Agreement mandated in subsection (a) that the articles of incorporation of any assignee contain the identical covenants, requirements, and prohibitions that were contained in the Articles of Incorporation of Principal FC.  In addition, under § 4.02(b) of each Purchase and Sale Agreement, the purchaser covenanted that it would remain the sole shareholder of the assignee, that it would not cause or permit the assignee to violate any of its covenants, and that it would not cause any of the described "Insolvency Events" to occur.  Further, under § 4.02(c) of each Purchase and Sale Agreement, the assignee covenanted that it would not violate its articles of incorporation, and that it would not sell, transfer, assign, or delegate its obligations regarding the Purchase Money Notes.

Section 4.02(d) of each Purchase and Sale Agreement provided:

Purchaser's right to delegate its obligations under the Purchase Money Notes and to be released from liability thereunder as provided in this Section 4.02 is a one-time right.  If Purchaser exercises its right to delegate its obligations under the Purchase Money Notes and is released from liability thereunder, and Purchaser thereafter assumes liability under one or more Purchase Money Notes, Purchaser shall have no further right to delegate its obligations under such Purchase Money Note and be released from liability thereunder.

Article V of each Purchase and Sale Agreement governed the Purchase Money Notes.  Section 5.01 of each agreement mandated:

Each Purchase Money Note delivered by the Issuer[8] on the Closing Date shall be dated as of the Closing Date.  All other Purchase Money Notes that are delivered after the Closing Date for any other purpose under this Agreement shall be dated the date of their execution.

The Purchase Money Notes were listed and described in Schedule V to each Purchase and Sale Agreement.

Representing the purchase price, Principal executed in favor of Prudential three promissory notes ("Purchase Money Notes") totaling $504,637,639.  Two of these, designated Purchase Money Notes Nos. 2 and 3, were each in the amount of $239,238,347, and payable on January 1, 1999, and January 1, 2002, respectively.  Both of these notes were dated December 20, 1991.  Principal also executed Purchase Money Notes Nos. 4-7 to Prudential's subsidiaries PruSupply Capital Assets, Pruco Life Insurance Company, and Prudential Realty Securities II, Inc., in the same total amount, $478,476,694 as that of Purchase Money Notes Nos. 2 and 3.[9]  All four of these Purchase Money Notes were dated December 20, 1991.  That same day, Purchase Money Notes 2 and 3, from Principal to Prudential, were cancelled.

---

[8]  Article I of each Purchase and Sale Agreement defined "Issuer" as follows:

Issuer: The obligor under the Purchase Money Notes.  The initial Issuer shall be the Purchaser.  If the Purchaser is released from its obligations with respect to the Purchase Money Notes pursuant to Section 4.02, its assignee shall become the Issuer.

[9]  Prudential Realty Securities II, Inc., was issued two notes.  Paragraph 25 of the Joint Stipulation of Facts incorrectly lists Purchase Money Note No. 7 as payable to Prudential Realty Securities, Inc.

Representing the purchase price, Prudential executed in favor of Principal its promissory notes, designated Purchase Money Notes Nos. 1 and 2, each in the amount of $239,238,347, payable in full on January 1, 2002, and January 1, 1999, respectively.  Both of these Purchase Money Notes (which totaled $478,476,694) were dated December 20, 1991.  Also on December 20, 1991, Prudential executed Purchase Money Notes Nos. 3 and 4 to Principal FC in the same total amount ($478,476,694) as that of Purchase Money Notes Nos. 1 and 2.  Both of these Purchase Money Notes were dated December 20, 1991.

The agenda for the closing on December 20, 1991, reflects that, among the documents delivered at the closing were the Purchase Money Notes payable to Principal, a copy of the cancelled Purchase Money Notes payable to Principal, the Purchase Money Notes payable to Principal FC, and a related "escrow letter."  The escrow letter, dated December 20, 1991, was signed by the representatives of Principal, Principal FC, and Prudential's subsidiaries.  It requested that the law firm Cadwalader, Wickersham & Taft (Cadwalader) acknowledge that it was holding in escrow the Purchase Money Notes from Prudential to Principal (totaling $478,476,694); the Purchase Money Notes from Prudential to Principal FC (totaling $478,476,694); an executed "Sale, Assignment, Assumption and Release Agreement;" Principal's letter of instructions to Prudential (executed and dated December 23, 1991) regarding the "transfer of Purchase Money Notes from [Principal] to Principal FC;" and other documents related to Principal FC.  Cadwalader was instructed to cancel the Purchase Money Notes from Prudential to Principal (Nos. 1 and 2, totaling $478,476,694), and to deliver the other documents to the parties, upon faxed instructions from Principal expected on December 23, 1991.  Cadwalader countersigned the escrow letter, "Accepted and Agreed."

Also on December 20, 1991, Principal and Principal FC each gave a separate letter of instruction to Prudential for transferring Prudential's payments with respect to "the Purchase Money Notes issued by you pursuant to that certain Purchase and Sale Agreement, dated December 20, 1991 . . . and payable to the undersigned."  One instruction letter directed that Prudential's payments should be "for credit to Principal Mutual Life Insurance Company Account No. 014752."  The other letter directed that Prudential's payments should be "for credit to Principal FC, Ltd. Account No. 7051417."

The parties to the "Sale, Assignment, Assumption and Release Agreement" (Assignment Agreement), which bore a date of December 23, 1991, were PruSupply Capital Assets, Inc., Pruco Life Insurance Company, and Prudential Realty Securities II, Inc. (the "Payees"); Principal Mutual Life Insurance Company, and Principal FC.  Prudential was not a party to that agreement. The Assignment Agreement stated that Principal desired to "sell" the "Assets" (defined as the Purchase Money Notes Nos. 1 and 2 from Prudential payable to Principal, listed in the attached Schedule B) to Principal FC in return for Principal FC's assumption of liability on Principal's four notes to the Prudential subsidiaries (Principal's Purchase Money Notes Nos. 4-7).  The Assignment Agreement also stated, in § 2.02, that the "Payees" (*i.e*, Prudential's subsidiaries) agreed to the transfer, and, in § 2.01, that Principal and Principal FC intended the transaction was "a sale . . . and not a capital contribution or a transfer in exchange for stock."

In § 3.01 of the Assignment Agreement, Principal FC covenanted that it would not: (i) violate its Articles of Incorporation; (ii) amend or modify ¶ 5 of its Articles of Incorporation "without the prior written consent thereto of the Payees who are the registered owners of not less than 66 2/3% of the aggregate outstanding principal balance of the Notes;" or (iii) transfer its obligations related to the Notes without the owners' prior written consent, except if the obligations were assumed by Principal.  In § 3.03 of the Assignment Agreement, Principal also agreed, *inter alia*, to remain "the sole direct or indirect shareholder of [Principal FC]," to not cause or permit any "Insolvency Events" with respect to Principal FC, and to not cause or permit any violation of Principal FC's Articles of Incorporation.

As of December 31, 1991, the books of Principal FC showed the notes receivable from Prudential, the notes payable to Prudential's subsidiaries, the interest receivable and payable on the notes, the $1,000,000 capital contribution, and miscellaneous amounts, including federal income tax payable on the interest.

In the 1991 consolidated federal income tax return filed by Principal with its subsidiaries (including Principal FC), Principal reported the mortgage loan sale to Prudential for the aggregate selling price of $477,057,257, and gain on the sale of $68,032,598.  Principal elected to report the gain on the installment method under section 453 of the Code, and did not include any of the gain in its income for that year.  Neither its 1991 return nor its consolidated returns for subsequent years showed any interest on deferred tax under section 453A of the Code.  The Internal Revenue Service (IRS) audited Principal's consolidated returns for the tax years 1991-1994 and ultimately determined that Principal was liable for additional federal income tax consisting of interest on its deferred tax liability under section 453A of the Code.[10]

**B.      The Guaranty Fund Assessment Issue[11]**

State guaranty fund associations were created by state legislation, generally based on the Model Life and Health Insurance Guaranty Fund Association Act adopted in 1970 by the National Association of Insurance Commissioners (NAIC).  The Iowa Life and Health Insurance Guaranty Association Act, Chapter 508C, Code of Iowa (the Iowa Act), enacted in 1987, is illustrative of these state statutes.  In general, such associations are authorized to levy assessments against insurance companies licensed to do business in their states, in order to

---

[10]  The IRS allowed deductions for the interest on deferred tax assessed and paid for each of the years in suit.  In the event that plaintiff prevails on this issue, these deductions will need to be reversed and the resulting additional tax liability offset against any tax refund or credit for the years in suit.

[11]  This issue also applies to Principal's subsidiary, Principal National Life Ins. Co.  For the sake of brevity, references to Principal National are omitted here.  The parties agree, however, that the ultimate disposition of this issue for the years in suit also applies to Principal National.

provide a fund for the protection of policyholders of companies that become insolvent, and to support the orderly rehabilitation or liquidation of insolvent insurers.

Section 508C.5 of the Iowa Act provides that a "person" licensed to transact any kind of insurance to which Chapter 508C applies is a "member insurer" of the association, and Section 508C.6 provides that such insurers are required to remain members "as a condition of their authority to transact insurance business in this state." Section 508C.2 provides that "[m]embers of the association are subject to assessment to provide funds to carry out the purpose" of providing protection against the failure in the performance of contractual obligations under insurance policies and annuities as a result of the impairment or insolvency of the member insurer that issued the policies. Section 508C.7 provides for a board of directors composed of member insurers whose selection is subject to approval of the state insurance commissioner, who is charged with ensuring that all member insurers are fairly represented. Section 508C.9(1) provides that "the board of directors shall assess the member insurers . . . at the time and for the amounts the board finds necessary."

The NAIC Model Act contained an optional provision (Section 13) that would permit a member life insurance company to offset up to 20 percent of its assessment against its state premium tax, franchise tax, or income tax liability for each of the five succeeding calendar years, until the assessment was recouped. Most states have a state premium tax, which is in the nature of an excise tax, levied by a state on the premiums collected by an insurance company in that state, in lieu of an income tax. During the years in suit, the statutes of 35 states included the 20-percent-per-year offset provision, while another 8 states and the District of Columbia provided for offsets in different amounts. Seven states and Puerto Rico allowed no offsets. Section 508C.19(1) of the Iowa Act provides credits against an insurer's state premium tax liability for guaranty fund assessments paid, up to 20 percent of the payment for each of the succeeding five calendar years.

During the years in suit, Principal paid the total amounts of all assessments made by state guaranty fund associations in the states in which it did business. When Principal paid a guaranty fund assessment in a state that allowed no offset against future premium taxes, that payment was deducted by Principal in full in the year paid, both for NAIC Annual Statement purposes and for federal income tax purposes. When Principal paid a guaranty fund assessment in a state that allowed offsets against future premium taxes, that payment was capitalized and amortized by Principal over the period permitted by the state, both for Annual Statement purposes and for federal income tax purposes. At least initially, Principal had at least two reasons for capitalizing the payments in states that allowed premium tax offsets: (i) some states required the payments of the guaranty fund assessments to be capitalized, in order for the insurer to qualify for the offset against premium taxes; and (ii) if the payments were not capitalized, Principal's statutory surplus would be reduced correspondingly. Of these, it was particularly important to Principal to recognize the asset on its books so as not to take the surplus reduction.

Thus, on its federal income tax returns for tax years prior to 1991, Principal deducted in full only the assessments paid to guaranty fund associations in states which allowed no offset

against future state taxes.  With respect to states that allowed offsets, Principal capitalized the assessments paid and amortized them ratably over the periods prescribed.  Only the sum of those amounts (full deductions for states that allowed no offsets plus amortized amounts for states that allowed offsets) was included in "Insurance Taxes" on the Annual Statement, and deducted by Principal as a part of "Other Deductions" in its tax returns for those years.

During an audit of Principal's 1987-1988 tax returns, Principal raised with the IRS the issue whether all of its guaranty fund assessment payments should be current expenses.  The IRS treated this request as an informal claim, and, on February 10, 1992, sent Principal a notice proposing to disallow that claim.  On April 7, 1992, Principal responded with a memorandum disagreeing with the proposed disallowance, contending that Principal was not obliged to capitalize the assessment payments because its right to the state tax offsets was not fixed under the "all events" test applied to tax accrual accounting; in this memorandum, Principal did not contend that the assessments were "taxes" deductible under section 164 of the Code. Subsequently, on June 29, 1992, Principal forwarded to the IRS a Form 3115 ("Application for Change in Accounting Method"), to be effective for its tax year 1992, together with a "Statement of Relevant Facts."  The latter document stated that "[t]he assessments by the state guaranty associations and the state comprehensive health insurance associations are best characterized as taxes . . . deductible in full in the year paid or accrued under section 164 of the Internal Revenue Code."

For the tax years 1991 through 1994, Principal claimed as deductions on its federal income tax returns the total amounts of all guaranty fund assessments paid in such years that are at issue in this suit.  It did not obtain the IRS's prior consent to treat the previously-capitalized and amortized payments as "taxes" currently deductible under section 164 of the Code. Principal's 1991 and 1992 returns were audited by the IRS.  Principal's treatment of the guaranty fund assessment payments at issue on its 1991-1994 returns was disallowed by the IRS.

*          *          *          *          *

Following an examination of Principal's returns for 1991-1994, the IRS assessed income tax deficiencies and interest.  Principal paid that assessment and subsequently filed timely claims for refund of a portion of the additional tax and interest.  The claims were disallowed in part, and Principal thereafter timely filed this suit for refund.  Trial in this matter was held on the morning of March 7, 2005.  Brief testimony was received from two witnesses – Robert L. Howe, who previously was Deputy Commissioner and Chief Examiner of the Iowa Insurance Commissioner's Office; and Jed Fisk, who, at one point, was plaintiff's Assistant Director of Corporate Taxes.  The parties then filed post-trial briefs, leading to a post-trial argument that was held on January 27, 2006.

## II.   DISCUSSION

As noted, there are two distinct issues in this case, although both require the court to ascertain whether the substance of a transaction is as advertised by the form. The court will consider these issues *seriatim*.

### A.   The Section 453A Interest Issue

On December 20, 1991, Principal sold a portfolio of commercial mortgages to Prudential and received in payment two purchase money notes totaling $478,476,694. Simultaneously, Prudential sold a portfolio of commercial mortgages to Principal and received in payment three purchase money notes – the first for $26,160,945 (to balance the deal) and two others totaling again $478,476,694. That same day, per prior agreement, the latter two notes were cancelled and Principal issued four new notes, again totaling $478,476,694, to three Prudential subsidiaries. Also that day, Prudential issued two notes totaling $478,476,694 to Principal FC, a newly-formed and wholly-owned subsidiary of Principal. Three days later, on December 23, 1991, Principal, Principal FC, and the three Prudential subsidiaries executed an agreement in which Principal allegedly sold and assigned the notes it had received from Prudential, in exchange for which Principal FC assumed Principal's obligations to the three Prudential subsidiaries. Prudential then cancelled the notes it had originally given to Principal. At the end of this transaction, Principal FC held notes payable by Prudential and the three Prudential subsidiaries held matching notes essentially payable by Principal FC.

Perhaps, the hardest aspect of analyzing this transaction (besides keeping the notes straight) is identifying the critical decisional point – that upon which the proper tax treatment here hinges. By way of prelude, the court endeavors to describe the Code provisions that impact the transaction *sub judice*, and the parties arguments thereon, ultimately with the goal of revealing that decisional point.

### 1.   Background

We begin with common ground. Plaintiff is the parent of an affiliated group of corporations that filed consolidated federal income tax returns for the taxable years in question. By filing consolidated returns, such corporations "consent to all the consolidated return regulations prescribed under section 1502 [of the Code] prior to the last day prescribed by law for the filing of such return." 26 U.S.C. § 1501. Section 1502 broadly authorizes the Secretary to adopt consolidated return regulations as he "may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group . . . may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability . . . and in order to prevent avoidance of such tax liability." 26 U.S.C. § 1502. "Section 1502 grants the Secretary 'the power to conform the applicable income tax law of the Code to the special, myriad problems resulting from the filing of consolidated income tax return.'" *Rite Aid Corp. v. United States*, 255 F.3d 1357, 1359 (Fed. Cir. 2001) (*quoting Am. Standard, Inc. v. United States*, 602 F.2d 256, 261 (Ct. Cl. 1979)). At

times, these consolidated return regulations use an aggregate approach, treating the entire group as one economic unit, while in other instances, they adopt an entity approach, recognizing each corporation as a separate legal person. *See* Treas. Reg. § 1.1502-12.

Reflecting the breadth of the sixteenth amendment ("incomes, from whatever source derived"), the tax laws, almost from the start, have provided that gains and losses are generally "realized" in the year that they are received or incurred. *See* 26 U.S.C. § 1001(a); *see also* 26 U.S.C. § 61(a)(3); *Cottage Sav. Ass'n v. Comm'r of Internal Revenue*, 499 U.S. 554, 559 (1991).[12] Yet, little more than a decade after the first income tax, Congress recognized that a sale for future payments presented several difficulties under the realization concept, prompting it, in Revenue Act of 1926, ch. 27, § 212(d), 44 Stat. 9, 23 (Part II) (1926), to establish specific rules to deal with deferred payments.[13] Under these rules, now found in section 453 of the Code, when property is sold for an installment obligation, the gain from the sale is recognized each year in which part of the obligation is paid. 26 U.S.C. § 453(a), (b). Under section 453(c), the gain recognized each year is that proportion of the payment received in that year which the gross profit from the sale bears to the total contract price. *See Thom v. United States*, 283 F.3d 939, 942 (8th Cir. 2002) (describing this section); *ASA Investerings P'ship v. Comm'r of Internal Revenue*, 201 F.3d 505, 506-07 (D.C. Cir.), *cert. denied*, 531 U.S. 871 (2000) (same). By providing this method of accounting, Congress intended "to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price." *Comm'r of*

---

[12] The concept of income realization dates back to the earliest Revenue Acts, *see, e.g.*, the Revenue Act of 1918, ch. 18, § 202(b), 40 Stat. 1057, 1060 (1919), and the Revenue Act of 1913, ch. 16, § II(B), 38 Stat. 114, 167 (1913), and was the subject of the Supreme Court's landmark opinion in *Eisner v. Macomber*, 252 U.S. 189 (1920). Following the latter decision, the progenitor of section 1001(a) of the Code was enacted as section 202(a) of the Revenue Act of 1924, ch. 234, 43 Stat. 253, 255 (1924). The legislative history of section 202(a) reflects that it was intended "to show clearly the method of determining the amount of gain or loss from the sale or other disposition of property . . . [and] merely embodies in the law the present construction by the Department and the courts of the existing law." S. Rep. No. 68-398, at 13 (1924); *see also* Loren D. Prescott, Jr., "*Cottage Savings Association v. Commissioner*: Refining the Concept of Realization," 60 Fordham L. Rev. 437, 438-40 (1991).

[13] Before enacting this provision, Congress attempted to refine the realization concept by first passing section 202(c) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 230, which provided that "no gain or loss shall be recognized [on an exchange of property] unless the property received in exchange has a readily realizable market value." But, Congress found in 1924 that the "readily realizable market value" concept was "so indefinite that it cannot be applied with accuracy, nor with consistency." H.R. Rep. No. 68-179, at 13 (1924); *see* S. Rep. No. 68-398, at 14 (1924). This prompted it to enact section 203(a) of the 1924 Act, *to wit*, that "[u]pon the sale or exchange of property the entire amount of the gain or loss, determined under section 202 shall be recognized, except as hereinafter provided in this section."

*Internal Revenue v. S. Tex. Lumber Co.*, 333 U.S. 496, 503 (1948); *see also Warren Jones Co. v. Comm'r of Internal Revenue*, 524 F.2d 788, 792 (9th Cir. 1975) (describing the legislative history in detail).

Congress eventually came to view installment reporting as tantamount to the government giving a taxpayer an interest-free loan.  In 1987, it reacted by enacting section 453A(a)(1) of the Code, which states generally that "interest shall be paid on the deferred tax liability with respect to [an installment obligation to which the section applies]."[14]  Section 453A(b)(1) makes the interest requirement applicable to "any obligation which arises from the disposition of any property under the installment method," where the sales price exceeds $150,000.  Qualifying this general rule is the requirement that an obligation that arose during the taxable year be "outstanding as of the close of such taxable year" and that the total face amount of all of such installment obligations held by the taxpayer (including all members of a controlled group, such as Principal's consolidated group) exceed $5,000,000.  26 U.S.C. § 453A(b)(2).  The "deferred tax liability" on which the interest is imposed is defined in section 453A(c)(3) as the product of the amount of gain "which has not been recognized as of the close of [the] taxable year" times the maximum rate of tax for that year.[15]  Completing the statutory mechanism, section 453B(a)(1) of the Code states:  "If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and – (1) the amount realized . . . or

---

[14]  *See* Revenue Act of 1987, Pub. L. No. 100-203, § 10202(c), 101 Stat. 1330, 1330-390 (1987); H. Rep. No. 100-495, at 926-31 (1987); Conf. Rep. on the Omnibus Budget Reconciliation Act of 1987, *as reprinted in* 1987 U.S.C.C.A.N. 2313-1245, 2313-1672 to -1677.

[15]  An example will demonstrate the mechanics and terminology of sections 453 and 453A(c).  Assume in 1991, X Corp. sold property for $12 million, of which $2 million was paid in cash and the remaining $10 million was evidenced by a ten-year interest-only installment obligation.  X Corp.'s basis in the property at the time of the sale was $6 million.  The $10 million note is the only obligation arising during 1991.  Assume further that the underpayment rate in effect under section 6621(a)(2) for December 1991 was eight percent.  Under section 453, the selling price and the total contract price are $12 million.  The gross profit is $6 million and the gross profit ratio is 50 percent.  The amount of the interest on deferred tax liability under section 453A(c) is $54,400:  $4 million (the unrecognized gain as of December 31, 1991) times 34 percent (the maximum tax rate for capital assets in corporate solution in 1991) times 50 percent (the "applicable percentage" with respect to obligations arising during 1991) times eight percent (the assumed underpayment rate).  The $54,400 of interest on deferred tax liability is reflected on the tax return as a payment of tax and is remitted to the government with the tax return.  Assuming the tax rate and the underpayment rate remain the same for 1992, the amount of the interest on deferred tax liability for December 31, 1992, will also be $54,400.  This amount is owed the government every year until the $10 million note is paid off (no interest on the deferred tax liability is owed in the final year of collection of the note).

(2) the fair market value . . . ."  26 U.S.C. § 453B(a)(1).[16]  If this provision is triggered, income is realized thereunder and, unless another provision of the Code requires otherwise, that income then is recognized as taxable income under section 1001(c) of the Code.  If this occurs, interest is no longer owed under section 453A(a)(1) of the Code, as there is no longer a "deferred tax liability" under section 453A(c)(3) of the Code.

Plaintiff contends that, under section 453B(a), all of the $68,032,598 gain on Principal's installment sale to Prudential was "recognized" when it "sold" Prudential's notes to Principal FC, thereby eliminating its "deferred tax liability" on the installment notes for purposes of the interest provisions of section 453A of the Code.  While its income on the installment notes was recognized for purposes of section 453A, plaintiff asserts that any tax owed thereon was deferred under the consolidated return regulations, as income from an intercompany "sale."  The latter result, plaintiff contends, stems from Treas. Reg. § 1.1502-17(a), which provides that the tax accounting method used by each member of an affiliated group is determined as if such member filed a separate return.  An exception to this rule, governing installment accounting for intercompany sales, is made by Treas. Reg. § 1.1502-13(c)(1)(i), which provides, as a general rule: "To the extent gain or loss on a deferred intercompany transaction is recognized under the Code for a consolidated return year, such gain or loss shall be deferred by the selling member (hereinafter referred to as 'deferred gain or loss')."  Deferred intercompany gain must be restored at some later point time.  The regulations provide several occasions for this – for example, where either the selling or buying company ceases to be a member of the affiliated group or if the property is sold or otherwise disposed outside of the group.  *See* Treas. Reg. § 1.1502-13(f)(1).  However, the latter rule restoring a deferred gain does not apply to the extent the sale outside the group is accounted for on the installment method.  Rather, the remaining deferred gain is restored each year based on a fraction, the numerator of which equals the installment payment received

---

[16]  Section 453B(a)(1) actually predates the enactment of section 453A, as it is virtually identical to section 44(d) of the Revenue Act of 1928, which later became section 453(d) of the Internal Revenue Code of 1954.  The legislative history of the 1928 Act describes the purpose of this provision, as follows:

> The installment basis accords the taxpayer the privilege of deferring the reporting at the time of sale of the gain realized, until such time as the deferred cash payments are made.  To prevent the evasion the subsection terminates the privilege of longer deferring the profit if the seller at any time transmits, distributes, or disposes of the installment obligations and compels the seller at that time to report the deferred profits.

H.R. Rep. No. 70-2, at 16 (1928).  This report also noted that "[w]hether or not the gain or loss realized under the section is recognized for tax purposes, depends upon general principles of law embodied in the income tax provisions, the exchange of installment obligations in connection with tax-free exchanges, for instance, being cared for by section 112."  *Id.*; *see also* S. Rep. No. 70-960, at 24 (1928).

for the year and the denominator of which is the total contract price.  Treas. Reg. § 1.1502-13(e)2).

Defendant, however, asseverates that the transaction between Principal and Principal FC did not trigger section 453B(a)(1) of the Code, as there was no "sale" or other "disposition" of the Prudential notes by Principal to Principal FC.  But, like the plot of a chain novel, defendant's arguments in support of this claim have shifted over time.

In its pretrial filings, at trial and even in its post-trial briefs, defendant contended that there was no "sale" or other "disposition" here primarily under the so-called "step transaction" doctrine.  While the latter doctrine has many variations,[17] a common ingredient thereof is that the tax treatment of an integrated transaction is revealed by combining or ignoring particular steps. Yet, when asked which steps it wanted to combine or ignore here, defendant could not identify any, ultimately leading it to abandon its step transaction claim in the midst of its post-trial argument.  What it really meant to say, defendant asserted then, was that under the "substance over form" doctrine the transfer of the notes from Principal to Principal FC was not a sale, but a contribution to capital under section 351(a) of the Code.  Toward this end, it invoked – for the first time in this litigation – section 1.453-9(c)(2) of the regulations, which provides –

> Where the Code provides for exceptions to the recognition of gain or loss in the case of certain dispositions, no gain or loss shall result under section 453(d) in the case of a disposition of an installment obligation.  Such exceptions include: Certain transfers to corporations under section 351 and 361; contributions of property to a partnership by a partner under section 721; and distributions by a partnership to a partner under section 731 . . .

See also Stephen F. Gertzman, Federal Tax Accounting ¶ 5.06[3][a] (2006).[18]  Because under this regulation no income was triggered under section 453B, defendant asserted, plaintiff continued to have a "deferred tax liability" under section 453A(a)(1) that remained subject to the interest charge under section 453A(c).

---

[17]  See Falconwood Corp. v. United States, 422 F.3d 1339, 1349-51 (Fed. Cir. 2005); see also King Enters., Inc. v. United States, 418 F.2d 511, 516 n.6 (1969).

[18]  While no regulation directly interprets section 453B(a), the wording of that subsection derives from section 453(d)(1), prior to its amendment by the Installment Sales Revision Act of 1980, Pub. L. No. 96-471, 94 Stat. 2247.  Plaintiff does not challenge the validity or applicability of this regulation herein.  The rationale for the regulation apparently is that certain nonrecognition events do not constitute dispositions within the meaning of section 453B(a)(1). One might also surmise that even if a disposition were to occur under section 453B, a "deferred tax liability" under section 453A(c)(3) would remain if that income was not recognized under the Code, a view that Congress seemingly had in mind when it enacted the progenitor of section 453B.  See H. Rep. No. 70-2, at 16; S. Rep. No. 70-960, at 24 (same).

At long last then a potentially pivotal issue emerges – whether the transaction at issue triggered gain under section 453B(a)(1) or instead was a nonrecognition event under section 351 of the Code.[19]  But, should this court reach this issue, which was not raised until proof was closed and post-trial briefing was completed?

Under Rule 16 of the Federal Rules of Civil Procedure, which is virtually identical to RCFC 16, legal, and, particularly, factual theories not raised in pretrial filings generally are considered to be waived or abandoned.  *See Price v. Inland Oil Co.*, 646 F.2d 90, 95-96 (3d Cir. 1981) (binding parties to representations in pretrial memoranda); *Rodrigues v. Ripley Indus.,* 507 F.2d 782, 786-87 (1st Cir. 1974); *Zwicker Knitting Mills v. United States*, 1980 WL 4737 at * 9-10 (Ct. Cl. Trial. Div. 1980) (issue would not be considered that was not raised in pretrial submissions).  While there are limited exceptions to this rule (*e.g.*, to prevent manifest injustice, RCFC 16(e)), they are rarely invoked if, in addition, the issue is not raised until after proof has closed.  *See Price*, 646 F.2d at 96.  Yet, the circumstances of this case are somewhat unusual in that plaintiff did not object to defendant's raising this issue during its closing argument, perhaps because the record is replete with evidence that plaintiff's tax planners heavily considered section 351 in designing this transaction.  Nor did plaintiff assert that it was prejudiced by the new argument, although one can certainly imagine that it would have liked the opportunity to provide more evidence on this subject – it simply asserted that defendant was wrong.  Accordingly, because it is unclear whether plaintiff was surprised or prejudiced by this new issue and because, in the court's view, the record, though far from ideal, is adequate to rule upon this issue, the court hesitantly will consider defendant's section 351 argument.[20]

## 2.   Was the transaction a sale or section 351 transaction?

Were we dealing with a post-1995 transaction, the answer to the above highlighted question likely would be found in the consolidated return regulations themselves, which now indicate, by way of example, that the transfer of the installment notes by a parent to its subsidiary does not eliminate the parent's deferred tax liability, thus making the parent liable for the interest

---

[19]  At times the court will refer to such nontaxable events as involving a "contribution to capital," of which a transfer under section 351(a) is a common form.

[20]  *See Galindo v. Stoody Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986) (issue considered where record "replete" with references to the issue and addressed by both parties at closing argument); *McFadden v. Sanchez*, 710 F.2d 907, 911-12 (2d Cir.), *cert. denied*, 464 U.S. 961 (1983) (new issue may be raised at late stage in proceedings where no prejudice); *Laguna v. Am. Export Isbrandtsen Lines, Inc.*, 439 F.2d 97, 101-02 (2d Cir. 1971) (new issue may be raised where record already adequate); *see also Zwicker Knitting Mills*, 1980 WL 4737 at *11 ("In considering whether a new issue may be raised after the trial of a case, the major concern must be to avoid prejudice to the litigants.").

under section 453A(c).[21]  But, the transaction at issue occurred in 1991, before those regulations were promulgated.  So, the question remains – how does one distinguish between a transmission, distribution, sale or other disposition, on the one hand, and a section 351(a) contribution to capital, on the other, for purposes of section 453B?

Section 1001(c) of the Code familiarly provides, as a general rule, that all gains are recognized.  26 U.S.C. § 1001(c).  By way of an exception to that rule, section 351(a) of the Code states that –

> No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

Relying, in part, on the statute's legislative history,[22] the Court of Claims once described the essence of this nonrecognition provision thusly –

---

[21]  Treas. Reg. § 1.1502-13(c)(7)(ii) (example 6), *added by* T.D. 8597, 1995-32 I.R.B. 6, provides the following guidance regarding the treatment of an intercompany sale of installment obligations:

> (a) Facts.  S holds land for investment with a basis of $70x.  On January 1 of Year 1, S sells the land to X in exchange for X's $100x note, and S reports its gain on the installment method under section 453.  X's note bears interest at a market rate of interest in excess of the applicable Federal rate, and provides for principal payments of $50x in Year 5 and $50x in Year 6.  Section 453A applies to X's note.  On July 1 of Year 3, S sells X's note to B for $100x, resulting in $30x gain from S's prior sale of the land to X under section 453B(a).

> (b) Timing and attributes.  S's sale of X's note to B is an intercompany transaction, and S's $30x gain is intercompany gain.  S takes $15x of the gain into account in each of Years 5 and 6 to reflect the $15x difference in each year between B's $0 gain taken into account and the $15x recomputed gain.  S's gain continues to be treated as its gain from the sale to X, and the deferred tax liability remains subject to the interest charge under section 453A(c).

[22]  *See* S. Rep. No. 67-275, at 11 (1921) (The section was to provide "new rules for those exchanges or 'trades' in which, although a technical 'gain' may be realized under the present law, the taxpayer actually realizes no cash profit."); Carlton Fox, Observations Regarding the Documentary History of the Revenue Acts for the Information of the Members of the Tax Division of the Department of Justice 2-3 in Committee Reports on the Revenue Acts 1913-38, 1939-1 C.B. (part 2) (limited ed.) (1940).  For a detailed discussion of this legislative history, *see* Ronald H. Jensen, "Of Form and Substance: Tax-Free Incorporations and Other Transactions under Section 351," 11 Va. Tax Rev. 349, 381-87 (1991).

[t]he transferor in section 351 cases is required to remain in control, albeit indirectly, after the transfer.  There is, in short, a transfer in form only, a technical transfer not one of substance.  The section is designed to give present tax relief for internal rearrangements of the taxpayer's own assets, accompanied by no sacrifice of control and no real generation of income for the owner – and to defer taxation until a true outside disposition is made.

*E.I. Du Pont de Nemours & Co. v. United States*, 471 F.2d 1211, 1214 (Ct. Cl. 1973).[23]  It is beyond peradventure that plaintiff meets the conditions of section 351(a) that it be a "person" and in "control" of the subsidiary after the transaction.[24]  Moreover, there appears to be little doubt that the Prudential notes given by Principal to its subsidiary constituted "property" within the meaning of section 351.[25]  Nor, since Principal FC was a wholly-owned subsidiary, is it

---

[23]  *See also Peracchi v. Comm'r of Internal Revenue*, 143 F.3d 487, 489 (9th Cir. 1998) ("It's merely a change in the form of ownership, like moving a billfold from one pocket to another."); *Portland Oil Co. v. Comm'r of Internal Revenue*, 109 F.2d 479, 488 (1st Cir. 1940), *cert. denied*, 310 U.S. 650 (1940) (predecessor of section 351, § 112(b)(5) of the 1928 Act, provides that gain will not be taxed "where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain, or closed out a losing venture."); Treas. Reg. § 1.1002-1(c) ("The underlying assumption of these [nonrecognition] exceptions is that the new property is substantially a continuation of the old investment still unliquidated.").

[24]  Section 368(c) of the Code, which defines "control," provides that at least 80 percent of the voting power in the transferee corporation must be possessed in order for "control" to exist.  *See generally*, *Russell v. Comm'r of Internal Revenue*, 832 F.2d 349, 353 (6th Cir. 1987); *Brams v. Comm'r of Internal Revenue*, 734 F.2d 290, 292-293 (6th Cir.1984); *Six Seam Co. v. United States*, 524 F.2d 347, 355-56 (6th Cir. 1975).

[25]  Courts have given the term "property" a "generous definition," consistent with its normal understanding, *E.I, Du Pont de Nemours*, 471 F.2d at 1218, stating, in one case, that property, for this purpose, "encompasses whatever may be transferred."  *United States v. Stafford*, 727 F.2d 1043, 1052 (11th Cir. 1984) (quoting *Hempt Bros, Inc. v. United States*, 354 F. Supp. 1172, 1175 (M.D. Pa. 1973), *aff'd*, 490 F.2d 1172 (3d Cir.), *cert. denied*, 419 U.S. 826 (1974)).  The term readily subsumes a variety of accounts receivable transferred by a parent to a subsidiary, *see Hempt Bros., Inc.*, 490 F.2d at 1175-76; *Bongiovanni v. Comm'r of Internal Revenue*, 470 F.2d 921, 923-24 (2d Cir. 1972); *P.A. Birren & Son, v. Comm'r of Internal Revenue*, 116 F.2d 718, 719 (7th Cir. 1940); and, in several instances, it specifically has been held to include installment obligations, *see, e.g., Hartford-Empire Co. v. Comm'r of Internal Revenue*, 137 F.2d 540, 543 (2d Cir.), *cert. denied*, 320 U.S. 787 (1943) (that notes "were property cannot be doubted"); *Reed v. Comm'r of Internal Revenue*, 129 F.2d 908, 913 (4th Cir. 1942); *Portland Oil Co.*, 109 F 2d at 486-87; *Duncan v. Comm'r of Internal Revenue*, 9 T.C. 468, 470-72 (1947).

disqualifying that Principal did not receive stock back directly in exchange for the notes,[26] but instead Principal FC assumed one of its parents obligations.[27]  The controversy, rather, swirls around what the Court of Claims in *E.I. Du Pont* described as the other "prime elements" of section 351: that the property  was "transferred" to a corporation solely in "exchange" for stock in such corporation.  *E.I. Du Pont de Nemours*, 471 F.2d at 1213.

The decisional law often has chosen to define what is a "transfer" within the meaning of section 351(a) in the negative, that is, by defining what is ***not*** a "transfer."  Thus, in *Portland Oil Co.*, it was said that a section 351 transfer "lacks a distinguishing characteristic of a sale, in that,

_____

[26]  At first blush, it would appear that this requirement was not met, as plaintiff did not receive any shares of Principal FC in exchange for its notes.  But, settled judicial doctrine makes clear that the exchange requirement of section 351(a) is met where a sole stockholder transfer property to a wholly-owned corporation, even though no stock or securities are issued.  In such circumstances, "[i]ssuance of new stock . . . would be a meaningless gesture."  *Lessinger v. Comm'r of Internal Revenue*, 872 F.2d 519, 522 (2d Cir. 1989); *see also Estate of Kluener v. Comm'r of Internal Revenue*, 154 F.3d 630, 634 (6th Cir. 1998) (where shareholder transfers property to wholly-owned corporation, section 351 applies even if it receives "nothing at all"); *Jackson v. Comm'r of Internal Revenue*, 708 F.2d 1402, 1405 (9th Cir. 1983); *Comm'r of Internal Revenue v. Morgan*, 288 F.2d 676, 680 (3d Cir.), *cert. denied*, 368 U.S. 836 (1961).  Indeed, this court would have little difficulty concluding that the transfer of stock by Principal FC a week before the notes were transferred was so integral to the overall transaction as to be treated as exchanged not only for the initial capitalization of the corporation, but also for the notes that ultimately allowed the subsidiary to produce income.  *See Six Seam Co.*, 524 F.2d at  356; *Burr Oaks Corp. v. Comm'r of Internal Revenue*, 365 F.2d 24, 28 (7th Cir. 1966), *cert. denied*, 385 U.S. 1007 (1967); *C-Lec Plastics, Inc. v. Comm'r of Internal Revenue*, 76 T.C. 601, 607-08 (1981); *D'Angelo Assocs. v. Comm'r of Internal Revenue*, 70 T.C. 121, 129-31 (1978); *see also* Bittker & Eustice, Fed. Income Tax'n of Corp. & Shareholders (hereinafter "Bittker & Eustice") ¶ 3.14[2] (2005) ("More commonly, transferors attempt to alter the tax consequences of a § 351 exchange by dividing it into a sale of some of the property for cash or other property and a transfer of the balance for stock.  If the two steps are integral parts of a single transaction (a factual issue), the division will not be respected, and the transaction will instead by treated as a unitary § 351 exchange . . . .").

[27]  To reach this conclusion, one must read section 351(a) in conjunction with section 357(a) of the Code.  The latter provision provides that the assumption of liabilities in exchange for stock "shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351 or 361, as the case may be."  *See also Black & Decker Corp. v. United States*, 436 F.3d 431, 435 (4th Cir. 2006); *Perrachi*, 143 F.3d at 490-91; *see* 11 Mertens Law of Fed. Income Tax'n (hereinafter "Mertens") § 43A:29 (2005) ("If a Section 351 transaction would provide for nonrecognition of gain, except that as part of the consideration another party assumes the liability of the transferor taxpayer, then . . . the taxpayer receives nonrecognition treatment on the transfer.").

instead of the transaction having the effect of terminating . . . the beneficial interests of the transferors in the transferred property, . . . the transferors continue to be beneficially interested in the transferred property." *Portland Oil Co.*, 109 F.2d at 488 (*quoting Am. Compress & Warehouse Co. v. Bender*, 70 F.2d 655, 657 (5th Cir.), *cert. denied*, 293 U.S. 607 (1934)).[28] Elsewhere, courts have emphasized that the putative transferor must relinquish all of its rights to the property, including the right to receive income therefrom. *See also Estate of Sanford v. Comm'r of Internal Revenue*, 308 U.S. 39, 43 (1939) ("essence of a transfer is the passage of control over the economic benefits of property"). These cases reflect that, properly viewed, the twin requirements of section 351(a) that property be "transferred" and be involved in an "exchange" are correlative – two sides of the same coin, so to speak – as the "transfer" must be "solely in exchange" for stock in order to yield nonrecognition treatment. As such, it is hardly surprising that an ordinary sale neither qualifies as a "transfer" nor an "exchange" under this provision. *See Peracchi*, 143 F.3d at 490; *Utley v. Comm'r of Internal Revenue*, 906 F.2d 1033, 1036-37 (5th Cir. 1990); *Bradshaw v. United States*, 683 F.2d 365, 367 (Ct. Cl. 1982).

"The proper characterization of a transaction as a 'sale' or a 'capital contribution,' is a question of fact to be decided . . . on the basis of all the objective evidence." *Bradshaw*, 683 F.2d at 372.[29] "While the form of the transaction is relevant," the Court of Claims instructed in *Bradshaw*, this court is "required to examine all of the pertinent factors in order to determine whether the substance of the transaction complies with its form." *Id.; see also Aqualane Shores, Inc. v. Comm'r of Internal Revenue*, 269 F.2d 116, 119 (5th Cir. 1959) ("'Evidence which may tend to prove that a transaction was a contribution to capital may be of many sorts.'" (*quoting Sun Properties, Inc. v. United States*, 220 F.2d 171, 175 (5th Cir. 1955)). Ultimately, as is true in refund suits generally, it is the taxpayer's burden to demonstrate that the form of its transaction accords with its substance. *See Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) ("The burden is therefore on the taxpayer to show that the form of the transactions reflects their substance."); *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 165-66 (D. Conn. 2004), *aff'd*, 150 Fed. Appx. 40 (2d Cir. 2005) (unpublished) (same); *Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 778-79 (S.D. Ohio 2001), *aff'd,* 326 F.3d 737 (6th Cir.

---

[28]  *See also Reef Corp. v. Comm'r of Internal Revenue,* 368 F.2d 125, 129-30 (5th Cir. 1966), *cert. denied*, 386 U.S. 1018 (1967); *Stanley, Inc. v. Schuster*, 295 F.Supp. 812, 816 (S.D. Ohio 1969), *aff'd, per curiam*, 421 F. 2d 1360 (6th Cir.), *cert. denied*, 400 U.S. 822 (1970); David B. McGinty, "Economic Substance, Business Purpose, and Tax Avoidance in Section 351 Contingent Liability Transactions After *Black & Decker*, *Coltec*, and *Hercules*," 36 Cumb. L. Rev. 1, 21-22 (2006).

[29]  *See also Utley*, 906 F.2d at 1036-37; *Truck Terminals, Inc. v. Comm'r of Internal Revenue*, 314 F.2d 449, 453-55 (9th Cir. 1963).

2003), *cert. denied*, 540 U.S. 1104 (2004) (same); *see also United States v. Janis*, 428 U.S. 433, 440 (1976); *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932).[30]

Often cases in this *genre* hinge on whether the notes received by shareholders transferring property to their controlled corporation are viewed as true debt versus disguised equity, with the former indicative of a "sale," and the latter an "exchange." *See, e.g.*, Bittker & Eustice, ¶ 3.14; Mertens § 43A:05. Of course, Principal FC did not issue a new note to Principal as part of the transaction, but rather assumed its parent's debt on the notes issued to the Prudential subsidiaries. Yet, even in this different setting, logic suggests that some of the factors that courts have employed in distinguishing between debt and equity may reveal whether the assumption of this obligation, together with the other features of transaction, were characteristic of an installment sale versus a transfer under section 351(a). Particularly helpful are those factors that step back from the terms of the notes involved and look more globally at the overall allocation of risks effectuated among the parties, ultimately with the goal of determining whether that pattern is more characteristic of a sale or a contribution to capital. The decisional law suggests that among these are: (i) whether the new corporation was thinly (or adequately) capitalized, as reflected, for example in high debt-to-equity ratio;[31] (ii) whether the ability of the shareholders of the corporation to receive consideration for the alleged sale depended upon the success of the new corporation's business;[32] (iii) whether the shareholders exercised extraordinary control over the operations of the new corporation and, if so, whether that control was reserved to them as an

---

[30] The parties have not discussed the potential application herein of section 7491 of the Code, under which the burden of proof may sometimes be shifted to the United States, presumably because the audit herein occurred prior to the effective date of that provision. *See* Internal revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, §3001(c), 112 Stat. 685, 727 (1998).

[31] *See Hayutin v. Comm'r of Internal Revenue*, 508 F.2d 462, 472 (10th Cir. 1974); *Burr Oaks Corp. v. Comm'r of Internal Revenue*, 43 T.C. 635, *aff'd*, 365 F.2d 24 (7th Cir. 1966), *cert. denied*, 385 U.S. 1007 (1967); *Stanley, Inc.*, 295 F. Supp. at 816.

[32] *See Bradshaw*, 683 F.2d at 374; *Hayutin*, 508 F.2d at 473-74; *Curry v. United States*, 396 F.2d 630, 633 (5th Cir. 1968) ("[i]f repayment of an advance is contingent upon the success of the business, the advancement is usually considered a contribution to capital"); *Aqualane Shores*, 269 F.2d at 119 (capital contribution where "[t]he obligations were a participation in the pot luck of the enterprise"); *Am. Compress*, 70 F.2d at 657 (finding that a transaction "lack[ed] a distinguishing characteristic of a sale" because "the transferors continue[d] to be beneficially interested in the transferred property"); *Cairo Developers, Inc. v. United States*, 381 F. Supp. 431, 439 (M.D. Ga. 1974), *aff'd*, 561 F.2d 572 (5th Cir. 1977) (contribution to capital where repayment "was predicated on the success of the venture").

integral part of the supposed sale;[33] (iv) whether there was a non-tax business purpose for choosing a sale;[34] and (v) whether there were (or were not) other indicia of a *bona fide* sale at arm's length.[35] Again, as has been observed in the debt/equity cases, it is apparent that these factors are not entitled to equal weight – "[t]he object of the inquiry is not to count factors, but to evaluate them." *Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir. 1969); *see also Sarkes Tarzian, Inc. v. United States*, 240 F.2d 467, 470 (7th Cir. 1957). Because the distinction between paradigmatic debt and paradigmatic equity has been blurred by the rapidly evolving use of hybrid instruments combining debt and equity features, as well as special-purpose securitization vehicles, the need for careful evaluation now is greater than ever.

Applying the above criteria to the facts at hand, it first might appear that Principal FC was not "adequately capitalized for its intended purpose." *Bradshaw*, 683 F.2d at 374. Although it received $1 million in capital from Principal, the subsidiary ultimately assumed Principal's liability on the notes to the Prudential subsidiaries, which totaled over $525 million. Hence, assuming *arguendo* that the notes that Principal FC received from its parent are not treated as capital, the subsidiary was left with a debt-to-equity ratio of approximately 525 to 1. This ratio

---

[33] *See Hayutin*, 508 F.2d at 474 ("Other factors present here which indicate a capital contribution are the fact the noteholders . . . were the actual promoters of Builders, the fact they would bear the principal loss if Builders failed, and the fact they had substantial control over Builders."); *E.I. Du Pont de Nemours*, 471 F.2d at 1215 ("It is this cardinal element of continuing control by the taxpayer – *i.e.* that a third party does not at the time acquire substantial interest in the property transferred, or control over it – which supports the nonrecognition of gain under section 351."); *Am. Compress*, 70 F.2d at 657 ("The transaction . . . lacks a distinguishing characteristic of a sale, in that, instead of the transaction having the effect of terminating or extinguishing the beneficial interests of the transferors in the transferred property, after the consummation of the transaction the transferors continue to be beneficially interested in the transferred property and have dominion over it by virtue of their control of the new corporate owner of it."); *see also Helvering v. Cement Investors, Inc.*, 316 U.S. 527, 533 (1942) (the hallmark of section 351 is deferment of gains or losses "where 'there has been a mere change in the form of ownership' or where the taxpayer has not 'closed out a losing venture'"(*quoting Portland Oil Co.*, 109 F.2d at 488)).

[34] *Truck Terminals Corp*, 314 F.2d at 453 ("Lack of such a non-tax purpose would be worthy of note; not because it necessarily indicated a divergence of substance from form, but because it failed to negate other evidence inducing that inference."); *Woolley Equip. Co. v. United States*, 268 F. Supp. 358, 363 (E.D. Tex. 1966) ("The presence of substantial non-tax business reasons that the transaction be in the nature of a sale rather than a capital contribution confirms that the conveyances were sales in substance as well as in form.").

[35] *See Bradshaw*, 683 F.2d at 372-73; *Hayutin*, 508 F.2d at 472-73; *Western Hills, Inc.v. United States*, 71-1 U.S.T.C. ¶ 9410 at *7 (S.D. Ind. 1971); *LDS, Inc. v. Comm'r of Internal Revenue*, 51 T.C.M. 1433, 1436 (1986); *Marsan Realty Corp. v. Comm'r of Internal Revenue*, 22 T.C.M. 1513, 1521-23 (1963).

suggests that, hypothetically, an outside seller might have thought twice before selling the notes in question to Principal FC in exchange for the latter's assumption of an installment obligation owed by the seller, based on concerns regarding Principal FC's capacity to service the seller's debt.[36]  On the other hand, as it actually happened, Principal FC apparently did not default on any of its obligations here, an *ex ante* observation to be sure, but, nonetheless, an indication that its thin capitalization perhaps did not represent as significant an entrepreneurial risk, as might first appear.[37]

In fact, most decisions do not afford independent weight to a transferee corporation's thin capitalization, but rather view the adequacy of such capitalization through the prism of the overall risk allocations effectuated among the parties by the transaction.  Where those allocations are characteristic of a sale – for example, where there is relatively clear assurance that the transferee corporation will be able to repay the outstanding debt – thin capitalization has not been fatal to sales treatment.  Such was the holding of the Court of Claims in *Bradshaw*, *supra*, which likewise concerned whether a transfer was a sale or contribution to capital under section 351(a).  There, the taxpayer formed a wholly owned corporation for the purpose of selling to it raw land which the corporation was to develop.  In forming the corporation, the taxpayer transferred an automobile valued at $4,500 to the corporation in exchange for the corporation's stock.  On the same day, the taxpayer transferred land to the corporation in exchange for five interest bearing

---

[36]  This concern was well-explained in one article thusly –

The debt-equity ratio is of great importance to creditors as it indicates to what extent the business may suffer losses without any impairment of their interests. The higher the ratio, the lower is the protection afforded to creditors against sudden business slumps, and hence the less likely will be the possibility of creditors' advances.

Note, "Thin Capitalization and Tax Avoidance," 55 Colum. L. Rev. 1054, 1058 (1955) (footnote omitted); *see also* James M. Peaslee and David Z. Nirenberg, Federal Income Taxation of Securitization Transactions 103 (3d ed. 2001) (hereinafter "Peaslee & Nirenberg") ("Too high a ratio (*thin capitalization*) suggests that a purported creditor is accepting the risks of the debtor's business and should therefore be regarded as a proprietor rather than a creditor.") (emphasis in original).

[37]  While the determination of whether a transaction is a sale or a contribution ordinarily is made by reference to the time of the transaction, this has not prevented courts from citing missed payments on what was supposed to be debt as indication that a note was, in fact, equity. *See In re Lane*, 742 F.2d at 1311, 1317-19 (missed payments signified equity rather than debt). The reverse seemingly ought to hold true, as well.  As the Supreme Court indicated in *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933), "[e]xperience is . . . available to correct uncertain prophecy," and is thus a "book of wisdom that courts may not neglect."

-26-

promissory notes totaling $250,000, to be repaid over the course of six and one half years. Reviewing the facts, the Court of Claims focused on the overall risk posed by the transaction, concluding that because "there existed a reasonable assurance of repayment of the notes regardless of the success of the business," the thin capitalization of the newly-created corporation did not indicate that shareholder was "assuming the risk of loss normally associated with equity participation." 683 at 375. Other courts have likewise looked to the rosy likelihood of repayment in concluding that transfers to thinly capitalized corporations were, nonetheless, sales.[38] Some of these cases, indeed, involved debt/equity ratios higher than that arguably present here. *See, e.g., Baker Commodities, Inc. v. Commissioner*, 48 T.C. 374, 396 n.20 (1967), *aff'd on another issue*, 415 F.2d 519 (9th Cir. 1969), *cert. denied*, 397 U.S. 988 (1970) (692½ to 1 ratio not fatal).

As in *Bradshaw*, it hardly can be contested that Principal's ability to receive consideration on the alleged sale was dependent upon the success of its subsidiary's business – a risk, at first blush, that might resemble that possessed by a shareholder, rather than a seller under an installment arrangement.[39] But, realistically speaking, how much entrepreneurial risk was occasioned by having Principal FC hold a relatively static group of assets and obligations, assiduously designed to have matching cash inflows and outflows?

To be sure, the notes exchanged between Principal and Prudential did not include a cross-default feature, absolving one corporation from paying if the other defaulted. But, there is absolutely nothing in the record to suggest that Principal was concerned that the Prudential subsidiaries might default, leaving Principal FC with the obligation to pay the notes held by the Prudential subsidiaries, but no income to do so. To the contrary, every indication is that the parties viewed the Prudential notes as a stable source of revenue from which Principal FC could discharge its obligations. The concern, rather, was that ***Principal*** might become insolvent, which led the parties to view Principal FC as a so-called "bankruptcy remote entity," with safeguards designed to prevent it from becoming bankrupt or from being consolidated with its parent in a

---

[38] *See also Gyro Eng'g Corp. v. United States*, 417 F.2d 437, 439 (9th Cir. 1969) (thin capitalization not disqualifying where transferred property had "self liquidating potential") *Piedmont Corp. v. Comm'r of Internal Revenue*, 388 F.2d 886, 890-91 (4th Cir. 1968) (thin capitalization not determinative where reasonable likelihood of repayment); *Rowan v. United States*, 219 F.2d 51, 55 (5th Cir. 1955); *N. Ind. Pub Serv. Co. v. Comm'r of Internal Revenue*, 105 T.C. 341, 353 (1995), *aff'd*, 115 F.3d 506 (7th Cir. 1997); *cf. Aqualane*, 269 F.2d at 120 (thin capitalization indicative of capital contribution where extremely unlikely that shareholders would be repaid).

[39] *See Hardman v. United States*, 827 F.2d 1409, 1413 (9th Cir. 1987) ("If repayment is not dependent upon earnings, the transaction more resembles a sale."); *Stinnett's Pontiac Serv., Inc. v. Comm'r of Internal Revenue*, 730 F.2d 634, 638-39 (11th Cir. 1984) ("if repayment is possible only out of corporate earnings, the transaction has the appearance of a contribution of equity capital").

bankruptcy case or similar proceeding.  Other provisions – in which Principal, for example, covenanted that it would remain the sole shareholder of Principal FC and would ensure that the latter did not avoid its responsibility to pay the Prudential subsidiaries – played a similar role, serving to minimize the entrepreneurial risks associated with Principal FC's operations, provided no alterations were made in its charter and bylaws.  Accordingly, while Principal FC might be viewed as thinly capitalized, there is no indication that it was inadequately capitalized, so as to deprive Principal of the reasonable assurance that its notes to the Prudential subsidiaries would be repaid.

One might argue that, as a result of these various provisions and covenants, Principal did not truly part with – and Principal FC did not truly receive – the economic benefits and risks associated with owning the transferred notes, undercutting the notion that the transfer to its wholly-owned subsidiary terminated Principal's interests in a fashion consistent with a sale.  But, defendant did not make this argument, even belatedly – perhaps because the decisional law has been hesitant to place too much emphasis on the relationship between risk of loss and tax ownership.  That hesitancy certainly was well in evidence in *Commissioner of Internal Revenue v. Brown*, 380 U.S. 563 (1965), in which the Supreme Court held that the transfer of a business in exchange for notes payable solely out of the transferees profits was, nonetheless, a sale for capital gains purposes.  Justice White, writing for the majority, rejected claims that because the transferee did not have any risk of loss, the ownership of the business had been retained by the transferor, holding the transaction "obviously" fit the "common and ordinary meaning" of a sale, as well as its state law definition.  *Id.* at 569, 571.[40]  Thirteen years later, in its seminal decision in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Court held that the

_____

[40]  More extensively, the Court stated –

A "sale," however, is a common event in the non-tax world; and since it is used in the Code without limiting definition and without legislative history indicating a contrary result, its common and ordinary meaning should at least be persuasive of its meaning as used in the Internal Revenue Code.

*Brown*, 380 U.S. at 570-71.  It added that "risk-shifting of the kind insisted on by the Commissioner has not heretofore been considered an essential ingredient of a sale for tax purposes."  *Id.* at 574; *see also Boone v. United States*, 470 F.2d 232, 236 (10th Cir. 1972) ("The most significant aspect of the Supreme Court's decision in *Brown* was that part which completely dispelled the notion that a sale in this context is somehow different from a sale in its ordinary sense, and in this connection the Court observed that there was no precedent for the Commissioner's argument that a sale does not qualify as such if the purchase price derives from the earnings of the company.").  This is not to suggest that risk-shifting is entirely irrelevant.  *See Rose Hills Mem. Park Ass'n v. United States*, 463 F.2d 425, 432 (Ct. Cl. 1972), *cert. denied*, 414 U.S. 822 (1973) ("Though we agree that shifting of risk is not a *sine qua non* to a sale, we believe that it becomes relevant in a situation like that before us.").

purchaser/lessor in a sale/leaseback arrangement should be recognized as the tax owner of the asset transferred, stating that:

> where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

*Id*. at 583-84.  Of course here, as in *Frank Lyon*, we have a genuine multi-party transaction, which defendant readily admits was not shaped solely by tax-avoidance features, suggesting that Principal FC must be considered the owner of the Prudential notes, for tax purposes.  Defendant, despite extensive discovery, certainly has not shown otherwise.

Notwithstanding, at the closing argument, defendant asserted that the transfer to Principal FC was a contribution to capital because Principal retained pervasive control over the operations of its subsidiary.  The latter fact again cannot be gainsaid:  the articles of incorporation of Principal FC limited that corporation to owning only certain eligible investments – primarily the purchase money notes issued by Prudential and designated high-grade instruments in which to invest temporarily loan payments received from Prudential – and assuming Principal's obligation on the purchase money notes that it issued to the Prudential subsidiaries.  And Principal FC specifically could  not: (i) incur any other indebtedness; (ii) purchase or sell any other assets, except the aforementioned investments; (iii) distribute any dividends that would prevent it from it from making the payments on the notes held by the Prudential subsidiaries; (iv) make any loans or advances; or (v) merge, consolidate with, or transfer its assets to any entity that did not have similar limitations.  Nor could the subsidiary sell or assign its major asset – the Prudential notes – to a party, other than Principal.  Yet, another provision of Principal FC's articles stands out, seemingly revealing why these other limitations were included.  It stated that the articles could not be "amended or modified without the prior written consent of the registered owners of not less than 66 2/3 % of the aggregate outstanding principal balance of the" Principal notes – in other words, they could not be amended unless Prudential consented.  This provision suggests what significant portions of the record confirm – that the purpose of these control mechanisms was not so much to protect Principal, as Prudential.

As such, the various control features emphasized by defendant do not provide a basis for recharcterizing the sale to Principal FC as a capital contribution.  *Per contra*.  If anything, they serve to confirm that there was at least one non-tax business purpose underlying the transaction, *to wit*, using Principal FC to hold the Prudential notes as a so-called "bankruptcy-remote entity" or BRE.  Such BREs are frequently used in securitized lending to lessen the likelihood that a bankruptcy court will order a substantive consolidation of an insolvent parent with a solvent subsidiary.  *See In re Central European Indus. Development Co.*, 288 B.R. 572, 576 (Bkrtcy.

N.D. Cal. 2003).[41]  Various commentators have noted the importance of transfers to such BRE's being sales, rather than contributions to capital, with one leading treatise observing –

> The sale/financing distinction is not confined to the tax world.  It also arises in evaluating whether a transfer removes the transferred assets from the reach of the transferor's creditors, particularly in the context of a bankruptcy or insolvency of the transferor.  In the patois of securitizations, a transfer that does this is referred to as a *true sale*.  When a sale is "untrue" it is recast as a secured borrowing for creditors' rights purposes.  There is then a risk that a bankruptcy court or other receiver having jurisdiction over the transferor could delay payments to the transferee, or force a liquidation of assets and repayment of claims, thereby depriving investors of the continuing benefits of their investment.

Peaslee & Nirenberg, *supra*, at 61 (emphasis in original) (footnote omitted).[42]  Thus, for Prudential to maximize its insolvency protections, the transaction in question had to be more like a sale than a capital contribution.  Consistent with that notion, research reveals that the types of controls contained in Prudential FC's charter are typical of those of bankruptcy-remote entities.[43]

_____

[41]  "Substantive consolidation, a construct of federal common law, emanates from equity."  *In re Owens Corning,* 419 F.3d 195, 205 (3d Cir. 2005).  It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor."  *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005).  This authority arises from the broad equity jurisdiction of the bankruptcy court conferred by 11 U.S.C. § 105(a), which provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

[42]  *See also* F. Scott Kieff & Troy A. Paredes, "An Approach to Intellectual Property, Bankruptcy, and Corporate Control," 82 Wash. U. L. Q. 1313, 1326 (2004) (noting importance of a "true sale"); Steven L. Schwarcz, "The Alchemy of Asset Securitization," 1 Stan. J.L. Bus. & Fin. 133, 135 (1994) ("The transfer is intended to separate the receivables from risks associated with the originator.  For this reason, the originator will often structure the transfer so that it constitutes a 'true sale,' a sale that is sufficient under bankruptcy law to remove the receivables from the originator's bankruptcy estate.") (footnotes omitted); *see generally In re Owens Corning*, 419 F.3d at 210-12 (describing factors that lead to substantive consolidation).

[43]  Summarizing these features, a recent Standard & Poors report identifies, *inter alia*, the following: (i) restrictions on the ability of the BRE to incur additional indebtedness, other than the indebtedness associated with the current transaction; (ii) the transaction documents and charter documents should expressly describe the purpose for which the BRE is formed and limit those activities to those necessary to accomplish the purpose for which it was formed; (iii) prohibitions on the consolidation and liquidation of the BRE and restrictions on mergers and

These controls thus serve to confirm that Principal had a non-tax business purpose to conduct a true sale with its subsidiary – again, a factor that supports plaintiff's characterization of the transaction.  While defendant claims otherwise, it never explains – certainly, not with evidence – why Prudential would have participated in the transfer to Principal FC, if, as defendant contends, that transaction served only to create tax advantages for Principal.[44]

Finally, although certainly not determinative in its own right, it is worth noting that plaintiff, as well as Prudential and its subsidiaries, consistently described the transaction as a sale in all of the agreements, going so far as to state in the Assignment Agreement – "Principal and [Principal FC] acknowledge and intend that this transaction is a sale of the Assets by Principal to [Principal FC] and not a capital contribution or a transfer in exchange for stock."  To be sure, long ago, the Supreme Court opined that whether a transaction qualifies as a tax-free exchange "is to be tested by what in fact was done rather than by the mere form of words used in the writings employed."  *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 493 (1937).  And this is particularly so when both the transferor and the transferee are commonly controlled, as "the labels that parties attach to their transactions provide no guarantee of the appropriate tax treatment."  *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 581 (5th Cir. 1977); *see also Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968).  At best, "the subjective expressions of intent must be weighed against the facts which support contrary inferences."  *McSorley's, Inc. v. United States*, 323 F.2d 900, 902 (10th Cir. 1963); *see Crawford Drug Stores v. United States*, 220 F.2d 292, 296 (10th Cir. 1955).  Nonetheless, nothing in the transactional documents here contradicts plaintiff's root claim that the transaction in question was a sale, rather than a contribution to capital, providing additional evidence – albeit slight – in support of plaintiff's characterization of the transaction.

In arguing to the contrary, defendant quotes liberally from the raft of documents it introduced indicating that extensive tax planning occurred here.  But, scores of cases indicate that there is nothing, *per se*, wrong with planning a transaction so as to minimize taxes, even to the effect of including steps designed to effectuate that purpose, provided that the transaction does not lack economic substance.  *See, e.g., Frank Lyon Co.*, 435 U.S. at 580 ("The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences.  We cannot ignore the reality that the tax laws

---

asset sales; and (iv) prohibitions on amendments to the charter and transaction documents.  *See* Standard & Poors, Legal Criteria for U.S. Structured Finance Transactions 43-57 (2004); *see also* Peaslee & Nirenberg, *supra*, at 63 n.20; David B. Stratton, "Special-Purpose Entities and Authority to File Bankruptcy," 23-MAR. Am. Bankr. Inst. J. 36 (2004).

[44]   This is not to say that the standards used for determining what is a true sale for bankruptcy purposes are synonymous with those employed in distinguishing between a sale and a contribution to capital under section 351(a).  The point, rather, is that there are indications here that having the transaction treated as a sale for other purposes was consistent with plaintiff's alleged non-tax business purpose for the transaction.

affect the shape of nearly every business transaction.") (footnote omitted); *Yosha v. Comm'r of Internal Revenue*, 861 F.2d 494, 497 (7th Cir. 1988) (Posner, J.) ("There is no rule against taking advantage of opportunities created by Congress or the Treasury Department for beating taxes."). And, as the Supreme Court emphasized in perhaps the most famous tax case in history, the presence *vel non* of tax planning considerations certainly does not in itself demonstrate that a transaction was devoid of economic substance –

> The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. . . . But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.

*Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *see also Knetsch v. United States*, 364 U.S. 361, 365 (1960) (trial court's finding of the taxpayer's motivation was irrelevant); *Levy v. Comm'r of Internal Revenue*, 91 T.C. 838, 853 (1988) ("business transactions are not necessarily deprived of economic substance because of the existence of significant tax benefits that accrue to investors."). In short, despite defendant's attempt to give them a nefarious cast, plaintiff's motivations here are largely irrelevant – what instead is important is, in the words of *Gregory*, "what was done."

Ultimately, then, each of the various factors identified above points to the conclusion that the transaction here was a true sale. With little to support its contrary claim, defendant seems to proceed as if its mere incantation of the phrase "substance over form" is enough to carry the day – that that phrase, perhaps thrice repeated, will transmute the lead of a sale into the gold (from defendant's perspective) of a contribution to capital. But, this is a tax refund case, not a J.K. Rowling novel, and any claim of "substance over form" here must be solidly grounded in the law and, particularly, the facts. And, defendant's claim is not. Based on the record, the court instead finds that the transaction in question did not effectuate either a "transfer" or an "exchange" within the meaning of section 351(a) of the Code. It follows, *a fortiori*, that the exchange between Principal and Principal FC did not constitute a nonrecognition event under section 351(a) of the Code, so as to trigger section 1.453-9(c)(2) of the regulations. As defendant's other arguments on this point are likewise meritless,[45] the ineluctable conclusion is that section 453B

---

[45]   Primary among defendant's remaining arguments is that even if the transfer was a sale, there was no disposition under section 453B because Principal must continue to pay tax under § 1.1502-13(e)(1) of the regulations, as its deferred gain is restored. This argument fails for at least three reasons. First, the plain language of section 453B(a) states that gain results when an installment obligation is "sold," such that a sale alone is sufficient to relieve the taxpayer of the section 453A(c) interest charge. Indeed, while section 453A(c)(3) defines a "deferred tax liability" in terms of income that has "not been recognized," the consolidated return regulations in effect during the years in question clearly treated recognition and deferral as being distinct concepts. *See, e.g.*, Treas. Reg. § 1.1503-13(c)(1)(i) (talking about income that has been "recognized under the Code" as being then "deferred."). In short, the subsequent deferral and restoration of gain under the consolidated return regulations does not appear to impact whether a deferred tax liability continues to exist for purposes of sections 453A and 453B. Second, the

of the Code applied to the transaction in question, relieving taxpayer of the interest charge of section 453A(c).

## B.    The Guaranty Fund Assessments

The court now turns to the question whether certain payments plaintiff made with respect to state guaranty fund assessments were currently deductible as taxes under section 164(a) of the Code.  The latter subsection allows, as a deduction, "State and local . . . taxes" that "are paid or accrued within the taxable year in carrying on a trade or business."[46]  Section 164(b)(2) provides that for purposes of section 164, "[a] State or local tax includes only a tax imposed by a State, a possession of the United States, or a political subdivision of any of the foregoing, or by the District of Columbia.  *See also* Treas. Reg. § 1.164-3(a).  Critically for our purposes, this provision allows for the current deduction of amounts paid or accrued as taxes that would be treated as a capital expenditures (and amortized) were they considered other forms of trade or business expenses.  *See* H. Rep. No. 88-749, at 50 (section 164 was designed to permit deduction of taxes "even though otherwise they might have to be capitalized."); S. Rep. 88-830, at 55 (1964) (same).

Although section 164 lists general descriptors (*e.g.* "state or local"), it does not define what is a tax.  In addressing this issue, this court is obliged to look beyond any state statutory labels or appellations by state officials (or former state officials, as occurred here), and instead must focus on the exaction's actual operation and effect.  *See United States v. Reorganized CF&I Fabricators of Utah, Inc.* (hereinafter "*CF&I*"), 518 U.S. 213, 220-21, 224-25 (1996).  Invoking the plain meaning of that term, the Supreme Court, in several analogous settings, succinctly has

---

cases defendant cites to the contrary are inapposite, as neither involves a change in the ***obligee***, but rather hold that a disposition does not occur where there is a change in the ***obligor***.  *See Cunningham v. Comm'r of Internal Revenue*, 44 TC 103, 107-08 (1965); *J.C. Wynne v. Commissioner*, 47 B.T.A. 731, 735-36 (1942).  In fact, the IRS has acknowledged that a change in the obligee of notes constitutes a disposition.  *See* Rev. Rul. 82-122, 1982-1 C.B. 80 (disposition occurs where ther ights accruing to the obligee under the original installment sale disappear); Rev. Rul. 75-457, 1975-2 C.B. 196; *see also* Kevin M. Keyes, Fed. Tax'n of Fin. Instruments & Transactions § 3.05[2][a][ii] (2005).  Third, nothing in the legislative history of section 44(d) of the Revenue Act of 1928, the progenitor of section 453B, supports any departure from the plain statutory language.  Indeed, the accompanying report states that "[w]hether or not the gain or loss realized under the section is recognized for tax purposes, depends upon general principles of law."  H. Rep. No. 70-2, at 16 (1928).

[46]  The statutory predecessor of section 164(a) dates back to 1913.  Revenue Act of 1913, § II(B), 38 Stat. 114, 167.  The current formulation of section 164 was added to the Code by the Revenue Act of 1964, Pub. L. No. 88-272, § 207(a), 78 Stat. 19, 40, and modified in 1986 to repeal the deduction for sales taxes.  Before 1964, the Code did not specifically list the types of taxes that were deductible.  *See* H. Rep. No. 88-749, at 50 (1963).

defined a "tax" as an "'enforced contribution to provide for the support of government.'" *CF&I*, 518 U.S. at 224 (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)).[47]  Essentially the same definition has been enunciated and applied in cases[48] and revenue rulings[49] dealing with section 164.  Critically, under this definition, "[n]ot every exaction by the sovereign is a tax." *Sims*, 72 T.C. at 1007.  Several cases and rulings thus have emphasized that a tax represents a means of raising revenue for the carrying on of government as "distinguished from a levy or fee assessed by a governmental authority for a particular privilege or for the purpose of providing local benefits accruing to the property." *Dubitzky*, 60 T.C. at 34.[50]  A tax then is "a levy and collection of revenue without relationship to a specific governmental privilege or service." *Cox v. Comm'r of Internal Revenue*, 41 T.C. 161, 164 (1963).

A few words of elaboration on the dichotomy between a tax and a regulatory fee are warranted.  Perhaps the clearest explication of this may be found in *San Juan Cellular Tel. Co. v. Public Serv. Comm'n*, 967 F.2d 683 (1st Cir. 1992), an opinion authored by then chief judge, now justice, Breyer.  At issue was whether a periodic fee imposed by Puerto Rico was a "tax" under

---

[47]  *See United States v. New York*, 315 U.S. 510, 515 (1942) ("a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government."); *United States v. Butler*, 297 U.S. 1, 61 (1936) ("A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government."); *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906) (same); *accord*, *City of New York v. Feiring*, 313 U.S. 283, 285 (1941) ("§ 164 extends to those pecuniary burdens laid upon individuals or their property . . . for the purpose of defraying the expenses of government or of undertakings authorized by it").

[48]  *See Campbell v. Davenport*, 362 F.2d 624, 627-29 (5th Cir. 1966); *Sims v. Comm'r of Internal Revenue*, 72 T.C. 996, 1006-08 (1979); *Dubitzky v. Comm'r of Internal Revenue*, 60 T.C. 29, 34 (1973).

[49]  Thus, Rev. Rul. 57-345, 1957-2 C.B. 132, *revoked on its facts by* Rev. Rul. 60-366, 1960-2 C.B. 63, construing a New Mexico statute, defined tax as "an enforced contribution, exacted pursuant to legislative authority in the exercise of taxing power, and imposed and collected for the purpose of raising revenue to be used for public or governmental purposes." *See also, e.g.*, Rev. Rul. 81-194, 1981-2 C.B. 54; Rev. Rul. 81-193, 1981-2 C.B. 52; Rev. Rul. 81-192, 1981-2 C.B. 50; Rev. Rul. 81-191, 1981-2 C.B. 49; Rev. Rul. 70-622, 1970-2 C.B. 41.

[50]  *See also Campbell*, 362 F.2d at 628; Rev. Rul. 60-366, 1960-2 C.B. at 36 ("if the fee is exacted for the primary purposes of regulating and restraining an occupation or privilege deemed dangerous to the public or to be specially in need of public control, and compliance with certain conditions is required in addition to the payment of the prescribed sum, such fee is a license"); Rev. Rul. 57-345, 1957-2 C.B. at 133 ("Taxes are . . . distinguishable from various other . . . contributions and charges imposed for particular purposes under particular powers or functions of the Government," including charges "primarily imposed for the purpose of regulation," such as "dog licenses, automobile inspection, and automobile title registration") (quoting I.T. 3511, 1941-2 C.B. 2, 90); Bittker & Lokken, Fed. Tax'n of Income, Estates, & Gifts ¶ 32.1 (2005).

the Butler Act, 48 U.S.C. § 872, aptly described by the court as similar to the better known Tax Injunction Act, 28 U.S.C. § 1341. *Id*. at 684.  Surveying cases that had examined, in different contexts, whether assessments were taxes or fees, the court explained that courts –

> have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other.  The classic "tax" is imposed by a legislature upon many, or all, citizens.  It raises money, contributed to a general fund, and spent for the benefit of the entire community.  The classic "regulatory fee" is imposed by an agency upon those subject to its regulation.  It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive.  Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.
>
> Courts facing cases that lie near the middle of this spectrum have tended (sometimes with minor differences reflecting the different statutes at issue) to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation.

*Id*. at 685 (citations omitted).  Applying this framework, it determined that the fee at issue was not a tax because the money was not for general governmental purposes, but for use by a particular agency.  *Id*. at 686-87.

Subsequently, the Ninth Circuit distilled the *San Juan Cellular* holding into a three-pronged approach, stating in *Bidart Bros. v. California Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996) –

> The *San Juan Cellular* test calls for the consideration of three primary factors in determining whether an assessment is a tax: (1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed.

*See also Qwest Corp. v. City of Surprise,* 434 F.3d 1176, 1183 (9th Cir. 2006); *Cumberland Farms, Inc. v. Tax Assessor*, 116 F.3d 943, 946-47 (1st Cir. 1997).  The *San Juan Cellular* standard has found favor with courts faced with deciding, in various legal contexts, whether a revenue raising provision was a regulatory fee or a tax.  *See, e.g., Hedgepeth v. Tennessee*, 215 F.3d 608, 612-15 (6th Cir. 2000); *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134-36 (4th Cir. 2000); *Hexom v. Or. Dep't of Transp*., 177 F.3d 1134, 1135-39 (9th Cir. 1999); *Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1310-12 (10th Cir. 1999); *Hager v. City of W. Peoria*, 84 F.3d 865, 870-72 (7th Cir. 1996).  The court sees utterly no reason not to apply these standards here as the construction of "tax" they represent is at least as broad as that applicable in the context of section 164(a) of the Code.  *See San Juan Cellular*, 967 F.2d at 685 ("Courts have had

to distinguish 'taxes' from regulatory 'fees' in a variety of statutory contexts.  Yet, in doing so, they have analyzed the legal issues in similar ways.").[51]

So what do we have here – a regulatory fee or a tax?  The Iowa statute that establishes the ground rules for the Iowa Life and Health Insurance Guaranty Association[52] derives from a model act adopted in most states in the 1960s and 1970s.[53]  It states that assessments are made to "provid[e] the funds necessary to carry out the powers and duties of the association."  Iowa Code § 508C.9(1).  There are two classes of assessments under the statutory mechanism –

> a.   Class A assessments shall be made for the purpose of meeting administrative costs and other general expenses and examinations . . . not related to a particular impaired or insolvent insurer.

> b.   Class B assessments shall be made to the extent necessary to carry out the powers and duties of the association . . . with regard to an impaired insurer or an insolvent domestic, foreign, or alien insurer.

*Id*. at § 508C.9(2).  The Iowa law goes on to provide that the amount of the Class A assessment shall be determined by the association's board; while the total amount of the Class B assessments is also determined by the association, the statute provides that total amount "shall be allocated for assessment purposes among the accounts as the liabilities and expenses of the association, either experienced or reasonable expected, are attributable to those accounts, all as determined by the

---

[51]  A cluster of cases construing the term "tax" in the context of the Tax Injunction Act have indicated that term should be construed "broadly" to effectuate the purposes of that Act. *See, e.g., Valero Terrestrial Corp.*, 205 F.3d at 134 ("the term 'tax' is subject to a 'broader' interpretation when reviewed under the aegis of the TIA").  If anything, one might argue that a more restrictive definition of the word "tax" ought to apply in the context of section 164(a), which is subject to the maxim that statutes affording deductions depend upon "legislative grace" and generally should be narrowly construed.  *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); *see also INDOPCO, Inc. v. Comm'r of Internal Revenue*, 503 U.S. 79, 84 (1992) (deductions are "strictly construed").  Nonetheless, the court will apply the broader meaning of tax employed in the case law here.

[52]  The association is a "nonprofit legal entity," Iowa Code § 508C.6(1), and is governed by a board of directors selected by member insurers, subject to the approval of the state commissioner of insurance, *id*. at § 508C.7(1).  *See* J. Ernest Hartz, Jr., "State Insurance Guaranty Association," 22-FALL Brief 20 (1992) (discussing this and other features of the associations as they arise in other states).

[53]  *See* Wilcott B. Dunham, Jr. & Donal A. Kinney, "Life and Health Insurance Guaranty Associations," 580 PLI/Comm 277, 279 (1991) (discussing the Post-Assessment Property and Liability Insurance Guaranty Association Model Act).

association and on as equitable a basis as is reasonably practical." *Id*. at § 508C.9(3)(a).[54]  In some circumstances, however, an insurer may be relieved of having to pay the assessment, *to wit*: "[t]he association may abate or defer, in whole or in part, the assessment of a member insurer if, in the opinion of the board, payment of the assessment would endanger the ability of the member insurer to fulfill its contractual obligations." *Id*. at § 508C.9(4).  Moreover, the statute offers the prospect of a refund if the assessments are not needed to deal with an impaired or insolvent insurer.  *Id*. at § 508C.9(6).[55]  Less clear is what happens if the assessment is not timely paid, as there is no collection mechanism identified in the statute.  Rather, the Iowa Code simply provides that the commissioner of insurance "may suspend or revoke the certificate of authority to transact insurance" in the state or "may levy an administrative penalty" on the member, "not [to] exceed five percent of the unpaid assessment per month."  *Id*. at § 508C.11(2).

Under the law, the facts of this case indicate that the assessment is not a tax.  First, in terms of who imposed this charge – it is neither a legislative body, nor even a state agency, but rather the board of the association, selected by the member insurers, that determines the amount of the assessment, whether a particular insurer may be relieved therefrom, and whether an assessment previously collected should be abated and refunded.  These circumstances – in which the amount of the assessment is essentially controlled by the industry on which it is imposed and can be waived entirely if a particular insurer encounters difficulty paying – weigh heavily in favor of characterizing the assessment as a regulatory fee.  *See Bidart*, 73 F.3d at 931 (fee was

---

[54]  As to this point, the statute further states that –

Assessments for funds to meet the requirements of the association with respect to an impaired or insolvent insurer shall not be made until necessary to implement the purposes of this chapter.  Classification of assessments under this subsection shall be made with a reasonable degree of accuracy, recognizing that exact determinations may not always be possible.

Iowa Code at § 508C.9(3)(c).

[55]  Specifically, the statute indicates –

By an equitable method as established in the plan of operation, the board may refund to member insurers, in proportion to the contribution of each insurer to that account, the amount by which the assets of the account, including assets accruing from net realized gains and income from investments, exceed the amount the board finds is necessary to carry out during the coming year the obligations of the association with regard to that account.  A reasonable amount may be retained in any account to provide funds for the continuing expenses of the association and for future losses if refunds are impractical.

*Id*. at § 508C.9(6).

not a tax where it could be adjusted by independent body of apple growers); *San Juan Cellular*, 967 F.2d at 686; *see also Wright v. Riveland*, 219 F.3d 905, 911 n.3 (9th Cir. 2000) (fact that assessment could be returned to payee if an emergency arose indicative of a "fee," rather than a "tax"). That the class of those assessed is relatively narrow, essentially limited to certain types of insurance companies, cuts in the same direction. This again is an indication that the assessment is not a tax. *See Bidart Bros.*, 73 F.3d at 931 ("[a]n assessment imposed upon a broad class of parties is more likely to be tax than an assessment imposed upon a narrow class."); *San Juan Cellular*, 967 F.2d at 685; *Trading Co. of N. Am. v. Bristol Twp. Auth.*, 47 F. Supp. 2d 563, 568-69 (E.D. Pa. 1999). So too is the fact that the assessments are segregated from the revenues of the state and benefit only a very discrete segment of the public – the association itself, to the extent that the assessments defray the cost of its operations, and, depending on the year, an insolvent insurer and those filing claims ultimately allowed under its policies.[56] Moreover, the indirect benefit that may accrue to the general public by, for example, promoting confidence in the insurance industry, is simply not the type of general benefit that makes the assessment in question a tax. *See Wright*, 219 F.3d at 912 ("incidental benefit" not enough to cause assessment to be a tax); *Bidart Bros.*, 73 F.3d at 932-33; *Union Pac. R.R. Co. v. Pub. Utilities Comm'n*, 899 F.2d 854, 859-61 (9th Cir. 1990) (assessment levied to fund a regulatory program not a tax, even where there is a "collateral" benefit to the public). Rather, the question here is who is the principal beneficiary – and the answer is that it is not a significant portion of the general public.

Examination of each of the *San Juan Cellular* factors thus places the assessment *sub judice* decidedly at the "regulatory fee" pole of the spectrum. On analogous facts, the First Circuit reached a similar conclusion in *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1 (1st Cir. 1992). There, the court applied all the factors identified by *San Juan Cellular* in determining whether a levy on motorists to fund an accident compensation fund was a tax. The court described the compensation fund by noting that "the accident-compensation statute is essentially a social welfare program and tort reform law to impose on motor vehicle owners as a class the cost of the accidents they cause and to assure compensation for accident victims." *Id.* at 5. It found that the fees were not a tax because they were held separately from the general state funds, were dedicated exclusively to reimburse private parties and to cover the fund's administrative expenses, were collected only from those seeking the privilege of driving on state

---

[56] *See Wright*, 219 F.3d at 912 (state-authorized 35% deduction of inmate's outside earnings did not constitute a tax, as revenue flowed only "to benefit a segment of the population consisting of the victims of crime and the inmates themselves"); *San Juan Cellular*, 967 F.2d at 685 (3 percent charge not a tax where proceeds used to defray costs of public service commission); *Miss. Power & Light Co. v. U.S. Nuclear Regulatory Comm'n*, 601 F.2d 223, 228, 231-32 (5th Cir. 1979), *cert. denied*, 444 U.S. 1102 (1980) (charge was a "fee," not a "tax," because it helped pay for costs of administrative agency's regulatory activities); *Kerr-McGee Corp. v. Edgar*, 837 F. Supp. 927, 930 n.2 (N.D. Ill. 1993) (storage fees for nuclear by-products was not a tax as funds were "earmark[ed] for purposes consistent with the overall regulatory scheme"). It should be noted that plaintiff has made no attempt to show what portion of the payments it seeks to deduct corresponded to Class A versus Class B type assessments.

highways, and were proportioned (for motor vehicles as a class) to compensate victims for the specific damage resulting from that activity. *Id*. at 6. Morever, while the specific issue presented in this case appears to be one of first impression, it is noteworthy that a variety of state cases, employing standards similar to those enunciated in *San Juan Cellular*, have specifically held that insurance guaranty fund assessments are fees. *See, e.g., Executive Life Ins. Co. v. Comm'r of Revenue*, 1991 WL 149137 at *7 (Minn. Tax. 1991) (finding guaranty association assessments were "licences" or "fees" and not taxes where member insurers received refunds of unused assessments, as this return of funds was "clearly not a public purpose")*; Aetna Life Ins. Co. v. Wash. Life & Disability Ins. Guar. Ass'n*, 520 P.2d 162, 171-72 (Wash. 1974) (holding guaranty fund assessments did not constitute a tax but rather were "trust funds assessed by a private association to be retained in private bank accounts to carry out the purpose of the [guaranty] act," and were not used to meet the "current expenses of government").[57]

        In arguing to the contrary, plaintiff stresses a crediting provision in the law that, in at least some of the states involved, provides that "[a]n insurer may offset an assessment . . . against its premium tax liability . . . to the extent of twenty percent of the amount of the assessment for each of the five calendar years following the year in which the assessment was paid." Iowa Code § 508C.19(1). But, the fact that a portion of the paid assessment may be treated as a credit against a tax does not convert the assessment into a tax itself, any more than a payment generating any other type of credit would be considered a tax. Likewise, that some of the state statutes in question say that, in some circumstances, sums that would have been refunded, but for the fact they previously gave rise to a credit against premium taxes, must be deposited in the state treasury, *see id*. at § 508C.19(2), does not magically convert those assessments into a tax. This circumstance – which the record suggests has happened only once in all the states at issue during the years in question – simply reflects the logical reality that an insurer should not be allowed to obtain a refund of an amount previously credited against its tax liability. *See San Juan Cellular*, 967 F.2d at 687 (fact that after five years, fees collected but not used for special regulation-related purposes, were deposited into a General Fund did not convert the fee into a tax). Again, it does not alter the nature of the assessment *ab initio*. Accordingly, neither the crediting provision nor the seemingly remote possibility that an amount collected as a fee might end up in a state's general fund does not alter the fundamental nature of the assessments at issue – they are not taxes.

        Hence, the assessment payments made by plaintiff are not currently deductible under section 164(a). Although plaintiff hints at why these payments might be currently deductible under other provisions of the Code, the remainder of its arguments are dedicated to rebutting contentions made by defendant as to why, even if the assessment are treated as taxes, they might

---

        [57] While Federal law determines what constitutes a tax under federal law, *see Trailer Marine Transp. Corp*., 977 F.2d at 5, "[s]tate law determinations as to whether a fee is a tax may still be pertinent or instructive," *Diginet, Inc. v. Western Union ATS, Inc.*, 845 F. Supp. 1237, 1240 (N.D. Ill.1994).

not be currently deductible, *e.g.*, that the payments thereof must be capitalized under sections 263(a)(1) and 811(a) of the Code.  To the extent that plaintiff might charitably be viewed as having mounted an argument that the assessment payments should not be capitalized but are currently deductible under section 162 of the Code (sans a citation to that section), it remains that the record does not remotely contain enough evidence to allow for the resolution of that question, including information on the nature and longevity of the various benefits plaintiff received on accounts of the payments made and the varying potential for assessment payments eventually to be credited against premium taxes in the many states involved here.  As it undeniably was plaintiff's burden to provide those facts, any further arguments regarding the current deductibility of the assessments in question in the context of this case must necessarily fail.  *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935) ("[u]nquestionably the burden of proof is on the taxpayer"); *Lewis v. Reynolds*, 284 U.S. at 281; *Cinergy Corp. v. United States*, 55 Fed.Cl. 489, 500 (2003).

## III.    CONCLUSION

This court need go no further – what plaintiff called a sale was, indeed, a sale; what it called a tax, was not.  In other words, based on the foregoing, the court concludes that plaintiff is entitled to a refund as to the section 453A issue, but not as to claims regarding its payment to the guaranty fund associations.

At the parties' request, the court will withhold the entry of a judgment to permit the parties to submit computations consistent with the court's determination of the issues, showing the correct amount of the judgment to be entered herein.  The following procedure (which loosely tracks Rule 155 of the U.S. Tax Court's Rules of Practice and Procedure) shall be employed:

1.    On or before May 31, 2006, the parties shall file a status report proposing the judgment amount that should be entered in this case.

2.    Should the parties agree as to the amount of the proposed judgment, they shall so indicate.  Agreeing to the entry of such judgment neither signifies agreement with this court's findings and conclusions nor waives any arguments or rights the parties might otherwise have, nor, in particular, impacts upon any party's right to an appeal.

3.    If the parties disagree as to the proposed judgment, they shall, in the filing described in paragraph 1, submit competing proposals for that judgment, together with an explanation as to why they believe their proposal more accurately tracks this court's opinion.

4.    On or before June 30, 2006, the parties may file a response to the proposed judgment and rationale offered by the other party.

5.      This process shall not be employed to reargue or seek reconsideration of any of the points resolved by this court's findings and conclusions.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge